# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

WISCONSIN ALUMNI RESEARCH
FOUNDATION,

                      Plaintiff,

          v.

APPLE INC.,

                   Defendant.

Case No. 14-cv-00062-BBC

---

## PLAINTIFF WISCONSIN ALUMNI RESEARCH FOUNDATION'S
## MOTION TO COMPEL DEFENDANT APPLE INC.
## TO PRODUCE EXECUTABLE SIMULATION SOFTWARE

---

## FILED UNDER SEAL
## CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER

Morgan Chu
Gary Frischling
Jason Sheasby
Alan Heinrich
Christopher Abernethy
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Telephone:   (310) 277-1010
Facsimile:    (310) 203-7199
MChu@irell.com; GFrischling@irell.com;
JSheasby@irell.com; AHeinrich@irell.com;
CAbernethy@irell.com

Jennifer L. Gregor
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Telephone:   (608) 257-3911
Facsimile:    (608) 257-0609
JGregor@gklaw.com

*Attorneys for Plaintiff*
*Wisconsin Alumni Research Foundation*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................2

III.    LEGAL STANDARD ........................................................................................6

IV.     ARGUMENT ......................................................................................................7

     A.      The Federal Rules of Civil Procedure Entitle WARF to Discovery of the
               ███ Simulator ...........................................................................................7

     B.      Apple's ███ Software Is Highly Relevant to WARF's Damages Claims, as
               It Can Simulate the Performance Benefit Gained from Apple's Infringement ........8

     C.      Apple's Purported Production of All ███ Output Documents 'that Presently
               Exist' Does Not Excuse It from Producing the ███ Executable Software ...........11

           1.      Apple Has Not Demonstrated that Production of the ███ Software
                   Would Be Cumulative ................................................................................12

           2.      Rule 34 Expressly Permits Testing and Measuring ...................................12

     D.      Apple Has Not Established Any Undue Burden Sufficient to Withhold
               Production of the ███ Executable Software .......................................................14

V.      CONCLUSION ................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alloc, Inc. v. Unilin Beheer B.V.*,
  No. 02-C-1266, 2006 WL 757871 (E.D. Wis. Mar. 24, 2006) ................................... 7

*Ammons v. Gerlinger*,
  No. 06-C-20-C, 2007 WL 5659413 (W.D. Wis. March 12, 2007) ............................ 6

*Baine v. General Motors Corp.*,
  141 F.R.D. 328 (M.D. Ala. 1991) .............................................................................. 14

*Burke v. New York City Police Dep't*,
  115 F.R.D. 220 (S.D.N.Y.1987) ................................................................................ 14

*Commonwealth Scientific & Indus. Research Organisation v. Cisco Sys., Inc.*,
  No. 6:11-CV-343, 2014 WL 3805817 (E.D. Tex. July 23, 2014) ............................ 10

*Cormack v. United States*,
  117 Fed. Cl. 392 (2014) ............................................................................................... 9

*Dow Chem. Co. v. Mee Indus., Inc.*,
  341 F.3d 1370 (Fed. Cir. 2003) .................................................................................... 9

*Dynetix Design Solutions Inc. v. Synopsis Inc.*,
  No. 11-CV-05973 PSG, 2013 WL 772670 (N.D. Cal. Feb. 28, 2013) ....................... 8

*Elan Microelectronics Corp. v. Apple Inc.*,
  No. C 09-1531 RS (PSG), 2011 U.S. Dist. LEXIS 61644 (N.D. Cal. Jun. 8,
  2011) ........................................................................................................................ 7, 8

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970),
  *modified and aff'd*, 446 F.2d 295 (2d. Cir. 1971) ................................................. 9, 10

*Grasso v. Bakko*,
  No. 08-CV-471-SLC, 2009 WL 224022 (W.D. Wis. Jan. 29, 2009) ......................... 8

*Jenkins v. White Castle Mgmt. Co.*,
  No. 12 C 7273, 2014 WL 3809763 (N.D. Ill. Aug. 4, 2014) .................................... 15

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,
  984 F.2d 422 (Fed. Cir. 1993) ..................................................................................... 9

*Keco Industries, Inc., v. Stearns Elec. Corp.*,
  285 F. Supp. 912 (E.D. Wis. 1968) .......................................................................... 14

**Page(s)**

*Kuryakyn Holdings, Inc. v. Just In Time Distrib. Co.*,
    No. 09-CV-702-WMC, 2013 WL 4454733 (W.D. Wis. Aug. 16, 2013) .................. 13

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .................................................................... 8, 9

*Metavante Corp. v. Emigrant Savings Bank*,
    No. 05-CV-1221, 2008 WL 1969596 (E.D. Wis. May 5, 2008) ................................ 6

*Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*,
    171 F.R.D. 246 (D. Minn. 1997) ................................................................. 15

*Mobil Oil Corp. v. Amoco Chemicals Corp.*,
    915 F. Supp. 1333 (D. Del. 1994) .............................................................. 10

*MSTG, Inc. v. AT&T Mobility*,
    No. 08-C-7411, 2011 WL 841437 (N.D. Ill. Mar. 8, 2011) ...................................... 9

*Murata Mfg. Co. v. Bel Fuse, Inc.*,
    422 F. Supp. 2d 934 (N.D. Ill. 2006) .......................................................... 9

*Primex, Inc. v. Visiplex Techs., Inc.*,
    No. 05-C-515-S, 2006 WL 538992 (W.D. Wisc. Feb 24, 2006) ................................ 8

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
    989 F. Supp. 547 (D. Del. 1997) ............................................................... 10

*Spieker v. Quest Cherokee, LLC*,
    No. 07-1225-EFM, 2008 WL 4758604 (D. Kan. Oct. 30, 2008) ............................. 12

*St. Paul Reinsurance Co. v. Commercial Fin. Corp.*,
    198 F.R.D. 508 (N.D. Iowa 2000) .............................................................. 14

*Thacker Eng'g, Inc. v. Chicago Hous. Auth.*,
    No. 87 C 365, 1988 WL 84714 (N.D. Ill. Aug. 11, 1988) ...................................... 14

*Trading Techs. Intl. v. eSpeed*,
    No. 04-C-5312, 2007 WL 704525 (N.D. Ill. Mar. 1, 2007) ...................................... 9

**Statutes**

35 U.S.C. § 284 (2011) .................................................................................. 8

**Rules**

Fed. R. Civ. P. 26(b)(1) ......................................................................... 6, 7, 11, 13

Fed. R. Civ. P. 33(a) ...................................................................................... 11

**Page(s)**

Fed. R. Civ. P. 34(a) .................................................................................. 7, 13

Fed. R. Civ. P. 37 ........................................................................................ 1, 6

I.      **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 37, Plaintiff Wisconsin Alumni Research Foundation ("WARF") respectfully moves this Court for an order compelling Defendant Apple Inc. ("Apple") to promptly produce or make available for inspection and testing the executable software, known as ▉▉▉▉ that Apple uses to simulate and test the processors accused of infringement in this case. Filed concurrently herewith is the Declaration of Christopher Abernethy In Support of WARF's Motion to Compel Apple to Produce Executable Simulation Software, including Exhibits A-J thereto. All references to Exhibits in this Motion refer to the Exhibits to the Abernethy Declaration.

WARF requested production of Apple's ▉▉▉ software early in the case in WARF's Request for Production No. 51, served on April 4, 2014. Ex. A at 11. The ▉▉▉ software and its related documentation and files are directly relevant to damages issues in this case, as the software is capable of simulating and measuring, among other things, the performance benefits gained by Apple's infringing processors from incorporating the invention claimed in WARF's U.S. Patent No. 5,781,752 ("the '752 patent"). Apple has already effectively conceded that such data is relevant by serving a damages contention interrogatory asking WARF to identify "the specific amount of performance benefit that [WARF] allege[s] the invention claimed in the '752 patent contributed to each of the Accused Products." Ex. B at 7.

Apple admits that its engineers use ▉▉▉ to simulate and test Apple's processors. However, Apple has refused to produce or make available for inspection the executable version of the ▉▉▉ software and its related configuration files that would allow WARF to run simulations concerning Apple's infringing processors. Rather, Apple has only produced the ▉▉▉ source code, which cannot be used to run simulations, and a handful of "presentations and emails summarizing" the results of certain ▉▉▉ tests run by Apple's engineers in the past. Ex. C at 1.

Apple does not deny that WARF cannot run simulations without the executable ▮ files. Apple simply maintains that it has no obligation under the Federal Rules of Civil Procedure to produce any files that would allow WARF's experts to run simulations.

Apple's failure to produce the executable ▮ files has hampered WARF's discovery efforts and is prejudicing WARF's ability to fully develop its damages case. For months, counsel for Apple assuaged WARF's concerns with repeated assurances that any delay in the production of ▮ was due to the apparent difficulty in finding the right people at Apple to talk to. However, it was not until five months had passed that Apple raised for the first time its theory that allowing WARF to run simulations was "not properly within the scope of discovery." *Id.* at 1. This is a dispute that could have—and should have—been resolved months ago but for Apple's unreasonable delay. WARF asks this Court to order Apple to promptly produce an executable version of ▮ by a date certain—*e.g.*, within one week of the Court's order—so that WARF may continue prosecuting its case in accordance with the Court's procedural schedule.

## II.   FACTUAL BACKGROUND

WARF initiated the above-captioned litigation on January 31, 2014. D.I. 1, Compl. WARF's Complaint alleged, among other things, that Apple has infringed and currently infringes the '752 patent by making, using, selling, offering to sell, and importing processors that practiced the claimed invention (hereinafter "Accused Processors"). *Id.* ¶ 19. The '752 patent is directed to a table-based data dependency prediction circuit in a processor capable of executing load and store instructions in a different order than that specified in the program sequence. D.I. 1-1, '752 pat. at 3:51-5:34. Among the processors accused of infringement are Apple's A7 chip, and post-A7 chips that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. D; Ex. E at 1-4. The infringing features of the Accused Processors are embodied in, among other things, a hardware

feature of the Accused Processors that Apple refers to as the ███████████████████
███████ Ex. E at 1-4.

On April 4, 2014, WARF served on Apple WARF's First Set of Requests for Production (Nos. 1-83). Ex. A. WARF's Request No. 51 asked for the production of "Any simulator that is capable of simulating the operation of Data Dependency Prediction[1] and all Documents Relating To any such simulator." *Id.* at 11.

On May 5, 2014, Apple responded to Request No. 51, admitting that the request "call[ed] for the production of software, if any, used by Apple to simulate the operation of the accused functionality, and documents relating to such software." Ex. F at 32-33. Nonetheless, Apple responded by stating that it "will produce non-privileged ***documents*** . . . that relate to software for simulating" Apple's chips. *Id.* (emphasis added). WARF responded by letter on June 17, 2014, stating that, among other things, "Apple must produce the ***actual software*** for any simulator, in addition to documents relating to it." Ex. G at 18 (emphasis added). In its response dated July 3, 2014, Apple completely ignored this issue, stating merely that it had produced "performance model code [*i.e.*, source code] for both the A6 and the A7." Ex. H at 15.

The parties thereafter discussed Request No. 51 on no fewer than ***five*** meet and confer teleconferences. Abernethy Decl. ¶ 12. Despite its objections, Apple's counsel expressly and repeatedly ***agreed*** that Apple ***would produce*** all of the ████ configuration, executable, and source code files that WARF was requesting. *Id.* ¶ 13; Ex. I at 2. Apple's counsel asked that WARF give Apple some time to "talk to the right technical people," find the relevant files, and load them onto Apple's source code review computers at its counsel's offices. Abernethy Decl.

---

[1]    In its First Set of Requests for Production, WARF defined "Data Dependency Prediction" as referring to "any processing technique for conditionally executing load operations and store operations in a different order than that specified in the program sequence, in which the out-of-order execution is conditioned upon a prediction as to whether a load operation is dependent upon an older store operation [including] load-store dependency prediction." Ex. A at 2.

¶ 13; Ex. I at 2. As months passed without any movement regarding the production of the ███ files, WARF's counsel repeatedly raised WARF's concerns. Abernethy Decl. ¶ 13; Ex. I at 2, ¶ 7. During an August 25, 2014 meet and confer, Apple's counsel reassured WARF that Apple was "going to produce [the] ███ executable code . . . for sure." Abernethy Decl. ¶ 13; Ex. I at 2. Apple's counsel explained that the delay was merely due to it being "difficult to get to the right people" with technical knowledge of ███ Abernethy Decl. ¶ 13; Ex. I at 2. On an August 29, 2014 meet and confer, WARF's counsel asked again for an update and an ETA regarding the production of the ███ files, including the executable code. Abernethy Decl. ¶ 13; Ex. I at 2. Apple's counsel were unable to provide any ETA, again professing that "it's been difficult to track down the executable." Abernethy Decl. ¶ 13; Ex. I at 2. WARF's counsel specifically asked if Apple's purported delay was a stalling tactic and whether Apple was now refusing to produce the ███ executable and configuration files. Abernethy Decl. ¶ 13; Ex. I at 2. Apple's counsel responded that "we haven't refused to give [WARF] anything." Abernethy Decl. ¶ 13; Ex. I at 2.

Despite its forgoing representations, and despite that fact that it had produced the source code files for ███ on September 10, 2014, Apple abruptly changed its position, claiming for the first time that (1) the executable files were "not properly within the scope of discovery" because they would "allow WARF's experts to create new data" by "run[ning] simulations"; (2) "[a]n executable version of ███ in an environment that would allow WARF to run simulations does not exist"; and (3) "creating an executable version [on a review laptop] would create an unnecessary burden on Apple and its engineers." Ex. C at 1.

WARF's counsel responded by letter on September 19, 2014, recounting the parties' previous meet and confer calls and explaining again that the executable, configuration, and source code files were *all* needed to run simulations. Ex. I at 2. WARF further noted that, like the ███ source code, the configuration and executable files could be loaded onto the review

- 4 -

computers at the offices of Apple's outside counsel. *Id*. at 3. Finally, WARF expressly clarified that it was not requesting any newly created executable files, only those existing executable files that Apple itself uses to simulate the performance of its processors. *Id*.

Apple's counsel responded by letter on September 25, 2014, unmistakably stating that "Apple will not be producing an executable version of ███ Ex. J at 1-2. In an attempt to justify its refusal, Apple stated that, in addition to the ███ source code, Apple had produced "all performance outputs from ███ created during the development of [the A7 processor] *that presently exist*." *Id.* (emphasis added). Apple further stated that "███ does not presently exist in any local environment *that could be transported to Los Angeles for use by WARF's experts* and Apple is under no obligation to create such an environment." *Id.* (emphasis added). Moreover, Apple contended that "creating a local ███ environment would be unduly burdensome and prejudicial," as it would purportedly take "days of an Apple engineer's time." *Id.* Lastly, Apple stated *for the first time* that "the program itself is . . . not relevant to any issue in this case" because it is an "internal design tool." *Id.*

The parties met and conferred one last time on September 29, 2014. Abernethy Decl. ¶ 14. During the call, Apple's counsel confirmed that an executable version of ███ exists and is accessible from Apple's servers. *Id.* Other than stating that the "trace files" used by ███ were large and that two days would purportedly be required to set up the software on a laptop, Apple's counsel refused to identify any other technical details that would make production unduly burdensome. *Id.* WARF's counsel proposed that instead of having Apple produce the files, WARF could inspect and test the software on-site at Apple's campus, as Apple's engineers do, thus removing the purported burden of loading the ███ software onto a review laptop. *Id.* Apple's counsel responded by stating that, even though the parties have a robust protective order currently in place, allowing such an inspection was "a whole different issue" because it would

expose Apple to "all sort of security risks." *Id.* Apple's counsel agreed to respond to WARF's request for on-site inspection by Wednesday, October 1, 2014. *Id.* Apple failed to do so. *Id.*

Apple does not dispute that its engineers have used ███ to simulate the performance benefits gained by the Accused Processors due to their infringing use of the ████████ ████████████████. Nor does Apple dispute that, to run simulations, WARF's experts would need *at least* (1) the ████ executable software, which runs the simulations; (2) the ████ configuration files, which define the parameters of the simulated chip; and (3) the ████ source code, which can be used to confirm the functionality that occurs during a simulation. *See* Ex. I at 2-3, Ex. J at 1-2. Nonetheless, Apple has refused to produce the requisite ████ executable and configuration files. With the parties at a clear impasse, WARF filed the instant motion to compel.

## III.   LEGAL STANDARD

WARF brings this Motion under Rule 37 of the Federal Rule of Civil Procedure, which permits a party to seek an order compelling discovery if an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. *See* Fed. R. Civ. P. 37(a)(1)-(4). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). "Even when information is not directly related to the claims or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the good cause standard under Rule 26(b)(1)." *Metavante Corp. v. Emigrant Savings Bank*, No. 05-CV-1221, 2008 WL 1969596, at *1 (E.D. Wis. May 5, 2008).

"Relevance is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Ammons v. Gerlinger*, No. 06-C-20-C, 2007 WL 5659413, at *1 (W.D. Wis. March 12, 2007) (citations and quotations omitted). Thus, "[a] request for discovery should be considered relevant

if there is any possibility that the information sought may be relevant to the subject matter of the action." *Alloc, Inc. v. Unilin Beheer B.V.*, No. 02-C-1266, 2006 WL 757871, at *2 (E.D. Wis. Mar. 24, 2006). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).. "The objecting party bears the burden of demonstrating why a particular discovery request is improper." *Alloc*, 2006 WL 757871, at *2.

## IV.   ARGUMENT

### A.   The Federal Rules of Civil Procedure Entitle WARF to Discovery of the ██ Simulator

The Federal Rules of Civil Procedure expressly contemplate the production of things for the purpose of inspection, testing, and measuring. Rule 34(a)(1) permits a party to request, within the scope of Rule 26(b), that any other party "produce and permit the requesting party or its representative to inspect, copy, test or sample . . . items in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Rule 34(a)(2) alternatively permits a party to request "entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." Fed. R. Civ. P. 34(a)(2).

Pursuant to Rules 26 and 34, WARF requested production of the ████ software that Apple uses internally to simulate the Accused Processors. With the software, WARF's experts could test and evaluate any performance benefit attributable to the infringing ██ ██ ████████████████ functionality.

Although Apple now contends that it does not have to produce proprietary testing tools, it has been ordered in the past to produce similar internal tools used to test and evaluate functionality of accused products. *See Elan Microelectronics Corp. v. Apple Inc.*, No. C 09-1531 RS (PSG), 2011 U.S. Dist. LEXIS 61644, at *14-15 (N.D. Cal. Jun. 8, 2011). In *Elan*, a

proprietary tool was used by Apple to test and evaluate the functionality of products incorporating touch screens and touch pads capable of multi-finger interactions. *Id*. at *6. Elan, who had accused such devices of infringement, sought production of that tool to similarly evaluate the functionality of the accused devices. *Id.* at *5. Apple resisted both production and inspection of the test tool by the plaintiff's experts. *Id.* at *6-8. However, the Northern District of California ordered Apple to produce the test tool for inspection at Apple's counsel's offices. *Id.* at *8. Here, WARF has requested ███ for a similar purpose—to evaluate the functionality of the Accused Products, namely, the performance benefits associated with the Accused Products' ████████████████████. Like the test tool in *Elan*, the ███ simulator, including its executable files,[2] are properly discoverable.

### B.    Apple's ███ Software Is Highly Relevant to WARF's Damages Claims, as It Can Simulate the Performance Benefit Gained from Apple's Infringement

Courts regularly compel discovery where one party withholds information relevant to damages. *See, e.g.*, *Grasso v. Bakko*, No. 08-CV-471-SLC, 2009 WL 224022, at *1 (W.D. Wis. Jan. 29, 2009) ("Because defendant is seeking information that is relevant to plaintiff's damages claim, I will grant her motion to compel."). When Apple is found to infringe the '752 patent, WARF will be entitled to, at minimum, "a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (2011). A reasonable royalty rate is typically assessed by analyzing a hypothetical "arms-length" negotiation between a willing licensor and a willing licensee. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 (Fed. Cir. 2012).

---

[2]    Executable files that are needed to run otherwise discoverable software or source code are properly discoverable. *See, e.g.*, *Primex, Inc. v. Visiplex Techs., Inc.*, No. 05-C-515-S, 2006 WL 538992, at *1 (W.D. Wis. Feb 24, 2006) (awarding attorney's fees and costs where court ordered defendant to "produce sample products as well as all relevant separate executable files of its source code for the products at issue in this action."); *see also Dynetix Design Solutions Inc. v. Synopsis Inc.*, No. 11-CV-05973 PSG, 2013 WL 772670, at *3 (N.D. Cal. Feb. 28, 2013) (ordering production of "enabling devices" so that plaintiff could test code on its own system).

In analyzing the hypothetical negotiation, the parties and the court typically rely on the fifteen-factor analysis set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d. Cir. 1971). *See LaserDynamics*, 694 F.3d at 60 n.2; *see also Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) ("[T]he district court should consider the so-called Georgia-Pacific factors in detail, and award such reasonable royalties as the record evidence will support.").

Patent infringement cases, of course, "are not exceptions to the rule that discovery is liberal and relevancy is broadly construed." *Murata Mfg. Co. v. Bel Fuse, Inc.*, 422 F. Supp. 2d 934, 945 (N.D. Ill. 2006) (citing *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)). Accordingly, many courts have held that information falling within the scope of the *Georgia-Pacific* factors is relevant and discoverable. *See, e.g.*, *Cormack v. United States*, 117 Fed. Cl. 392, 407 (2014) (ordering production of documents relevant to *Georgia-Pacific* factors 8 and 9); *MSTG, Inc. v. AT&T Mobility*, No. 08-C-7411, 2011 WL 841437 at *3-4 (N.D. Ill. Mar. 8, 2011) (ordering production of prior settlement negotiations as relevant to the process of hypothetical negotiation); *Trading Techs. Intl. v. eSpeed*, No. 04-C-5312, 2007 WL 704525, at *2 (N.D. Ill. Mar. 1, 2007) (granting motion to compel production of patent licenses relevant to *Georgia-Pacific* factors 2, 12, and 15).

A key *Georgia-Pacific* factor is "the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." 318 F. Supp. at 1120 (Factor 9). Analysis of this factor often overlaps with the next factor, "the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Id.* (Factor 10). Analyzing these factors often involves examining the specific benefits conferred by implementation of the

claimed invention. *See Commonwealth Scientific & Indus. Research Organization v. Cisco Sys., Inc.*, No. 6:11-CV-343, 2014 WL 3805817, at *13 (E.D. Tex. July 23, 2014) ("CSIRO").

For example, in *CSIRO*, the Eastern District of Texas recently held that *Georgia-Pacific* factors 9 and 10 favored an "upward adjustment of the baseline royalty rate" where the plaintiff was able to demonstrate that the claimed invention (a wireless networking apparatus) resulted in "***higher speeds***" and "***lower power consumptions.***" *Id.* (emphasis added). As another example, in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547 (D. Del. 1997), the court found that quantifiable performance benefits over prior devices attributable to the infringement "weigh[ed] strongly in favor of a higher royalty rate." *Id.* at 611; *see also Mobil Oil Corp. v. Amoco Chemicals Corp.,* 915 F. Supp. 1333, 1361 (D. Del. 1994) (factoring that "Mobil's patented xylene isomerization technology provided increased production, higher PX yield and lower xylene losses" into damages analysis).

The requested ▇▇ executable files—which are needed to simulate and quantify the performance benefits gained by the Accused Processors from their infringement of the '752 patent—unquestionably fall within at least the scope of *Georgia-Pacific* factors 9 and 10 described above, and as such they are relevant to the determination of a reasonable royalty rate. Despite already producing the ▇▇ source code and a handful of documents that discuss the results of certain previously run simulations, Apple now contends that its "internal design tools" like ▇▇ are *not relevant* to this litigation. But Apple has already effectively conceded the issue of relevance, both due to its foregoing production of ▇▇ source code and documentation, and because Apple itself specifically requested similar information from WARF in its Second Set of Interrogatories. In Apple's Interrogatory No. 12, Apple requested that WARF provide the following information:

> Describe any ***performance benefit*** that you allege the invention claimed in the '752 patent provided to the Accused Products, including, without limitation:

> (i) the **specific amount of performance benefit that you allege the invention claimed in the '752 patent contributed to each of the Accused Products**; and
> (ii) all facts supporting your allegation.

Ex. B at 7 (emphasis added).

As such, Apple cannot reasonably contend that the ▇ executable software is *irrelevant* to this litigation, because ▇ simulations are capable of providing the *exact information that Apple itself requests* in its Interrogatory No. 12—namely, an identification of the "specific amount of performance benefit" gained by the Accused Processors due to their implementation of the infringing ▇▇▇▇. Notably, Apple's Interrogatories are subject to the same Rule 26(b) relevance requirement as WARF's Requests for Production. *See* Fed. R. Civ. P. 33(a)(2).

Likewise, Apple has also conceded that the outputs of ▇ simulations are relevant to this litigation, as Apple contends that it has produced "all performance outputs from ▇ created during the development of [the A7 processor] that presently exist." Ex. J at 1. If the outputs of ▇ simulations previously run by Apple's engineers are relevant to this litigation, then so too is the ▇ executable software that created such outputs, as well as the outputs of any simulations that WARF's experts may run using the ▇ software after it is produced.

### C.   Apple's Purported Production of All ▇ Output Documents 'that Presently Exist' Does Not Excuse It from Producing the ▇ Executable Software

Apple's alleged production of "all performance outputs from ▇ created during the development of [the A7 processor] ***that presently exist***" is not an adequate substitute for WARF's independent simulation and testing of the Accused Processors. Ex. J at 1-2 (emphasis added). Apple has not demonstrated that production of the ▇ software would be cumulative of any documents that it has produced. Moreover, at any rate, Federal Rule of Civil Procedure 34 expressly permits testing and measuring of *things*, even if related documents are produced.

- 11 -

1.     **Apple Has Not Demonstrated that Production of the ███ Software Would Be Cumulative**

Apple does not contend that it has *actually produced* any "outputs from ███ rather, Apple merely professes that it produced all such outputs "*that presently exist*." Ex. J at 1-2 (emphasis added). WARF has not been able to locate any "presently exist[ing]" ███ output files in Apple's production. The few documents regarding ███ that WARF *has* located in Apple's production are mostly e-mails (as opposed to actual ███ outputs) that vaguely discuss simulations run by Apple engineers in the past, most of which are directed to features of the Accused Processors other than the infringing ████████████.

Accordingly, on the parties' September 29, 2014 meet and confer, counsel for WARF asked Apple to identify a mere *five* exemplary ███ output files in Apple's production that show the amount of performance benefit attributable to the ████████████ Despite agreeing to provide this information by no later than Wednesday, October 1, 2014, Apple's counsel failed to identify even *one* such ███ output in Apple's production. This is precisely why WARF needs access to the ███ executable software, to run the simulations itself. If Apple's contention is that allowing WARF to run simulations would be cumulative over already produced documents, Apple has not carried its burden. *See Spieker v. Quest Cherokee, LLC*, No. 07-1225-EFM, 2008 WL 4758604, at *3 (D. Kan. Oct. 30, 2008) ("Defendant, the party opposing discovery based on an assertion that the ESI is cumulative, carries the burden of proof on this issue."). Moreover, WARF should at the very least be allowed to run simulations to confirm or disprove the accuracy or relevance of any actual ███ outputs created by Apple's engineers—to the extent that Apple ever produces or identifies any.

2.     **Rule 34 Expressly Permits Testing and Measuring**

Apple contends that the ███ executable software is beyond the scope of discovery because WARF's testing would "***create*** evidence regarding the performance benefits." Ex. J at 2

(emphasis in original); *see also* Ex. C at 1 ("We view this request—designed to allow WARF's experts to create new data—to be unreasonable and not properly within the scope of discovery."). This argument lacks merit.

Apple's asserted position is contrary to the plain language of Rule 34. As explained in the 2006 Amendment Advisory Committee Notes, the amended Rule 34(a) "expressly permits" "an opportunity to test . . . materials sought under the rule ***in addition to inspecting and copying them***." Fed. R. Civ. P. advisory committee notes (emphasis added). To the contrary, Apple appears to contend that WARF is entitled only to "inspect" ███ Indeed, Apple has only produced ███ source code. If Apple's argument were credited, it would effectively swallow Rule 34(a), as all testing necessarily contemplates the "creation" of test results.

In any event, running simulations and reporting the results is not creating anything new *per se*. The simulation is merely a means to quantifiably measure aspects of the simulated chip. Apple's argument that this measuring creates new evidence would be the same as saying that using a yard stick to measure the length of something would also create new evidence, *i.e.*, the length of the measured object. And even if Apple's argument is grounded in an unsupported belief that WARF's results would be somehow unreliable or inaccurate, the proper forum for that dispute is in pre-trial evidentiary or *Daubert* motions, not during discovery. *Kuryakyn Holdings, Inc. v. Just In Time Distrib. Co.*, No. 09-CV-702-WMC, 2013 WL 4454733, at *1 (W.D. Wis. Aug. 16, 2013) (citing Fed. R. Civ. P. 26(b)(1) ("The ultimate admissibility of such evidence can await another day. For now, Abbe has demonstrated that this discovery is 'relevant to the subject matter involved in this action' and 'appears reasonably calculated to lead to the discovery of admissible evidence.'").

**D.      Apple Has Not Established Any Undue Burden Sufficient to Withhold Production of the ▮▮▮ Executable Software**

"The party objecting to a discovery request has the burden of establishing the impropriety of the request," which include establishing that the request is unduly burdensome. *See Thacker Eng'g, Inc. v. Chicago Hous. Auth.*, No. 87 C 365, 1988 WL 84714, at *7 (N.D. Ill. Aug. 11, 1988). The mere fact that production "would be burdensome and expensive and would interfere with a party's normal operations is not inherently a reason to refuse an otherwise legitimate discovery request." *Baine v. General Motors Corp.*, 141 F.R.D. 328, 331 (M.D. Ala. 1991); *see also Keco Industries, Inc., v. Stearns Elec. Corp.*, 285 F. Supp. 912 (E.D. Wis. 1968) (allowing inspection of 100,000 files and stating that defendant "is not in a strong position to complain of burdensome requests" where plaintiff was seeking damages for lost profit and goodwill "amounting to over half a million dollars"). In other words, the resisting party must demonstrate that the request is "of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000) (quoting *Burke v. New York City Police Dep't*, 115 F.R.D. 220, 224 (S.D.N.Y.1987)).

Apple has not met its burden. Apple does not dispute that it is in possession of an executable version of ▮▮▮ as well as the configuration files and trace files necessary to run simulations using the software. Apple also does not dispute that these files can all be loaded onto a review laptop in order to allow WARF and its experts to run simulations at the offices of Apple's outside counsel. Rather, Apple merely professes that it would take two days to load an executable version of ▮▮▮ onto a laptop. WARF pressed counsel for Apple to explain the technical issues underlying the alleged undue burden in producing these files; however, Apple refused to provide *any* technical details whatsoever to support of its bare assertions, which is plainly insufficient as a basis for restricting otherwise proper discovery:

It is simply not adequate to reflexively say that this burden is "undue." That is a common refrain of parties to litigation who would prefer, understandably, not to comply with discovery requests that involve anything other than the slightest effort. But modern litigation often requires efforts that might have been regarded as difficult and thus avoidable years ago. A party claiming undue burden must do more than intone the phrase. . . . ***Undue burden or expense, actual or potential, must be shown by "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.***"

*Jenkins v. White Castle Mgmt. Co.*, No. 12 C 7273, 2014 WL 3809763 (N.D. Ill. Aug. 4, 2014) (emphasis added).

Even if it *would* take two days, that fact would fall far short of establishing an undue burden. On the parties' most recent meet and confer, Apple failed to explain how loading an executable version of ▇ onto a laptop was any more burdensome than the task it has already performed in loading ▇▇▇ of source code on the review laptop—a task to which Apple never objected as unduly burdensome. Indeed, the Protective Order that Apple requested acknowledges that it would take Apple ***up to seven days*** to load source code onto review computers. D.I.38, Protective Order § 11(c). In any event, given the direct relevance to WARF's damages case of measuring the performance benefits associated with the '752 technology, roughly two days of an Apple engineer's time cannot be considered unduly burdensome.

Finally, Apple *could* choose to eliminate the alleged undue burden altogether by simply allowing WARF's counsel and experts to inspect ▇ on Apple's campus in the same manner that Apple engineers do, thus removing the need to load anything onto a laptop. Apple has admitted that ▇ is stored on a server and accessed by Apple engineers. Although Apple contends there are unspecified "security risks" in allowing WARF on-site access, Apple ignores the robust Protective Order already entered in this case, which provides more than adequate protection for either on-site inspection or review at outside counsel's office. *See Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 171 F.R.D. 246, 250-51 (D. Minn. 1997)

(allowing on-site inspection over objection where "NCI's trade secrets will be properly preserved by the provisions of the Protective Order that the parties have negotiated.").

For example, in addition to general restrictions on the disclosure of protected material under the Protective Order, all materials provided on review computers are to be made available only "in a secure room on a secure computer without Internet access or network access to other computers and on which all access ports have been disabled." D.I.38, Protective Order at § 11(c)(i). Likewise, "no recordable media or recordable devices" are allowed in the review room. *Id.* § 11(c)(ii). Other protections include the ability for Apple to "visually monitor the activities of [WARF's] representatives," (*id.* at § 11(c)(iv)), restrictions on copying, (*id.* at § 11(c)(v), (ix)), required advanced notice of review (*id.* at § 11(c)(vi)), and restrictions on the total number of individuals allowed to review (*id.* at § 11(c)(x)). The Protective Order also contains a patent prosecution bar (*id.* at § 6), and any individual intending to review protected material must be cleared by the other side and sign an acknowledgement (*id.* at § 12).

Accordingly, because the ▮ executable software and configuration files are directly relevant to WARF's damages claims, and because Apple has not established that it will face any undue burden in producing such files or making them available for inspection, the Court should order Apple to comply with its discovery obligations.

## V.    **CONCLUSION**

For the foregoing reasons, WARF respectfully requests that this Court issue an order compelling Apple to produce or make available for inspection by a date certain—e.g., within seven days of the Court's order—any simulator that is capable of simulating the operation of Data Dependency Prediction (as defined in WARF's First Set of Requests for the Production of Documents) and all documents relating to any such simulator, as sought by WARF's Request for Production No. 51, including at least the following:

- 16 -

1.      All ▪▪▪ executable files used by Apple to simulate each of the Accused
        Processors;

2.      All documents relating to any such ▪▪▪ executable files used by Apple to
        simulate each of the Accused Processors; and

3.      All other files (such as configuration or trace files) that are necessary for WARF
        to run simulations using the ▪▪▪ executable files.


                                    Respectfully submitted,


Dated: October 3, 2014              By:  */s/ Jennifer L. Gregor*

                                    Morgan Chu
                                    Gary Frischling
                                    Jason Sheasby
                                    Alan Heinrich
                                    Christopher Abernethy
                                    IRELL & MANELLA LLP
                                    1800 Avenue of the Stars, Suite 900
                                    Los Angeles, CA 90067-4276
                                    Telephone:   (310) 277-1010
                                    Facsimile:    (310) 203-7199
                                    MChu@irell.com; GFrischling@irell.com;
                                    JSheasby@irell.com; AHeinrich@irell.com;
                                    CAbernethy@irell.com

                                    Jennifer L. Gregor
                                    GODFREY & KAHN, S.C.
                                    One East Main Street, Suite 500
                                    Madison, WI 53703
                                    Telephone:   (608) 257-3911
                                    Facsimile:    (608) 257-0609
                                    JGregor@gklaw.com

                                    *Attorneys for Plaintiff*
                                    *Wisconsin Alumni Research Foundation*