UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN ALUMNI RESEARCH FOUNDATION,

      Plaintiff,

—vs—                     Case No. 14-CV-62-WMC

APPLE, INC.,             Madison, Wisconsin
                         October 5, 2015
      Defendant.        8:10 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY, and a jury

APPEARANCES:

For the Plaintiff:
                Irell & Manella LLP
                BY:  MORGAN CHU
                    GARY FRISCHLING
                    JASON SHEASBY
                    ALAN HEINRICH
                    AMY PROCTOR
                    CHRISTOPHER ABERNETHY
                    TONY ROWLES
                1800 Avenue of the Stars, Ste. 900
                Los Angeles, California  90067

                Godfrey & Kahn, S.C.
                BY:  JENNIFER GREGOR
                One East Main Street, Ste. 500
                Madison, Wisconsin  53703

Also appearing:  Joshua Oppenhuis-Technology consultant
                Carl Gulbrandsen Managing Director-WARF

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
(608)255-3821

```
 1  For the Defendant:
                    Wilmer Cutler Pickering Hale & Dorr
 2                  BY:  WILLIAM LEE
                         JORDAN HIRSCH
 3                       LAUREN FLETCHER
                    60 State Street
 4                  Boston, Massachusetts  02109

 5                  Wilmer Cutler Pickering Hale & Door
                    BY:  DAVID MARCUS
 6                       JAMES DOWD
                         ANDREA JEFFRIES
 7                       DEREK GOSMA
                    350 South Grand Avenue, Ste. 2100
 8                  Los Angeles, California  90071

 9                  Cetra Law Firm
                    BY:  CATHERINE CETRANGOLO
10                  20 North Carroll Street
                    Madison, Wisconsin  53703
11
    Also appearing:   David Sayres - Technology consultant
12                    Gerard Williams - Apple engineer
                      Iain Cunningham-Director of Litigation
13

14                      * * * * *

15                      I-N-D-E-X
```

```
16  Conference                                4-34
    Voir Dire                                35-136
17
    Opening statement by Mr. Chu            167-188
18  Opening statement by Mr. Lee            188-221

19

20  PLAINTIFF'S WITNESSES        EXAMINATION      PAGES

21  CARL GULBRANDSEN       Direct by Mr. Chu     222-238
                           Cross by Mr. Marcus   250-260
22                         Redirect by Mr. Chu   261-261

23  GURINDAR SOHI          Direct by Mr. Frischling  261-302
                           Cross by Mr. Lee      304-325
24

25
```

1                         I-N-D-E-X

2   PLAINTIFF'S EXHIBITS                    IDENTIFIED/RECEIVED

3   Ex. 1        '752 patent               264        264
       3A         ISCA '97 paper           289        ---
4       5         Intel presentation       291        292
      151         Photo - Moshovos plaque  296        297
5     276         '81 study                315        315
      385         Presentation 8-96        294        294
6     410         Email                    277        278
      452         Email                    283        284
7     461         Review feedback          288        288
      463         Email chain              234        234
8     466         Slide deck               224        ---
      468         Email response           231        231
9     601         Press release            301        302

10  DEFENDANT'S EXHIBITS

11  Ex. 865      '96 publication           280        281
     1669         Shattuck letter          254        254
12   1671         Shattuck letter          256        256
     1672         Shattuck letter          257        258
13   1674         Shattuck letter          248        249
     1688         Shattuck letter          259        259
14   1698         3-26-96 email            321        321
     1723         Webb page                232        232
15   1725         Email                    230        251

16  Sealed pages                          74-76

17

18                      *  *  *  *  *

19       (Proceedings called to order.)

20            THE CLERK:  Case Number 14-CV-62.  *Wisconsin*

21  *Alumni Research Foundation v. Apple, Inc*. called for

22  conference.  May we have the appearances, please.

23            MR. CHU:  Good morning, Your Honor.  On behalf

24  of WARF:  Morgan Chu, Gary Frischling, Jason Sheasby,

25  and Alan Heinrich.

1    THE COURT:  Very good.  I'll hear then

2  appearances for Apple.

3    MR. LEE:  Good afternoon, Your Honor.  On

4  behalf of Apple:  Bill Lee, David Marcus, Jim Dowd,

5  Cathy Cetrangolo.  Thank you.

6    THE COURT:  Thank you.  I'll just emphasize,

7  although given the cast of characters, it's probably

8  obvious we won't be doing any kind of appearance when

9  the jury panel comes in.  We will remain seated.  They

10  will be brought in.  The first 14 will be seated in the

11  box.  The remainder of the jury panel will be in the

12  left corner.  I appreciate the parties keeping that

13  open.  And then we will proceed with the voir dire.

14    During the voir dire, you will introduce

15  yourselves, as you may recall in the materials, which

16  means you introduce any counsel that will appear during

17  the course of the trial.  And then I'll have you

18  introduce your client.  You can simply say -- if you

19  have one sentence -- hopefully by now we know what would

20  be noncontroversial -- one sentence as to who your

21  client is, and if you have a client representative,

22  stand and introduce them.  And then we will proceed with

23  the voir dire.  And that's all laid out in the current

24  form of the voir dire.

25    I will ask initially any other issues with respect

1   to voir dire.  I know the last version was provided to

2   both sides last night, but I'll hear from WARF if there

3   are any remaining issues.

4           MR. CHU:  None, Your Honor.

5           THE COURT:  All right.  And so we're clear,

6   Mr. Chu, you're free to speak at your mic there.  I know

7   it sometimes is the practice of counsel to stand at the

8   podium, and if that's your preference, you're free to do

9   it.  But don't feel as though for purposes of the record

10  -- you're welcome to stand or sit as you feel free, but

11  you don't have to use this particular mic.  All the mics

12  are live, unless you turned them off yourself, which may

13  be appropriate in a certain circumstance.  But in any

14  event, if you want to just stand at counsel table,

15  that's fine.

16      Let me ask the same question of Apple.  Any further

17  issues with voir dire?

18          MR. LEE:  None, Your Honor.

19          THE COURT:  All right.  I'm going to ask the

20  same question, just so we don't have -- we've got lots

21  of surprises.  The parties are creative in their

22  submissions.  But just for those that are coming up

23  immediately, any issues for either party with respect to

24  the introduction instructions at this point?  I'll hear

25  first from WARF.

1           MR. CHU:  None, Your Honor.

2           THE COURT:  Any for Apple?

3           MR. LEE:  No, Your Honor.

4           THE COURT:  All right.  Good.  As far as

5    openings are concerned, I'm only aware of one issue, but

6    I'll hear from the parties if there are others.  There

7    seems to be a concern as to whether Apple can actually

8    state when it became aware of the '752 patent in

9    opening.  I view this as one of those early examples of

10   both sides hoping the Court is hypertechnical.  It's not

11   my inclination at trial.  I view the basic story --

12   whether copying is in or not for liability, that's a

13   basic part of the story, and I'm going to allow Apple to

14   say when they became aware of the patent.  Obviously

15   they're not going to be able to argue that it has any

16   significance for purposes of infringement, but it's part

17   of the basic story of the case and I think it's

18   overreaching for either side to think that they can

19   leave out the rough story here.

20       In fact, particularly with respect to this, even if

21   WARF is eliminating copying and it's not -- doesn't --

22   therefore the exact date of knowledge by Apple with

23   respect to the patent-in-suit may not bear directly on

24   copying, it's still sort of a background fact, and to

25   that extent, I think the jury is entitled to know it.

1   So that's coming in.

2       I believe -- I'm going to hold on closing

3   instructions and verdict form at this point.  The

4   parties have provided ample additional information for

5   the Court to think about.

6       There was a concern raised by Apple with respect to

7   what they characterize as counter counterdesignations.

8   I've appreciated the efforts by the parties to work

9   together, but once you've given me the designations with

10  the counterdesignations, if either side thinks they're

11  entitled to something more -- I guess in this case it

12  really would be WARF thinks it's entitled to something

13  more -- they should work that out before it's submitted

14  to the Court.  But you don't get to wait until the Court

15  rules on the designations and counterdesignations.  In

16  fact, I've never seen that tried before.  Again, I think

17  it's -- I understand everyone is working on the fly and

18  you have enough people to massage things, but there has

19  to be a practical cutoff.  We're in trial now, so I

20  think Apple's motion is well-founded, as I understand

21  it.

22      When you submit it to the Court three days before

23  its introduction, that's it.  I'm going to rule on it

24  and that's the end of the story.  So

25  counterdesignations, whatever they may entail, are out

1    except to the extent that either side is welcome to

2    argue that in terms of a counterdesignation, that

3    something additional now is required because of that

4    counterdesignation.  But that should be done in the

5    submission to the Court the three days before its

6    submission.

7        Since it was WARF who tried to propose it, any

8    clarification you need from that?

9        MR. SHEASBY:  Your Honor, there's no

10   clarification.  I will say that in light of that, there

11   are some significant objections to their

12   counterdesignations that we've made to them.  In other

13   words, I understand we can't respond to their

14   counterdesignations, but we think their

15   counterdesignations are not proper designations.  They

16   go beyond the scope --

17       THE COURT:  Because they're incomplete?

18       MR. SHEASBY:  Because they're incomplete or

19   because they go beyond the scope.

20       THE COURT:  Well, beyond the scope doesn't

21   necessarily apply.  I'm not -- if it's not relevant to

22   that phase of the trial that's fine.  But if it's -- now

23   that you're going to use that witness, they are free to

24   ask questions that are relevant of that witness.  So if

25   the objection is beyond the scope, that's not going to

1   be sustained.

2           MR. SHEASBY:  Okay.

3           THE COURT:  I'm not sure what that would mean

4   either.

5           MR. SHEASBY:  So there are a small number of

6   incomplete objections that we --

7           THE COURT:  And those I will address then.  If

8   they're in the materials to the Court, I will address

9   them.

10          MR. CHU:  Your Honor, may I ask a question for

11  clarification for the future?

12          THE COURT:  Certainly.  Yeah.

13          MR. CHU:  So let's suppose one party designates

14  on subjects A, B, and C.  The other party designates on

15  A, B, C, and D, and the first party then says well, I

16  also want to designate on D.  We could call that a

17  counterdesignation.  What I heard the Court say is get

18  all that in on time so you can rule on everything at

19  once three days before.

20          THE COURT:  That's correct.

21          MR. CHU:  Thank you.

22          THE COURT:  I would view that as incomplete.

23  If you want to call that a counter counterdesignation, I

24  don't care about the vocabulary as long as it's all

25  given to me at the same time.  We're not going to do a

1  rolling designation, as I've already indicated with

2  respect to some efforts to supplement.

3      All right.  Any questions by Apple with respect to

4  the Court's ruling?

5          MR. LEE:  None, Your Honor.

6          THE COURT:  Okay.  I understand that we will

7  need to take up some issues that the parties have not

8  been able to agree on with respect to sealing of

9  exhibits and we'll do that in a moment.  I take it there

10 are no other issues for opening except for

11 confidentiality.  The parties have exchanged their

12 demonstratives or exhibits they intend to introduce in

13 opening and that we don't need to address that.

14     As you can tell, I'm just trying to clear up what

15 it is that's still at issue with respect to that period

16 before lunch.  Since -- I'll wait for Apple.  Any

17 further with respect to openings?

18         MR. CHU:  May I have just a moment, Your Honor?

19         THE COURT:  All right.  Let me hear then from

20 Apple.

21         MR. LEE:  Your Honor, the answer is yes, there

22 are a number of objections that are opening slides that

23 we met and conferred on last evening that have been

24 resolved.  And I would also say --

25         THE COURT:  But there remain some for the Court

1    to decide.

2              MR. LEE:  Yes.

3              THE COURT:  Very good.

4              MR. LEE:  I think, Your Honor, the sealing

5    issues for the opening, in terms of what either party is

6    showing, we don't need to address those now.  I think

7    the confidential issue for the slides is not --

8              THE COURT:  I know I said I would come to those

9    because it seemed to me it's appropriate now, but I want

10   to take up the opening slides first.  Does WARF have its

11   own sets of issues?

12             MR. HEINRICH:  We do, Your Honor.  Alan

13   Heinrich.  So we have just a couple issues.  First --

14             THE COURT:  Is there any chance we could call

15   these up as we talk about them?

16             MR. HEINRICH:  Sure.  So if we go to Apple's

17   opening, there is a set of slides -- I'll just give one

18   example.  But you can call up Slide DDX 1-48.  It's

19   Slide 48 DDX-1.

20             THE COURT:  My monitor is still coming on.

21   There we go.  All right.  And your objection is?

22             MR. HEINRICH:  So this is a series of slides

23   that are from Apple's damages expert, Dr. Hitt, and

24   Dr. Hitt -- that's the wrong -- I'm sorry, it's Slide

25   48.  That's 51.  So this is one example.  It's actually

1    from Dr. Hitt's report at page 81, and this is part of a

2    series of photos and diagrams that he's included to

3    argue that the LSD predictor is a very tiny part of

4    Apple's products for purposes of his apportioning

5    analysis.  And we think it's inappropriate for Apple to

6    be making these arguments about --

7            THE COURT:  All right.  Well, I understand --

8    let me ask Apple's counsel how is it you intend to use

9    this?

10           MR. LEE:  Your Honor, this would be

11   Mr. Williams, who actually designed the chip, is going

12   to describe the Apple -- if Your Honor turns back to

13   I-44, if we go back to I-44, he's just basically -- he's

14   going to say here is the product that's been accused of

15   infringing.  Then the jury is going to hear about the

16   system-on-a-chip; identify where it is.  The jury is

17   going to hear about, as Your Honor knows, the CPU.  The

18   next slide just shows where it is.  And then within the

19   CPU, there is the dependency predictor, which is in the

20   NBR.  So the slide that Mr. Heinrich has showed Your

21   Honor, I-48, if we could have that, just identifies

22   where that is.

23       And then I-50 shows within that blocked diagram

24   where the dependency predictor is.  This is just showing

25   where it is within the product.

1          THE COURT:  I'll hear really briefly.

2          MR. HEINRICH:  Just to be clear, if that's what

3    they're going to be using this for --

4          THE COURT:  Again, I'd encourage the parties --

5    I know that everyone is on the fly, but that seems like

6    the kind of question that could be asked outside the

7    presence of the Court.  But I'm going to allow it for

8    that limited purpose.  I understand your concern.

9    Perhaps if there's any more like that, you can clarify

10   and we can take it up just before openings.  If you have

11   some that are more substantive --

12         MR. HEINRICH:  I would like clarification that

13   Slides 52 through 54 won't be used.  These were slides

14   on --

15         THE COURT:  You know what?  We're not doing

16   this.  We're not having a discussion.  We're going to

17   have a break before we start the voir dire at 9 a.m. and

18   I would encourage the parties to discuss.  If your

19   concern is that it could be misused, then clear that up.

20   Let me know when I come back in or after voir dire.  But

21   if you just have a fear that the other side is not going

22   to use an exhibit properly in opening, clarify that with

23   each other.

24       Was there anything else?

25         MR. HEINRICH:  That's all, Your Honor.

1          THE COURT:  All right.  What about for Apple?

2          MR. LEE:  Your Honor, if we could bring up --

3    there are slides -- maybe I could just address a couple

4    and that would give us enough guidance.  But if I could

5    start with their slide --

6          THE COURT:  You need to be on defendant's

7    slide?  Who's calling it up?  I'm happy to have either

8    side.  I've got plaintiff now.  Do I need defendant?

9          MR. LEE:  I actually have a hard copy if it

10   would help, Your Honor.

11         THE COURT:  Why don't we call it up.  It will

12   show me roughly.

13         MR. LEE:  Can we bring up WARF's opening

14   slides?  And could I have Slide 4.

15         THE COURT:  I'm happy if WARF can do that.  I

16   apologize.  The most important people in the room become

17   the IT people and I don't know either name at this

18   point.

19     I can come to you.  There you are.  Now, we may

20   have our first tech problem.  I've got your laptop

21   activated.

22         MS. CETRANGOLO:  Your Honor, I think it's best,

23   the way that they have this set up, these two are going

24   to control it themselves.

25         THE COURT:  All right.  So I'll just leave it

1   on plaintiff's laptop and you're working through them?

2   That's fine.  It's good to know.

3       Why don't I let you explain your concern.

4           MR. LEE:  This is open -- and this goes to your

5   ruling on MIL 14 about WARF's business model and what

6   they do and what doors have been opened.  But it also

7   goes, Your Honor, if you'll recall that we agreed that

8   argument about what happened with stem cells and WARF

9   would not go in.

10      This is a picture of Mr. Carl Gulbrandsen with

11  President Bush receiving an award for vitamin D, not for

12  the '752 patent.  If we're going to keep out things --

13          THE COURT:  I understand the concern.  Let me

14  hear from WARF as to why you think this is appropriate

15  for opening.

16          MR. CHU:  As long as the same rule is applied

17  throughout the trial, we're happy not to use the slide,

18  Your Honor.

19          THE COURT:  I don't know what that means, the

20  same rule.  I've made clear there's a limited amount

21  that either side is going to be saying about the

22  background of their company.  I can see where this is

23  potentially prejudicial, particularly given that we're

24  here in Madison, Wisconsin.  But similarly Apple isn't

25  going to be able to stand up and tell their amazing

1   corporate story, certainly not in infringement.

2       So with that said -- if that's what you mean by

3   both ways, that will be the case, then we should leave

4   this slide out in opening.

5           MR. CHU:  We will, Your Honor.

6           THE COURT:  All right.

7           MR. LEE:  Could I have Slide No. 2, please.

8   And Your Honor, this just -- our concern is, as Your

9   Honor said that, what the government wants and what the

10  law provides, what the patent --

11          THE COURT:  I'm just going to -- *disclose your*

12  *amazing inventions*.  Did you get that from a document

13  from the U.S. Patent Office?

14          MR. CHU:  Not the *amazing* part, Your Honor.

15          THE COURT:  I don't recall seeing it either.

16          MR. CHU:  That's fine.

17          THE COURT:  In its current form, I'm not going

18  to allow this slide.

19          MR. CHU:  Okay.

20          THE COURT:  If you want to tone it down and

21  explain just roughly what the U.S. Patent Office is

22  about, I might consider it.  But in its current form

23  it's out.

24          MR. CHU:  Very well.

25          MR. LEE:  Your Honor, we discussed these, so we

1   have some guidance from Your Honor now.  Maybe at the

2   break we can talk about the remaining issues.

3        THE COURT:  That would be great.  I'd

4   appreciate it.  And if there are any other issues, as I

5   say, we will definitely take a break before openings and

6   we can take up any last-minute issues at that time.  If

7   not, before we have our jury panel coming in.

8        Let me do this then:  I'll hear from both sides if

9   there are issues you think are profitably taken up.  The

10  other two that I'm inclined to consider are at least to

11  get a sense of where your confidentiality dispute

12  remains and to take up the objections to exhibits, some

13  seven Apple exhibits which are anticipated being used

14  during the liability phase.

15       So let me hear first from Apple as to -- I'm sorry,

16  from WARF as to your preference.

17       MR. HEINRICH:  So we do have one additional

18  issue, Your Honor.  Just clarification on when the issue

19  of WARF's entitlement to a claim for damages based on

20  the Samsung --

21       THE COURT:  Oh, thank you.  That was on my

22  list.  I view that as damages.  It's extraneous to the

23  principal issues on liability.  We're going to go

24  forward to a damage phase.  I know technically -- and

25  again, this is where I think we have to be practical

1  once we get to trial.

2      Technically it's certainly a liability question

3  with respect to those products, but it really isn't

4  material to the jury deciding anything until we get to

5  damages.  You're either going to win on liability or

6  you're not, unless there was some argument, and I can't

7  imagine that Apple would make it, that there's a chance

8  they could win just on that product.  That's really

9  WARF's argument, not Apple's.  So I don't understand the

10  need to address it in liability.

11      MR. LEE:  Actually, Your Honor, that's

12  precisely the concern what --

13      THE COURT:  Then I'm totally missing the thrust

14  of the argument.

15      MR. LEE:  And actually, we may have been

16  unclear about this.  So if I just --

17      THE COURT:  I understand what your right to --

18  WARF's right to recover those sales might be and what

19  needs to be proven and that that is a question are they

20  liable or not.  I'm not missing that point.  But I'm

21  missing why that needs to be taken up in the liability

22  phase.

23      MR. LEE:  For this reason, Your Honor:  There

24  are two separate issues.  And Your Honor is correct

25  about the one you've just identified, which is the

1  vicarious liability.

2          THE COURT:  Yeah.

3          MR. LEE:  The product, the thing that leaves

4  the Samsung facility and goes overseas, is a different

5  thing than the A7 chip that's imported in the phone and

6  which is the basis for the direct infringement claim.

7  So --

8          THE COURT:  There's got to be a so what there

9  somewhere.  You're about to tell me.  So what?

10         MR. LEE:  Because it doesn't infringe.  It's

11 not --

12         THE COURT:  So what?

13         MR. LEE:  Well, Your Honor --

14         THE COURT:  I mean let me ask it a different

15 way:  Is WARF going to argue that they get to go forward

16 with a damage claim if they lose on liability with

17 respect to every other product?

18         MR. HEINRICH:  Absolutely not, Your Honor.

19         THE COURT:  So I've lost you.

20         MR. LEE:  Okay.  I apologize.  There are two

21 sets of products here.

22         THE COURT:  I understand that.  No, but leave

23 that aside.  You win.  They never even hear about the

24 Samsung overseas product as sold unless they win on

25 their general liability case.  Why is Apple arguing,

1  other than it sounds good strategically for you to be

2  able to tell the jury about it, why are you arguing for

3  an additional product being liable?

4           MR. LEE:  Your Honor, because the jury could

5  find, we hope not, but they could find that the A7 chips

6  that are imported in the phone infringe, but the Samsung

7  wafers do not.  And so this is -- I understand, as we

8  said we understand --

9           THE COURT:  Yes, they could decide that.  And

10 they will decide that in the damage phase of the trial.

11          MR. LEE:  It then requires, Your Honor, both of

12 us to recall our infringement experts to testify about

13 the Samsung wafers and why they infringe.

14          THE COURT:  Yes, it does.

15          MR. LEE:  Right.  And that's the problem for

16 us.

17          THE COURT:  Why is that a problem?

18          MR. LEE:  Because Your Honor, we think that if

19 they're deciding the question of liability --

20          THE COURT:  I just told you I disagree -- I

21 mean I really am having trouble understanding why it's

22 so crucial.  This jury will understand that they can

23 only award as to Samsung if they find a violation

24 specific to Samsung.  If you told me all our experts are

25 committed to be on a flight by the end of the day on

1    Thursday, but that's not what you're saying.

2        You're saying something -- I understand technically

3    what you're saying, but you're not telling me why you're

4    prejudiced.

5            MR. LEE:  Your Honor, I'm not -- there's

6    nothing we can say beyond what we've said on it, so...

7            THE COURT:  All right.  Then --

8            MR. LEE:  But I think just so we all

9    understand, I think Your Honor's -- one of my concerns

10   was that the liability experts will have to come back,

11   Dr. Conte, Dr. August.

12           THE COURT:  And WARF is willing to live with

13   that, to the extent it's true.  I don't know if it is or

14   not.  But I haven't heard why Apple isn't willing to

15   live with that.

16           MR. LEE:  Could I ask Mr. Dowd?

17           THE COURT:  Very briefly.  Mr. Dowd.

18           MR. DOWD:  I'm sorry.  I hesitate --

19           THE COURT:  No, no.  Just go ahead.

20           MR. DOWD:  The issue is that there's a separate

21   limitation that the wafers from Samsung don't practice

22   in addition to the things --

23           THE COURT:  I mean you people are either

24   deliberately not hearing me or -- that's fine.  There's

25   a separate issue.  The jury will have to appreciate that

1   separation.  You'll have to call back experts if that's

2   going to be argued.  WARF is willing to do those with

3   their experts and you'll have to do it with yours.  I

4   mean --

5           MR. DOWD:  Okay.

6           THE COURT:  -- there's plenty of things that we

7   will be able to have disputes about during trial.  But

8   if we're just not seeing it the same way, then

9   continuing to tell me -- I'm looking for some evidence

10  of prejudice.  I haven't heard it.  We're going to do it

11  in the second phase.

12          MR. DOWD:  Understood, Your Honor.

13          THE COURT:  Thank you very much.  Again, this

14  might be sort of the technical aspect.  It's liability,

15  yes, but a jury is going to understand they only get

16  this if they show something more with respect to

17  liability and that's what we'll explain during the

18  damages phase.  All right?

19      All right.  Was there something more then for WARF?

20          MR. HEINRICH:  No, Your Honor.

21          THE COURT:  All right.  Something more for

22  Apple beyond the -- their exhibits and confidentiality

23  that you wanted to be sure to take up before voir dire?

24          MR. LEE:  Nothing else, Your Honor.

25          THE COURT:  Thank you.  Then let's take up the

1    confidentiality issue.  And perhaps WARF could explain

2    to me where you think the dispute remains as to the

3    sealing of information.

4         MR. HEINRICH:  Your Honor, there are two

5    aspects of the dispute.  One involves the timing of the

6    disclosure of cross-examination exhibits.  Apple

7    proposes that the parties exchange cross-examination

8    exhibits, in many cases before the witness's direct

9    testimony will even have ended, and given the nature of

10   cross-examination we just don't think that's practical.

11   What we have suggested to Apple, they have a list of

12   documents that they believe are highly confidential.  We

13   propose that they make redactions ahead of time to those

14   documents and then we can meet-and-confer on those

15   redactions outside the context of which particular

16   witness they're going to be used for.  Just again, given

17   the nature of cross-examination.

18        THE COURT:  And is that, in WARF's view, the

19   remaining matter under dispute?

20        MR. HEINRICH:  It's still unclear to us what

21   Apple's proposal is in terms of examining witnesses.

22   They have proposed to us -- I didn't see it in their

23   papers, some of them were very late, but they proposed

24   to us that witnesses --

25        THE COURT:  Both sides' papers have been very

1   late.  That's surely not --

2           MR. HEINRICH:  Yes.  Absolutely, Your Honor.

3           THE COURT:  That goes without saying at this

4   point.  But go ahead.

5           MR. HEINRICH:  The proposed restrictions on how

6   witnesses can be examined, they suggested that certain

7   lines of documents can't be stated and we think that

8   that's not going to work in terms of how the jury --

9           THE COURT:  All right.  I'll let them

10  characterize what their position is then.  But before I

11  do, let me just confirm the parties are -- are you

12  exchanging the day before the list of witnesses for the

13  next day?  How are you working this?

14          MR. HEINRICH:  Two days before.

15          THE COURT:  All right.  Very good.  Then let me

16  hear from Apple.  Let's start with this timing of

17  cross-examination exhibits.  I'm not sure I follow where

18  the concern is.

19          MR. LEE:  We're not asking -- what our proposal

20  is, Your Honor, had been -- we made some progress.  Our

21  proposal --

22          THE COURT:  It sounds like you have.  I'm

23  actually quite pleased that these are the two areas.

24          MR. LEE:  Yeah.  We had proposed that we just

25  -- without identifying what witness they're going to be

1    used with, that we each disclose to the other the

2    confidential documents we might use.

3         THE COURT:  And that sounded like exactly what

4    you were proposing.

5         MR. LEE:  He -- sorry.

6         THE COURT:  Is that right?

7         MR. HEINRICH:  So I was proposing that they

8    have redactions to our --

9         THE COURT:  When you say *they*, both sides would

10   exchange those documents that they believe the other

11   side might introduce at trial that should be redacted;

12   right?

13        MR. HEINRICH:  Not quite, Your Honor.  So we

14   have exchanged -- we have already exchanged the

15   documents that are in their confidential list that both

16   sides anticipate they may use in direct examination.  We

17   haven't had a problem with that.

18        THE COURT:  Right.

19        MR. HEINRICH:  So the question is which

20   documents are going to be used in cross-examination.

21        THE COURT:  It may be that we're having a

22   problem in terminology.  Both sides -- I don't care

23   about cross-examination or not.  There are exhibits that

24   will be admitted into evidence and therefore published

25   to the jury and on the public screen.  Are you with me?

1          MR. HEINRICH:  Yes.

2          THE COURT:  I don't care if they're introduced

3   in cross-examination or they're introduced in direct.

4   Those are the exhibits that the parties should have

5   already exchanged.  Have they not?

6          MR. HEINRICH:  So we have -- we have obviously

7   exchanged our witness lists.  We have not identified a

8   subset of documents that we may be using in

9   cross-examination from the --

10         THE COURT:  There should be no subset.  There

11  are exhibits for which you anticipate offering them in

12  evidence or not.  If you're talking in cross-examination

13  about exhibits that you might use to impeach or to

14  refresh recollection, those are never going to be shown

15  on the screen, period.  They're going to be shown to the

16  witness, but not to the jury, not on the public screen,

17  not on this screen.  I hope we're consistent.  And so

18  you don't need any sealing.

19     Your concern may be what they're asked about with

20  respect to that exhibit, but that's subject areas, and

21  you should start generally, and hopefully the parties

22  will have a general sense as to what those are.  But

23  we're only talking about exhibits that are going to be

24  admitted at trial.  Otherwise we're talking about

25  subject matter.  And if the parties haven't reached some

1   general understanding of subject matter, you should

2   really work hard to do that before you get a witness on

3   the stand.  If there's really a disagreement, we'll have

4   a sidebar as to how far you're going to go into it.  But

5   I don't expect a lot of sidebars on subject matter

6   confidentiality.  Is that clear?

7            MR. HEINRICH:  Yes, Your Honor.

8            THE COURT:  All right.  So I think there may be

9   no further misunder -- if it's clear for WARF, let me

10  find out why it's not for Apple.

11           MR. LEE:  This is helpful, Your Honor.  I think

12  -- I'm looking at Mr. Heinrich.  But I think with Your

13  Honor's guidance, I think what we thought we were

14  proposing and what I would again propose is that we

15  exchange lists of things that we think we're going to

16  use without identifying witnesses.  We're not asking

17  anybody to give up their trial strategy, and then --

18  many of them will be Apple.

19      The reason we wanted to do this is so we could

20  prepare redacted versions that would --

21           THE COURT:  I understand that.

22           MR. LEE:  -- be used publicly.

23           THE COURT:  It doesn't matter.  If it's going

24  to be used for cross-examination but not introduced into

25  evidence, there's no need to exchange those.

1          MR. LEE:  I understand.

2          THE COURT:  They don't even have to be on your

3    exhibit list.

4          MR. LEE:  We understand that.  So we're

5    concerned about things that would go into evidence.  I

6    think both of us recognize that.

7          THE COURT:  All right.  So I would say that you

8    now have an understanding, which is you both already

9    exchanged those things that will go into evidence.  If

10   you haven't, you should provide everything and then the

11   parties can indicate what they think needs to be

12   redacted from those matters.  Is that clear for Apple?

13         MR. LEE:  Yes, Your Honor.

14         THE COURT:  Have I complicated the matter for

15   WARF?

16         MR. HEINRICH:  No, Your Honor.

17         THE COURT:  Then let's move on to the second

18   issue, which is examining witnesses with exhibits.  I

19   guess I need to hear from Apple.  I've had it

20   characterized by WARF.  But so we're clear with respect

21   to examining witnesses with exhibits, the exhibit -- you

22   can certainly show a witness a document that won't be in

23   evidence yet, but it's only going to be a matter of

24   confidentiality after you move admission.  There are no

25   exhibits admitted yet in trial, so it seems to be the

1  same subset of exhibits we're talking about.

2          MR. LEE:  If I could give Your Honor an

3  example.

4          THE COURT:  Please, yes.

5          MR. LEE:  We actually may agree on this as an

6  example, and the question is if Your Honor agrees, we

7  can then apply it to others.  But one of the most

8  confidential and highly confidential things to Apple is

9  its source code.

10          THE COURT:  Understood.

11          MR. LEE:  There are a number of experts --

12  couple of experts who'll be talking about the source

13  code.  The procedure that we have proposed is that as

14  the source code comes in, because it will be offered by

15  both of us, that it be shown on the jurors' screens and

16  for Your Honor, but not for the general public.

17          THE COURT:  I don't think -- well, actually

18  maybe your IT people have already anticipated this.  Do

19  we have the capacity to show only to the jury and not on

20  the big screens?

21          MR. OPPENHUIS:  Only by shutting off the

22  monitor, Your Honor.

23          THE COURT:  What about this screen?

24          MR. CHU:  Can I make a suggestion?

25          THE COURT:  Why don't we do this:  At the

1  break, I have no -- I think it's appropriate.  There may

2  be situations where we're going to let the jury see

3  something that I will find -- although I want to say

4  it's going to be a narrow set.  If the jury sees it,

5  we're a long way down the road to making something

6  public, and in fact -- well, if it was going to be

7  appealed to the Seventh Circuit, I think you will have

8  accomplished that.  But perhaps not.  I will explain to

9  the jury that there may be some things that they're

10  looking at that they are obligated to keep confidential.

11  But at the break, why don't -- see if you can work out

12  your ability to keep that off the public screens.

13       Was there something more?

14       MR. LEE:  No.  That's the procedure that we

15  would propose.  We just have to figure out what it

16  covers.

17       THE COURT:  What are the names of your two IT

18  people?  I'll start on this end.

19       MR. CHU:  Joshua Oppenhuis.  Spelled

20  O-p-p-e-n-h-u-i-s.

21       THE COURT:  I'm not asking it, Mr. Oppenhuis,

22  because I intend to embarrass you in front of the jury.

23  I just think it's odd that I don't know since you become

24  an important part of the trial.

25       MR. SAYRES:  David Sayres.  S-a-y-r-e-s.

1          THE COURT:  Very good.

2          MR. CHU:  Your Honor, just that --

3          THE COURT:  I want to make a point for each of

4   them.  You already struck me as extremely good at what

5   you do just by virtue of how quickly you've anticipated

6   the Court's concerns and you obviously -- even if

7   counsel don't understand, you understand how this

8   monitor works and you've already overridden it, which is

9   fine with the Court as long as I can override you, which

10  I assume I can.  If I hit jury witness, you can't

11  override that.  I'm just going to assume that, unless

12  I'm advised after the break that that power has been

13  taken away from the Court.

14       With that said, the only thing that I've seen is

15  sometimes the IT experts are so good at what they do

16  that they anticipate highlighting before it's been

17  called to the witness's attention by counsel.  We're not

18  going to do that.  You're not an active participant in

19  the presentation of information to the jury.  So if you

20  have a practice of highlighting or calling out, that is

21  done at counsel's direction.  It's not done by probably

22  two people quite capable of doing it better than the

23  lawyers, but you're not testifying and you are a passive

24  participant to the -- to counsel's direction.

25       With that said, I'm not going to take up exhibits

1    at this time.  We'll do that at the break, the seven

2    additional exhibits, unless you tell me that's an issue

3    for the jury.  I want to make sure we get settled in.

4    You'll probably be advised, those of you sitting in the

5    far left side, you're going to need to move over.  But

6    you don't need to do that now, you can do it at the

7    break.  Because the jury will go into that area.  So

8    just move your materials.

9        After the break, I think we're in agreement that

10   laptops are open season on the right and left side of

11   the jury [verbatim].  But down the middle, phones,

12   laptops, anything else, unless you're with -- well, down

13   the middle they're not going to be on, and if they are

14   on, that's going to be an issue for the court security

15   officer.  And they're not looking for issues, they will

16   just let you know.

17       Anything further for WARF before we break?

18           MR. CHU:  No, Your Honor.

19           THE COURT:  Anything more for Apple?

20           MR. LEE:  One issue briefly.  From the outset

21   of the litigation, the Apple counsel, inside counsel,

22   who has been -- basically my contact is Iain Cunningham,

23   who Your Honor knows about because of the waiver issue.

24   He's not our corporate representative.  Mr. Williams,

25   the designer of the chip, will be.  We're not calling

1  Mr. Cunningham.  They have him on the may call list.  We

2  ask whether he could sit in.  I mean he is our client

3  contact and has been during the course of the evidence.

4  They've invoked the rule.

5          THE COURT:  I'm sorry, did you talk about that

6  with them?

7          MR. LEE:  Yes.  They said they wouldn't agree.

8          THE COURT:  And what is the concern?  You

9  actually think he may be called in this case?

10          MR. CHU:  Yes, Your Honor.

11          THE COURT:  It's a problem for me because -- so

12  is there -- will you have any attorneys for WARF in the

13  courtroom?

14          MR. CHU:  We will have at least one lawyer, but

15  that person will not be a witness under any

16  circumstances.

17          THE COURT:  Well, I know.  But he's on the may

18  call list, which means somewhere in your rebuttal case

19  you may call him.  Why don't we do this -- well, I guess

20  we don't really need a sidebar.  Why don't you explain

21  to me what he would be relevant to.

22          MR. CHU:  The willfulness case.  We would call

23  him in our case-in-chief in willfulness.

24          THE COURT:  All right.  I will exclude him

25  during the willfulness case.  If we get to that point,

1  he will be excluded.  But he's going to be allowed to

2  remain otherwise.  All right?

3      Unless there's something more for either side then,

4  we will take our break and reconvene as soon as we get

5  word that our jury panel is ready to go, which usually

6  is at nine, but it could be a few minutes after.  And

7  you'll be notified.  Again, once we're back, we will all

8  remain seated while the jury panel comes into the

9  courtroom.

10      Thank you both.

11          MR. CHU:  Thank you.

12          MR. LEE:  Thank you, Your Honor.

13          THE COURT:  You're free to move about as you

14  wish.

15      (Recess     8:55-9:15 a.m.)

16          THE COURT:  We'll go on the record for just a

17  moment.  Apparently we had one potential jury panel

18  member who did not make it in this morning, which is a

19  little unusual.  So you're going to get a new list which

20  will delete that name from your jury list.  But

21  otherwise they're lining up to come in.  And again,

22  we'll just remain seated as they parade into the

23  courtroom.

24  (Prospective jurors brought in courtroom at 9:19 a.m.)

25          (Proceedings called to order.)

1            THE CLERK:  Case No. 14-CV-62.  *Wisconsin*

2    *Alumni Research Foundation v. Apple, Inc.* called for

3    jury selection and trial.

4            THE COURT:  Good morning to the members of the

5    jury panel who have just arrived in the courtroom.

6    We're here or you are here, we all are here for the

7    trial that has just been named.  You are here for

8    possible jury service in Case Number 14-CV-62*, Wisconsin*

9    *Alumni Research Foundation v. Apple, Inc.*

10           Many people approach jury service with a certain

11   amount of apprehension and anxiety, but if all of us do

12   our jobs, most people end up feeling that jury service

13   was actually a worthwhile, even gratifying experience.

14   I'm confident that if we all do our jobs, you will as

15   well.

16           The United States courthouse that you entered this

17   morning is not the judges' courthouse, neither is it the

18   lawyers' courthouse nor even the parties' courthouse

19   that are before you.  This is your courthouse.  This is

20   your system of justice.  Indeed this building belongs to

21   the public and it is important for all of us to keep in

22   mind that the public's business is being conducted here

23   today.  To be able to continue to serve you better, we

24   will seek your input, not just as a jury, but as to how

25   we conduct this trial.  We, all of us today, each of you

1  has a stake in this system.

2      When this trial concludes, you will not only be

3  asked to rule on the case, but to tell us anonymously

4  what we did right and what we did wrong.  We cannot

5  serve the public and improve our system of justice

6  without each of your valuable contributions, and you

7  will be asked for it.

8      Other than by paying taxes and voting, service on a

9  jury is probably the most important duty that most of us

10  will undertake in support of our system of government.

11  Only by realizing how unique our system of justice is

12  and how dependent it is on good people like you can you

13  truly understand and appreciate it.

14      Trial by jury has been eliminated in many countries

15  of the world.  The United States justice system is the

16  place where most of the jury trials in the world are now

17  held.  Contrary to I think the impression that most of

18  us have, we, that is to say the United States, has the

19  highest involvement of nonlawyers of any system in the

20  world.  That is a heritage that was handed down by the

21  people who founded our country.  I cannot describe its

22  importance any better than the United States Supreme

23  Court justices did in the video that you watched this

24  morning so I won't attempt to do so.  Instead, I just

25  want to emphasize your role as jurors.

1    In a trial, my job as the judge is to decide legal

2 questions and the juror's job is to decide fact

3 questions.  The judge decides what kind of evidence is

4 admissible and instructs the jurors at the end of the

5 trial as to the law that they must apply in deciding the

6 case.

7    These instructions provide a legal yardstick, if

8 you will, by which you, as juror members, must measure

9 the evidence in order to decide the case.  The jurors

10 decide what the facts are; that is, they decide from the

11 evidence admitted at trial what actually happened.  An

12 important part of the juror's job is to decide what

13 testimony to believe and what testimony not to believe.

14 In deciding what actually happened, the juries are

15 searching for the truth.  Many people, in fact, define a

16 trial as the search for the truth.

17    The trial begins with voir dire, which literally

18 means from the Latin and French, although it's

19 pronounced much more elegantly in either of those

20 languages, it means to speak the truth or to inquire.

21 And consistent with those definitions, the purpose of

22 voir dire is to ask a series of questions of jury panel

23 members and to obtain candid, truthful responses to help

24 ensure that we seat a jury comprised of impartial

25 individuals, which is a fundamental right of both

1   parties to this case.

2       The clerk has already seated the first 14 jury

3   panel members as the prospective jurors in the jury box.

4   All prospective jurors, and now I'm speaking about the

5   group in the back left corner, should listen carefully

6   to the questions that I pose as you may be called

7   forward and asked same or similar questions.  In fact,

8   my first initial questions are going to be directed to

9   all of you, including those in the back.

10      Before I begin, let me ask you all to stand at this

11  time, including those in the back, raise your right

12  hand, and be sworn by our clerk.

13      (Prospective jury panel sworn in by clerk.)

14          THE COURT:  You should answer I do if you do.

15          THE JURY:  I do.

16          THE COURT:  Thank you.  And you may be seated.

17      I want to introduce each of you to our court

18  personnel.  I've already introduced myself.  I'm Bill

19  Conley.  I will be the judge presiding over this matter.

20  And the clerk who just swore you in is Kyle Fredrickson.

21  He will be the deputy clerk who will work with me on

22  this matter.

23      Does anyone in the jury panel, including you in the

24  back, does any one of you know either of us before

25  today?  Just raise your hand if you do.  (No response.)

1  Thank you.

2       I'm going to describe the case very generally just

3  to orient you as to the nature of the subject matter and

4  the parties.  The plaintiff here, Wisconsin Alumni

5  Research Foundation, also will commonly be referred to

6  during the course of the trial as WARF, owns U.S. Patent

7  No. 5,781,752.  The Court and the parties may refer to

8  this patent as the '752 patent, the WARF patent, or even

9  the patent-in-suit.  It is the patent that's directly at

10 issue in this case.

11      This patent was originally issued to its claimed

12 coinventors, a University of Wisconsin professor and

13 three of his then graduate students, and the rights

14 under the patent were assigned by the inventors to the

15 plaintiff here, WARF.

16      The '752 patent is titled *Table Based Data*

17 *Speculation Circuit for Parallel Processing Computer* and

18 it relates generally to architectures of electronic

19 computers and specifically to electronic computers for

20 processing.

21      Apple designs and sells smartphones, iPhones, and

22 tablets like the iPad.  Certain iPhones and iPads

23 contain a system-on-chip, also which we'll refer to as

24 SoC, system-on-chip, or as a processor.  WARF alleges

25 that this SoC or processor infringes certain claims of

1  the '752 patent.  Apple denies that it infringes the

2  '752 patent and also contends that the claims of the

3  patent are invalid.

4       Has any one of you ever heard of this case before

5  today?  And again, I would ask you to raise your hand.

6  I see one hand raised.  Any others?  All right.  And let

7  me just direct this question to Juror No. 9, Ms. Lynch.

8  Is that -- is that because you read about it or you know

9  something more than what you read in the paper?

10           PROSPECTIVE JUROR LYNCH:  I just read about it.

11           THE COURT:  You can hold the mic.  It's fine.

12  And in reading about it, I'll be instructing all members

13  of the jury, you probably appreciate that what's in a

14  newspaper report or television will be incomplete at

15  best.  It will be inaccurate at worst.  Do you feel as

16  though what you read has caused you to form an opinion

17  as to who should win in this case?

18           PROSPECTIVE JUROR LYNCH:  No.  It was just the

19  same stuff you said.

20           THE COURT:  So basically what I read as a

21  description of the case is about all you could tell me

22  about the case?  Do you remember anything about the

23  nature of the article itself?

24           PROSPECTIVE JUROR LYNCH:  It was online.

25           THE COURT:  All right.  And do you feel as

1 though you have any impression, that you have some

2 partiality as you start out my questioning?  And I'll

3 ask you some specifics as well for you to think about

4 it.

5        PROSPECTIVE JUROR LYNCH:  I don't think so.

6        THE COURT:  All right.  I want you to think

7 about that.  If something comes back as we go through

8 this, you think it might affect your impartiality, then

9 you should let me know.

10     The trial of this case will begin today, October

11 5th, and depending on a number of variables, will last

12 from one to two weeks.  This means that the trial could

13 last through next Friday, October 16th.  I should also

14 note that although next Monday, October 12th, is a

15 federal holiday, which would normally mean this court

16 would be closed, the court may opt to hold trial on that

17 day if the case is moving at a slower pace than

18 expected.  I will keep you appraised of the progress of

19 the trial for your own information and planning

20 purposes.  But you should plan on serving until the

21 16th, if necessary.

22     The trial day will generally run from 8:30 a.m.

23 until 5:30 p.m., with an hour break for lunch and a

24 short break of 15 to 20 minutes, usually about 20

25 minutes, in the morning and again in the afternoon.  You

1   will have at least an hour for lunch plus those two

2   additional short breaks.  Is there any one of you who

3   would be unable to serve as a juror during this time for

4   any reason, including vision, hearing, or other health

5   limitations?  If that applies to you, you should raise

6   your hand.  And I see one hand raised.  If you could

7   pass the mic back.

8           THE BAILIFF:  There's a problem with the mic

9   right now.

10          THE COURT:  That figures.  Why don't you -- why

11  don't you stand, it's Juror No. 4, and let me know what

12  your issue is.

13          PROSPECTIVE JUROR COLSTAD:  I'm scheduled for

14  carpal surgery on my hand next Tuesday morning.

15          THE COURT:  Okay.  I would like to excuse you,

16  but I don't know yet whether I can.  I take it that's

17  been something that had been scheduled for some time?

18          PROSPECTIVE JUROR COLSTAD:  Yes.

19          THE COURT:  And if you're not able to get in

20  then, you could be pushed back substantially so you'd

21  like to proceed.

22          PROSPECTIVE JUROR COLSTAD:  I would.

23          THE COURT:  In any event, you're ready to have

24  this done.  With all the time you've waited, you'd like

25  to have it done now.

1          PROSPECTIVE JUROR COLSTAD:  Yes.

2          THE COURT:  Are you in active pain with it?

3          PROSPECTIVE JUROR COLSTAD:  No.  I just can't

4   feel much in my hand.

5          THE COURT:  So it would be nice to have it

6   taken care of.

7          PROSPECTIVE JUROR COLSTAD:  Yes.

8          THE COURT:  And I'm not -- I'm not minimizing,

9   but in terms of your ability to follow and listen to the

10  matters in this trial, that's something you're able to

11  do.

12         PROSPECTIVE JUROR COLSTAD:  I can do that, yes.

13         THE COURT:  Okay.  I will keep it in mind.

14         PROSPECTIVE JUROR COLSTAD:  Okay.

15         THE COURT:  And if we get to the point where

16  I'm confident that we have a sufficient number, we can

17  come back to that.  But thank you very much.

18      I didn't see any other hands.  Were there any other

19  hands raised?  (No response.)  Thank you.

20      I'm now going to ask the attorneys for both sides

21  in this case to stand and introduce themselves and their

22  law firms very briefly.  And then after they're done, I

23  would ask that all counsel who are named stand and just

24  turn for a moment so that the other members of the jury

25  panel can see them.

1        And you may proceed on behalf of WARF.

2            MR. CHU:  Good morning, Your Honor.  Thank you

3    very much.  Good morning, Ladies and Gentlemen.  My name

4    is Moran Chu.  I practice with the firm Irell & Manella.

5    And I'm going to introduce a number of my colleagues who

6    may have speaking parts during the course of the trial.

7    And I'll start with my colleague Gary Frischling.  Amy

8    Proctor.  Alan Heinrich.  Jason Sheasby.  Tony Rowles

9    maybe.  And Chris -- there's another individual I do not

10   see in the courtroom at this time, Your Honor.  And

11   then --

12           THE COURT:  And Chris's last name is?

13           MR. CHU:  Abernethy.  And then we are also

14   working with Jennifer Gregor.

15           THE COURT:  Very good.  Does anyone in the jury

16   panel, including you in the back behind the bar, know

17   any of those lawyers or the law firm that was named?

18   Just raise your hand if you do.  (No response.)  Very

19   good.  Thank you.

20        And I will ask then Apple's counsel to do the same.

21           MR. LEE:  Good morning, Your Honor.  Good

22   morning, Ladies and Gentlemen.  My name is Bill Lee.

23   I'm from the law firm of Wilmer Hale.  And with us are

24   Jim Dowd, David Marcus, and there is another lawyer,

25   Jordan Hirsch, you may hear from during the course of

1   the trial.  Together with us is Cathy Cetrangolo.  And

2   that's the group of lawyers that you will hear from.

3             THE COURT:  All right.  Very good.  And I'll

4   ask the same question of the entire jury panel.  Anyone

5   who knows any of those lawyers or the law firm that was

6   mentioned?  (No response.)

7        Very good.  Then at this time I'm going to ask

8   Mr. Chu to introduce your client and corporate

9   representative.

10            MR. CHU:  Thank you very much, Your Honor.  I'd

11  like to introduce Dr. Carl Gulbrandsen, who is the

12  managing director of the Wisconsin Alumni Research

13  Foundation.

14            THE COURT:  Thank you very much.  And I'll ask

15  the same question.  Does anyone know Mr. Gulbrandsen

16  before today?  Just raise your hand.  (No response.)

17       Very good.  Let's do the same for Apple's corporate

18  representative.

19            MR. LEE:  Your Honor, I'll introduce two people

20  who are present in the courtroom.  I'm going to

21  introduce Mr. Gerard Williams from Apple, who is one of

22  the engineers who designed the products you'll hear

23  about, and Mr. Iain Cunningham, a director of litigation

24  at Apple.

25            THE COURT:  All right.  Do anyone in the jury

1   panel know either of those gentlemen?  (No response.)
2   Thank you.
3       With that then, I'm going to turn briefly to a
4   rather long list of names, and it's possible that you
5   will recognize one of these names.  If you do, it's
6   likely that they're not the same person and I realize
7   now that I may butcher a few of these names.  Usually
8   I'm better about asking about pronunciations, but I'll
9   do my best.  And counsel, correct me if the
10  pronunciation should be different.  And just raise your
11  hand if you know one of these people who may be
12  mentioned or involved in this case or called in this
13  case.
14      Murali Annavaram.  David August.  Todd Austin.
15  Peter Bannon.  Emily Bauer.  Keith Baxter.  Robert
16  Blattberg or Blattberg, B-l-a-t-t.  Scott Breach.  Is it
17  Lee Cagan?  Mark Chandler.  Robert Colwell.  Thomas
18  Conte.  Iain or Iain Cunningham.  It's I-a-i-n.  William
19  Dally, D-a-l-l-y.  Julie Davis.  James L. Day, Jr.
20  Richard Donaldson.  Jack Doweck, D-o-w-e-c-k.  Kaiann
21  Drance, D-r-a-n-c-e.  Joel Emmer, E-m-m-e-r.  David
22  Fite, F-i-t-e.  Patrick Gelsinger.  Carl Gulbrandsen,
23  who you've already heard.  Lorin Hitt.  Michael Jaynes.
24  W. Michael Johnson.  Christopher Knittel, K-n-i-t-t-e-l.
25  Knittel perhaps.  And just so you know, we're now in the

1   double A.  We started with A, we're now at double A and

2   we go to VV, so we're more than halfway.

3        Catharine Lawton.  Scott Mahlke, M-a-h-l-k-e.

4   Andreas Moshovos, M-o-s-h-o-v-o-s.  Patrick McNamara.

5   Stephan Meier, M-e-i-e-r.  Deanna Moris, formerly known

6   as Deanna Dietrich.  Trevor Mudge.  John Mylius,

7   M-y-l-i-u-s.  Mylius.  David Papworth.  Glenn Reinman.

8   It's R-e-i-n-m-a-n.  The German would be Reinman.  I

9   suppose it could be Reinman.  Jeffrey Risher.  Ronnie

10  Ronen.  We're coming down the stretch.  Gerald or Jerry

11  Shattuck.  Gurindar Sohl, S-o-h-l -- I'm sorry, Sohi or

12  Sohi.  Thank you. Simon C. Steely, Jr.  Suparn Vats.

13  David Webb.  Jayna Whitt.  Gerard Williams, the III.

14  Terani Vijaykumar.  That's probably butchered.  It's

15  Vijaykumar probably more likely.  And Adi Yoaz, Y-o-a-z.

16  I'm always amazed when you do that many names that

17  somebody doesn't at least know someone by that name.

18  Mathematically I think you get any 26 people together

19  and two of them have the same birthday and yet we don't

20  find a hand for this.

21       We're going to now move on to something which we

22  have found works well.  Hopefully all of you in the box

23  have your sheet of paper, and we're going to start with

24  Juror No. 1 asking that you just stand and describe

25  yourself using this list as a guide.  I'm going to state

1   that this is not meant to be exhaustive, but we're going
2   to ask you your name; age; city or town of residence;
3   where you were born and raised; your marital status;
4   number of children, if any; your current occupation;
5   former, if retired; the same for your spouse or domestic
6   partner; any military service, including branch, rank
7   and approximate date of discharge if it applies to you;
8   how far you went to school; major areas of study, if
9   any.  Specifically I would ask you to state in this case
10  whether you attend, attended or graduated from a
11  University of Wisconsin institution; your membership in
12  any group or organizations; hobbies and leisure-time
13  activities; favorite types of reading material;
14  favorites types of television shows, music, movies and
15  other entertainment; bumper stickers; letters to the
16  editor, or calls into radio or television shows.
17      We've come up with this list only to try to assist
18  in an efficient way the parties to sort of get a sense
19  of who you are as a person.  If you think there's
20  something else that's outside this list that may be
21  relevant or if you feel identifies you as an individual,
22  you're welcome to offer that as well.  The point is not
23  to be intrusive but to keep in mind that the parties
24  have a right to choose a panel that they think will be
25  impartial.  And so you should be as forthcoming as you

1   can in describing these factors.

2        And with that by way of introduction, we'll start

3   with Juror No. 1.

4             PROSPECTIVE JUROR BETTENHAUSEN:  My name is Sue

5   Bettenhausen.  I'm from Milton, Wisconsin, and I'm 45.

6   I was born and raised around Janesville, Wisconsin.

7        Currently married.  No children.

8        I am a marketing communications director, which is

9   kind of like a creative director.

10       My spouse is a high school art teacher.

11       No military service.

12       I am a graduate from the University of

13  Wisconsin-Whitewater with a bachelor's in marketing.

14       Any groups.  One of my hobbies is riding horses, so

15  I'm a member of a number of horse-riding organizations.

16       Favorite types of reading:  Probably kind of how-to

17  and that sort of thing.  Mostly to do with horses or

18  another hobby, race cars.

19       Television:  Kind of like a History Channel buff,

20  so American Pickers, that sort of thing.

21       And no bumper stickers or any of that sort of fun

22  stuff.

23            THE COURT:  All right.  You mentioned that you

24  were involved in marketing communications.  What kind of

25  company are we talking about?  Is it a product that

1  you're marketing or a service?

2        PROSPECTIVE JUROR BETTENHAUSEN:  We're a direct

3  marketing company, so I manage the area that produces

4  the catalogues and websites and that sort of stuff for

5  the direct marketing business.

6        THE COURT:  Can you describe the product just

7  generally.

8        PROSPECTIVE JUROR BETTENHAUSEN:  We run kind of

9  three different companies.  We do marketing materials

10  for -- one is a forestry company, one is an agriculture

11  company, and one services the towing industry.

12        THE COURT:  And is your company one that

13  services or provides marketing services for those three

14  independent entities or are they owned -- each of those

15  are owned by the company you work for?

16        PROSPECTIVE JUROR BETTENHAUSEN:  Correct, yeah.

17        THE COURT:  The latter.

18        PROSPECTIVE JUROR BETTENHAUSEN:  They have a

19  parent company.

20        THE COURT:  And you're employed by the parent

21  company.

22        PROSPECTIVE JUROR BETTENHAUSEN:  Yes.

23        THE COURT:  All right.  Do you mind mentioning

24  the name of the company?

25        PROSPECTIVE JUROR BETTENHAUSEN:  Ariens

1   Specialty Brands.

2          THE COURT:  All right.  You may be seated.  And

3   we'll go to Juror No. 2.

4          PROSPECTIVE JUROR PICKERING:  Yes.  My name is

5   Bruce Pickering.  I'm 69 years old.  I live in Beloit,

6   although I was born and raised north of La Crosse in a

7   farming community, so I'm a displaced farm kid.

8          I am presently divorced.  I have two children.

9          I'm also retired.  I worked formerly for Fairbanks

10  Morse in Beloit for 37 years.  I was in the research and

11  development engineering department.

12         I was in the military service from 1966 to 1969.

13  Well, actually 1970.  I was in the U.S. Navy in the

14  submarine service at that time.

15         I graduated high school, went to trade schools

16  before I started at Fairbanks.  Then I was under an

17  apprentice program there and then had some additional

18  education while in that apprenticeship program.  And

19  then I went to two schools while I was in the Navy for

20  the engines that we were using.

21         I'm not currently -- well, I'm in a church.  I'm in

22  Green Baptist Church.  Other than that, I'm no longer in

23  any groups or organizations.

24         Hobbies:  I've got to say pretty much involved with

25  motorcycling.  I like vintage and classic motorcycles.

1    I have a few of those and that takes a lot of my time.

2    I like to restore them and actually ride them.

3         Reading material:  Mostly motorcycle-related,

4    engineering-related, and stuff like that.  Mechanical

5    things.

6         I don't watch television.

7         I listen to a lot of music.  I like Southern Gospel

8    music probably about the best.  I have that on most of

9    the time I'm awake at home.  So other than that, that's

10   about it for me.

11        THE COURT:  Let me just ask you a little bit

12   about your work.  I take it if you were going to

13   describe an area of expertise, it would probably be

14   engines; is that right?

15        PROSPECTIVE JUROR PICKERING:  Yeah.  Engines

16   and mechanical things.

17        THE COURT:  All right.  So you haven't earned a

18   formal degree in mechanical engineering, but between all

19   of the training that you've done and the on-the-job

20   work, you would consider yourself a mechanical engineer.

21        PROSPECTIVE JUROR PICKERING:  That's correct.

22   In the research and development area.

23        THE COURT:  All right.  And what I wanted to

24   talk to you about, what is it that Fairbanks Morse --

25   what is it that they do?

1          PROSPECTIVE JUROR PICKERING:  Fairbanks Morse.

2    They're actually a major engine manufacturer -- well,

3    mostly engines.  They're a diverse company.  But in

4    Beloit, it was mostly engines, and we built engines for

5    initially railroads, for locomotives and stuff.  A lot

6    of the submarines and Navy ships had them and still have

7    them.  They're still building engines for the Navy at

8    this time.  A lot of power plants, nuclear standby

9    engines, a lot of Fairbanks Morse, and also we build the

10   Colt-Pielstick, the MAN, and one other -- ELCO engines.

11          THE COURT:  So fair to say that aside from your

12   motorcycle work, you didn't work on auto or motorcycle

13   engines, you worked on very large engines.

14          PROSPECTIVE JUROR PICKERING:  Yeah, I worked on

15   very large engines in my job, but I went to auto tech

16   school before I went to Fairbanks Morse.  And I've

17   worked on motorcycles since I was 14 years old.

18          THE COURT:  Here's the reason I'm asking:  I'm

19   asking about the research and development side.  You're

20   aware, for example, there are patents for motorcycle

21   engines and car engines.  You know about that.

22          PROSPECTIVE JUROR PICKERING:  Certainly.

23          THE COURT:  Did you do research and development

24   for anything like that or did you mainly do it for the

25   large engines on the job?

1          PROSPECTIVE JUROR PICKERING:  Yeah, I don't --
2    yeah.  I was just involved with research on the job and
3    anything that would be patented on the job.
4          THE COURT:  That's what I was going to ask you
5    about.  So were you involved in developing patents or
6    applying for patents for your company?
7          PROSPECTIVE JUROR PICKERING:  No.  Anything
8    that I worked on, was involved in, it was all
9    automatically the property of the company that I worked
10   for.
11         THE COURT:  All right.  And were you named as
12   an inventor on any patent that you know of?
13         PROSPECTIVE JUROR PICKERING:  Not that I'm
14   aware of.
15         THE COURT:  All right.  Were you -- did you
16   have any role in the application, patent application
17   process?
18         PROSPECTIVE JUROR PICKERING:  Not at all.
19         THE COURT:  So your research and development
20   amounted to what?  What did you do in terms of research
21   and development?
22         PROSPECTIVE JUROR PICKERING:  Well, I worked in
23   what was the engine lab where we did a lot of the
24   testing and the development.  But I also got into the
25   design, the testing, and then the report writing and

1  stuff like that.

2          THE COURT:  Sure.

3          PROSPECTIVE JUROR PICKERING:  And lots of times

4  we were called on, our group, to go out in the field at

5  different locations in different countries to work on

6  the newer applications that maybe were having some

7  difficulties or something along that line.

8          THE COURT:  I've got it.  Thank you very much.

9  Actually I should say two things:  One is with respect

10  to the work that you've done in developing product,

11  you're going to hear from both sides about the

12  development of technologies involving computer

13  processors.  Do you think you can listen and weigh both

14  sides' evidence as presented in the courtroom?  Not that

15  you set your common sense aside or your experience, but

16  that you will weigh the evidence here as opposed to

17  saying well, it must have worked like that because

18  that's how it worked when I did it.

19          PROSPECTIVE JUROR PICKERING:  I would certainly

20  think so.

21          THE COURT:  The other thing is I just want to

22  thank you for your service to our country, particularly

23  during a challenging time.

24          PROSPECTIVE JUROR PICKERING:  You're welcome.

25  Can I add one thing as a comment?

1          THE COURT:  Very briefly.  I hesitate because I

2     don't know what it's going to be.

3          PROSPECTIVE JUROR PICKERING:  When they landed

4     the first man on the moon, I was on short patrol on Hong

5     Kong.

6          THE COURT:  Very exciting.

7          PROSPECTIVE JUROR PICKERING:  It was.

8          THE COURT:  Juror No. 3.

9          PROSPECTIVE JUROR VAN HORN:  My name is Ben Van

10    Horn.  I'm 37 and I live here in Madison, Wisconsin.  I

11    was born and raised in Washington state in the woods.

12         I'm married with four kids.

13         Currently I do sequel reporting, crystal reports

14    for health care for a consulting company here in town.

15         My wife works for Woodman's, a local grocery store.

16         No military service.

17         I have a bachelor's in information systems from

18    Washington State University, a master's in information

19    systems from Brigham Young University in Utah.

20         I'm a Mormon.  Also I'm a member of the Project

21    Management Institute here in Wisconsin.

22         Hobbies and leisure time:  I play video games and

23    chase after kids.  That's my leisure time.  I play D&D.

24    I have to admit that, I guess.

25         Favorite type of reading material would be fantasy

1    and sci-fi.  D&D Splatbooks.

2         Favorite type of television shows:  I like Drunk

3    History, Enemies, cartoons I can watch with the kids.

4    Thank goodness they're not like Barney shows, they're

5    the teen ones like Big Hero 6 is my recent movie.

6         And I think I have an antiWalker bumper sticker on

7    my car.  My wife put it there.  I don't know what it

8    says.

9         THE COURT:  All right.  Let me ask you a little

10   bit about your education in information services.  I

11   imagine it involves some computer science courses.

12        PROSPECTIVE JUROR VAN HORN:  Yes.

13        THE COURT:  Did it mainly involve computer

14   science and computer software in managing information or

15   is it more general than that?

16        PROSPECTIVE JUROR VAN HORN:  It's mostly

17   computer and human interactions, making sure the people

18   can actually use the machines and get information out of

19   it instead of just data.

20        THE COURT:  All right.  You probably have

21   figured out, since I described it already, that part of

22   this is information processing through a processor and

23   doing it accurately.  Do you have any concerns that your

24   training might make it difficult for you to decide the

25   case based on what's presented in the courtroom as

1   opposed to your general knowledge?

2       I'm essentially asking the same kind of question I

3   posed to Juror No. 2, which is do you think that you

4   would have a tendency to view while I know how this

5   works and assume that you understand it, as opposed to

6   listen closely to the evidence and the testimony,

7   including expert testimony in the courtroom, and

8   weighing that as your basis for your decision-making?

9           PROSPECTIVE JUROR VAN HORN:  I don't think it

10  will be a problem.  I'm familiar with relation databases

11  and how they work, but even just the description of the

12  patent sounds interesting, but not something I really

13  know a lot of.

14          THE COURT:  All right.  So you feel -- at least

15  so far, and again, I'll ask you to think about this as

16  we go through the voir dire process, but so far you

17  don't think that your background is going to be such

18  that you will be partial to either side in this case.

19  Is that a fair statement?

20          PROSPECTIVE JUROR VAN HORN:  Correct.

21          THE COURT:  Thank you very much.  And we'll

22  pass the mic to Juror No. 4.  We've learned a little bit

23  about -- I don't know if you were a secretary at some

24  point or you just use the computer a lot, but that seems

25  to be the two places.

1          PROSPECTIVE JUROR COLSTAD:  No.  Piano.

2          THE COURT:  There you are.  Why don't you tell

3   us a little bit about yourself.

4          PROSPECTIVE JUROR COLSTAD:  My name is Sandra

5   Colstad.  I'm 67 years old.  I live in New Glarus.  I

6   was born in Monroe and raised in Belleville.

7          I'm married 45 years and I have three children.

8          I am not currently employed.  I was a kindergarten

9   teacher and first grade teacher for 36 years.  My

10  husband also was a teacher, middle school math and

11  science teacher, and he is also retired.

12         Neither one of us were in the military.

13         I graduated with a BS from University of

14  Wisconsin-Oshkosh in lower elementary.  I got my

15  master's in reading from University of Wisconsin-Oshkosh

16  as well.

17         I belong to the Monroe Swiss Singers.  I also

18  belong to Gilda's Club here in Madison.

19         Right now my favorite hobby, I guess, is traveling

20  and I love to read about traveling.  I also like to read

21  anything light and not too detailed right now.  I like

22  musicals and I like sitcoms that are funny.  Don't like

23  any kind of violence whatsoever.

24         The only bumper sticker I have is a Hope for a Cure

25  breast cancer on my car.

1        THE COURT:  Very good.  Thank you very much.

2   And you may pass the mic to Juror No. 5.

3        PROSPECTIVE JUROR BLANG:  Hi.  My name is

4   Michelle Blang and I'm 41.  I live in Waunakee,

5   Wisconsin.  I'm born and -- raised in Waunakee, but born

6   in Madison, Wisconsin.

7        I've been married for about three months now,

8   second marriage, and we have five children together,

9   three of which are biological and I now have two

10  stepchildren.  I should mention too I'm going through a

11  name change, so my new last name -- I'm in the process,

12  so it will be Leyer, L-e-y-e-r.

13       No military service.

14       My current occupation, I'm an executive recruiter

15  and I just started my own company in December of last

16  year.  I was formerly running a talent acquisition for a

17  Greek yogurt company called Chobani in New York.  My

18  husband is the chief operation officer for a probiotic

19  company here in the area.

20       I have a bachelor's degree from the University of

21  Wisconsin-Eau Claire.

22       Not part of really any groups or organizations.  My

23  kiddos keep me pretty busy.

24       Hobbies would include going to all of my children's

25  sporting events and things like that.  Exercising.  I

1   love to hike and bike and things like that.

2        Reading material would be very light reading.  I

3   love cooking light.  Love to cook.  And any kind of

4   mindless reading.

5        Television shows.  I would say I don't watch much

6   television or that sort of thing or watch movies, but

7   the Today Show I'll have on in the morning, Dateline,

8   and any kind of HGTV.

9             THE COURT:  I'm sorry.  Go ahead.

10            PROSPECTIVE JUROR BLANG:  And no bumper

11   stickers or call-ins or anything of that nature.

12            THE COURT:  Is there certain kinds of

13   businesses that you're a recruit executive for?

14            PROSPECTIVE JUROR BLANG:  Yeah.  Typically

15   natural and organic food and beverage manufacturing

16   companies throughout the country, including Canada as

17   well.  And then some nutraceutical companies.  I do work

18   with a probiotic company, actually my husband's company,

19   recruited several folks there.

20            THE COURT:  All right.  And in the process of

21   that, did you ever encounter individuals, I guess

22   perhaps including your husband, who were developing

23   products with -- involving intellectual property that

24   might be patented?  Is that a subject matter you really

25   got into?

1          PROSPECTIVE JUROR BLANG:  I have not.

2          THE COURT:  Even with your husband you haven't

3    talked about how he would be protecting information that

4    was developed in his company?

5          PROSPECTIVE JUROR BLANG:  Right.  I know he is

6    working with a patent attorney right now for a specific

7    function of the company and I know nothing about it, and

8    that's actually fairly recent.

9          THE COURT:  Thank you very much.  We'll go to

10   Juror No. 6.

11         PROSPECTIVE JUROR WEST:  My name is Brad West.

12   I was -- I'm 45 years old.  I was born and raised in

13   Palmyra, Wisconsin, which is just a small town.  It's

14   actually a village.

15         I'm married.  I have one daughter.

16         My current occupation is I'm a foreman of a machine

17   shop in the Village of North Prairie.  My wife is a

18   dialysis technician.

19         I have no military.

20         I went through a four-year apprenticeship program

21   to become a journeyman for tool and machining.

22         I'm not in any groups.

23         My hobbies are pretty much spent with my kid doing

24   hunting, fishing, playing a lot of baseball.

25         I don't read a whole lot.

1      And the only thing I really watch on TV is sporting

2  events.

3      THE COURT:  Your four-year apprenticeship

4  program, was that through the company?

5      PROSPECTIVE JUROR WEST:  Yes.  Yes, sir.

6      THE COURT:  And then you're qualified to belong

7  to a union or --

8      PROSPECTIVE JUROR WEST:  Journeyman.

9  Journeyman status.

10      THE COURT:  And the kind of machining that you

11  work with?

12      PROSPECTIVE JUROR WEST:  We do a lot of repair

13  work for pump companies and stuff like that.  We do some

14  crane work for -- we're a job shop, so we get jobbed out

15  from like companies like Harnischfeger and stuff like

16  that out of Milwaukee.

17      THE COURT:  And you would be repairing or

18  retooling individual parts that fit on to existing

19  equipment.

20      PROSPECTIVE JUROR WEST:  Correct.

21      THE COURT:  Very good.  Thank you.  Juror No.

22  7.

23      PROSPECTIVE JUROR ELMER:  My name is Angeline

24  Elmer and I live in Oregon, Wisconsin.  I'm 40 and thus

25  my eyes, I need bifocals.  But I'm stubborn so I haven't

1    gone to the eye doctor.  So I have to take my glasses

2    off here.

3            THE COURT:  The most important thing is you can

4    see distance and close up effectively using the glasses.

5            PROSPECTIVE JUROR ELMER:  Yes.

6            THE COURT:  Most importantly for the parties

7    who will be presenting things.

8            PROSPECTIVE JUROR ELMER:  Yes.

9            THE COURT:  Thank you.

10           PROSPECTIVE JUROR ELMER:  I currently live in

11   Oregon, Wisconsin.  I was born and raised in Brooklyn,

12   Wisconsin, so I haven't traveled very far.

13       I'm married and have three children.

14       I am currently the front desk coordinator at a

15   chiropractic clinic.  My husband is a delivery driver

16   for a liquor company.

17       I have never served in the military.

18       My bachelor's degree is in psychology and

19   complementary and alternative health, and I'm currently

20   working on a master of arts in counseling, none of which

21   are through the University of Wisconsin.

22       I'm not a member in any type of group or

23   organization.

24       Leisure-time activities is writing papers for my

25   education.

1        Favorite type of reading would be textbooks.

2        Don't watch any TV.  Listen to a wide variety of

3    music.

4        And I have no bumper stickers or any of that kind

5    of stuff.

6             THE COURT:  Thank you very much.  Juror No. 8.

7             PROSPECTIVE JUROR MARTINSON:  My name is Lisa

8    Martinson.  I was born and raised in Sun Prairie,

9    Wisconsin, which I live now.

10       I'm an attorney.  My husband is a web developer.

11       I've not served in the military.

12       I studied and graduated from the University of

13   Wisconsin-Madison for my undergrad and JD.

14       And just professional organizations -- well, I have

15   two kids and I do a lot with them and a lot of running.

16       I like to read historical fiction.  Fiction.

17       I don't really watch a lot of TV.  Listen to a wide

18   variety of music.  Mostly just kid movies right now.

19       And no bumper stickers.

20            THE COURT:  Can you tell me a little bit about

21   your own practice area.

22            PROSPECTIVE JUROR MARTINSON:  Sure.  I do

23   family law, estate planning, tax preparation, and some

24   real estate.

25            THE COURT:  Have you ever encountered

1   intellectual property in the law?

2           PROSPECTIVE JUROR MARTINSON:  No.

3           THE COURT:  Didn't take it as a course in law

4   school?

5           PROSPECTIVE JUROR MARTINSON:  No.

6           THE COURT:  In your own practice, you obviously

7   develop various areas of expertise and you also have

8   some working knowledge as to what takes place in a

9   courtroom.  You realize that your obligation will be to

10  take off that hat and to listen closely to the legal

11  instructions that I provide you and to follow those

12  instructions, even if you think I got it wrong.  It's my

13  job to establish what the law is --

14          PROSPECTIVE JUROR MARTINSON:  Yes.

15          THE COURT:  -- that you'll need to apply.  I

16  don't say that facetiously because each of us,

17  particularly if you're trained in the law, may think you

18  have a different perspective.  Similarly as a lawyer,

19  you appreciate that you're just one voice on a jury.

20  You don't bring special expertise in terms of

21  fact-finding.

22          PROSPECTIVE JUROR MARTINSON:  Right.

23          THE COURT:  You bring your common sense and

24  your own life experience.  So I don't mean to minimize

25  that, but both you and your fellow members should view

1  you as another participant in the process of

2  deliberating over facts.  You understand that.

3           PROSPECTIVE JUROR MARTINSON:  Yes.

4           THE COURT:  Any concerns about your ability to

5  play that role in this case?

6           PROSPECTIVE JUROR MARTINSON:  No.

7           THE COURT:  All right.  You mentioned your

8  husband is a web developer.  Did he have computer

9  science training of any kind?

10          PROSPECTIVE JUROR MARTINSON:  Yes.

11          THE COURT:  All right.  And where did he get

12 that?

13          PROSPECTIVE JUROR MARTINSON:  He went to the

14 University of Wisconsin and MATC here in Madison.

15          THE COURT:  All right.  And did he earn a

16 degree from the University of Wisconsin in computer

17 science?

18          PROSPECTIVE JUROR MARTINSON:  No.  His

19 undergrad was there and then he went back to school.

20          THE COURT:  I'm with you.  Has he talked to you

21 about computer processing or how computers work?

22          PROSPECTIVE JUROR MARTINSON:  Yes.

23          THE COURT:  That's come up.

24          PROSPECTIVE JUROR MARTINSON:  Yes.

25          THE COURT:  Been a source of frustration as he

1  developed webs.  You're laughing and I don't know why.

2         PROSPECTIVE JUROR MARTINSON:  I asked him

3  because I was interested.

4         THE COURT:  Sure.  Lawyers tend to ask a lot of

5  the questions.

6         PROSPECTIVE JUROR MARTINSON:  Yes.

7         THE COURT:  We may not be good at listening,

8  but we're good at asking questions.  And so in the

9  process of that -- I probably shouldn't even use that

10  term.  In listening to his experiences with computers,

11  do you think that you developed any opinions about --

12  and here we're dealing with a very specific area --

13  processing or the communication of information by the

14  software that might make it difficult for you to be fair

15  to both sides here, whether it's the University --

16  whether it's WARF or it's Apple.

17         PROSPECTIVE JUROR MARTINSON:  No.  I have not

18  developed any opinions.

19         THE COURT:  All right.  Very good.  If you

20  could be good enough to pass the mic straight down,

21  we'll go then to Juror No. 13 -- actually 14 on our

22  dance card.  If you would stand and just describe

23  yourself.

24         PROSPECTIVE JUROR EGGER:  My name is Mark

25  Egger.  I originally come from Poynette, Wisconsin,

1    about 20 miles north of here.  Me and my wife, Ruth,

2    have been married going on 37 years.  We lost our son

3    two years ago, the only child we had.

4        I went to school, technical school, back in the

5    70's, Madison Area Technical School, for auto mechanics.

6    Open doors.

7        I currently work at the Poynette School District as

8    a building and ground supervisor.

9        My hobbies include -- still include cars, which I

10   don't put bumper stickers on.  Thank you.

11            THE COURT:  Let me just ask you a couple

12   questions.  First of all, I am sincerely sorry for your

13   loss.  My mother always said, I think as a deterrent to

14   our doing anything really stupid, is that there could be

15   no greater loss, and as a father myself, I'm sure that's

16   true.

17        What I want to ask about, first I didn't hear your

18   age.

19            PROSPECTIVE JUROR EGGER:  My age is 58.

20            THE COURT:  All right.  And the nature of the

21   auto work that you did?

22            PROSPECTIVE JUROR EGGER:  It was auto mechanics

23   back then.  Things have changed.  That was back in the

24   mid 70's.

25            THE COURT:  Right.  And it was working directly

1  on individual cars, not developing product or something

2  like that.

3           PROSPECTIVE JUROR EGGER:  Correct.  Yes.

4           THE COURT:  Very good.  Thank you very much.

5  We'll go then to Juror No. 13.

6           PROSPECTIVE JUROR WEISERT:  I'm Charmain

7  Weisert.  I'm 59.  I live in LaValle, Wisconsin, which

8  is just a village as well.  Grew up in Reedsburg,

9  Wisconsin.

10      I'm married; have two children.

11      I'm a human resources generalist.  I've done that

12  my entire life, my career.  My husband is a maintenance

13  supervisor at a large printing company.

14      I do not have military service.

15      I had two years at U.W.-Baraboo and then went on

16  and got my bachelor's degree in organizational

17  management from Viterbo.

18      I'm not really involved in any memberships.  I do

19  volunteer.  My husband is a veteran, so I volunteer with

20  his legion.

21      Hobbies and leisure times:  I spend time with my

22  little grandson and ride bike and walk and garden.

23      And favorite readings would be anything cooking

24  basically.  I enjoy that.

25      Not a big television watcher as well.  Maybe Buying

1  Alaska or something like that.

2      I do not -- I listen to Wisconsin Public Radio all

3  the time.  That would be my entertainment.

4          THE COURT:  Could you just tell me in human

5  resources, you said human resources generalist, the

6  kinds of company you generally would work for.

7          PROSPECTIVE JUROR WEISERT:  Right now I work

8  for manufacturing.  It's customized welders.  Prior to

9  that I worked with nurses and social workers.  A bank --

10  I worked in the banking industry for a while.

11          THE COURT:  All right.  You or your husband

12  ever involved in intellectual property work?

13          PROSPECTIVE JUROR WEISERT:  No.

14          THE COURT:  Thank you very much.  And pass the

15  mic to Juror No. 12.

16          PROSPECTIVE JUROR COURTNEY:  I'm Michael

17  Courtney.  45.  I live in Janesville, Wisconsin.  Born

18  and raised in Milton, Wisconsin.

19      Married with two children.

20      I am a lead CNC programmer for Prent Corporation.

21  My wife works for Van Gelders travel agency as a tour

22  planner.

23      No military service.

24      Attended U.W.-Whitewater for two years,

25  pre-engineering.

1    Membership in a 12-person whiskey bottle club.

2    And I curl for a hobby, ice curling.

3    Favorite types of reading material used to be

4  science fiction, fantasy.  Don't really dab in that too

5  much anymore.

6    We DVR like four different TV shows and we get to

7  them eventually.  Mostly comedy.

8    Bumper stickers:  Only have my bottle club

9  membership sticker and hockey sticker.  That's about it.

10    THE COURT:  Your programming work in -- is it a

11  large print company or smaller one?

12    PROSPECTIVE JUROR COURTNEY:  It's for a

13  packaging -- we do thermoforming packaging.

14    THE COURT:  All right.  So you're dealing with

15  the computer modeling or the creation of the

16  instructions to the machine.  Is that fair?

17    PROSPECTIVE JUROR COURTNEY:  Yeah.  Basically

18  we use software to create CNC tool paths, set it up on

19  the CNCs and create the parts there.

20    THE COURT:  All right.  Obviously part of this

21  case is going to be about software.  Do you have any

22  concerns that your own experience may get in the way of

23  your ability to listen closely to the evidence as

24  presented and decide based on that evidence?

25    PROSPECTIVE JUROR COURTNEY:  I don't know if

1  now is the time, but I do have a concern.  Am I exempt

2  from nondisclosure agreements here?

3        THE COURT:  You would be subject to some

4  disclosure obligation that I would instruct the jury on

5  as a whole.  If what you're asking is can I disclose

6  something now that would otherwise be subject to

7  confidentiality, we'll do that at sidebar.  Do you think

8  there is something you need to disclose?

9        PROSPECTIVE JUROR COURTNEY:  Maybe.

10        THE COURT:  Why don't we do that now.  It will

11  just take a moment, if you could step down and just come

12  over to the far corner of the courtroom.  And counsel

13  may join me.

14     (Discussion at sidebar at 10:12 a.m.)

15        THE COURT:  This won't be heard by others as

16  long as you speak into this mic.

17        PROSPECTIVE JUROR COURTNEY:  As long as I speak

18  in it?

19        THE COURT:  Into it, yeah.  Can you tell me

20  what -- you obviously think there's something maybe

21  relevant by virtue of the work you've done; is that

22  right?

23        PROSPECTIVE JUROR COURTNEY:  Correct.

24        THE COURT:  I will instruct you that you are

25  obligated to answer truthfully relevant information to

1    assist the parties here in deciding whether you could be
2    impartial.  So to the extent that you feel bound by some
3    obligation, this portion of the record will be put under
4    seal.  It would only be available for use by the parties
5    during the course of trial and we will keep it
6    confidential or on appeal.
7         (Herein begins sealed portion of transcript.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14          (Sealed portion of transcript)
15
16
17
18
19
20
21
22
23
24
25

1

2          (Herein ends sealed portion of transcript.)

3               THE COURT:  I'm just going to ask you to go

4     back then at this point.  Thank you.

5          (End of sidebar discussion at 10:15 a.m.)

6               THE COURT:  And we will then move to Juror No.

7     11.

8               PROSPECTIVE JUROR BURNS:  Hi.  I'm Brianna

9     Burns.  I'm 28 years old.  I currently live in Sun

10    Prairie, but I was born and raised in Madison.

11         I'm single.  I do have a 5-year-old daughter.

12         I work in customer service at WPS Health Insurance.

13    I've been there for eight years.

14         No military service.

15         I'm currently also a full-time student at MATC for

16    supervisory management.  I do intend to get my

17    bachelor's from U.W.-Madison or another U.W. school next

18    year.

19         I'm a member of Phi Beta Kappa and I also run a

20    women's Bible study group.  Not a lot of leisure time,

21    so most of that is spent with my daughter.  Reading is

22    mostly textbooks these days or my Bible study book.

23         Don't watch a lot of TV.

24         I do have a Badger bumper sticker and 102.5 bumper

25    sticker.

1          THE COURT:  I will ask others about this more

2   generally, but I haven't done it.  But because you have

3   a Badger sticker on your bumper, the University of

4   Wisconsin, both because the inventors were either

5   working there or going to school there, as well as the

6   fact that WARF gets inventions from the University of

7   Wisconsin system may influence some members of the jury

8   panel.  Do you think that you would consider that and

9   that you might favor WARF, Wisconsin Alumni Research

10  Foundation, over Apple in this case?  Is that a concern

11  to you?

12          PROSPECTIVE JUROR BURNS:  I don't think so.

13  Obviously I grew up in Madison so I'm a fan of U.W.

14  system schools.  But I also use a lot of Apple products,

15  so I think I favor both.

16          THE COURT:  And that's fair.  I will instruct

17  all of you, I'll come back to this for everyone, but to

18  think about whether you have a sense of affiliation,

19  whether to Apple or to University of Wisconsin, that

20  might influence your ability to be impartial and to just

21  be honest about that with yourself and with the parties.

22      Thank you.  You may sit down.  And we'll go to

23  Juror No. 10.

24          PROSPECTIVE JUROR POTHOF:  Hi.  My name is Jeff

25  Pothof.  I'm 37 years old and I grew up in Randolph,

1  Wisconsin, a little town about 40 miles north of

2  Madison.  Currently I live in Waunakee, Wisconsin.

3       I'm married to my wife.  We have two children, a

4  four-year-old, and an 18-month old.

5       Current occupation:  I'm currently a faculty

6  physician at the University of Wisconsin Hospital on the

7  Department of Emergency Medicine; serve as the vice

8  chair of quality and operations for the department.

9  Also have a small appointment with the William S.

10 Middleton Veterans Hospital as their interim VA Service

11 Chief of Emergency Medicine.  And also I function as a

12 flight physician for the University of Wisconsin Med

13 Flight.

14      No military service.

15      My wife is in elementary education.  She currently

16 stays home with the children; has her master's in school

17 counseling and did a little bit of school counseling in

18 the DeForest School District a couple years ago.

19      As far as my education, I went to undergrad at

20 Edgewood College here in Madison; obtained my MD from

21 the University of Wisconsin School of Medicine in public

22 health.  Did my specialty training in emergency medicine

23 at the University of Michigan Health System in Ann

24 Arbor, Michigan, and while there did a brief scholarship

25 program in health care administration.

1    I'm a member of the American College of Emergency

2    Physicians; serve on a couple of their committees, both

3    their quality and performance committee, and then also a

4    chair elective there, quality improvement and patient

5    safety section.  So do some work with like quality and

6    health care.

7    As far as leisure activities in the small bit of

8    time I have left, I like to get outside, do hunting,

9    fishing, boating, hang out with the girls, and things

10   like that.  Don't spend a lot of time watching t.v., but

11   the wife and I are trying to get through Game of

12   Thrones.

13   And I don't have any bumper stickers and I don't

14   call in to radio shows.

15           THE COURT:  Let me just ask you a little bit.

16   Do you have an understanding of the current relationship

17   between the University of Wisconsin Hospital and Clinics

18   and the University of Wisconsin?

19           PROSPECTIVE JUROR POTHOF:  So --

20           THE COURT:  It changed.

21           PROSPECTIVE JUROR POTHOF:  -- it just changed.

22   Essentially as it pertained to me, the hospital was

23   separate.  We were both --

24           THE COURT:  I'm just asking about you have a

25   general understanding.

1          PROSPECTIVE JUROR POTHOF:  I have a general

2     idea of how it was and how it's going to be.

3          THE COURT:  So it's a little less closely

4     affiliated.  Certainly it's different in terms of your

5     employer.

6          PROSPECTIVE JUROR POTHOF:  Right.

7          THE COURT:  Do you have -- you graduated from

8     the U.W.  Do you have any concerns about your ability to

9     be impartial to both sides here; in other words, not to

10    come with any sense that you would like an outcome

11    favorable to the University of Wisconsin system?

12         PROSPECTIVE JUROR POTHOF:  Sure.  I think not.

13    I mean it's a big university.  I've had nothing at all

14    to do with WARF.

15         THE COURT:  All right.  And that's what was

16    going to be my next question.  Have you ever been

17    involved in any kind of patenting of an idea or

18    protection of intellectual property for the University?

19         PROSPECTIVE JUROR POTHOF:  No, nothing like

20    that at all.

21         THE COURT:  Or for the hospital.

22         PROSPECTIVE JUROR POTHOF:  Nothing.

23         THE COURT:  Thank you very much.  And we'll go

24    to Juror No. 9.

25         PROSPECTIVE JUROR LYNCH:  My name is Courtney

1  Lynch.  I'm 38 years old and I reside in Janesville,

2  Wisconsin.  I was born and raised in Schofield,

3  Wisconsin, which is just outside of Wausau.  I've been

4  married for ten years with no children.

5       I am currently an inside sales supervisor with nine

6  people for two different companies.  My husband is a

7  warehouse worker for a dairy supply company.

8       No military service.

9       I have a bachelor's degree in psychology from the

10  University of Wisconsin-Whitewater.  In January I will

11  be returning to Whitewater for a degree in HR.  I took

12  two classes online through University of

13  Wisconsin-Madison for library science a few years ago.

14       I'm a member of a book club and a red hat

15  organization.

16       My hobbies are mostly reading and sports.

17       I enjoy true crime and all kinds of mystery novels.

18       Favorite types of TV shows is also the NCIS,

19  Criminal Minds-type shows.  All kinds of movies.  Lots

20  of different music.  And we are season ticket holders

21  for the Badgers.

22            THE COURT:  Inside sales meaning that you deal

23  with the people who go out into the field to make sales?

24            PROSPECTIVE JUROR LYNCH:  No.  My sellers stay

25  inside and they just make a high volume of outbound

1  calls to our existing catalogue customers.

2          THE COURT:  I'm with you now.  And you

3  supervise what it is they're doing.

4          PROSPECTIVE JUROR LYNCH:  Yep.  I make sure

5  that they're hitting their call metrics, they're

6  following the objectives we set forth for the calls that

7  they're making.

8          THE COURT:  All right.  And do you work with

9  software substantially in that role?

10          PROSPECTIVE JUROR LYNCH:  We have an operating

11  system that we use every day.

12          THE COURT:  But it's mainly just entering data

13  into it.

14          PROSPECTIVE JUROR LYNCH:  Yeah.

15          THE COURT:  You wouldn't be involved in

16  following up or modifying the software.

17          PROSPECTIVE JUROR LYNCH:  I sort of am involved

18  in that process.

19          THE COURT:  In a small company you can have

20  lots of roles.

21          PROSPECTIVE JUROR LYNCH:  It's a new system to

22  us and so we're involved in making -- if this doesn't

23  work, let's fix it.  I have done some testing.

24          THE COURT:  Sure.  In that capacity, you've

25  seen probably both the strengths and weaknesses of

1    software.  Do you think you can set any preconceived

2    notions about that aside and listen to the evidence as

3    presented in this courtroom and make a decision based on

4    the evidence in the courtroom?

5           PROSPECTIVE JUROR LYNCH:  Yes.

6           THE COURT:  All right.  You say that fairly

7    confidently.  You don't have any reason to think

8    otherwise.

9           PROSPECTIVE JUROR LYNCH:  No.

10          THE COURT:  All right.  Good.  You may be

11   seated.  Thank you very much.  And I'm now going to ask

12   some questions that are specific to the box.  I would

13   really stress for Members of the Jury -- and if you're

14   not a Member of the Jury, you shouldn't be sitting in

15   the left corner of the courtroom.  But I would ask for

16   you who are Members of the Jury if you could keep in

17   mind the questions that I asked.  Try to remember if you

18   would have answered yes or raised your hand with respect

19   to a question, because if you're called forward, while I

20   will try to assist you, it's very helpful if you keep in

21   mind questions that came up that would have applied to

22   you.

23       Now, for people who are in the jury box at this

24   moment, my questions originally will just go to your own

25   court experience.  How many of you have been a party to

1  a lawsuit, either a plaintiff or a defendant in a

2  lawsuit?  If that applies to you, just raise your hand.

3  (No response.)  Thank you.

4      How many of you have ever been a witness to a

5  lawsuit?  That would include having your deposition

6  taken as part of a lawsuit.  I see one hand.  Why don't

7  we -- I don't know how close the mic is to you, but

8  Juror No. 10.  Was this in relation to your work in the

9  emergency area?

10         PROSPECTIVE JUROR POTHOF:  Yes.  It was back in

11  Ann Harbor, Michigan, where I was an expert witness for

12  a couple cases that were taken to trial.

13         THE COURT:  Okay.  So this didn't involve any

14  of your -- you weren't a fact witness, you were an

15  expert witness.

16         PROSPECTIVE JUROR POTHOF:  Correct.

17         THE COURT:  And in that capacity, you were

18  retained by a party to a lawsuit?

19         PROSPECTIVE JUROR POTHOF:  I think so.  I mean

20  they just called me in and had me testify in front of

21  the jury.

22         THE COURT:  And you were paid some fee for

23  that.

24         PROSPECTIVE JUROR POTHOF:  Small amount of

25  money, yeah.

1    THE COURT:  I didn't mean to imply otherwise, I

2    just wanted to know.  And in that role, you were given

3    certain information and then developed some opinions, I

4    assume medical opinions.

5    PROSPECTIVE JUROR POTHOF:  A lot of it was more

6    the facts pertaining to the case and how the injuries

7    could have occurred, not necessarily an opinion on a

8    specific medical process or something like that.

9    THE COURT:  Understood.  But it was with

10   respect to your medical judgment as to what injuries may

11   have been caused by the accident or --

12   PROSPECTIVE JUROR POTHOF:  Right.

13   THE COURT:  All right.  And there are going to

14   be experts testifying in this case for both sides.  Do

15   you think you can listen to their testimony as given on

16   the stand and not necessarily identify with them, given

17   that you've had the experience?  Can you -- you're going

18   to hear both sides, so I guess what I'm really most

19   concerned about is whether you would identify with an

20   individual expert if you felt like their experience was

21   similar to your own.

22   PROSPECTIVE JUROR POTHOF:  Yeah, I don't think

23   so.  It seems like such a very different topic too.  I

24   don't think so.  It would be almost completely foreign.

25   THE COURT:  All right.  Did you actually have

1    your deposition taken in the case that you -- or the

2    cases that you worked on as an expert?

3            PROSPECTIVE JUROR POTHOF:  I'm trying to

4    remember.  I think for one no, and for the other one I

5    think there was.  I remember sitting at a table with a

6    bunch of lawyers.

7            THE COURT:  All right.  And someone was taking

8    it down as the court reporter is here?

9            PROSPECTIVE JUROR POTHOF:  No, it wasn't

10   actually in the courthouse.  It was just in some

11   conference room.

12           THE COURT:  There wasn't a video or there

13   wasn't a court reporter?

14           PROSPECTIVE JUROR POTHOF:  I don't think, just

15   people writing down on notepads.

16           THE COURT:  Fair enough.  And you never

17   testified at trial.

18           PROSPECTIVE JUROR POTHOF:  I testified at trial

19   in one, and I think the other one it was whatever

20   happens before trial.

21           THE COURT:  All right.  Anything about that

22   experience that you found particularly positive or

23   negative, without going into it?

24           PROSPECTIVE JUROR POTHOF:  No.  I'd say I'm

25   pretty neutral about the whole thing.

1          THE COURT:  And again, you don't think it would

2    have an impact on your ability to weigh the evidence as

3    provided, both the fact witnesses and the expert

4    witnesses who testified at trial; that you understand

5    your obligation is to weigh that evidence and make a

6    decision based on what's presented in the courtroom.

7          PROSPECTIVE JUROR POTHOF:  Correct.  I don't

8    think I'd be influenced.

9          THE COURT:  All right.  I didn't see any other

10   hands with respect to being a witness.  So let me just

11   ask of the group as a whole how many of you have served

12   previously on a jury?  Just raise your hand if you

13   served on a jury before.  (No response.)  Thank you.

14       These questions are going to be a little bit more

15   pointed.  They relate to this case.  When I say pointed,

16   I don't mean particularly intrusive.  Most of them are

17   not.  If you find any question that seems to you

18   something that you personally find intrusive, as you've

19   seen we have the capacity to have a discussion at

20   sidebar with white noise that lets us just make a record

21   of that discussion without sharing it with everyone else

22   and I'm happy to do that with respect to any of these

23   questions if you identify yourself, and at that point

24   you want to discuss it at sidebar, I'm happy to do it.

25       How many of you regularly use a computer?  That's

1    pretty much a home run.  And how many of you use a

2    computer every day?  Every week?  So I guess that's a

3    home run at that point.

4         How many of you would say that you read technology

5    magazines or follow technology news or trends?  Again, I

6    just ask you to raise your hand if that applies to you.

7         All right.  And let me go back to Juror No. 3, if

8    you could pass the mic back.  Can you just describe the

9    kinds of technology that you follow.  It could be all

10   kinds, which would be fine.  When you answered yes to

11   the question or raised your hand, what was it that you

12   were answering yes to?

13             PROSPECTIVE JUROR VAN HORN:  I read slash.org,

14   which is a technology website.  They bring up any type

15   of tech news.  Usually I kind of skip over -- I guess I

16   focus mostly on privacy issues and anything that's

17   happening in space right now.

18             THE COURT:  All right.  If it were on a

19   specific computer coming out, would that be likely

20   something that would catch your attention?

21             PROSPECTIVE JUROR VAN HORN:  I would skip that.

22             THE COURT:  Okay.  I think I'll stop there then

23   unless there's something about that you think would

24   influence you here.  I will admonish everyone on the

25   jury during the course of the trial that's not something

1  you would be able to do.  You just simply couldn't look

2  at technology websites.  It just wouldn't be

3  appropriate.  And would you have a problem with that?

4         PROSPECTIVE JUROR VAN HORN:  It would be sad.

5  But no, I would not have a problem.

6         THE COURT:  Very good.  If you'd pass the mic

7  forward, I think there was one other individual who

8  identified themselves.  Thank you.  Juror No. 14.

9         PROSPECTIVE JUROR EGGER:  I do a lot of online

10  research for automobiles, what's up and coming, the

11  usual magazines:  Hot Rod, Car Craft, all of that.

12         THE COURT:  Just looking for car trends.

13         PROSPECTIVE JUROR EGGER:  Correct.

14         THE COURT:  Okay.  You probably could continue

15  to do that during this trial, although I'll instruct

16  everyone as to the proper way to think about looking at

17  material.  Very good.

18      Was there anyone else who raised their hand?  (No

19  response.)  Thank you.

20      I'm going to ask you about a number of areas, and

21  some of this you would have already identified during

22  your descriptions of yourselves, but I'm going to just

23  confirm it.  Do you or someone close to you have any

24  education, training or work experience in any of the

25  following areas?  And I'm just going to mention each one

1  and have you raise your hand if this applies to you.

2      Do you have any education, training or work

3  experience in computer programming?  Just raise your

4  hands.  I see two hands.  I think we have the mic here,

5  so if you pass it straight back.  Juror No. 8.  And your

6  experience is?

7          PROSPECTIVE JUROR MARTINSON:  It isn't mine,

8  just my husband's experience and his education.

9          THE COURT:  And you're right to identify that

10  and we've talked a little bit about him as a web

11  developer and computer courses he would have taken.

12          PROSPECTIVE JUROR MARTINSON:  Um-hmm.

13          THE COURT:  Anything more about that that you

14  think may apply or that would influence you during the

15  course of this trial?

16          PROSPECTIVE JUROR MARTINSON:  I guess maybe

17  just his opinions about programming and privacy issues

18  and how technology has developed in the last so many

19  years.

20          THE COURT:  It doesn't sound like any of those

21  opinions would apply directly to this case.  But do you

22  have concern that they may have some influence on how

23  you think about the technology or your ability to be

24  impartial in deciding the issues that are presented to

25  you here?

1          PROSPECTIVE JUROR MARTINSON:  To be honest, I

2    think maybe I would be -- I'd have to clear my mind of

3    maybe thinking a little too much about like Big Brother

4    kind of issues and stuff like that, but I don't

5    necessarily know that that's it.

6          THE COURT:  I doubt very much that that will be

7    an issue, but I suppose in the sense that we come ever

8    more capable of moving lots of information and seeing

9    it, I suppose it resonates.  In this case, both sides

10   are claiming to have been concerned with advancing that

11   ability, so I don't know that you would fall one or the

12   other.

13         PROSPECTIVE JUROR MARTINSON:  Right.

14         THE COURT:  But is that a concern to you?  Do

15   you think it would influence your ability to listen to

16   the testimony and to weigh it as I instruct you,

17   including as I instruct you on the law?

18         PROSPECTIVE JUROR MARTINSON:  No, but it's

19   something that I am concerned about.  I'm trying to be

20   honest.

21         THE COURT:  Yeah.  Which is what you should be

22   doing.  If I appear to be anything other than grateful

23   for your raising the issue, each of you should raise any

24   concerns you have at this point.  That's fair to the

25   parties and to the system of justice that we're all a

1    part of.

2        But I understand you would have -- you can't help

3    but have concerns about privacy and loss of privacy in

4    our modern culture.  What I'm asking is do you have any

5    reason to think, aside from the fact it's going to be in

6    the back of your mind, that it would tip the balance

7    between how you would feel about either side in this

8    case?  Or can you be impartial and decide based on the

9    law as I give it to you and the evidence as presented?

10            PROSPECTIVE JUROR MARTINSON:  Yes.

11            THE COURT:  All right.  Thank you.  You can

12    pass the mic to your right.  And we've talked a little

13    bit with Juror No. 3 about his own background.  Anything

14    more you would add to that?

15            PROSPECTIVE JUROR VAN HORN:  I started out

16    college as a computer science major, so I don't -- I

17    can't say I can currently program, but I did learn how

18    to program in CE, C++, CORBAL, just the basic.

19            THE COURT:  So you have background in those

20    areas.

21            PROSPECTIVE JUROR VAN HORN:  Yes.

22            THE COURT:  This will go, I think it's fair to

23    say, well beyond that sort of understanding.  But it

24    doesn't mean that you won't bring some of that to the

25    table, which may assist you in understanding, but may

1  also get in the way.  To the extent that the evidence in

2  the courtroom controls, do you think you'll allow it to

3  do that?  In other words, the facts presented here in

4  the courtroom are what control, not your own general

5  understanding of how computer science or programming

6  works.

7          PROSPECTIVE JUROR VAN HORN:  I believe so, yes.

8          THE COURT:  All right.  Is there any hesitation

9  about that?

10          PROSPECTIVE JUROR VAN HORN:  I'm trying to

11 think how to put it in words.  I don't think there's

12 going to be, but I've been spending the last seven years

13 working with doctors and nurses and management and that

14 group, and trying to explain how programming works to

15 them.  And so getting -- and getting feedback back from

16 them how they think it works, and I spend a lot of time

17 summing it down to saying sure, let's go with that as

18 opposed to actually giving them --

19          THE COURT:  Really -- they're really --

20          PROSPECTIVE JUROR VAN HORN:  Technically that

21 doesn't work that way.

22          THE COURT:  Right.

23          PROSPECTIVE JUROR VAN HORN:  So I do believe

24 that I can follow feedback, especially from an expert

25 witness or expert testimony or something.  But I do take

94

1   issue at times with it being dumbed down too much.

2            THE COURT:  So your concern would be is if they

3   try to make an analogy that you don't think is very

4   accurate, that you may not agree with it.

5            PROSPECTIVE JUROR VAN HORN:  Or if someone says

6   that you can't connect to a database when like, well,

7   yeah, you can connect to the database.

8            THE COURT:  So you bring that experience.  If

9   both sides present evidence and it's consistent; in

10  other words, both sides' experts say this is how it

11  works and it's inconsistent with how you believe it

12  works, you understand your obligation is to weigh the

13  evidence in the courtroom, not bring some background

14  that you have.

15           PROSPECTIVE JUROR VAN HORN:  Oh, in that case,

16  totally.  I mean if both sides agree, you've got to go

17  with what the expert says even if it --

18           THE COURT:  Seems inconsistent with your

19  experience.

20           PROSPECTIVE JUROR VAN HORN:  Correct.

21           THE COURT:  All right.  Why don't you pass the

22  mic to the right.  We're talking about computer

23  programming involvement.

24           PROSPECTIVE JUROR PICKERING:  Right.  I did

25  have a short course at a technical school, a six-week

1  night course on PLC programming.  Didn't get in too

2  deep.  Did very, very basic stuff, so I really don't

3  understand a whole lot about it.

4          THE COURT:  Thank you.  Was there anyone else?

5  (No response.)

6      I'm going to ask the same question:  This is you or

7  someone close to you have any education, training or

8  work experience in the area of information technology.

9  Anything more than we've already talked about?  Juror

10  No. 3.

11          PROSPECTIVE JUROR VAN HORN:  No.

12          THE COURT:  I would apply that to everyone

13  here.  Anything more than what we've already talked

14  about?  (No response.)  All right.  And I don't see any

15  hands.

16      So we're going to go to you or someone close to you

17  having education, training or work experience in

18  microarchitecture.  (No response.)  I see no hands.

19      The same question.  You or someone close to you,

20  education, training or work experience with accounting.

21  As part of your -- well, let's just explore it.  If you

22  could pass the mic down to Juror No. 11.

23          PROSPECTIVE JUROR BURNS:  I'm in an accounting

24  class currently.

25          THE COURT:  Okay.  So you're taking accounting,

1   basic accounting.  Some of the issues here may be fairly

2   sophisticated accounting.  It's the parties' job to make

3   it understandable, but do you have any concern that your

4   limited experience might get in the way of listening to

5   that evidence and deciding on that evidence?

6           PROSPECTIVE JUROR BURNS:  No.

7           THE COURT:  You can pass the mic then to the

8   far left.  And I'll ask the same question of Juror No.

9   14.

10          PROSPECTIVE JUROR EGGER:  My wife was in

11  banking for 35 years.  She has since retired.  Does my

12  budget for home.

13          THE COURT:  Anything about that experience

14  would cause you concern about your ability to listen

15  other than she'd be better at following that than you?

16          PROSPECTIVE JUROR EGGER:  Correct.  No, I don't

17  believe it would make a difference.

18          THE COURT:  Very good.  The next question is as

19  to training, education or work experience in the law.

20  And obviously Juror No. 8 has already explained her

21  involvement personally.  But anyone else have education,

22  training or work experience in the area of law,

23  including someone close to you?  (No response.) Thank

24  you.

25          The last area is engineering, and I've heard from a

1   number of people about their own background with

2   engineering.  So let me just focus.  Other than as

3   you've already described, do you or someone close to you

4   have any education, training or work experience in the

5   area of engineering?  (No response.)  Thank you.

6        This sort of goes to the whole area of product

7   development and invention.  Have you or someone close to

8   you been involved in the development of a new product or

9   invention?  Just raise your hand if you or someone close

10  to you has been involved in the development of a new

11  product or invention.  Yes, sir.

12       PROSPECTIVE JUROR PICKERING:  What we

13  previously discussed.

14       THE COURT:  Okay.  Anyone else?  Juror No. 2 is

15  indicating that we've already discussed your level of

16  involvement.  Anyone else?  Yes.  This has to do with

17  the probiotic -- development of probiotic.  Beyond what

18  you already discussed, anything else?

19       PROSPECTIVE JUROR BLANG:  Nothing other than

20  that.  Just my husband develops -- he's the science guy

21  behind the products.

22       THE COURT:  Understood.  Was there anyone else?

23   (No response.)  All right.  I assume by that answer

24  that you or someone close to you -- is there anyone who

25  has personally or someone close to them applied for a

1  patent, been listed as an inventor on a patent

2  application or owned a patent?  Raise your hand.  I

3  guess we really haven't talked about your own

4  involvement with patents.

5        PROSPECTIVE JUROR PICKERING:  I had a close

6  friend that developed a product on his own and had a

7  patent on it, and I think I was a cosigner on it or

8  something like that.  And I don't really understand a

9  whole lot about it.

10        THE COURT:  Do you know what happened to that

11  patent?  Was it ever --

12        PROSPECTIVE JUROR PICKERING:  Oh, yeah -- well,

13  that I don't know, if it ever was actually approved or

14  not, but...

15        THE COURT:  He applied for one.

16        PROSPECTIVE JUROR PICKERING:  Yeah.

17        THE COURT:  Very good.  Anything about that

18  experience you think would influence your ability to be

19  impartial here?

20        PROSPECTIVE JUROR PICKERING:  Not at all.

21        THE COURT:  All right.  It's a very similar

22  question:  Have you or someone close to you had dealings

23  or experience with the United States Patent and

24  Trademark Office?  (No response.)  Thank you.

25        Has any -- have you or someone close to you been

1    involved in legal action concerning patents?  (No

2    response.)

3        This is even more general.  Does your employer own

4    patents?  If your employer owns a patent, just raise

5    your hand.  All right.  As far as you know, if you think

6    they may own a patent, raise your hand so I just see

7    everyone's hands up.  I see three hands up.

8        Let's go first to Juror No. 10.  And I don't know

9    where the mic is.

10            PROSPECTIVE JUROR POTHOF:  Just under the

11   assumption that University of Wisconsin Hospitals and

12   Clinic and their associated kind of entities probably

13   own some patents.

14            THE COURT:  But you don't know what role they

15   may play in the business and you've had no involvement.

16            PROSPECTIVE JUROR POTHOF:  That's correct.

17            THE COURT:  Very good.  You can pass the mic to

18   your left.  Juror No. 12.  This has to do with the

19   printing corporation?

20            PROSPECTIVE JUROR COURTNEY:  I actually print

21   -- they're a plastic packaging corporation.  So their

22   patents deal with designs of packaging.

23            THE COURT:  All right.  Do you know are the

24   patents a significant part of the business?

25            PROSPECTIVE JUROR COURTNEY:  No, they're not.

1          THE COURT:  All right.  Very good.  And you can

2    pass the mic to Juror No. 13.

3          PROSPECTIVE JUROR WEISERT:  I work with, not

4    directly with, but with engineers and when we hire

5    people, they have to sign off on a confidentiality and

6    we have a policy that if they would develop --

7          THE COURT:  It would be assigned to --

8          PROSPECTIVE JUROR WEISERT:  -- a patent and how

9    to approach it, that kind of thing.

10         THE COURT:  Have you personally been involved

11   in that at all?

12         PROSPECTIVE JUROR WEISERT:  Nope.

13         THE COURT:  Do you know how important patents

14   are to the business as a whole?

15         PROSPECTIVE JUROR WEISERT:  I would imagine it

16   is important, but I --

17         THE COURT:  You have no personal knowledge.

18         PROSPECTIVE JUROR WEISERT:  Right.

19         THE COURT:  Does anyone here -- and this is a

20   very general question, so I'd ask you to think about it.

21   Does anyone in this group have strong opinions, whether

22   negative or positive, about patents generally or the

23   American patent system specifically?  So strong views,

24   positive or negative, about patents generally or the

25   patent system specifically.  (No response.)  Thank you.

1        Does anyone have a strong opinion, whether positive

2   -- I'm sorry, we do have a hand up.  I apologize.  And I

3   appreciate your holding it up and calling it.  If at

4   least the court security officer is good enough to see

5   it, we'll be fine.

6            PROSPECTIVE JUROR VAN HORN:  Sorry to keep

7   taking the mic.

8            THE COURT:  No, no, no.  It's understandable.

9   You have opinions.  Would you say they're positive,

10  negative, or having to do with privacy issues that you

11  talked about before?

12           PROSPECTIVE JUROR VAN HORN:  I think they're

13  too long personally.

14           THE COURT:  The patents themselves, how the

15  descriptions are too long?

16           PROSPECTIVE JUROR VAN HORN:  No, the extent of

17  time they're given are too long.

18           THE COURT:  Okay.  In the United States, the

19  length of the patent life is too long.

20           PROSPECTIVE JUROR VAN HORN:  Right.

21           THE COURT:  Would that influence you, do you

22  think, in deciding the issues in this case?

23           PROSPECTIVE JUROR VAN HORN:  No.  Because it's

24  over a patent that already exists.

25           THE COURT:  And it is the law.

1          PROSPECTIVE JUROR VAN HORN:  Correct.

2          THE COURT:  And you understand your obligation

3     would be to follow that as I instructed it.

4          PROSPECTIVE JUROR VAN HORN:  Absolutely.

5          THE COURT:  Was there anyone else who had

6     raised their hand?  (No response.)

7          I'm going to ask a similar kind of broad question.

8     I'd ask you to think about it.  Does anyone have a

9     strong opinion, whether positive or negative, about

10    large corporations?  So the very fact that they are

11    large, positive or negative.  (No response.) Thank you.

12         Should the evidence support it, would anyone have

13    any difficulty finding a patent valid or awarding

14    substantial monetary damages in this case if the

15    evidence supported it?  Again, raise your hand.  (No

16    response.)

17         Similarly should the evidence support it, would

18    anyone have any difficulty in finding a patent invalid

19    or in awarding zero damages?  Again, raise your hand.

20    (No response.)

21         Thank you.  At this time it's Juror No. 4,

22    Ms. Colstad, is it?  I'm going to excuse you and ask you

23    to sit at the back of the courtroom and we're going to

24    call forward another juror.  I would have done it

25    sooner, but I never know until we go through the voir

1    dire process which way it's going to turn.

2           THE CLERK:  Taking her seat will be Michael

3    Benesh.

4        (Prospective Juror Colstad excused at 10:44 a.m.)

5           THE COURT:  Mr. Benesh, I'd ask you to come

6    forward and sit in Ms. Colstad's seat.  Unfortunately

7    that means you have to negotiate your way through a

8    little bit.  It's unusual to get this far without having

9    a few people identified, which may be my fault, or it

10   may be that the matter is as straightforward as it

11   appears to the parties.  So I'm going to unfortunately

12   ask you to stand right away and introduce yourself.  If

13   someone could give you the sheet of paper, that would be

14   helpful.  Thank you very much.

15          PROSPECTIVE JUROR BENESH:  I'm Michael Benesh.

16   I'm 63 years old.  I live in Madison.  I was born in

17   La Crosse, Wisconsin.  Raised in Portage, Wisconsin.

18       I'm married with one child.

19       My occupation, I'm a business manager at a Catholic

20   church here in town.  My spouse is an IT director at an

21   insurance company here in town.

22       I have no military service.

23       I'm a graduate of accounting at University of

24   Wisconsin-Whitewater.

25       Membership, organizations:  None.

1      Hobbies:  I'm a bicyclist and a motorcycle rider.

2  I enjoy all kinds of sports.

3      Favorite type of reading material:  Sci-fi.

4      Television shows are Game of Thrones.  Mini series

5  on some of the premium channels.

6      And I have a Harley Davidson bumper sticker.

7          THE COURT:  And I realize this is a difficult

8  thing because we have covered so much ground, but in the

9  course of the ground that I did cover, do you

10 specifically remember anything that you would have

11 raised your hand for?

12         PROSPECTIVE JUROR BENESH:  Just obviously I

13 have an accounting background.  My degree is in

14 accounting.

15         THE COURT:  All right.  And do you think that

16 that would get in the way of your ability to listen to

17 the experts here and to weigh the evidence?

18         PROSPECTIVE JUROR BENESH:  Not at all.

19         THE COURT:  You say not at all because?  You

20 think you can listen fairly to the evidence that's

21 presented.

22         PROSPECTIVE JUROR BENESH:  Yes.

23         THE COURT:  All right.  You mentioned your wife

24 was involved as an IT director at an insurance company.

25 Can you name the insurance company?

1        PROSPECTIVE JUROR BENESH:  Sentry Insurance.

2        THE COURT:  Has she got a supervisory role in

3   IT or is she one of a number of people doing IT work

4   there?

5        PROSPECTIVE JUROR BENESH:  She's in a

6   supervisory role.

7        THE COURT:  All right.  Do you know how many

8   people she supervises?

9        PROSPECTIVE JUROR BENESH:  It's varied over

10  time.  It's probably at ten or so.

11        THE COURT:  All right.  And is there a specific

12  area of the intellectual technology, the business that

13  she's responsible for?

14        PROSPECTIVE JUROR BENESH:  Just to support the

15  architecture of the IT information that would go forward

16  to support the agents and qualifying people for the

17  insurance.

18        THE COURT:  So is it mainly on the business

19  side or the actuarial side or both?

20        PROSPECTIVE JUROR BENESH:  Probably on the

21  business side.

22        THE COURT:  All right.  Is there anything about

23  how she has described her job or the challenges in her

24  job that you think may make it more difficult for you to

25  be impartial to both sides here?

1          PROSPECTIVE JUROR BENESH:  Not at all.

2          THE COURT:  All right.  Let me mention a few

3    things.  Have you ever been a party to a lawsuit, a

4    witness in a lawsuit or on a jury?

5          PROSPECTIVE JUROR BENESH:  I've been called to

6    jury, but never been on a jury.

7          THE COURT:  All right.  And so did you go

8    through the selection process like this?

9          PROSPECTIVE JUROR BENESH:  Yes.

10          THE COURT:  Anything about that experience that

11    you found particularly negative or positive?

12          PROSPECTIVE JUROR BENESH:  No.

13          THE COURT:  Other than being called out at the

14    last minute to introduce yourself.

15          PROSPECTIVE JUROR BENESH:  No.

16          THE COURT:  Have you -- I assume you regularly

17    use a computer in your business.

18          PROSPECTIVE JUROR BENESH:  Yes.

19          THE COURT:  All right.  I just realized I

20    skipped over a question for the parties.  So for this

21    group as a whole, do you regularly use a so-called

22    smartphone?  How many of the members here use a

23    so-called smartphone?  I see all but a few hands.

24      How many of you would use that smartphone every

25    day?

1      Very good.  From what you said, probably not having

2   regular -- do you spend a lot of time with technology

3   news or technology magazines?

4           PROSPECTIVE JUROR BENESH:  No.

5           THE COURT:  Your wife's training I assume was

6   in information technology?

7           PROSPECTIVE JUROR BENESH:  Retail management.

8           THE COURT:  Okay.  And then she developed this

9   expertise on the job.  What was her background and

10  education?  High school?  College?

11          PROSPECTIVE JUROR BENESH:  Technical school.

12          THE COURT:  Very good.  And was it in the area

13  of information or just retail management?

14          PROSPECTIVE JUROR BENESH:  Retail management.

15          THE COURT:  Anyone close to you or yourself

16  have a background in engineering?

17          PROSPECTIVE JUROR BENESH:  Yeah, I have several

18  friends that are engineers.

19          THE COURT:  Have you ever talked to them about

20  patenting of intellectual property?

21          PROSPECTIVE JUROR BENESH:  No.

22          THE COURT:  What sorts of engineering do they

23  do?

24          PROSPECTIVE JUROR BENESH:  Electrical

25  engineering.  Mechanical engineering.

1          THE COURT:  Very good.  Anyone close to you or

2    yourself involved in the development of new products or

3    inventions, applications for patents or have experience

4    dealing with the United States Patent and Trademark

5    Office?

6          PROSPECTIVE JUROR BENESH:  No.

7          THE COURT:  Do you have strong opinions,

8    negative or positive, about patents generally or the

9    American patent system?

10         PROSPECTIVE JUROR BENESH:  No.

11         THE COURT:  All right.  And should the evidence

12   -- well, let me ask the same:  Strong opinions, positive

13   or negative, about large corporations?

14         PROSPECTIVE JUROR BENESH:  No.

15         THE COURT:  And should the evidence support it,

16   would you have any difficulty finding a patent valid or

17   awarding substantial monetary damages for infringement

18   of a patent?

19         PROSPECTIVE JUROR BENESH:  No.

20         THE COURT:  Similarly would you have trouble if

21   the evidence supported it to find a patent invalid or

22   awarding zero damages?

23         PROSPECTIVE JUROR BENESH:  No.

24         THE COURT:  You may be seated, and thank you

25   very much for your patience with me.

I mentioned to a couple of people as we went through this that it's fair to say that WARF, as the plaintiff, is affiliated with the University of Wisconsin system, and you'll hear more about that during the course of the trial.  I want you to think about that, as well as many of you who use and have mentioned that they use Apple products or use other computer technology or otherwise.

Keeping both of those things in mind if it applies to you, at the end of this case I am going to give you instructions that will govern your deliberations.  You are required to follow those instructions, even if you do not agree with them.  Is there any one of you who would be unable or unwilling to follow my instructions on the law?  (No response.)

I am going to ask some very specific, and I suspect I know the answer, but does anyone on the panel -- in this group of 14, do any of you own Apple stock?  Raise your hand if you do.  (No response.)  Very good.

Then finally, do you -- I'm talking to each of you to think back on what we discussed and also what you've heard during the course of the morning.  Do you know of any reason whatsoever why you could not sit as a trial juror with absolute impartiality to both parties in this case?  I see one hand.  Was there anyone else?

1      All right.  I'm going to ask Juror No. 9, if you'd

2  come to sidebar.

3          (Discussion at sidebar at 10:55 a.m.)

4          THE COURT:  If you could just -- we'll wait a

5  second.  But if you could speak right into this mic.  It

6  will pick it up.  You don't have to yell.  You said you

7  are concerned about your ability to be impartial.  Can

8  you tell me generally why?

9          PROSPECTIVE JUROR LYNCH:  I hate Apple.

10          THE COURT:  Well, I guess that simplifies that.

11          PROSPECTIVE JUROR LYNCH:  Everything about it.

12  To be fair --

13          THE COURT:  You can stop.  You can stop.  I'm

14  really glad that you mentioned it and the only reason

15  I'm stopping you is just in the off chance that anyone

16  else would overhear you.  You've made your point clearly

17  enough.

18      I'm going to dismiss you at this time.  I'd ask you

19  to just go to the back of the courtroom where

20  Ms. Colstad is sitting already, so back in that left

21  corner, and we'll come forward another witness.

22      Since I have counsel here, I'm going to ask you to

23  stay for a moment.  You may step down.

24          (Prospective Juror Lynch excused.)

25          THE COURT:  I feel as though there were a

1  couple questions, including the stock ownership, that

2  didn't get picked up in my last version of the draft.  I

3  suspect that's because the last version wasn't put in my

4  binder, which is very unusual.  I apologize.

5       MR. CHU:  So if you look at what I had as

6  Question 4, an example is 4C:  Have you ever purchased

7  or used a product made by Apple, products including

8  computers --

9       THE COURT:  Yes.

10       MR. CHU:  -- iPhones, and iPads.

11       THE COURT:  It should have been in this.  I

12  realized it only as I was getting through later on that

13  I hadn't asked questions that I had indicated I would.

14  Could I bother, so we're not delayed, if I could have it

15  from one of you?  The two questions it appears are the

16  last two?

17       MR. LEE:  I actually think, Your Honor, it's B,

18  C, and D.

19       THE COURT:  I appreciate that and I apologize

20  for that.  Since I have you here, were there any other

21  issues that you believe should be raised?

22       MR. CHU:  Yes.

23       MR. LEE:  Go ahead.

24       MR. CHU:  With Michael Courtney, who is in seat

25  No. 12.  He was sidebarred.  He said that, his words, he

1    "had a vested interest" because of the relationship with

2    a branch of his company.

3              THE COURT:  Yes.  So that's a movement for

4    cause.

5              MR. CHU:  Yes.  And second, he also I thought

6    said that he is a programmer, in response to an earlier

7    question.  In response to a later question where it was

8    are you a computer programmer, he did not raise his name

9    -- his hand.  And the cause concern is if he hears that

10   it's hundreds of millions of dollars if we get to the

11   damages --

12             THE COURT:  I'm not going to dismiss him on the

13   latter basis, but I do think there's some question as to

14   his company having something of a vested interest.  I

15   will tell you that I think it was not -- it did not

16   appear to me to be significant.  All of this is

17   subjective.  So I'm not going to dismiss him for cause,

18   particularly because it was clear in talking with him at

19   sidebar that the impact on his company would be

20   marginal.  It's not at all clear that the outcome of

21   this trial would have any impact on his company.  So I

22   didn't get a sense that there was any real likelihood of

23   him being -- his impartiality being impacted.  So I'm

24   going to deny that.

25             Was there something else?

1        MR. CHU:  Yes.  Mr. Van Horn, who is in seat

2   No. 3, the question that was asked, do you have any

3   strong opinions about the patent system, and he

4   immediately said too long.  Although he also said in

5   response to Your Honor's question that he would follow

6   your instructions and I'm -- put in the context of a

7   strong opinion where he's just saying it's too long, and

8   adding the context of this particular case, the amounts

9   involved and the like.

10       THE COURT:  Again, I'm not going to strike him.

11  It's a closer call for me because he also has the most

12  involvement with IT, and so it's a close question.  I'll

13  tell you what I will do is I will follow up with him

14  briefly to make sure that his views are such that there

15  -- it doesn't likely get in his way.  He raised a number

16  of issues, including privacy issues and others, so I

17  would at least follow up to assure myself.  But at this

18  point I'm not going to strike him.

19       MR. CHU:  Could I just share with Your Honor

20  that I think many lawyers, as well as people who are

21  involved in programming and software, many lawyers

22  realize that people who are involved in software

23  programming --

24       THE COURT:  I'm aware of the controversy over

25  the software and the tendency of people in software to

1    think the patents are too long.  I myself may share

2    that, but I'm not going to change my rulings in this

3    case because of it.  So unless there's something

4    specific to this witness, you don't need to remind me of

5    the issues.

6            MR. CHU:  There isn't.

7            THE COURT:  Anything more for you, sir?

8            MR. LEE:  Your Honor, two things.  On Juror No.

9    10, he's a faculty member.  He both has an appointment

10   at the hospital and is on the faculty.  So he's

11   literally on the same faculty as at least Professor

12   Sohi.  And we understand there's a lot of people with

13   U.W. affiliations, but being on the same faculty as a

14   witness, given the WARF/Madison relationship, we think

15   we would move to dismiss him for cause.

16       And I have one other that was just to ask Your

17   Honor to ask a followup question.

18           THE COURT:  Yes.

19           MR. LEE:  It's on Juror No. 8.  Her husband

20   went to --

21           THE REPORTER:  I'm sorry, I've lost the sound.

22           THE COURT:  Testing, testing.

23           MR. LEE:  I don't want to speak too loud.

24           THE COURT:  No, no.  You're fine.  She

25   literally lost the sound for some reason.

1           MR. LEE:  Her husband took computer programming

2    or computer engineering classes at U.W. Madison.  So I

3    think if we could just find out a little bit more about

4    what department and if we have some --

5           THE COURT:  I'm sorry, which juror is this?

6    14?

7           MR. LEE:  Juror No. 8.  It's the woman who was

8    the --

9           THE COURT:  I'm sorry?  The lawyer?

10          MR. LEE:  Juror No. 8.

11          THE COURT:  Okay.  I'm with you now.

12          MR. LEE:  And it's a collection of things.

13          THE COURT:  Her husband --

14          MR. LEE:  Her husband is a computer -- he's a

15   web developer.

16          THE COURT:  Right, right.  And I thought I had

17   explored that with her.  What else did you want to add?

18          MR. LEE:  When she came back, she said he took

19   his courses in computer science at University of

20   Wisconsin-Madison.  Just a little bit more information,

21   if she knows with whom.  Because if it was Professor

22   Sohi, I would like to know that.  Probably more me than

23   you.

24          MR. CHU:  I would want to know.

25          THE COURT:  Anything more then, gentlemen?

1          MR. LEE:  No.

2          THE COURT:  I will follow up with these

3     questions.  I will explore with Juror No. 13 and 10

4     their possible biases or ability to be impartial, and

5     then Ms. Martinson's husband's role.  Just so we're

6     clear, unless there is a request, we won't have a

7     further sidebar, we will go then forward.  But I may, if

8     I do have to excuse, you'll need to advise me if you

9     have a concern with respect to my voir dire of either of

10    the people called forward to replace them.

11         MR. CHU:  Yes.  Thank you, Your Honor.

12       (End of sidebar discussion at 11:01 a.m.)

13         THE COURT:  I apologize for that delay.  Before

14    I call forward an additional witness -- additional

15    juror, let me just ask a couple of followup questions.

16    First with respect to Juror No. 10, Mr. Pothof.  Some of

17    the witnesses may be or will be affiliated with the

18    University of Wisconsin-Madison, so effectively although

19    I guess -- do you view yourself as a member of the

20    faculty?  Do you teach courses on emergency medicine or

21    otherwise while at the University of Wisconsin Medical

22    School?

23         PROSPECTIVE JUROR POTHOF:  Yes.  I don't do a

24    lot of medical student teaching, but I do do some.  And

25    then mostly resident teaching within our own department.

1  Nothing undergrad though.

2          THE COURT:  The only concern being that since

3  some of the people testifying could be members of the

4  same faculty.  Is that an area of concern for you?  Do

5  you think that might influence or cause you to identify

6  with that witness, particularly an expert witness?

7          PROSPECTIVE JUROR POTHOF:  I wouldn't think so

8  unless it was someone who I knew personally, but I can't

9  imagine it would be anyone I know personally.

10         THE COURT:  And you say that even though you're

11 part of the same faculty why?

12         PROSPECTIVE JUROR POTHOF:  Because it's a big

13 enough university where even though faculty of the

14 University, I think the University somewhat segregates

15 itself out as far as people involved with medicine I

16 probably have a closer affiliation with versus an

17 engineering school or college of computer science or

18 whatever else.  So although I am faculty, I see myself

19 more as part of the medical campus more so than any

20 other part of the University.

21         THE COURT:  And you don't think that you would

22 weigh someone from another part of the University of

23 Wisconsin system versus a faculty member from another

24 University?

25         PROSPECTIVE JUROR POTHOF:  Not outside of

1    Madison.  Madison I think it would be harder.  But if

2    it's not Madison, then no.

3         THE COURT:  If you could be so good as to pass

4    the mic straight back.  I have a sort of similar just

5    followup.  And that is to say you did express not just

6    that you had an opinion that patents were too long, but

7    you expressed a strong opinion that they were too long.

8    Without getting into the specifics, have you had

9    experiences with respect to software patents where you

10   felt like they were impeding progress or is that -- did

11   it derive from a general sense or from a specific sense

12   with respect to software?  Without getting into the

13   specifics.

14        PROSPECTIVE JUROR VAN HORN:  It involved trying

15   to get access to old Nintendo video games.

16        THE COURT:  Okay.  So it was really from your

17   gaming experience.

18        PROSPECTIVE JUROR VAN HORN:  Correct.

19        THE COURT:  Which is understandable.  You said

20   you were a gamer so it's only fair.  My question really

21   goes to since you say you have a strong opinion about

22   it, whether you think that might influence how you view

23   the strength of an individual patent as will be

24   presented here.  In other words, since you don't think

25   as a general matter patents should be enforced as long

1  as they are, I take it that's your concern.  Do you

2  think it could undermine your ability to be impartial in

3  deciding the validity of this patent or a claim of

4  infringement under this patent?

5          PROSPECTIVE JUROR VAN HORN:  I don't think it

6  will be a problem.  My biggest concern is -- I would

7  refer to them as abandoned patents where it's still on a

8  video game and you have no legal method of playing.

9          THE COURT:  Of still getting the product.

10         PROSPECTIVE JUROR VAN HORN:  Correct.

11         THE COURT:  Understand.  All right.  I believe

12 the only other area was for Juror No. 8, Ms. Martinson.

13 Do you know what courses your husband actually took at

14 the University of Wisconsin-Madison and who it was that

15 taught the courses?

16         PROSPECTIVE JUROR MARTINSON:  For his undergrad

17 he did journalism, so it was all at MATC that he did

18 his --

19         THE COURT:  All right.  But he has subsequently

20 taken some courses at the U.W. Madison; right?

21         PROSPECTIVE JUROR MARTINSON:  No.  He did his

22 undergrad there and then moved to -- he did his

23 undergrad, graduated, and then later went back to school

24 for web development.

25         THE COURT:  And where did he do that?

1          PROSPECTIVE JUROR MARTINSON:  Madison Technical

2     College.

3          THE COURT:  Madison College I guess they like

4     to call themselves.

5          PROSPECTIVE JUROR MARTINSON:  Yes, right.

6          THE COURT:  Then we'll call forward one more

7     witness and we will be -- we'll be going forward to

8     selection shortly.  Was there something more for one of

9     the juror members?  If we could call forward the next

10    member of our jury panel.

11         THE CLERK:  Taking the seat of Ms. Lynch in the

12    front row will be Carol Michalski.

13         THE COURT:  While she is coming forward, I am

14    going to ask a general question of the entire panel.

15    And these are questions that had been modified and I was

16    working off an older version.  I apologize for this.

17    But they're all sort of subsumed in questions I've asked

18    already.  But please raise your hand if this would apply

19    to you.

20         Does anyone have a particularly strong opinion,

21    whether positive or negative, or affinity about the

22    University of Wisconsin, and specifically with the

23    University of Wisconsin-Madison, whether based on the

24    fact that you or someone are close there, attended

25    there, or because you are or were employed by the

1   University of Wisconsin or otherwise?  So in other

2   words, if you have a particularly strong opinion,

3   positive or negative, towards the University of

4   Wisconsin system and particularly University of

5   Wisconsin-Madison, would you raise your hand.  (No

6   response.)

7        Now, if I said you have a particularly strong

8   opinion about the University of Wisconsin Badgers, maybe

9   I would get some hands.  But there isn't anyone who

10  feels so strongly or has such a strong positive or

11  negative view of the University of Wisconsin you think

12  it would impact your ability to be impartial here.

13  That's what I'm understanding.  If that's not true, you

14  should raise your hand.  (No response.)  Thank you.

15       I think I've already asked this, but I'm going to

16  be certain.  Have you ever purchased or used a product

17  made by Apple?  Raise your hand if this applies to you.

18  All right.  All but two.

19       For those of you who raised your hand, did those

20  products include a computer?  So an iPad.  All right.

21  Did those products include an iPhone?  I said a

22  computer.  Probably iPads might be viewed differently.

23  Was there anyone who owned another Apple computer other

24  than an iPad or an iPhone?  All right.

25       And were those all basically stand-alone computers

1   that you used at a computer station?  Just raise your

2   hand -- actually for those who raised their hand with

3   respect to owning other than an iPad or an iPhone, that

4   owned an Apple computer, could you just describe what it

5   was generally?  We'll start at this end.  Juror No. 1.

6           PROSPECTIVE JUROR BETTENHAUSEN:  A Mac laptop.

7           PROSPECTIVE JUROR POTHOF:  Just a laptop.

8           THE COURT:  Anyone else who was not a laptop?

9   (No response.)  All right.  Thank you.

10          Then finally, does anyone have a strong opinion,

11   whether positive or negative, about Apple, the company,

12   whether based on ownership of stock, use of its product

13   or otherwise?  Again, just raise your hand if this

14   applies to you.  (No response.) Thank you.

15          Then we are going to hear from our new Juror No. 9.

16   If you could stand and introduce yourself.

17          PROSPECTIVE JUROR MICHALSKI:  I'm Carol

18   Michalski.  I'm 66.  I was born and raised in Madison.

19          I went to the University of Wisconsin and majored

20   in phy-ed and math and am a retired teacher at this

21   point.

22          I am married and have three children.

23          No military.

24          Undergrad.  My husband is a mechanical engineer

25   with a master's degree.

1          I do a lot of sports.  I read a lot of mystery and

2     current popular books.

3          I like my medical shows on TV.

4          I don't have any bumper stickers.  I don't call in,

5     write in, any of those kind of things.

6               THE COURT:  Very good.  Let me ask you -- well,

7     I guess first, do you know if your husband had ever been

8     involved in any kind of patenting project?

9               PROSPECTIVE JUROR MICHALEK:  No, he has not.

10              THE COURT:  His work as a mechanical engineer

11    has been in what field?

12              PROSPECTIVE JUROR MICHALSKI:  He was with the

13    University of Wisconsin with the physical plant.

14              THE COURT:  Have you ever been involved in the

15    jury or in trial, whether as a party, as a witness,

16    sitting on a jury or being called for jury selection?

17              PROSPECTIVE JUROR MICHALSKI:  I was on one jury

18    trial a couple years ago.  It was a drunk boating

19    incident.

20              THE COURT:  All right.  And did that go to

21    verdict?

22              PROSPECTIVE JUROR MICHALSKI:  Yes.

23              THE COURT:  Was it a criminal or a civil case?

24              PROSPECTIVE JUROR MICHALSKI:  I don't know.

25              THE COURT:  All right.  Do you remember what

1      the verdict was?

2              PROSPECTIVE JUROR MICHALSKI:  He was guilty.

3              THE COURT:  All right.  Which would have been a

4      criminal trial.  Did you serve as the foreperson of the

5      jury?

6              PROSPECTIVE JUROR MICHALSKI:  No.

7              THE COURT:  Anything about that experience that

8      you view particularly positive or negative?

9              PROSPECTIVE JUROR MICHALSKI:  I'm kind of a

10     life-long learner and I really enjoyed learning about

11     the process.  I was really impressed with it.

12             THE COURT:  Anything about it that you think

13     would impact your ability to be impartial here?

14             PROSPECTIVE JUROR MICHALSKI:  No.

15             THE COURT:  And I take it from your answer then

16     not a party to a lawsuit or a witness before now.

17             PROSPECTIVE JUROR MICHALSKI:  No.

18             THE COURT:  And do you regularly use a computer

19     yourself?

20             PROSPECTIVE JUROR MICHALSKI:  Yes.

21             THE COURT:  I just asked questions about the

22     specific uses that you may have of computers, but do you

23     or someone close to you have specific education,

24     training or work in computer programming or information

25     technology?

1          PROSPECTIVE JUROR MICHALSKI:  We're really bad

2    at our house.

3          THE COURT:  All right.  What about with respect

4    to accounting or law?

5          PROSPECTIVE JUROR MICHALSKI:  My brother is a

6    real estate lawyer, as is my daughter.

7          THE COURT:  All right.  She's a real estate

8    lawyer or a lawyer?

9          PROSPECTIVE JUROR MICHALSKI:  She's a lawyer.

10         THE COURT:  Okay.  Does she work in the

11   intellectual property field?

12         PROSPECTIVE JUROR MICHALSKI:  No.

13         THE COURT:  Anything about their experiences

14   you think would make it difficult for you to be

15   impartial?

16         PROSPECTIVE JUROR MICHALSKI:  No.

17         THE COURT:  Have you or someone close to you

18   ever developed a new product or an invention or patent,

19   sought a patent on a product or dealt with the United

20   States Patent and Trademark Office?

21         PROSPECTIVE JUROR MICHALSKI:  No.

22         THE COURT:  All right.  Do you have

23   particularly strongly held opinions, negative or

24   positive, regarding the American patent system?

25         PROSPECTIVE JUROR MICHALSKI:  No.

1        THE COURT:  What about with respect to large
2   corporations?
3        PROSPECTIVE JUROR MICHALSKI:  No.
4        THE COURT:  Would you have any difficulty
5   finding a patent valid or awarding substantial damages
6   if the evidence supported it?
7        PROSPECTIVE JUROR MICHALSKI:  I would have no
8   problem.
9        THE COURT:  Similarly would you have trouble
10  finding a patent invalid or awarding zero damages if the
11  evidence supported it?
12       PROSPECTIVE JUROR MICHALSKI:  No problem.
13       THE COURT:  At the end of the case, I will give
14  you instructions that will govern your deliberations.
15  Are you comfortable that you will follow those
16  instructions even if you don't agree with them?
17       PROSPECTIVE JUROR MICHALSKI:  Yes.
18       THE COURT:  I will ask this last question:
19  Aside from the athletic department, have any of you
20  donated money to the University of Wisconsin?
21     All right.  Then let me ask the general followup
22  question.  Do you know of any reason whatsoever why you
23  could not sit as a trial juror with absolute
24  impartiality to all parties in this case?  (No
25  response.)

1     Unless there is need by counsel, we're going to

2  proceed now with the exercise of what we call preemptory

3  challenges.  It's just the ability of both sides to

4  whittle down the number of people that actually serve as

5  juror members here.

6     While they're undergoing that process, you're free

7  to stand, to stretch.  If you need to, you can follow

8  the court security officer's direction and use the

9  facility.  This won't take long, but it will take 10 to

10 15 minutes.  When you're all back -- I would ask you to

11 go in two or threes because it's helpful to the parties

12 to actually see a face and identify in making their

13 determinations.  But you can stand.  You can stretch.  I

14 would ask that you generally not talk in the courtroom.

15 And if you are going to leave the courtroom, that you

16 not discuss anything that's happened this morning.  You

17 can talk about the courtroom decor, the Packer game.

18 Anything.  But nothing that's happened in the courtroom.

19 And when you all get back, I will give you very specific

20 instructions about how to conduct yourselves during

21 breaks.

22    With that then, I'm going to turn and talk to the

23 Members of the Jury who were not part of the final

24 group.  But feel free to stand or stretch if you need

25 to.

1        For those of you who were called forward and

2   excused and for those I guess four of you who were not

3   called forward, I want to thank you for your service,

4   particularly those who were not called forward at all.

5   We don't know -- in fact, our court prides itself on

6   only bringing in enough people to assure that we have

7   sufficient numbers to go forward with the trial.

8   Sometimes we're down to one or two.  We're down to four

9   here, but believe me that your coming and being

10  available was crucial to assuring that all of the people

11  who worked on this matter and who prepared to go forward

12  to trial were able to do so.  So I thank you for your

13  service in doing that.

14       And I also thank those of you who were excused for

15  whatever reason for your candid responses.  And all of

16  you are excused, except that you should report to

17  Teresita, our clerk for jury members, just to assure

18  that if you have any further obligations with respect to

19  jury service going forward, you know what those are.

20  But other than that, I thank you again for your service

21  and you're free to leave the courtroom.

22       (Prospective jurors leave at 11:18 a.m.)

23            THE COURT:  As I say, as soon as everyone is

24  back in the courtroom, I'll give you instructions.

25            MR. CHU:  Your Honor, may we have a very brief

1    sidebar?

2         THE COURT:  You may.

3      (Discussion at sidebar at 11:19 a.m.)

4         THE COURT:  The time for this would have been

5    before I impaneled this group of 14, but if you want to

6    make a record, go ahead.

7         MR. CHU:  No, no, it's not making a record.  I

8    realized that perhaps we inartfully drafted a question.

9    We would suggest that the Court would ask for those who

10   raised their hand on an Apple computer --

11        THE COURT:  This is not the time for that.  I

12   even turned and said unless counsel have a reason for

13   sidebar.  We're done.  That part of the case is done.

14        MR. CHU:  I didn't realize --

15        THE COURT:  So step back.  Thank you.

16     (End of sidebar discussion at 11:19 a.m.)

17     (Preemptory strikes     11:19-11:24 a.m.)

18        THE COURT:  Again, as soon as we have everyone

19   back I'll give you some short instructions.

20     (Pause      11:24-11:25 a.m.)

21        THE COURT:  Actually it appears we're fairly

22   close to impaneling a jury, so I'm going to wait and

23   give you all the instructions at the same time.  What we

24   will do is as soon as we've impaneled our jury and I've

25   dismissed those of you who are not called forward or

1  dismiss those who are called forward, then we will take

2  a 15-minute break and we will come back and I will give

3  you the full instructions and then we'll probably take

4  our lunch break.  So this break will be shorter because

5  we'll go to lunch after the instructions.  Those

6  instructions will give you an idea of how to conduct

7  yourselves during the course of the trial.

8      I do want to emphasize though during this 15-minute

9  break that we will be taking shortly, for those of you

10 who are impaneled as part of the jury, don't discuss

11 anything about the case with each other at all.  Period.

12 Nothing that's happened in the courtroom.  And do not go

13 to your -- the instinct we all have now, which is to

14 suddenly google or search or look anywhere, it's wrong.

15 It's wrong to the parties.  It can't happen.

16     So during the short break, because I think you're

17 entitled to one just to take a deep breath, I admonish

18 you strongly not to do that.

19         THE CLERK:  The following jurors are excused

20 and may take a seat at the rear of the courtroom.  Sue

21 Bettenhausen.  Bruce Pickering.  Benjamin Van Horn.

22 Lisa Martinson.  Jeffrey Pothof.  Michael Courtney.

23     The following jurors have been selected and shall

24 take the seats in the jury box.

25         THE COURT:  And as your name is called, you'll

1   just be asked to move to your right so we end up filling

2   from the right chair.  Michael Benesh, if you would go

3   to the far chair -- others should stay seated until

4   called.  Michelle Blang.  Bradley West.  Angeline Elmer.

5   And then Ms. Michalski, you can stay where you're

6   seated.  That's perfect.  Sorry.  Ms. Burns, if you

7   would take one seat to your right.  Ms. Weisert, if you

8   would do the same.  And finally, Mr. Egger.

9        And since I have you all safely ensconced there, I

10  said I would give you a break immediately, but since we

11  just stretched, let me give you the instruction on

12  breaks and recesses that I normally would do if the voir

13  dire would take longer.  Keep these things in mind for

14  all breaks, including the one you're about to take.

15       During breaks and recesses as well as the end of

16  each day, please keep in mind the following

17  instructions -- and all of the instructions that I'm

18  going to give you during the course of trial you will

19  have with you during your deliberations.  But this one

20  you really need to focus on.

21       First, do not discuss the case either among

22  yourselves or with anyone else during the course of this

23  trial.  The parties to this lawsuit have a right to

24  expect from you that you will keep an open mind

25  throughout the trial.  You should not reach a conclusion

1  until you have heard all of the evidence, have heard the

2  lawyers' closing arguments and my instructions to you on

3  the law, and have retired to deliberate with each other

4  as a juror.

5      Until -- as a jury, excuse me.  Until you retire or

6  deliberate, you may not discuss this case with anyone,

7  even your fellow jurors.  After you retire to

8  deliberate, you may begin discussing the case with your

9  fellow jurors, but you cannot discuss the case with

10  anyone else until you have returned a verdict and the

11  case is at an end.

12      Think about it this way:  You've just pledged to be

13  impartial.  By human nature we all start to develop

14  impressions or opinions.  You're to try to keep an open

15  mind yourself throughout the trial.  In fact, you can't

16  really reach any definitive conclusion until you've

17  heard my instructions on the law and the arguments from

18  counsel about the evidence that you heard.  So even if

19  you start to form opinions, realize that they can't be

20  your final judgment.  But more importantly, don't share

21  those initial impressions, which are not fully formed or

22  fully informed, with anyone else on the jury because

23  then you're influencing them in a way that shouldn't

24  even be true of you.  So that's why you don't discuss

25  the case or anything about what is done in this

1   courtroom until you deliberate.  And each of you make a

2   pledge to do that.

3        Second, I know that many of you -- in fact, all of

4   you I guess, use cellphones, BlackBerries, the internet,

5   and other tools of technology.  I really -- I can't

6   emphasize enough the importance of your not commenting

7   about this trial, talking to anyone about this case,

8   using these tools to communicate electronically with

9   anyone about this case during the trial.  This includes

10  your family and friends.  You may not communicate with

11  anyone about the case on your cellphone, through email,

12  Blackberry, iPhone, text messaging, on Twitter, through

13  a blog site, a website, an internet chat room, by way of

14  a social networking website including Facebook, MySpace,

15  LinkedIn, YouTube, and whatever has been invented in the

16  last two weeks.  You can't do it.  You cannot do it.

17       There have been stories recently in which trials

18  have had to be started from the beginning with a new

19  jury because a member of the jury communicated

20  electronically about the case during the trial.  You

21  can't imagine the cost and the inconvenience, and

22  frankly the stress experienced by the parties if you

23  should engage in that activity.  You cannot do it.

24       Third, do not permit any person to discuss the case

25  in your presence.  If anyone tries to talk to you

1    despite your telling him or her not to, report that fact

2    to the Court as soon as you are able; in this case, to

3    the court security officer, one of whom will always be

4    available to you.  Don't discuss the fact that someone

5    has talked to you with anyone, including your fellow

6    jurors.  Don't discuss anything about it with anyone

7    else.  Just call it to the Court's attention and I will

8    follow up.

9        Fourth.  Although it is a normal human tendency to

10   converse with people with whom one is thrown in contact,

11   please do not talk to any of the parties or their

12   attorneys or witnesses.  And by this I mean not only do

13   not talk about the case, but do not talk at all, even to

14   pass the time of day.  In no other way can all parties

15   be assured of the absolute impartiality that they are

16   entitled to expect from you as jurors.  The parties,

17   attorneys, witnesses and members, people in this room

18   are admonished similarly, so don't be offended if they

19   don't say hello to you in the hallway.  They're not

20   supposed to.  In fact, they would be violating this

21   Court's directive, just as you would be.

22       Fifth.  You, as jurors, must decide this case based

23   solely on the evidence presented here within the walls

24   of this courtroom.  No matter how interested you may

25   become in the facts of the case, you must not do any

1    independent research.  You may not do any investigation

2    or experimentation.  This means that during the trial,

3    you must not conduct any efforts to look into anything

4    about this case, the matters in the case, the

5    individuals or the corporations involved in the case.

6    In other words, you should not consult dictionaries,

7    reference materials, read newspapers, listen to the

8    radio or television if anything about this case should

9    be mentioned.  And again, I would especially admonish

10   you regarding the use of the internet.  Search engines,

11   websites, blogs or electronic tools to obtain

12   information about this case or to help you decide this

13   case would be wholly unfair to the parties in this

14   lawsuit and to the commitment that you're making as

15   jurors.  Please do not try to find out information from

16   any source outside the confines of this courtroom.

17       If an internet or newspaper headline catches your

18   eye or a television news lead catches your ear, do not

19   examine the article or listen further.  For anyone

20   familiar with the facts of a story, you know that media

21   accounts tend to be incomplete at best and are accurate

22   -- often inaccurate at worst.

23       Internet accounts are even worse.  They are much

24   worse.  News accounts or internet blogs may also contain

25   matters that are not proper for you to consider as a

1  matter of law.  However imperfect they may be, the Rules

2  of Evidence have been developed over hundreds of years

3  for a reason.  They are the best method that we've come

4  up with to provide parties with a fair hearing.  For

5  this reason, you are required to base your verdict

6  solely on the evidence admitted into this case.

7       That's the end of the instruction with respect to

8  breaks and recesses.  I'm confident that you will all

9  adhere to it, beginning with this recess, which will be

10 15 minutes.  We will reconvene at 10 to 12 for

11 introduction instructions and a short video.  All rise,

12 please.

13      We will wait for you to leave, if you would follow

14 the court security officer.

15      (Jury excused from courtroom at 11:35 a.m.)

16          THE COURT:  Given the lateness of the hour, I

17 will give the instruction and play the video, which is

18 part of the introduction instructions, and then we will

19 break for lunch.  Because we'll have a little extra

20 time, I probably will bring the jury back at one p.m. so

21 you should expect that we'll spend a little time on the

22 remaining exhibits during that break.

23      We will then reconvene at 1 p.m. for opening

24 statements by each side.  Let me just confirm with our

25 IT people that we have the video cued up so that's ready

1  to go at the time I call for it.  Thank you.

2      Was there anything more then for WARF at this time?

3          MR. CHU:  No, Your Honor.

4          THE COURT:  Anything more for Apple?

5          MR. LEE:  No, Your Honor.

6          THE COURT:  Thank you very much.  We are in

7  brief recess.  You're free to move about the courtroom.

8  We'll reconvene at 10 to 12.

9      (Recess            11:35-11:53 a.m.)

10         THE COURT:  Let's go back on the record again.

11  We'll just go back on the record and we'll bring the

12  jury out in a moment.  We're going to have to go until

13  12:30.  I didn't factor in the full 20 minutes for the

14  tape, so we'll discuss how we'll proceed.  We won't

15  reconvene until at least 1:30.

16      You should bring the jury out, please.  All rise,

17  please.

18      (Jury brought in courtroom at 11:54 a.m.)

19         THE COURT:  Please be seated.  Members of the

20  Jury, before I give you the introductory instructions,

21  I'm going to ask you all to stand, raise your right

22  hand, and be sworn by our clerk.

23      (Jury panel sworn in at 11:55 a.m.)

24         THE COURT:  Before you sit down Juror No. 1,

25  are you able to see the screen well?

1           PROSPECTIVE JUROR BENESH:  Yeah.

2           THE COURT:  Because if you'd prefer, everyone

3   can take a step to the left.  That will be your

4   permanent spot.  Maybe I'll have at least the back row

5   do that.  Why don't you just each go to your left one.

6   We're going -- we're going to make ample use of that

7   screen as well as the screens in front of you.  And you

8   may be seated.

9       Members of the Jury, we are about to begin the

10  trial of this case.  As I mentioned, the instructions

11  that I'm about to give you will help you understand how

12  the trial will proceed, how you should evaluate the

13  evidence, and how you should conduct yourselves during

14  the course of the trial.  I would remind you that you'll

15  have these before you during your deliberations.  You'll

16  have written versions of this same set of instructions.

17      The party who began the lawsuit is called the

18  plaintiff.  In this case, the plaintiff, as you heard,

19  was the Wisconsin Alumni Research Foundation or WARF.

20  The party against whom the suit is brought is called the

21  defendant.  In this case the defendant is Apple, Inc.

22      This case involves U.S. Patent No. 5,781,752, which

23  as I mentioned at the outset may be referred to

24  generally as the '752 patent, the WARF patent, or the

25  patent-in-suit.

1    As you've already heard, this patent is titled

2  *Table Based Data Speculation Circuit for Parallel*

3  *Processing Computer*.  WARF claims that the patent

4  intervention improves processing speed and efficiency by

5  scheduling computer instructions based on predictions

6  about how the instructions will behave.  The patent was

7  issued to its coinventors:  Gurindar Sohi, a professor

8  at the University of Wisconsin, and three of his then

9  graduate students.  The rights under this patent were

10  assigned by the inventors to WARF.

11    WARF alleges that Apple is infringing the '752

12  patent by making and selling its A7, A8, and A8X mobile

13  processes or systems-on-chip, SoCs.  Apple includes

14  these processors or SoCs in certain iPhone and iPad

15  products, but denies that any of its processes or SoCs

16  infringe the '752 patent.

17    On the claim of infringement, WARF, that is to say

18  the plaintiff, bears the burden of proof.  I apologize,

19  somehow I lost page two.  This seems to be the case

20  where I lose pages.  If either counsel have page two of

21  the instructions.  I think what happened is it printed

22  on the front page, but not on the second.  You will have

23  the complete set when you get this.

24    The case will proceed as follows:  First, WARF's

25  counsel will make an opening statement outlining its

case.  Immediately after that statement, Apple's counsel
will also make an opening statement outlining its case.
What is said in opening statements is not evidence, it
is simply a guide to help you understand what each party
expects the evidence to show.

Second, after the opening statements, WARF, as the
plaintiff, will introduce evidence in support of its
case.  At the conclusion of its case, Apple will
introduce evidence.  Neither party is required to
introduce any evidence or to call any witnesses on
claims for which the other party bears the burden of
proof.  If defensive evidence is introduced, the
opposing party may introduce rebuttal evidence.

Third.  After the evidence is presented, I will
instruct you on the law that you are to apply in
reaching your verdict.

Fourth.  The parties' counsel will make closing
arguments explaining what they believe the evidence has
shown, what inferences you should draw from the
evidence, and how both comport with the Court's legal
instructions.  What is said in closing argument is also
not evidence.  You will ultimately be asked to decide
what the evidence proves or does not prove.

Fifth.  You will retire to the jury room and begin
your deliberations.  As you heard, it is only at that

1  time that you should start to discuss the case among

2  yourselves.

3       You have already heard and will hear this term,

4  burden of proof, as well as numerous other legal terms

5  used during the trial.  In simple terms, the phrase

6  burden of proof means that the party who makes a claim

7  has the obligation of proving that claim.  At the end of

8  the trial, I will instruct you on the proper burden of

9  proof to be applied in this case as well as provide

10  other instructions guiding you on important terms, the

11  law generally, and your duties during deliberations.

12       I've already instructed you on your conduct during

13  breaks and recesses and I will try to remind you of that

14  obligation before breaks.  In deciding the facts, you

15  have to decide which testimony to believe and which

16  testimony not to believe.  You may believe everything a

17  witness says, part of it, or none of it.

18       In considering the testimony of any witness, you

19  may take into account many factors, including the

20  witness's opportunity and ability to see and hear and

21  know the things the witness testified about; the quality

22  of the witness's memory; the witness's appearance and

23  manner while testifying; the witness's interest in the

24  outcome of the case; any bias or prejudice the witness

25  may have; other evidence that may have contradicted the

1  witness's testimony, and the reasonableness of the

2  witness's testimony in light of all the evidence.  The

3  weight of the evidence does not necessarily depend upon

4  the number of witnesses who testify.

5       During the trial, you will hear the lawyers make

6  objections to certain questions or to certain answers of

7  the witnesses.  When they do so, it is because they

8  believe the question or answer is legally improper and

9  they want me to rule on it.  Please do not try to guess

10  why the objection is being made or what the answer would

11  have been if the witness had been allowed to answer it.

12  If I tell you not to consider a particular statement

13  that has already been made, put that statement out of

14  your mind and remember that you may not refer to it

15  during your deliberations.  Again, there are good

16  reasons that certain evidence is excluded and it is

17  important that you respect these rulings and directions.

18       During the trial, I may sometimes ask a witness

19  questions.  Please do not assume that I have any opinion

20  about the subject matter of my questions.  Generally I

21  am just trying to clarify something that I think may be

22  not as clear as it could be for you, as the jury,

23  deciding the facts.  If you wish to ask a question about

24  something you do not understand, write it down on a

25  separate slip of paper.  And when we come back for

opening statements, we will pass out pads and they will

be seated at each of your seats.  If when the lawyers

have finished all of their questioning of the witness

the question is still unanswered, your question is still

unanswered to your satisfaction, raise your hand and the

bailiff, in this case the court security officer, will

take written questions from you.  I will then review it,

I will show it to counsel and decide whether it is a

question that can be asked.  If it cannot, I will tell

you that.  I will try to remember to ask about questions

after each witness has testified, but this is a weakness

of mine because I'm interested in moving the trial

along.

Please, if you have a question that you think has

not been adequately answered, feel free to raise your

hand.  The court security officer will do a better job

than I.  But I will try to look and see if there are any

followup questions.  We will consider it.

If you want to take notes, those same notepads and

pencils will be available to you during the course of

the trial.  This does not mean that you have to take

notes.  Take them only if you want to or if you think it

will help you recall the evidence during your

deliberations.  Do not let notetaking interfere with

your important duties of listening carefully to all of

the evidence and of evaluating the credibility of the witnesses.

Keep in mind that just because you have written something down, it does not mean that the written note is more accurate than another juror's mental recollection of the same thing.  No one of you is the secretary for this jury.  No one of you is charged with the responsibility of recording evidence.  Each of you is responsible for recalling the testimony and other evidence.

And although you can see that the trial is being recorded, that is, is being taken down by a court reporter, you should not expect to be able to use trial transcripts during your deliberations.  You will have to rely on your own collective memories.

Evidence at trial includes the sworn testimony of witnesses, exhibits admitted into evidence, facts judicially noticed, and facts stipulated by counsel. You may consider only evidence that is admitted into the record.

In deciding the facts of this case, you are not to consider the following as evidence:  Statements and arguments of the lawyers; questions and objections of the lawyers; testimony that I instruct you to disregard or to consider for a limited purpose, and anything you

1    may see or hear when the court is not in session, even

2    if what you see or hear is done or said by one of the

3    parties or by one of the witnesses.

4        Evidence may be either direct or circumstantial.

5    Direct evidence is direct proof of a fact such as

6    testimony by a witness about what the witness said or

7    heard or did.  Circumstantial evidence is proof of one

8    or more facts from which you could find another fact.

9    For example, if the issue were whether it were raining

10   yesterday, you might have a witness come in and say they

11   were out in the rain.  That would be considered direct

12   evidence.  A witness might come in and say that they

13   noticed umbrellas in the entryway of a building that

14   were wet.  That would be considered circumstantial

15   evidence.  You are -- you should consider both kinds of

16   evidence.  The law makes no distinction between the

17   weight to be given to either direct or circumstantial

18   evidence.  You are to decide how much weight to give

19   that evidence.

20       A witness may be discredited by contradictory

21   evidence or by evidence that at some other time the

22   witness has said or done something or has failed to say

23   or do something that is inconsistent with the witness's

24   present testimony.  If you believe any witness has been

25   discredited, it is up to you to decide how much of the

1    testimony of that witness you believe.

2        If a witness is shown to have given false testimony

3    knowingly, that is voluntarily and intentionally about

4    any important matter, you have the right to distrust the

5    witness's testimony about other matters.  You may reject

6    all of the testimony of that witness or you may choose

7    to believe some or all of it.

8        The general rule is that if you find that a witness

9    said something before the trial that is different from

10   what the witness said at trial, you are to consider the

11   earlier statements only as an aid in evaluating the

12   truthfulness of the witness's testimony at trial.  You

13   cannot consider as evidence in this trial what was said

14   earlier before the trial began with two exceptions to

15   this general rule.

16       The first is for witnesses who are actual parties

17   in the case.  If you find that any of the parties made

18   statements before the trial began that are different

19   from the statements they made at trial, you may consider

20   as evidence in the case whichever statement you find

21   more believable.

22       The second is for statements made in earlier

23   depositions by witnesses who are now unavailable.

24       During the course of a trial the lawyers will refer

25   and read from depositions.  The parties may also play

portions of videotaped depositions.  Depositions are

transcripts of testimony or video of testimony taken

from witnesses while the parties are preparing for

trial.  Deposition testimony is given under oath just

like the testimony at this trial.  You should give it

the same consideration you would have had those

witnesses testified here in the courtroom.

     You are to consider -- as I probably said already

too much, but it can't be really emphasized enough.  You

are to consider only the evidence in the case.  But in

your consideration of the evidence you are not limited

solely to what you see and hear as a witness is

testifying.  You are permitted to draw from facts you

find that have been proved such reasonable conclusions

or inferences as seem justified in light of your

experience and common sense.

     I've mentioned that experts will testify in this

case.  A person's training and experience may have him

or her -- make him or her a true expert in a technical

field.  The law allows that person to state an opinion

here about matters in that field.  It is up to you to

decide whether you believe the expert's testimony and

choose to rely upon it.

     Part of that decision will depend on your judgment

about whether the expert's background, training, and

1    experience is sufficient for him or her to give the

2    expert opinion that you heard and whether the expert's

3    opinions are based on sound reason, judgment, and

4    information.

5        During the trial, an expert may be asked a question

6    based on assumptions that certain facts are true and

7    then asked for his or her opinion based on that

8    assumption.  Such an opinion is of use to you only if

9    the opinion is based on assumed facts that are proven

10   later.  If you find that the assumption stated in the

11   question have not been proven, then you should not give

12   any weight to the answer the expert gave to that

13   question.

14       At this juncture, I will ask that you turn your

15   attention to the monitors in the jury box or I believe

16   this larger monitor, which may be easier for some of you

17   to view, so that you can watch a video that explains the

18   basics of the U.S. patent system, the parts of the

19   patent, and how a person obtains a patent.

20       (Video played      12:12-12:27 p.m.)

21       THE COURT:  At the close of the trial, as I've

22   already indicated, you will receive specific

23   instructions about the law that you are to follow when

24   you deliberate over the evidence that will be presented

25   to you shortly.  In fact, after lunch you'll finally

1    hear from the parties in their opening statements as to

2    what they believe the evidence is going to show in this

3    case.  I hope, as was said on the video, that you find

4    this to be a interesting and ultimately gratifying

5    experience.

6         I would remind you at this lunch break we're going

7    to take that you not discuss what's been said.  I can't

8    emphasize its importance.  The only thing more important

9    is that you not write about it or do any independent

10   research about it.  You each are keeping your own

11   counsel and making your own decisions and you're really

12   not prepared to do that until you've heard all of the

13   evidence as well as my instructions and the closing

14   arguments of the parties.

15        In any event, at 1:30 we will reconvene and hear

16   opening statements from the parties.  Until that time,

17   you are free to go about your lunch.

18        (Jury excused from courtroom at 12:29 p.m.)

19            THE COURT:  The parties can be seated.  It

20   seems to me the most productive use of our time to

21   ensure that you have time for your lunch is to address

22   the trial demonstratives from Dr. Conte and then the

23   objections to Apple's exhibits.

24        I'm going to start with the trial demonstratives,

25   and I'll hear from WARF -- actually really from Apple as

1    to the nature of the specific objections.  If we could

2    call up Slide, I guess it's 34, is that the first of

3    them?

4            MR. DOWD:  Thank you, Your Honor.  Jim Dowd on

5    behalf of Apple.  What I've tried to do this morning is

6    WARF got to us a new set around five o'clock this

7    morning, which is par for the course, and I've tried to

8    break them into buckets to just streamline the

9    presentation.

10           THE COURT:  That's fine.

11           MR. DOWD:  If we could actually start with what

12   should be Slide 158.

13           THE COURT:  All right.  If someone has a hard

14   copy, I'm happy to look at that as well.

15           MR. DOWD:  Actually, Your Honor, I do.  May I

16   approach, Your Honor?

17           THE COURT:  Yes.  That's fine.  Please do.  And

18   maybe while you're doing that, if the IT can figure out

19   how to call it up, that would be great.  Thank you.

20           MR. SHEASBY:  Your Honor, that slide is -- I

21   think you may have a wrong set.  Why don't I do the

22   following:  Let me pass up to everyone the set we

23   served, and to be clear, we served it at 2:45 in the

24   morning.

25           THE COURT:  It almost goes without saying that

1   everyone is working too hard and too long on this

2   matter.

3           MR. SHEASBY:  May I approach?

4           THE COURT:  You may approach, certainly.  So is

5   there a way to translate the number so I know I'm

6   looking at it correctly?

7           MR. DOWD:  I'm just doing that now.

8           MR. SHEASBY:  I have a translation actually, so

9   if counsel would tell me the slide, I actually can

10  translate it.

11          MR. DOWD:  Your Honor, I have the slide.

12          THE COURT:  Call it up or tell me what I'm

13  looking at.

14          MR. DOWD:  I believe it's 165.

15          THE COURT:  All right.  I have it in front of

16  me.

17          MR. DOWD:  As an example.  But it's really --

18          THE COURT:  If Rule 1 applied, Apple is liable

19  for subcontracting manufacturing.  Is that the one on

20  the screen now?

21          MR. DOWD:  That's correct.  And this is part of

22  a sequence that I believe should now be out, based on

23  Your Honor's ruling this morning, that the Samsung

24  issues are for the damages phase.  The complete set in

25  this would go from -- I believe it's 162 through -- to

1    the end of the presentation.

2              THE COURT:  And to get to the heart of it, your

3    objection is that it's not relevant?

4              MR. DOWD:  This is material that is going at

5    the issue of vicarious liability.  So there's -- there

6    are really two objections.  The first would be, as I

7    understood Your Honor this morning, that is an issue for

8    the second phase, not an issue for liability.  The

9    second thing is that this is --

10             THE COURT:  Let's just say not an issue for the

11   liability phase and we'll be on the same page.  In any

12   event, you had a second objection.

13             MR. DOWD:  The second objection is that when we

14   get to the liability phase, if these are offered, we

15   would have an objection to Dr. Conte offering this

16   because this isn't the subject area of his expertise.

17   It's not his expertise to do things like interpret

18   contract language or decide if someone is an agent of

19   somebody else.  He's a technical expert who's here to

20   talk about processors.

21             THE COURT:  All right.  I'll hear briefly.

22             MR. SHEASBY:  Yes, Your Honor.  Two important

23   distinctions.  First, what Dr. Conte is doing in this

24   slide is describing the Rule --

25             THE COURT:  When you say *this slide*, you're

1  talking now about the 165 slide?

2      MR. SHEASBY:  165.  Obviously these were

3  exchanged before Your Honor's ruling this morning.  None

4  of this is coming into the liability phase.

5      THE COURT:  So there's nothing to talk about

6  for purpose of the current phase of trial.

7      MR. SHEASBY:  Unless you want to hear about --

8      THE COURT:  Not particularly at this stage.  If

9  there's some objection in the damage phase, I'll hear

10  it.  So that addresses this group, I believe.

11      MR. DOWD:  I believe that's correct.  The next

12  group, let me see if I can correlate it.  It was the old

13  Slide 121, and if Mr. Sheasby has the correlation to

14  where that is now, I'd take his guidance.

15      MR. SHEASBY:  I think I can find it.

16      THE COURT:  Looks like an infringement claim

17  chart with checks.

18      MR. DOWD:  Actually it's the doctrine of

19  equivalents slides.

20      MR. SHEASBY:  Those are out.  We agreed with

21  them last night.

22      THE COURT:  Very good.  This is getting easier

23  and easier.

24      MR. DOWD:  Hopefully it will stay easier.  That

25  is out because its doctrine of equivalents.  If we go to

1  -- in this group, the objection is really that what the

2  slides are are essentially jury instructions.  They're

3  instructions on what the law is.

4        THE COURT:  Couple of those I've seen so far

5  strike me that way, but I'm going to have to have the

6  specific example called up or the right number given to

7  me before I can --

8        MR. SHEASBY:  61 is an example, Jim.

9        MR. DOWD:  I think -- old 61 or current 61?

10        MR. SHEASBY:  Current 61, I think.

11        THE COURT:  It's on your screen now.

12        MR. DOWD:  That -- yes, thank you.  That's a

13  serviceable example.  This is in the nature of a jury

14  instruction.  This is along the lines of the

15  instructions the Court has given preliminarily.

16        THE COURT:  That's out.  An expert is not going

17  to testify as to what the standard of proof is.

18        MR. SHEASBY:  Your Honor, to be clear, and just

19  for clarification --

20        THE COURT:  You can clarify, but it's out.

21        MR. SHEASBY:  Yes.  Is Professor Conte allowed

22  to describe the rules that he followed in preparing his

23  analysis?

24        THE COURT:  He can say this is the rule I

25  followed, but you're not putting a screen up with an

1    expert explaining this standard of proof.  I understand

2    -- he can testify that this was the standard I applied,

3    but we're not going to emphasize that he somehow has

4    adopted the correct standard.

5             MR. SHEASBY:  So I understand, the slide will

6    not go up.

7             THE COURT:  Very good.  Next.

8             MR. DOWD:  Just so we get it on the record, at

9    least under the old numbers it was 61, 62, 63, 67, and

10   121.  I think with the Court's guidance, we can agree on

11   that.

12            MR. SHEASBY:  We'll --

13            THE COURT:  I'm looking at 61.  Which I said is

14   out.  62 is out as well.  Again, I won't prevent the

15   witness from describing his understanding, but we're not

16   going to overemphasize it, and frankly, I'm not sure a

17   witness should be describing what is relevant and what

18   is not relevant.  He's not testifying as to the law.  I

19   understand he has described his standard generally, but

20   to say intent or knowledge is not required, I'm not even

21   sure he should testify to that.  He should simply

22   testify this is what I did and you can explain why he

23   didn't spent any time on intent or knowledge.  He looked

24   at the accused product, looked at the claims, and he

25   made his determination as to infringement.  So I would

1  say 62 is out completely.

2      63, I don't know that there's -- or 64, I guess, on

3  my numbers.  Is there an objection to that?

4          MR. DOWD:  It looks as though 63 --

5          THE COURT:  Has been eliminated.

6          MR. DOWD:  -- has been eliminated.  And then

7  the next one I have is 121, which was the DOE, and that

8  has been addressed.

9          THE COURT:  All right.  Anything else?

10          MR. DOWD:  That's all in my bucket.

11          THE COURT:  Very good.  Then let me take up the

12  exhibits.

13          MR. DOWD:  I'm sorry, Your Honor.

14          THE COURT:  I'm sorry, there's something more

15  for Conte?

16          MR. DOWD:  I'm sorry.

17          THE COURT:  That's fine.  Go ahead.

18          MR. DOWD:  So what I've tried to do is put them

19  in buckets by issue.

20          THE COURT:  Yes, you did.  The next bucket.  I

21  was being overly optimistic.

22          MR. DOWD:  Sorry, Your Honor.

23          THE COURT:  What number are we talking about?

24          MR. DOWD:  The next one should be -- it used to

25  be 47.  Let's see.

1          MR. SHEASBY:  It's still 47.

2          THE COURT:  All right.

3          MR. DOWD:  So...

4          THE COURT:  The nature of the objection?

5          MR. DOWD:  So the slide has changed slightly

6  from the one that I had.  The concern in this bucket is

7  slides that use claim terms in a manner that is not

8  consistent with the Court's claim construction.

9          THE COURT:  And here it is not because?

10          MR. DOWD:  Here the Court has given a

11  construction of what the term predict means, prediction

12  means, and it's not danger of ongoing collection of

13  information.  A prediction requires, under the Court's

14  construction, in fact executing which requires that --

15          THE COURT:  On 48; right?

16          MR. DOWD:  In 48 is the definition of

17  prediction.  I'm not objecting to 48.  But 47, which

18  suggests that predictions are just ongoing -- danger of

19  ongoing --

20          THE COURT:  I will -- well, I'll hear you very

21  briefly, but I'm inclined to exclude 47 because it just

22  complicates what the expert really should be opining.

23          MR. SHEASBY:  So Your Honor, one of the things

24  that we can't every time we say the word prediction

25  repeat the whole construction.

1          THE COURT:  No, but you can repeat it once at

2    the beginning, and that should be what's stated, not his

3    encapsulation of the concept before he then lives with

4    the construction given by the Court.  So 47 is out.

5        Next slide.

6          MR. DOWD:  So the next one, let's see --

7          THE COURT:  And again, these are all

8    demonstratives anyway.  It's not as though they're

9    coming into evidence.  They're supposed to be

10   encapsulating testimony or give ease to an expert to

11   describe what they did.  And I agree we shouldn't be

12   overemphasizing things that the expert shouldn't be

13   opining on to begin with.

14         MR. DOWD:  Sorry.  I'm just trying to

15   correlate.  As I'm correlating, I'm trying to see what's

16   applying.

17         THE COURT:  Both counsel have done pretty well.

18   Why don't you give us the number that you believe it is

19   and we'll see if we can get to it that way.  Are we

20   still on the bucket of improper validity opinions?

21         MR. DOWD:  I was, Your Honor.  I'm just trying

22   to see how to correlate.  I'm sorry, Your Honor, what

23   I'm trying to do is correlate both the numbers and then

24   identify what has changed on the slide on the fly to see

25   if there's still an objection.

1           THE COURT:  Let's do this:  We're going to be

2  breaking for lunch shortly.  Would the two of you sit

3  down and see if you can reach agreement if there are

4  specifics?  When will Dr. Conte -- we'll have a break

5  before he is called because we'll do openings which are

6  roughly -- are you still thinking 45 minutes to an hour?

7           MR. CHU:  Yes.

8           THE COURT:  Same?

9           MR. LEE:  Same, Your Honor.

10           THE COURT:  So we'll probably be able to take a

11  break.  Is Dr. Conte going to be your first witness?

12           MR. CHU:  No.  Dr. Gulbrandsen is.

13           THE COURT:  All right.  We should be in pretty

14  good shape.  If you could be back at 1:25 and if there

15  are still issues, we'll take them up then.  Otherwise

16  we'll take them up at the next break.

17           MR. DOWD:  Thank you, Your Honor.

18           THE COURT:  I was hoping to get to the

19  exhibits.  How soon will Apple be expecting to introduce

20  the several exhibits that are going to be objected to?

21           MR. MARCUS:  Your Honor, David Marcus for

22  Apple.  It's not something we need to take up right now.

23  And with respect to the contested liability exhibits,

24  many of them or all of them turn on the Court's rulings

25  on the deposition designations relating to David Webb.

1          THE COURT:  Mr. Weber or Webb.

2          MR. MARCUS:  So I think for right now, Your

3  Honor, we're fine.

4          THE COURT:  All right.  Actually why don't I --

5  I'll review that over the lunch hour as well and see if

6  I can narrow at least the nature of the parties'

7  disagreement on that score.

8      So anything more for WARF before we break?

9          MR. CHU:  There's one opening slide the Court

10  asked me about amazing inventions and other things, so

11  we took out that language.

12          THE COURT:  I saw that.  It was up on the

13  screen for a moment.

14          MR. CHU:  Yes.  And --

15          THE COURT:  That looks appropriate to me.  I'll

16  ask if -- have you shown this --

17          MR. CHU:  Yes.

18          MR. LEE:  Your Honor, I still think this is

19  Your Honor's province, but if Your Honor thinks it's

20  acceptable, we're not going to agonize about it.  But,

21  you know, the question whether U.S. government wants

22  disclosure, whether the rules apply to everyone in

23  exchange, this is what you're supposed to --

24          THE COURT:  I'm going to allow it.  It borders

25  on argument and I certainly hope it is not -- there's

1  not argument made when it's presented.  But in terms of

2  stating what the general purpose of the patent laws are

3  in our country, I'm going to allow you to make that

4  general representation.

5        Anything more for Apple?

6            MR. LEE:  No, Your Honor.

7            THE COURT:  Very good.  Then we will reconvene

8  at 1:25 and start opening statements at 1:30 and you're

9  free to move about the courtroom.  We're in recess.

10 Thank you.

11       (Noon recess        12:43-1:27 p.m.)

12           THE COURT:  Please remain seated while we take

13 up a couple matters before we bring out the jury.  I did

14 provide you with the court's ruling on the Webb

15 transcript.  That still leaves the Court with a few

16 questions on the exhibits that are supported by the

17 testimony, particularly as to their admissibility.  But

18 we can take that up at the break.  And I anticipate

19 taking up -- well, I'll take up something with regard to

20 Conte if that would be productive if it's substantially

21 meaningful to do it at the break as well.

22           MR. SHEASBY:  Your Honor, I think that we've

23 made pretty substantial progress.  There are two areas

24 where we need Court guidance.

25           THE COURT:  Sure.  Maybe you could call it up.

1    I'd have to look at it.

2           MR. SHEASBY:  Sure.  The first one relates to

3    Slide 69.

4           THE COURT:  All right.  I have it in front of

5    me.

6           MR. SHEASBY:  So one of the items we need to do

7    is we need to read into the record the admissions from

8    Apple, and these are unobjected to admissions.  They're

9    going to be in the record.  They're going to be read.

10   And to speed up Professor Conte's presentation as

11   opposed to him presenting all the evidence that he used

12   to establish that A7 chip is representative of all

13   infringing chips, he just cites to Apple's admission

14   that that's the case.

15          THE COURT:  I understand.  I'll hear from Apple

16   as to its objection.

17          MR. DOWD:  Yep.  Thank you, Your Honor.  Jim

18   Dowd on behalf of Apple.  I think probably a better

19   place to go is Slide 89, if we could go there.  And

20   while that's coming up, there are really two objections,

21   Your Honor.  The first is that the use of RFAs was not

22   in the expert's reports, so this is material that is

23   beyond the scope of the experts's report.

24          THE COURT:  Well, that's not true.  He was

25   opining on those elements.  So to the extent that he's

1   now relying on the admission, that's perfectly

2   acceptable.  He can rely on other evidence.  It's been

3   made part of the record.

4        But what's your other concern?

5        MR. DOWD:  My other concern is probably

6   highlighted best on Slide 89, which we now have up.

7   What he's done is he's taken something that is a Request

8   for Admission --

9        THE COURT:  And really made something out of

10  it.  I agree.  I think this has gone too far.  It's not

11  a demonstrative.

12       MR. SHEASBY:  No problem, Your Honor.

13       THE COURT:  If you want to just have the

14  request to admit and he can explain why he's relying on

15  it correctly and not correctly, that's fine.  But he's

16  not going to be able to amplify testimony by additional

17  highlighting.

18       MR. DOWD:  And Your Honor --

19       MR. SHEASBY:  Understood.

20       MR. DOWD:  -- while we're on this slide,

21  there's a second issue which is throughout the slides,

22  there's this kind of pejorative term *Apple jargon*.  I

23  think it's fine if they say Apple terminology, but to

24  call what we say somehow like hiding what we do is

25  incorrect.

1          THE COURT:  You want to propose an alternative

2     to jargon?

3          MR. SHEASBY:  I -- I was thinking about using

4     Apple's words or Apple's terminology.  Whatever they

5     would prefer.

6          MR. DOWD:  Terminology would be fine.

7          THE COURT:  Terminology -- well, there could be

8     something that's fine, too.  But since everyone is in

9     agreement, let's go with terminology.

10       Was there something else more then for me to rule

11    on?

12         MR. SHEASBY:  So there was one other issue

13    which I think is worth getting the Court's guidance on,

14    which is in Conte's report, he talks about the steps

15    that led to the invention, the history.

16         THE COURT:  Understood.

17         MR. SHEASBY:  This is directly in his report.

18    I can cite you the paragraphs.  And they're objecting to

19    that as somehow being validity testimony.  I think that,

20    to be clear, whatever is in his first report is in his

21    first report.  They're on notice of what he's going to

22    say.  He's certainly not going to say this was valid

23    over Hesson or valid over Steely, but he is going to say

24    this was important work because that supports the

25    objective indicia and he has fully disclosed his

1   opinions that this relates to important work.

2        Let's go to Slide 45, for example.  So what we've

3   agreed to them is to remove the word *key* discovery

4   because they didn't like that.  So it's just going to

5   say discovery.  And what Professor Conte says is his

6   report is that the '752 patent inventors established

7   that a relatively small population of load-store pairs

8   responsible for recurring dependencies over short

9   periods of time, but these -- but there would be a

10  change in the subset as time progressed.

11       THE COURT:  All right.  Let me hear from Apple.

12  What's the objection to the slide?

13       MR. DOWD:  So I think in part the objection is

14  resolved by the removal of key discovery.  That was one

15  issue.  I'm glad to hear that that's now resolved.

16  There were a couple of these, Your Honor, that aren't

17  actually ripe and I think this is one of them wherein

18  the lightning round meet-and-confer we just had, I'd

19  asked Mr. Sheasby if he could get me the citations to

20  the report.  He hasn't followed up with me yet.

21       THE COURT:  All right.  We're going to withhold

22  on that.  Is there some other category I can refer to?

23       MR. SHEASBY:  Yes, Your Honor.  There is one

24  other category.  By the way, for the record that's Conte

25  report 179.  I did give that citation.

1        THE COURT:  If you did -- just so we're clear,

2   we're not having this discussion.  You're either ready

3   to address it, having fully discussed it, or not.  It's

4   represented to me you're not.  In any event, Conte is

5   not coming on until after the break.  If we need to,

6   we'll do it by sidebar.  But you should see how far you

7   can get before you bring a matter to me.

8      Now, you said there was another category.

9        MR. SHEASBY:  There is one slide I think we're

10  working on.  Mr. Dowd, you had the slide about the nine

11  pipelines.  Do you want to pull that up?  Because I

12  think that is fully resolved.

13        MR. DOWD:  That should be 70.

14        MR. SHEASBY:  Okay.  70.  So this is a slide of

15  Apple's pipeline and it says nine pipelines.  And in

16  Dr. Conte's report he actually does identify nine

17  parallel execution pipelines.  That's paragraph 120.

18  This is another category they are objecting to.  And I

19  don't understand --

20        THE COURT:  All right.  Let me hear from Apple.

21  What's the objection?

22        MR. DOWD:  So this was another one where --

23  this is another one where I asked for citation; I hadn't

24  gotten it until just now.  So if I could --

25        THE COURT:  Let's just bring the jury out.  All

1  rise, please.  While we're waiting for the jury, just a

2  reminder the middle of the court is a

3  computer/iPhone/laptop-free area.  WARF has its area

4  that it's allowed to by its people on the left and Apple

5  on the right of the courtroom.  But the center of the

6  courtroom, there should be no use of any electronic

7  devices, and the court security officer will remind you

8  if you forget.

9        (Jury brought from courtroom at 1:34 p.m.)

10        THE COURT:  Please be seated.  Welcome back

11  from lunch.  As I indicated, we will begin now with

12  opening statement for the plaintiff WARF.  Mr. Chu.

13        MR. CHU:  Thank you very much, Your Honor.  May

14  it please, Your Honor.

15        MR. LEE:  Your Honor, we ask that be moved from

16  the present location so it's not blocking our view.

17        THE COURT:  This is the kind of thing I really

18  wish had been handled ahead of time, but why don't we

19  put it off to the left.  If you can set it down for now.

20  And then going forward, if either side has a problem

21  with how things are arranged, they need to raise it

22  before we get the jury back in the room.  Why don't you

23  proceed.

24        MR. CHU:  Thank you, Your Honor.  Ladies and

25  Gentleman of the Jury.  Good afternoon.  My name is

1   Morgan Chu and I represent the people at the Wisconsin

2   Alumni Research Foundation.

3        As you know, this is a patent case and we're going

4   to be talking about a particular patent quite a bit over

5   the next couple weeks.  And I'd first like to introduce

6   to you Professor Guri Sohi from the University of

7   Wisconsin-Madison.  I'd also like to introduce to you

8   one of his graduate students from a good number of years

9   ago, Dr. Scott Breach.  Thank you very much.

10       And as you will hear, going back for Professor Guri

11  starting in the 1980's and then later with Dr. Breach

12  and two other graduate students, they started working on

13  a very tough problem that people around the world at

14  some of the largest corporations and the best academic

15  institutions around the world were looking at.

16       But first let me explain what is WARF or the

17  Wisconsin Alumni Research Foundation.  You were very

18  briefly introduced to Dr. Carl Gulbrandsen this morning

19  and he is the managing director.  Dr. Gulbrandsen will

20  be our very first witness.  So he will describe in a

21  little bit more detail what they do and, excuse me,

22  basically they serve as a supporting organization for

23  the University of Wisconsin.  They help manage

24  disclosures of inventions, applying for patents, and

25  managing patents.

1        Now, I want you to take a trip back in time with me

2   for just a little bit.  It's the later 1980's.

3   Computers were much more primitive than they are today.

4   But Dr. Sohi had been thinking about a problem that was

5   deviling people quite a bit, and it involved something

6   that's called out-of-order processing.  I'm going to

7   show you very briefly, if we could just set this up and

8   I think we can set it up right here, right here, so --

9        THE COURT:  The problem is that you don't have

10  a mic right there, so you're not going -- you're miked.

11  Very good.  Thank you.  As long as you stay by the

12  podium or come back or go to that spot.

13       MR. CHU:  Can everyone hear me fine?

14       MR. LEE:  If I may come around to see.

15       THE COURT:  Sure.

16       MR. CHU:  And this is going to be --

17       THE COURT:  Wherever you want to stand.

18       MR. CHU:  This is going to be a relatively

19  simple explanation.  I've written up load 3, and

20  computer scientists and programmers think about loading

21  as loading some information from memory, which acts like

22  a filing cabinet for information, and loading it into a

23  processor, which is the brains of the computer.  So if

24  the computer, the processor is going to do some work, it

25  needs to get information from memory, that information

is loaded into the processor, and then it may do some work.

So let's assume the first instruction is load the number 3 into the processor.  And let's assume that the second instruction is load the number 4.  And the third instruction is add 3 plus 4 equals 7.

Now, long ago, computers in a sense were very similar to a narrow country road.  The processors were not as good and they would receive instructions and do them just one by one by one.  And then people said well, sometimes the load 4, the second instruction, might be ready earlier than load 3.  But if everything was done in order, then the computer would have to wait.  It would waste the resources.  So long before Professor Guri started thinking about some problems related to this, other people said we can find ways to execute computer instructions out of order.  If load 3 is ready, we'll execute that.  But if it's not ready and load 4 is ready, we'll execute that.

In this example you can see that it's okay to execute the instructions out of order.  Doesn't matter whether you load the load 4 first or the load 3 first. And just to stay with this example, if there was another instruction like add 3 plus 4, you can see that it wouldn't work to do the addition before the load 4.

1    This, the addition, has to come after these load

2    instructions.  We're okay with that?

3        Okay.  Now, I'm going to take this down just to

4    make it easier for others.  So in a real computer system

5    in the late 1980's, in the 1990's, people were thinking

6    about how do we get to do this better?  Because they had

7    become sufficiently complicated, people saw some

8    problems.  And there was always the possibility that if

9    you did two instructions out of order, it might cause a

10   mistake to be made.  And then if a mistake is made,

11   instead of speeding up the computer, the computer would

12   have to go backwards, throw away all of the work that

13   had been done, begin again to get it right, and to make

14   sure that the two particular instructions were executed

15   in the correct order.

16       But Professor Sohi is thinking about something

17   that's even more complex than that.  He's thinking not

18   about the computers of that time, he's thinking about

19   computers that he thinks will come into existence years

20   into the future, computers that didn't exist in the late

21   1980's or early 1990's.  But he and others could foresee

22   how computers were getting faster and faster.  And he

23   started to look to the horizon and indeed was looking

24   over the horizon.  And just as we, as human beings, no

25   matter how good our eyesight is, we cannot see over the

horizon.  He was thinking about computers and what they

might be able to achieve 10, 15, 20 years in the future

and how the problems of doing out-of-order execution of

computer instructions would be so much more complex, and

thinking about that vision, how he might be able to

solve it.

So at first he's thinking about it.  But by 1992

and '93, there are three very lucky graduate students

and one very lucky Professor Sohi, and Professor Sohi

would probably say he's the luckiest of all.  There were

three graduate students who come to U.W. Madison and

they want to work, each of them individually, with

Professor Sohi.  And he talks to them about the problems

that he's been thinking about.  And they embark on

trying to make computers faster for this out-of-order

execution to minimize those collisions that would cause

the computer to have to redo the work and to maximize

the number of times the prediction of allowing

instructions to be executed out of order would work.

And they were working on it all the time.  You probably

know some people who in their lives they get very

excited about something, and it might have to do with

the arts or reading or something else.  Well, graduate

students, particularly those in many fields at U.W.,

work incredibly hard.  And over the next several years

1   this group of four put in the equivalent of more than 11

2   person years to try and solve this problem.  They came

3   up with a lot of good ideas they thought; lots of them

4   didn't work.  There were failures along the way.  There

5   was a lot of times they had to go back to the drawing

6   board.

7       But finally toward the tail end of 1995, they think

8   they've got it.  They've been testing it and testing it

9   and testing it.  And what they have is a way to have a

10  better prediction of what will happen when the

11  instructions are executed as fast as they can possibly

12  be, including out of order, minimizing the times when

13  the instructions should have been in a different order.

14      And by 1996, they applied to the United States

15  Patent Office for a patent.  And at that point, there's

16  a rigorous examination.  The Patent Office has people

17  who are trained in a particular area of technology, so

18  it's not a biologist or it's not a structural engineer

19  or general electrical engineer, it's someone who knows

20  this technology and they have technical degrees.  And

21  they're also trained in the law.  And they carefully

22  examining -- examine the application and say well,

23  explain this better to me or I'm not going to accept

24  this.  And then from the application in 1996 after this

25  very careful examination by the United States Patent

1  Office, they decided to grant Professor Sohi and his

2  three graduate students a United States patent.  That is

3  the patent involved in this very case.

4      Now, I'm going to look more closely at some of the

5  background to this and the evidence that you will hear

6  during the course of this trial.  This is just some

7  basics about why we have patent laws.  U.S. government

8  wants disclosure of inventions.  And in exchange, if

9  someone wants to use one's invention, that person needs

10  permission for a limited period.  And as you heard this

11  morning, after the patent expires, everyone gets the

12  benefit of the technology and can use it for free.  And

13  the same rules apply to everyone, whether you're a

14  university, whether you're the world's largest

15  corporations or just a group of three graduate students

16  and one professor.

17      And the way to think about a patent is this:  Some

18  of you may own your own home or you rent an apartment

19  and you have control over your home or your apartment.

20  No one can come in and squat on your land or in your

21  apartment without your permission.  A patent license, by

22  the way, is just a fancy legal phrase of granting

23  permission to use someone's patent rights.

24          THE COURT:  Mr. Chu, I just want to make sure

25  you're on pace for your original estimate for opening.

1           MR. CHU:  Yes.

2           THE COURT:  Because we're not going to start at

3    a basic level that's already part of -- that was done in

4    the video.

5           MR. CHU:  Yes.

6           THE COURT:  If you would move that part.

7           MR. CHU:  Yes, I will.  Thank you very much,

8    Your Honor.  So this depicts what it is for real estate.

9    And you'll hear about claims for a patent and it must be

10   within this real estate area.  This is the face of the

11   patent, and as you can see, there's the number, there

12   are the named inventors, and then there's WARF.

13         Professor Sohi is a full professor.  He's the past

14   chair of the computer science department.  And here are

15   photographs of the three students.  You already met

16   Dr. Breach.

17         Here are the particular Apple products that are

18   alleged to infringe in this case.  This is the back of

19   an iPhone product and we're showing the A8 processor.

20   And it's part of the A8 processor where the infringement

21   takes place.  And one of the beauties of Professor

22   Sohi's invention is it doesn't take up a lot of space in

23   the processor.  It does its magic with a very small

24   number of circuits using very little power.  So it

25   increases performance without having much of an effect

1  on the power needs, which is very important for

2  something such as a smartphone.

3      As I mentioned, the processor is like a brain.

4  Here are three topics that we're going to cover.  As I

5  mentioned, a computer memory is like a filing cabinet

6  for information.  And I'm going to introduce a couple

7  words here.  One I've already mentioned.  When the

8  information is going from the memory to the processor,

9  it's called a load.  And when the processor is sending

10 the information back to the memory, it's called a store.

11     So here is a little more detail than what I drew

12 up.  The first instruction is load 3 from memory.  Here

13 is the second instruction.  Here is the addition, and

14 now I'm going to add something to that.  We have a 7 and

15 then we're going to store the 7 back to memory.

16     So this is an animation to give you an idea, first

17 of all, when computer instructions are executing in

18 their normal order.  Each of the blue cars is a computer

19 instruction.  And this is the way it used to be done.

20 Execution in program order.

21     Now, the program order can lead to bottlenecks, and

22 here is an illustration of that.  So we have this truck

23 3 -- we've all been behind a truck like that -- and all

24 the other instructions have to wait.  So there's wasted

25 time as a result.

1        Now, the order execution can increase performance.

2   And here is an example.  Now, the instructions are being

3   executed out of order.  The other instructions aren't

4   waiting on instruction 3, the red truck, and we have

5   better performance.

6        Dependent load-and-store instructions must execute

7   in the right order.  So let me first illustrate this.

8   We see the blue instructions going by, and here we see

9   the car 8 getting behind truck 3.  And computer people

10  would say load-8 loading information from memory is

11  dependent on store-3; that you can't not load-8 go by

12  until truck 3 is executed.  They're dependent.  And if

13  there isn't the computer waiting, then the computer may

14  make a mistake trying to increase performance.

15       So computer people will also use another word, they

16  say it's called *speculation*.  But here is a way to think

17  about it.  They want to have a way to predict what's

18  going to happen, where with the large complexity it's

19  very difficult to know at any fraction of a moment in

20  time which instruction is dependent on another.  So the

21  computer could speculate that they're not dependent.

22  Take a guess.  Taking an educated guess or trying to

23  predict.  And that's the basic problem that's being

24  attacked.

25       So what if you don't know a store-3 must come

1   before load-8?  You might speculate that they're not

2   dependent, and I'll show that.  Well, it looks like it

3   worked out okay.  It was a correct speculation.  There's

4   no dependency, speculation was correct, speed improves.

5   Hurray.

6        But what if the opposite is true?  What if there is

7   a mis-speculation if load-8 and store-3 are dependent,

8   then there's a mis-speculation, and that's what this

9   misrepresents.  What does the computer then have to do?

10  It's worse than just slowing down.  The pipeline needs

11  to be flushed and all that work needs to be thrown out.

12  And the computer has to do work to flush the pipeline.

13  And then all the work has to be redone, making sure

14  those two dependent instructions are executed in the

15  correct order.

16       So this is an article back in 1996 where Professor

17  Sohi is sharing with the world his thinking about this

18  problem.  At the time in 1992, '93, '94, in that time

19  period, computers were getting pretty good.  And a way

20  to think about the complexity of the computer is how

21  many transistors are there on a little computer chip.

22  And the transistor is the equivalent of a little switch.

23  It's just on or off, and all digital computers have them

24  and the more transistors you had, the greater the

25  complexity but also the greater the computing power.

1    And at that time, the chips had one million, two

2  million, three million, roughly that number of

3  transistors.  Now, Professor Sohi, he's not thinking

4  about five and ten transistor computers, he's thinking

5  about hundreds of millions, 200/300 million, and indeed

6  he's thinking about in the future that there will be

7  chips made with over a billion transistors.  He is

8  focused on the future.

9    Here are the Apple infringing processors.  Those

10  are the computer chips in each of those infringing

11  products.  And the A7, which first came out with the 5s

12  iPhone, had reached the $1 billion milestone.  And the

13  A8 went to $2 billion transistors, and the A8X had 3

14  billion.  The earlier processors, like the A6, had fewer

15  transistors and they did not use Professor Sohi's

16  invention, which was oriented to more complex computers.

17  And in fact, the A6 had a number of transistors where

18  the jump from A6 to A7 increased the number by roughly

19  50 percent.

20    Now, others were working on this problem; IBM, then

21  the biggest computer company in the world.  There was

22  another very big computer company in the United States

23  and actually worldwide at the time called Digital

24  Equipment Corporation, and for a time it was the second

25  largest computer company in the United States, and with

180

1    IBM and Digital Equipment and other companies were

2    working on this problem.  And they thought that they had

3    solved it.  They first thought that this problem that

4    Professor Sohi and his students were studying was

5    infrequent and they said we've got it good enough.

6    We're within one percent of being perfect.  And I should

7    say in addition to IBM and Digital Equipment, there were

8    other people in academia and other corporations around

9    the world trying to solve this problem.  And they were

10   all essentially going left.  They had taken the left

11   fork in the road thinking that they had solved it.

12        But remember Professor Sohi and his graduate

13   students are looking over that horizon.  And what they

14   come up with is really completely different.  Over time

15   it was shown that what IBM and DEC did not only didn't

16   solve the problem, but there was scant evidence that it

17   was used -- their technology was actually used by them

18   or by others and certainly it's not being used today,

19   and in contrast the small group of four people in

20   Madison took a different fork, went in a different

21   direction, and they found a solution for the future.

22        So you will hear these words:  Load-store

23   dependency predictor or LSD, because that's how the

24   Apple engineers studying this problem called what they

25   were working on.  They were trying to work on an LSD

181

1  predictor.  And as you know, we're talking about the

2  load-and-store instructions between the memory and the

3  processor.  We're trying to look whether they're

4  dependent and we're trying to make a prediction for

5  something that will happen in the future.

6      What did they do?  And this is just an example of

7  some of the things they do -- did.  They tried to use

8  Digital Equipment technology that they had learned about

9  to use in their A7, and it didn't work.  And they tried

10  to use another kind of Digital Equipment technology that

11  they knew about.  It didn't work.  And then they tried

12  to design without a predictor, and that didn't work, and

13  they tried many, many other things.

14      And in fact, they were having a problem.  Now, they

15  have very good engineers, but as you can see here, this

16  engineer, Peter Bannon, was saying in an email the LSD

17  errors cause such a train wreck in the pipeline, we

18  can't afford to come up short on this because they have

19  a timeline to get the product to market and they want to

20  meet their goals and they've got to solve this problem.

21  And eventually, the way they solve this problem is to

22  use the very technology that Professor Sohi and his

23  graduate students had developed.

24      So you will hear from Professor Tom Conte.  He's

25  with the Georgia Institute of Technology, one of the top

1  technology schools in the country and president of the

2  IEEE computer society.  And Professor Tom Conte is here

3  in the courtroom and you will hear from him later this

4  week.  You'll hear what he did to study the question.

5  Is the A7, is the A8, are those processors infringing or

6  not infringing.  Here are those products and those

7  processors and all of them have LSD predictors that

8  infringe.

9       Now, you'll hear that Apple says well, they have

10  some defenses.  And they'll say there really isn't

11  infringement.

12       This is claim 1 from the patent.  At the very end

13  of the patent, this describes the metes and bounds of

14  the intellectual property in much the same way metes and

15  bounds are describing real property.  And I'm going to

16  highlight the basic Apple arguments that we think we'll

17  hear from them about during the course of this trial.

18       One of them has to do with attempting a

19  mis-speculation.  They say they don't detect a

20  mis-speculation.  But any kind of predictor looking at

21  load-store dependencies has to be able to determine

22  whether there is a mis-speculation.  Because if you

23  can't determine that, you don't know when you need to

24  redo the work.  So they do detect and determine that

25  there is a mis-speculation and you'll hear some

1   testimony and evidence about that.

2       They also say well, we don't really do this other

3   item -- and I'm going to come back to that -- associated

4   with the particular data consuming instruction, and they

5   don't do the third thing that I just highlighted.  So

6   I'm going to go through each of these.

7       And first with the mis-speculation.  Here is that

8   same claim language.  Let me go back, by the way, to the

9   claim for a moment.  They -- the words mis-speculation

10  appear a few different places in the claim and wherever

11  it appears they say well, we also don't do it there.

12  It's mis-speculation.  But the great bulk of the

13  language in this claim, these are engineering words such

14  as in a processor -- you now know what a processor is,

15  capable of executing program instructions in an

16  execution order differing from their program order, you

17  have some idea what that is -- but the great bulk of

18  what is in the claim describing the actual invention is

19  either not in dispute or not seriously in dispute and I

20  think it's basically these three arguments that we may

21  hear about.

22      So here is the first argument.  But Apple admits on

23  detecting a mis-speculation that mis-speculations occur.

24  Apple recovers from the mis-speculations.  And, of

25  course, logically Apple must detect mis-speculations to

recover.  So what their lawyers may be doing is trying
to change the words in the claim to have an additional
requirement.  But the metes and bounds that define the
patent claim are what's granted by the Patent Office, no
more, no less, and they would like to add words such as
this.

     Mis-speculation, again Apple says loads don't
access memory.  But Apple engineers call it memory or
memory subsystems.  And here is another one of their
arguments that relate to these particular words
associated with the particular data consuming
instruction.  And again, Apple, through its lawyers'
presentation, will try and add some words to the claim.

     But even with Apple's rewriting, Apple engineers
admitted, even with that rewriting, that they infringe
99.9 percent of the time.  And there would be an
infringement even if it was 5 percent or 10 percent or
20 percent of the time.  So even with the rewriting,
there is the infringement.

     And then next Apple will say if you don't believe
those two arguments, here is the next one.  It relates
to a prediction within a predetermined range.  Again,
there's an attempt to add words to the claim to change
the meaning.  So Apple is effectively trying to rewrite
the claim and change what the patent --

1        THE COURT:  Mr. Chu, there's a limit to --

2    there's argument and there's facts and I'd like you to

3    get to any further facts --

4        MR. CHU:  Yes.  Thank you, Your Honor.  So then

5    the argument is if it's infringed, if you don't believe

6    all the other arguments, then the patent is invalid.

7        And here are the basic facts that you'll hear about

8    on the question of whether a patent is invalid for

9    obviousness.  You'll hear facts about a person of

10   ordinary skill in the art, not extraordinary, and that

11   person is assumed to know about the prior art.  And the

12   question is would it have been obvious to that person of

13   ordinary skill at the time of the invention.

14       You'll also hear about objective evidence that the

15   invention was not obvious, and I'll give a few examples

16   of that evidence.  One type of evidence is whether the

17   patent was licensed.  If it was licensed, some unrelated

18   third party decided to take a license.  That would be

19   objective evidence of nonobviousness.

20       Another is whether the inventors were proceeding

21   contrary to accepted wisdom in the field, which was in

22   this case.  And the third area, among others, is whether

23   there was praise in the field and awards when they

24   recognized the value of the invention.  And I'm just

25   going to talk about one of these categories today.

1     Was the patent licensed?  Well, a number of years

2  ago WARF had to defend its patent, the same WARF patent

3  involved in this suit, by filing suit against Intel

4  here.  And then the case proceeded.  There were a lot of

5  -- there was a lot of information exchanged.  And

6  eventually when all was said and done, Intel agreed to

7  take a license.  And this is just part of it, showing

8  that it is the '752 patent that was being licensed by

9  Intel.  It was settled out of court.  There was no need

10  for a trial.

11     Now, they're going to point to Hesson and Steely,

12  two pieces of prior art, as Intel had done, and here are

13  the face pages of those two patents:  The Hesson IBM and

14  the Steely Digital Equipment patents.  And these are two

15  pieces of prior art that the Patent Office already

16  considered in granting WARF the patent.  And in

17  addition, the evidence will show that IBM and DEC had

18  failed to truly solve the problem, because if they had,

19  then the world would have beat a path to their door.

20  They would have used it in all their high-end computers

21  and the like.  And we'll have evidence about that as

22  well.

23     Next Apple's lawyers will say well, if that doesn't

24  fly here, they're going to point to the Chen papers.

25  There's a Dr. Chen.  But there are key differences

between what Dr. Chen was discussing.  He was discussing
in-order processing, not out-of-order processing, which
has evolved here.  The Chen papers discuss a static way
of doing this and not dynamic.  Let me stop for a moment
and discuss what I mean by dynamic.

If I were to provide a very short summary of the
invention, we're going to have much more testimony of
the details.  It is a computer circuit.  It is hardware.
And it is a very, very small piece of hardware.  And
it's intelligent and wise in making predictions, and in
addition, it's dynamic.  It's learning all the time.
It's getting smarter and smarter all the time.

Going back to the Chen papers, they are static, not
dynamic and always learning.  And Dr. Chen is using
software or a hybrid combination of software and
hardware as opposed to this hardware solution.  And then
they'll say well, if you don't believe the arguments on
the Chen papers, let's go to the EV6 and the EV6 is a
Digital Equipment chip and that Digital Equipment chip
shares a lot of the same characteristics as the Steely
reference.  It's more primitive than Steely and Steely
was already considered by and before the Patent Office.

We've summarized key aspects of the United States
patent clause.  And in conclusion, the evidence we
believe will demonstrate that Apple infringes.  And I

1    should tell you that that's our responsibility.  That's

2    WARF's responsibility to come forward with the evidence

3    to persuade you.  And now the WARF patent is valid, but

4    that's the responsibility of Apple.  They have to come

5    forward and persuade you.

6        You've been a terrific group of jurors.  I thank

7    you very much for your attention.

8            THE COURT:  Thank you, Mr. Chu.  And now, we

9    will hear opening statement for the defendant Apple.

10   Mr. Lee.

11           MR. LEE:  Could we switch the mic?  Can I

12   borrow the portable mic?

13           THE COURT:  Oh, sure.  I assume someone is

14   doing it because I'm not going to.

15           MR. LEE:  I think we're going to do it

16   collectively, Your Honor.  May I proceed, Your Honor?

17           THE COURT:  Please.

18           MR. LEE:  Your Honor.  Ladies and Gentlemen of

19   the Jury.  As I mentioned earlier, my name is Bill Lee,

20   and together with my colleagues Dave Marcus, Jim Dowd,

21   and Cathy Cetrangolo, we represent Apple.  With us today

22   are Gerard Williams, who is actually the person who

23   designed the real world chip that is in the iPhone and

24   the iPad; and Iain Cunningham, the Director of

25   Litigation at Apple.

1    Let me begin by saying the same thing that Mr. Chu

2    did.  Let us begin by thanking you for giving us our day

3    in court.  We know from the voir dire that each of you

4    is busy with your own individual lives and jury service

5    imposes a substantial burden on you.  But this case is

6    important.  It's important to WARF for the reasons that

7    Mr. Chu just related to you.  But it's important to

8    Apple, the company that brought to the marketplace, that

9    invented the iPhone and the iPad which now stand accused

10   of infringement.  It is important to the Apple

11   engineers, like Mr. Williams, who actually independently

12   developed, without any knowledge of the WARF patent or

13   the WARF research, the products that we see every day

14   and in every context.  And it's important to the many

15   people who've relied upon Apple to invent and innovate

16   for decade after decade.

17       Now, as you listened to Mr. Chu, you may have been

18   asking yourself if everything he says is true, why are

19   we here?  We're here because there are two sides to the

20   story and His Honor told you until both sides of the

21   story are told, until you've heard all the witnesses,

22   until you've seen all the exhibits, you will not have

23   the complete picture or see the complete puzzle.

24       And when you have the complete picture and the

25   complete puzzle, you will learn some things that WARF

1  did not tell you in its opening.  And before I take you

2  to the story in a chronological order that will put the

3  various facts you just got in detail in a way that will

4  make sense we suggest, I want to give you two examples.

5           THE COURT:  Mr. Lee, I suspect your mic is not

6  on.  I don't know that for a fact.  It will come in

7  better if you --

8           MR. LEE:  Better?  So let me give you two

9  examples.  Do you remember where Mr. Chu said that

10 Dr. Sohi was looking over the horizon and he saw future

11 computer chips with billions of transistors?  You will

12 read the '752 patent forever and not see a mention of

13 billions of transistors.  You will not find that

14 prediction in the patent that you are going to have to

15 review.  You're not going to find any prediction about

16 billions of transistors because the words aren't in

17 there.

18     Let me give you another example.  Mr. Chu said, and

19 I agree with him on this, referring to some of the

20 others scientists who worked in the field, if they had

21 solved the problem, the world would have beat a path to

22 their door.  Do you remember that just a few minutes

23 ago?  So let's talk not about Dr. Sohi's body of work,

24 not about Dr. Breach's other work, but let's talk about

25 this patent because that's the only thing that's going

1  to be before you.

2       And what will the evidence show?  The patent has

3  existed for 17 years.  It was issued 17 years ago by the

4  United States Patent Office.  Now, keep in mind what

5  Mr. Chu said.  If they had solved the problem, the world

6  would have beat a path to their door.  Well, for the

7  first two years after the patent issued in 1998, it

8  literally sat on a shelf.  No one did anything with it

9  at WARF.  No one did anything with it at U.W.

10      Two years later, more than two years later, WARF

11 decided it would try to license the patent to the major

12 computer manufacturers in the United States:  IBM,

13 Hewlett Packard, Compaq, Digital Equipment Corporation,

14 AMD, and Sun.  Those companies said no thanks.

15      Now, two things.  If they had solved this problem,

16 solved the horizon, do you think all those companies

17 would have said no thanks?  No.  They would have done

18 just what Mr. Chu said.  They would have beat a path to

19 the door of these four inventors.

20      But there is a reason they said no thanks.  And

21 you're not going to have to take my word for it.  The

22 lead inventor on this patent actually is Dr. Andreas

23 Moshovos.  He won't be here to testify live as far as we

24 know, but we're going to show you his deposition, the

25 lead inventor, the person who did the work that's in

1    this patent, not WARF.  And here is what he said in an

2    email back in 1998, 17 years ago.  "I fully respect that

3    DEC and later IBM identified the same problem earlier

4    than we did."

5        Who's looking over the horizon?  Who's identifying

6    the problem?  And what you're going to learn is that DEC

7    and IBM not only identified the problem earlier, they

8    came up with their own solutions.  That's why they said

9    no thanks.

10       In the 17 years since the patent issued, think

11   about all that has occurred in your own personal lives

12   in the development of computing devices.  In that 17

13   years, one company has taken a license to the patent,

14   and that's Intel.  That was in 2009 after WARF sued

15   Intel.  But there are some additional facts that WARF

16   didn't tell you about in its opening.

17       Intel funded the research in 1994 that led to this

18   patent.  Dr. Moshovos and Dr. Sohi presented the results

19   of the work to Intel scientists.  They provided them

20   written summaries of that work.  Intel thought it had a

21   right to use that research.  But after it got sued, it

22   settled because WARF said no, you don't have a right to

23   use it.  That's the only license, the only license in 17

24   years.  That's not beating a path to your door.

25       Now, in contrast you're going to learn that Apple

1    didn't fund the research.  Apple didn't have any

2    relationship with the University of Wisconsin

3    scientists.  Apple never talked to them.  Apple never

4    met with them.  In fact, Ladies and Gentlemen, Apple

5    didn't even know about the patent when it was designing

6    products that are going to be before you.  They didn't

7    know a thing.  But nevertheless, WARF accuses a chip in

8    Apple's iPhones and iPads, and I have them and you'll

9    see them and you'll be able to hold them, the iPhones

10   and iPads.  These are the accused products.  And since

11   they're the accused products, let me tell you a little

12   bit about them.

13        In 2007, Apple introduced the iPhone.  It's a

14   smartphone with an intuitive, easy-to-use touch screen

15   display.  This in my left hand is one of the original

16   iPhones.  In 2010, it introduced the iPad.  And in my

17   right hand is one of the original iPads, the first

18   commercially successful tablet computer.

19        The iPhone, the iPad were invented by Apple

20   engineers, Apple scientists, who put enormous time,

21   effort, and energy into developing these products.  Over

22   the years, one of the things they developed is something

23   that Mr. Chu referred to as the A7 chip.  You'll get to

24   hold this at some point during the evidence.

25        This is the A7 chip.  This is what the Apple

engineers developed that took the power of that laptop

sitting before Mr. Chu and put it in this chip so that

it could be used in these products.  That's a result of

the effort and innovation of the Apple scientists.  And

that's what stands accused of infringing.

Now, you learn that the WARF scientists actually

never made a chip.  They actually never made a working

product.  They never worked with anybody else to make a

working product.  Now, we're not saying that they

should.  They're faculty members at a university.  They

do research.  They publish papers.  That's the work that

they do.  But what you will learn from the evidence is

there's a difference between writing a solution on paper

and then ultimately designing a chip that can work in

real world products that you can use every day.

So I promised that I would give you the story in

chronological order and that's what I'm going to try to

do now.  The slide on the screen will tell you the four

chapters, which I hope is a logical progression of the

information that you will need to decide the case:

We'll talk about the technology, but particularly what

was known before; we'll talk about the development of

WARF's claimed invention; we'll talk about Apple's

independent development 15 years later of its own

solution, and then I want to come back to where Mr. Chu

ended, which is why are we here.

Now, before I go into the technology, you're going to find that we agree on many basic parts of the technology because all of this was known before anyone at Wisconsin started their work.  Mr. Chu mentioned several times that the scientists who were on the patent were at the University of Wisconsin-Madison.  It's true. We also know we're in Madison, the home of the University.  We're not here to say the University is anything other than a great institution.  We're not here to criticize Dr. Sohi's body of work.  That's not the issue.  The issue is there's a specific patent with specific requirements that has a specific history, and the mere fact that it came from Madison doesn't mean WARF wins.  It doesn't mean WARF loses.  Instead we're in the United States District Court before a judge appointed by the President of the United States where everybody gets a fair shake, WARF and Apple.  And all we're asking you to do is listen to the evidence, put it in its context, give it your best evaluation, and give us your best judgment.

Now, if I turn to the technology, let me go to the first chapter.  And I start -- I will start with the technology because that's what the case is about.  The details of the technology matter.  I'm going to take you

1    through it now in a few minutes.  I promise that my goal

2    is not to bore you after lunch with the details.  The

3    details will become important as we move through the

4    case.

5         You will hear from Dr. Robert Colwell.

6    Dr. Colwell, stand up now.  Dr. Colwell has 40 years of

7    experience working in the field of computer

8    architecture.  You've heard of the Intel Pentium

9    processor.  You may have seen advertisements.  You've

10   heard about them in computers.  This is the chief

11   architect of the original Pentium processor, the man who

12   helped designed a chip that was in 80 percent of the

13   computers over a long period of time.

14        He is going to tell you the history of what

15   happened in this field.  He will tell you how many

16   different people working on the same problem, just as

17   Dr. Moshovos said, and how others had developed

18   different solutions.  And that's the key.  Different

19   solutions.

20        Now, as Mr. Chu said, the case involves processors.

21   Each of us, and we know that some of you have, have used

22   computers, whether a desktop, a laptop, a smartphone.

23   They all have processors.  Processors are the brains of

24   the computer and they execute millions and millions of

25   instructions per second.

1     The instructions are stored in a memory.  The

2  processor goes to the memory, it fetches or grabs the

3  instructions, and then the processor executes them.  3

4  plus 4 equals 7.  Every instruction causes the processor

5  to perform a specific test or operation.  Every

6  individual task is small:  3 plus 4 equals 7.  2 plus 2

7  equals 4.  But because modern processors are capable of

8  executing billions of instructions per second, the

9  computer is capable of accomplishing those tasks in a

10 fraction of a second.

11     The functions we all know about:  Sending email,

12 sending photos, downloading a video, surfing the

13 internet are based upon a really discrete set of

14 instructions that are repeated over and over and over

15 again.  Dr. Colwell will explain to you that these

16 concepts were known for decades.  The WARF inventors

17 have testified to the same.

18     One particular type of instruction is important

19 here.  It's a memory instruction.  And these

20 instructions move information in and out of memory.

21 They're called *memory instructions*.  As you can guess,

22 these instructions are an important part of any program.

23 You need to get the information out before you can use

24 it.

25     So let me talk to you about two.  A store

1  instruction involves storing or writing data to a
2  specific location.  You can think of this example.  If
3  you make a deposit in your bank account or withdraw from
4  your bank account, you want to update the amount of
5  money that's in your checking account.  The store
6  instruction says I've deposited $100.  I've withdrawn
7  $100.  Load instructions involve reading the loaded data
8  from the memory location.  So now after you've updated
9  your checking balance by depositing $100, the load
10 instruction says okay, what's my checking account
11 balance?  I can go and find out.  It's been updated with
12 my deposit.  It's accurate.
13      Now, every computer program, no matter how complex,
14 is just a list of instructions telling the computer what
15 to do, like a recipe.  It's called, to computer
16 scientists, *program order*.  It can be important for the
17 processor to execute instructions in program order.  For
18 example, if you had been selected as jurors before the
19 court -- for example, you had to be selected as jurors
20 before the Court could give you the instructions it did
21 right before the lunch break.  The instruction to start
22 the trial, for Mr. Chu to open, for me to open was
23 dependent upon your being seated and sworn.  But other
24 instructions can be executed out of order:  The
25 instruction to move the exhibits into the room; the

1   instructions to set up the video screen; the

2   instructions to review his instructions with the lawyers

3   are not dependent on your being seated.  They could be

4   done in any order before you're seated, and by doing so,

5   we save time.

6       The same exact thing is true for store and load

7   instructions.  Some store and load instructions need to

8   be executed in program order.  Others can be executed

9   out of order.  Again, Dr. Colwell will explain to you

10  that these concepts had been known for 40 years before

11  the time the WARF patent was filed.

12      So when must a store and a load instruction -- when

13  must store and load instructions be executed in order?

14  The answer is whenever you have a store instruction

15  followed by a load instruction, which is what's shown on

16  the screen right now in Slide 1-9.  Whenever the store

17  is going to the same location, the load is accessing.

18  They have to be executed in program order.

19      Computer memory is a little bit like each of the

20  locations has an address, just like your house has an

21  address.  And so what is known here is the number 5

22  needs to be loaded to this address, and when it's loaded

23  or read, it's read with the same address.  Now, if

24  what's being stored is your $100 deposit to your

25  checking account, you want that to be stored at the

1  right address before you read out your balance,

2  otherwise the balance will be wrong.  They're dependent.

3      When they're dependent that way, they have to be

4  executed in the right order, otherwise in my bank

5  account example you would get a bank -- checking account

6  statement that was either too low or too high.

7  Whichever it is, you'd be getting the wrong information.

8      But there are other instructions that can be done

9  independently.  And if I go to Slide 1-10, in this

10  example the store storing the value 5 is going to one

11  address, 1 Oak Street.  But the load is coming from a

12  different address.  If that's true, they could be

13  executed out of order.

14      So imagine that what's happening here is that in

15  the store, we're storing your $100 to your checking

16  account.  But when you go to the ATM, what you want to

17  do is read out what's in your savings account, not your

18  checking account.  And you go to this location and you

19  read out what's stored there and you get your savings

20  account balance.  They can be done out of order because

21  they're not dependent upon each other.

22      Now, if you can do that because they're

23  independent, you can save time.  Some instructions are

24  dependent, some instructions are independent.  Some have

25  to be executed in order, others can be executed out of

1    order.

2        For decades, as Dr. Colwell will tell you,

3    processors -- way before the 1990's, processors were

4    designed to speculate.  And speculate means guessing at

5    whether you could execute a loaded instruction out of

6    order; guessing whether you could save some time by

7    executing out of order.  It means taking a chance.  If

8    it turns out that the instructions are independent, like

9    our checking and savings balance accounts, then it's

10   fine.  Going out of order will not be a problem, and as

11   we said, it probably will save some time.

12       But if it turns out the two instructions are

13   dependent, a deposit to your checking account, a

14   statement of what's in your checking account, then going

15   out of order will actually result in what's called a

16   mis-speculation or a mistake.  You will learn that when

17   a mis-speculation happens, when you read out your

18   checking account balance before the deposit has gone in,

19   the processor has to go back and it has to squash --

20   that's literally the word -- squash what has happened

21   before, start over again, and make it happen.

22       It was as if before you were sworn as jurors,

23   Mr. Chu and I decided to give our openings.  Those would

24   be two dependent events.  If we had done that, we would

25   have had to squash what we had done, wait for you to be

1    selected as jurors, and then done the openings again.

2    It would have cost time and effort.

3         Now, in my very simple examples it sounds like not

4    much, but in something like these products that are

5    executing millions and millions of instructions every

6    second, squashing, going back, doing again is a problem.

7         So what did scientists do?  They created

8    predictors.  And again, Dr. Colwell will explain

9    predictors were known for decades before the 90's.

10   Predictors are a little bit like what they sound.  They

11   are something that watches the instructions and make

12   predictions.  Predictions had been -- predictors had

13   been inventors -- invented and used before the 1990's.

14        That's the basic technology.  And if it sounds as

15   if Mr. Chu and I were saying the same thing on loads,

16   stores, and these other concepts, it's not a

17   coincidence.  These are concepts that were out there

18   long before the work of Mr. Moshovos and his colleagues

19   in the 1990's.

20        Now, to make those concepts work in products like

21   these is not easy.  It requires a lot of sophisticated

22   technology and a lot of sophisticated work.  This case

23   is just what Dr. Moshovos said.  It's about a whole

24   bunch of different scientists, some at the academy, some

25   in the industry world who were all looking at the same

1   problem, all armed with the same basic concepts, and all

2   of whom came up with slightly different solutions, and

3   in some cases, the same solution.  And at the end, this

4   case is about which of those solutions actually works;

5   right?  And which do not.

6       Now, you don't have to take Dr. Colwell's word for

7   it alone.  I've put on the screen the concepts we've

8   just gone through.  I'm not going to repeat them because

9   Mr. Chu and I now have both been through them.  The

10  evidence will establish that every single one of those

11  concepts was developed, published, publicly disclosed,

12  and actually put into real world working products before

13  Dr. Moshovos started his work.

14      Why is this work important?  It's important

15  because, as you learned from the video, a patent is only

16  valid if it's new and different and unobvious.

17      Now, Mr. Chu made the point that the patent was

18  issued by the Patent Office.  It was.  We don't deny

19  that.  But the video told you about the process and told

20  you exactly why we have an opportunity to bring to you

21  evidence that the Patent Office didn't hear.  WARF

22  scientists' own documents, documents that the Patent

23  Office didn't have and which we got only after we got

24  sued by WARF, will show that they are addressing the

25  same problem that many other folks were and folks came

1  up with different solutions and sometimes the same

2  solutions, all addressing the same problem with these

3  basic concepts.

4      Now, as I said, the lead inventor on this patent,

5  not Dr. Sohi's body of work on this patent, which is the

6  only patent before you, was Dr. Moshovos.  And I said to

7  you before, the lead inventor has acknowledged all of

8  this work going on by others, including at IBM and DEC.

9      On the screen right now is the email that I

10  referred to you earlier on.  Think about what

11  Dr. Moshovos is saying, and this is what the evidence

12  will show.  Dr. Moshovos is saying just because we at

13  U.W. are working on the same problem that others have

14  identified earlier doesn't mean we're using their

15  solution.  It doesn't mean that we're coming up with

16  something that copies them.  We agree.  Just working on

17  the same problem doesn't mean that you're coming up with

18  the same solution.  But that's exactly what WARF now

19  accuses Apple of, working on a similar or the same

20  problem and therefore coming up with the same solution.

21      So let me tell you now chronologically a little bit

22  about the work of these other people, all of which was

23  known before.  On Slide 15 is something called the

24  *Hesson patent*.  As you can see, it refers to a memory --

25  it refers to a memory dependence prediction.  This is

1    the very work that Dr. Moshovos was referring to in his

2    internal email.  There's no dispute that this work came

3    before the '752 patent.  In fact, it was filed two years

4    before the WARF patent was even filed.  Dr. Moshovos's

5    emails tells us this work was earlier work.  The Hesson

6    patent tells us in its titling that it's an invention

7    to, and -- if I could highlight -- dynamically control

8    the out-of-order execution of load-store instructions to

9    a processor.

10        So if I just draw your attention to this earlier

11   patent from IBM, this is the concept that they are

12   describing.  This is the concept on which they received

13   an invention.  And when you see it, and Dr. Colwell

14   takes you through it, you'll see that it has load

15   instruction, store instruction, speculation,

16   mis-speculation, predictors and predictions.  It is one

17   of several predictors that you'll hear about.

18        And what I'm going to do is accumulate them, and

19   this is just a little graphic, it may seem a little

20   silly, but we're going to show you all of the different

21   detectors, different ways of addressing different

22   problems.  A second one was Digital Equipment

23   Corporation, a major computer manufacturer.  This is the

24   work of someone named Dr. Steely.

25        Dr. Colwell will tell you this, as well as what was

on the screen now in Slide 18.  This was four years
before the WARF scientists even started their work.  The
patent talks about load instructions, store
instructions, speculation, mis-speculation, and
describes DEC's solution.  This is, on my little graphic
of Sherlock Holmes, yet another different predictor
using these old, well-known concepts to address, as
Dr. Moshovos says, a problem they knew about for years.

     You've learned about something called the EV6 on
the screen now in Slide 20.  This is a real world
product, a chip made to go into a real world functioning
product.  It was a data dependent solution that was done
before the '752 patent.  It allowed load instructions to
speculate.  It had a store instruction, it used a table,
it used it to prevent speculation, and it was sold and
put into computers, Compaq computers, that were in the
marketplace.

     And you will learn about the work of Professor
William Chen and others at the University of Illinois.
They too developed data dependence predictors before the
'752 patent.  Now, Mr. Chu's opening suggested that it
was different.  The only difference between the work of
Dr. Chen and what WARF inventors say is their invention
is that he did it and in a combination of hardware and
software rather than just hardware.  Same technique,

1   same everything, but just in hardware and software

2   rather than hardware.

3       Now, you remember Dr. Moshovos acknowledged the

4   work of IBM and DEC?  Dr. Moshovos's Ph.D. dissertation

5   also described the earlier work of Dr. Chen.  And that's

6   what's on Slide 24 from Exhibit 004.  And what you can

7   see is he says -- he said back then in his Ph.D.

8   dissertation exactly what we're saying to you now, he

9   used a software-hardware hybrid approach before

10  Dr. Moshovos and his colleagues to come up with their

11  own solution.

12      Now, Dr. Colwell will describe to you all of this

13  work:  The basic concepts, different people working the

14  field, the different solutions, and what each technique

15  was.  Dr. Moshovos, we'll show you his deposition,

16  studied all of this work that had been done by the

17  others before, before he came up with the other three

18  inventors with their specific solution.

19      This brings me to Chapter 2, the development of

20  WARF's claimed invention.  Now, as Mr. Chu said, we

21  start back around 1994 and Dr. Sohi and his three

22  graduate students are working on something called the

23  investigation of a multiscalar paradigm.  This patent

24  isn't about the investigation of the multiscalar

25  paradigm.  It's not about all of the work these folks

did.  It's about one very specific aspect of the work
that Dr. Moshovos put in his Ph.D. dissertation, and
that will be the focus.  That's why I can say to you
we're not here to criticize at all the body of
Dr. Sohi's work.  He's been applauded for it.  We
applaud him for it.  We're looking at this specific
patent.

So the WARF scientists claim, as you heard, to come
up with the idea in 1995.  Over the next few months they
ran some simulations.  They published some articles.
And you'll see articles published and articles praising
those published articles.  But again, they never built a
processor.  They never tried to built a processor.  They
never tried to make it work in a smartphone or a tablet.
In fact, the iPhone and the iPad weren't invented for
another decade.

Instead what you'll learn is that after
Dr. Moshovos had done his Ph.D. dissertation, the one
thing they did is go to WARF and ask to file a patent
application.  That resulted in the '752 patent, which is
now on Slide 28.  And Mr. Chu has drawn your attention
to the title -- the time it was filed, which is 1996.

But I want to draw you to a couple of important
things that were said in the patent that will help put
this all in chronological context.  If I go to Slide 29,

1    this is a statement from their patent.  This is a

2    statement that they made to the Patent Office when they

3    were seeking their patent.

4         And what it said is, referring now to Figure 3, and

5    you'll see the full patent, "The normal operation of the

6    data speculation circuit," remember that's what Mr. Chu

7    was talking about, "such as is known in the prior art,

8    must be modified slightly to accommodate the present

9    invention."

10        So what was this slight modification?  What was

11   this specific solution?  How was it different than what

12   was done before?  And the answer is in the claim.  And

13   you're going to look at this and say oh, my gosh, look

14   at all these words.  They're pretty technical.  They

15   are.  They're pretty dense.  They are.  The reason there

16   are so many words is that every word counts and these

17   are the words they had to use to describe what they said

18   was different in order to get a patent.  And every

19   single one of those words counts, both for infringement

20   and for validity.

21        So let me show you some specific requirements of

22   the patented claim.  If I could go to Slide 31.  Mr. Chu

23   referred to a portion of this, but I want to refer to a

24   little more context.  First, the claim requires

25   detecting a data dependence but also detecting a

1  mis-speculation.  You'll see there is a detection of

2  both.  So the patent requires that you both detect that,

3  my two instructions are dependent on each other, and you

4  detect that there's been a mis-speculation because the

5  load has mistakenly gone before the store.  It's reading

6  the bank account balance before the deposit and giving

7  you the wrong answer.  That requirement is right in the

8  claim and has been construed by the Court and those are

9  the words that have to govern the analysis you do.

10      A second requirement in the claim on Slide 32 is

11  that you produce a prediction associated with a

12  particular data consuming instruction.  Now, remember

13  this patent prosecution process is a secret process, as

14  the video said.  We didn't get to participate.  No one

15  else got to participate, only WARF.  WARF had the power

16  of the pen and the words *the particular data instruction*

17  are their words.  They put them in as a requirement.

18  And as you listen to the evidence today, in the days

19  that follow, ask yourself this question:  Are they

20  walking away from the words they put into the claim in

21  an effort to capture technology that was independently

22  developed 17 years later.

23      And the last limitation I'll draw your attention to

24  is a prediction threshold detector for preventing

25  speculation for instructions having a prediction within

a predetermined range.  Now, as I said, these are a lot

of words, but they're very important words because they

define what Dr. Moshovos said was different about his

solution.  And for each of the three things that I've

just drawn your attention to:  Detecting and

mis-speculation and a data dependence, a prediction

based upon a mis-speculation, and a particular load of

instruction and the one that's on the screen now, Apple

does something different.

Now, does Apple use the same basic concept?  Sure.

Everybody did.  But on each of these key things that

they put in their patent, we do something different and

we had to do it differently to make it work in these

products.

So what are the others going to show you WARF has

done with the patent?  As I explained a little bit

earlier, after the patent was issued nothing happened.

No one was beating down a path to the door.  No one was

seeking to take a license.  Instead, over the next 17

years no one took a license but Intel.

Now, I said I'd tell you a little bit more about

that and here is what the evidence is going to show.

The evidence is going to show that in 1994, Intel gave

Dr. Sohi's lab the money to fund this research.  You'll

see it in writing.  Dr. Sohi wrote it down in an

1   invention disclosure.  Dr. Sohi and his colleagues then

2   presented that work to Intel; invited their scientists

3   to view their work.  As you can suspect, Intel

4   scientists thought well, we funded it, it's been

5   presented to us, we might have a right to use it.

6       Ten years later, WARF sued Intel and said no, you

7   don't.  Intel took a license and settled a lawsuit in

8   this courtroom.  That's the only license for this

9   technology ever.

10      Now, let me go to chapter 3.  Apple and its

11  development of its product.  Apple was founded in 1976,

12  and I'm not going to go through the history.  It's not

13  relevant to the case.  But I am going to go through a

14  little bit of a history of the iPhone and the iPad

15  because they're the accused product.

16

17      The iPhone, as I mentioned, was introduced in 1997

18  and it truly changed the way we communicate with each

19  other.  Do you remember cellphones before then?  Flip

20  phones.  Sliders.  Backs.  Stylists.  This is the first

21  in 1997.  Since -- I'm sorry, 2007.  And since 2007

22  there have been ten different models.  Only the three at

23  the bottom, the iPhone 5s, the iPhone 6, and iPhone 6

24  plus are alleged to infringe.

25      If I turn to Slide 37, you'll see that we

1   introduced the iPad in 2010.  It's accused.  It's an

2   easy-to-use tablet computer and first really of its

3   kind.  There have been nine different models.  Only the

4   latter four are accused of infringement.  The first

5   five, no.

6       Now, most of you are familiar with smartphones, but

7   I don't know how many of you have ever looked inside.

8   So let me just take you inside for a minute so you can

9   see what we're talking about here.  On the screen now in

10  Slide 38 is an iPhone disassembled:  The screen, the

11  battery, the body.  This is the system-on-a-chip you

12  heard about.  These are the circuit boards.  This is the

13  system-on-a-chip.

14      Let me focus you down a little further from -- on

15  the system-on-a-chip.  This is the A7.  Remember the

16  thing I showed you that's about the size of my

17  fingernail?  That's what this is.  That's what

18  Mr. Williams and his team spent 18 months designing.

19  And I'll tell you a little bit about that in a minute.

20      But the system-on-a-chip is a system-on-a-chip.

21  It's a selection of a whole bunch of components.  And

22  the focus of Dr. Moshovos's patent is something that's

23  only part of the chip.  So within the chip system on a

24  chip there's a CPU.

25      So I've now given you on Slide 40 a map of

1    system-on-a-chip and I'm going to focus on the CPUs.

2    The CPUs, as you can guess, perform hundreds of

3    functions.  So let's focus down a little further on the

4    CPUs themselves and what you will see is that the

5    load-store dependency predictor that's at issue in this

6    case is a smaller portion of that.  But before I get to

7    that, I've now put on the screen the history of the SoCs

8    for Apple.  And I've put on the bottom the different

9    iPhones and iPads that they were in.  The only ones --

10   WARF concedes that these don't infringe.  The only ones

11   that are accused are the ones on the right that are in

12   red, and that's going to be the focus of our discussion

13   today.

14       Now, within those SoCs, as I said, are the CPUs and

15   within the CPUs we'll find the load-store dependency

16   predictor.  But let's talk a little bit about how this

17   A7, A8, and A8X came to be.  Dr. Williams is going to be

18   here throughout -- Mr. Williams is going to be here

19   throughout the trial.  He's come from California to tell

20   you about his work.  He's a very accomplished computer

21   architect.  Before he ever came to Apple, he worked at a

22   company called ARM designing real world microprocessors

23   that went into real world products, including those

24   earlier generation of cellphones, flip phones,

25   BlackBerries, PDAs.

1    When Mr. Williams arrived at Apple, Apple was

2    working on something called *Swift* and Swift made it into

3    real world products.  It was a real world success.  It

4    was in the iPhone 5 and 5c.  It had a load-store

5    dependency predictor.  But WARF concedes that one

6    doesn't infringe.  When Mr. Williams arrived, Apple was

7    working on the next generation, the A7 chip.  It's

8    called Cyclone, the one that we just showed you.  The

9    goal for Cyclone literally was to take the power of that

10   laptop, the power of your desktop, all of that computing

11   power and put it into this.  That was the goal.  For the

12   first time you had something in a mobile device that

13   could take all that computing power, be that small, work

14   in this.  It's a pretty ambitious goal.  No one had ever

15   done it before.  No one.

16   They decided to take something called 64-bit

17   architecture from that device and put it into this

18   device.  They decided they'd try to create a pipeline

19   from that device and put it into this device.  They knew

20   they were trying something that was different than

21   anybody had tried before.  So they assembled 100

22   engineers to design the Cyclone processor.  It took 18

23   months.  There are hundreds of features in that little

24   chip the size of my fingernail and the result was

25   incredible.  It worked.  And it worked in a real world

1  product.  And they were proud of the result.

2       Long before they ever got sued, Mr. Williams wrote

3  something on behalf of his team called *Birth of Cyclone*,

4  and it was to summarize the results of all of the hard

5  work by all of these folks.  And he wrote it was a

6  pretty amazing feeling, seeing something like this

7  happen.  The team actually pulled it off.

8       Now, within Cyclone there are hundreds of features,

9  and you're not going to have to know anything more about

10  it other than there are hundreds of features.  One of

11  them, one of them is the load-store dependency

12  predictor.  One of them is what's accused of infringing.

13       Now, it's a feature.  Mr. Williams and his team

14  didn't design features in this little chip that didn't

15  have a purpose.  But it's one of many.  So where is the

16  load-store dependency predictor in Apple's products?  If

17  I go back to my teardown, we saw the SoC.  Then we saw

18  the A7.  We saw the Cyclone processors.  And if I now

19  bring up Slide 48, you'll see the Cyclone floor plan.

20  Now, this is just a floor plan.  It doesn't show you all

21  the features, and we never claimed that it did.  But

22  within Cyclone, to do all these different things, it

23  makes it possible for you to take pictures, take videos,

24  download videos, surf the web, make telephone calls

25  still.  There's something called the MDR.

1      Within Cyclone the MDR is called the *mapper*

2  *dispatch retirement*, and within that unit, if I go to

3  the next slide, you will see the load-store dependency

4  predictor.  That's the focus of this case.

5      Now, as I said earlier, Apple developed its own way

6  of doing dependency prediction.  It did it in a way

7  that's different from the '752 patent and it did it in a

8  way that's different from the other work that was done

9  in the 1990's and Mr. Williams will tell you all about

10  that.  He will tell you that rather than make

11  predictions based on a particular instruction, they used

12  a group of instructions to be more conservative and more

13  sophisticated.  He will tell you that they used

14  something called *hashing* to accomplish this purpose.

15  You will search the '752 patent forever looking for a

16  reference to groups of instructions or hashing.

17      He will tell you that the Apple patent has

18  something called an *armed bit*.  Again, no reference to

19  that in the patent.  It's something that does the

20  dynamic prediction in a different way than Dr. Moshovos

21  and Dr. Sohi and his colleagues.  It actually is more

22  complex, but allows for more sophisticated speculation

23  decisions.  And he will tell you about something called

24  the *store-hit-younger load*.  It's a signal.  And what

25  the signal says is -- remember when I showed you the

part of the claim that requires you to detect a
mis-speculation?  The Apple system actually says there
could be a mis-speculation on the way.  It detects a
data dependence, and therefore, as a result, can be more
conservative, more precise, and more effective in this
device.

Now, you're going to learn more about all of this,
probably more than you ever wanted to know during the
course of the trial, but it will be important because
the question of whether what we did 17 years later with
no knowledge of their patent is the question.  And at
the end, if I go back to my Sherlock Holmes, you will
see there are lots of folks working on different
solutions to the same problem, including Apple.  But
perhaps most importantly, Mr. Williams is going to be
able to tell you why they made the choices they made,
not just that we're different, but why they made the
choices they made as they tried to take all of that
computing power and put it into this; why they had to
make choices that made clear that that chip could handle
all the different situations, situations that were never
contemplated in 1994 and 1996.  The solution that has
been made by Apple is different in the different arena.

Now, there was a reference during the opening to
the fact that Apple tried different designs.  Its

1   inventors even use colorful words like if we don't do

2   something, we're going to have a train wreck.  That's

3   what people do when they're designing something like

4   this.  And for the load-store predictor, the dependency

5   predictor, that little part or that specific part, to be

6   even more precise, there were four people who worked on

7   it.  Of those 100 engineers, there were four people who

8   devoted their time to that.

9        And when you look at the documents that Dr. Conte

10  is going to show you or Dr. Mudge is going to show you,

11  ask yourself these two questions:  First, what's the

12  whole series of documents.  If I take this email and I

13  look at what happened next week, what does it show me?

14  And what we'll show you is that the Apple engineers were

15  working on their own solution.  And the second thing it

16  will show is there's not a word, not a word about the

17  WARF patent.  And why?  Because Ladies and Gentlemen, on

18  the screen now is an undisputed chronology of what

19  happened in this case.

20           THE COURT:  Mr. Lee, I take it you're --

21           MR. LEE:  Close.

22           THE COURT:  You were the one who was concerned

23  about fairness.  I want to make sure I'm fair to both

24  sides.

25           MR. LEE:  I'm very close, Your Honor.

So this is the chronology.  Our load-store

dependency predictor was designed in 2011/2012.  It was

on the market in a product in 2013.  And then and only

then did Apple learn about the patent after the work was

done, after the product was designed.

So let me go to chapter 4 quickly.  Why are we

here?  We're here because WARF has said 17 years later

the work done by Apple independently infringes.  You

will hear from Dr. David August -- if I could go to

Slide 57, and Dr. August is right back here -- a

professor at Princeton, and he is going to explain to

you the differences between what Apple does and what's

in the claims.  And he's going to tell you that the end

result is the Apple product will actually allow

speculation when the WARF patent wouldn't, and prevent

speculation when the WARF patent would.

And in addition, Dr. Colwell is going to talk to

you about whether the patent actually is valid.  If the

Patent Office had known everything that you're going to

know, and they knew about Hesson and Steely, but they

didn't consider the EV6, they didn't know about

Dr. Moshovos's thesis, they didn't know about

Dr. Moshovos's email, would they have taken that phrase,

it's a slight modification, and said no, you're not

entitled to a patent.

1      So let me come to a close and thank you, as I did

2  at the beginning, for your time and attention.  Let me

3  just say one more thing.  Mr. Chu showed a slide about

4  the importance of the patent system; its importance to

5  innovation, intervention.  We agree.  It's critically

6  important to the American system and economy.  We don't

7  disagree for a second.  But there's another part of the

8  patent system he didn't mention and that's you.  And

9  when someone is accused of infringing a patent or when

10 someone believes a patent is invalid, what stands

11 between us and the accusation is you.

12     All we ask you to do is to listen to the evidence,

13 follow the details, as hard as it may be, let it take

14 you where your collective wisdom and common sense will

15 take you, and we believe and hope that that will be a

16 judgment for Apple.

17     Thank you, Your Honor.

18         THE COURT:  Thank you very much, Mr. Lee.  We

19 will now hear testimony from WARF.  They will call their

20 first witness.

21         MR. CHU:  Thank you very much, Your Honor.  We

22 call Dr. Carl Gulbrandsen.

23         THE COURT:  If you could clear the way for the

24 witness, I'd appreciate it.  Thank you.  I realize it's

25 close quarters in there.  Mr. Gulbrandsen, if you would

1    come around and just stand before the court reporter.

2    On either side of the podium is fine.  And if we could

3    be so good as to move the podium, that would be helpful

4    too.    (3:08 p.m.)

5        **CARL GULBRANDSEN, PLAINTIFF'S WITNESS, SWORN,**

6            THE COURT:   Whenever you're ready, Mr. Chu.

7            MR. CHU:  Thank you very much.

8                    DIRECT EXAMINATION

9    BY MR. CHU:

10   Q    What do you do?

11   A    I'm the managing director of Wisconsin Alumni

12   Research Foundation.  Essentially that means that I'm

13   the CEO of the organization.

14   Q    When did you join WARF?

15   A    I joined WARF in October of 1997.  When I first

16   joined, I was the Director of Patents and Licensing.  In

17   January of 2000 I became managing director of WARF, and

18   I continue as managing director today.

19   Q    Would you briefly describe your educational

20   background.

21   A    I have a bachelor's degree from St. Olaf College.

22   After college, I went in the Army for two years, got

23   married, and my wife and I decided to move to Madison

24   where I pursued a degree in physiology.  I obtained a

25   Ph.D. degree in physiology.  During that period of time
                    CARL GULBRANDSEN - DIRECT

1    we came to love Madison.  And my wife had a very good

2    job with the Madison Metropolitan School District.  We

3    had two children, so I decided to also get a law degree.

4         And I went to law school at the University of

5    Wisconsin-Madison after I got my Ph.D., and I graduated

6    in 1981 with a law degree, and then subsequently became

7    a patent lawyer.

8    Q    And very briefly, what did you do after you got

9    your law degree and your Ph.D. until you got to WARF?

10   A    After I received my law degree, I joined the local

11   firm by the name of Ross & Stevens.  It's today DeWitt,

12   Ross & Stevens.  Ross & Stevens happened to be the

13   outside general counsel for the Wisconsin Alumni

14   Research Foundation.  So I started out my career

15   representing WARF in various aspects.

16        I stayed at Ross & Stevens for about seven years.

17   And then I joined another firm, a patent law firm by the

18   name of Haight and Hofeldt, and I was there for about

19   three years.  And then we merged our office here in

20   Madison with the firm of Strauss, Strauss, William,

21   Thompson and Howard.  And I was there for about four or

22   five years when I then was invited to join a medical

23   device company in town by the name of Lunar Corporation

24   as just the inside general counsel.  And I did that.

25   Lunar was selling bone densitometers, which were devices

                    CARL GULBRANDSEN - DIRECT

1   based on technology that came out of the University of

2   Wisconsin-Madison.

3       While at Lunar, we spun off a pharmaceutical

4   company that was also developing a technology out at the

5   University of Wisconsin-Madison in the vitamin D area.

6   And in October 1997, I took advantage of an opportunity

7   opening at WARF, left Lunar Corporation, and joined WARF

8   as its Director of Patents and Licensing.

9   Q   I'd like to go to Exhibit PX 466 for which there is

10  no objections.  And let's just put briefly the first

11  page on the screen and would you describe basically what

12  this is.

13          MR. MARCUS:  Your Honor, objection.  MIL 14.

14          THE COURT:  We're on PX --

15          MR. CHU:  466 for which there --

16          THE COURT:  We'll have a brief sidebar.  Thank

17  you.  I apologize for this delay.  It won't take long.

18      (Discussion at sidebar at 3:12 p.m.)

19          THE COURT:  Mr. Gulbrandsen is just giving

20  general information with WARF; is that right?  Was he

21  named as a nonretained expert?

22          MR. CHU:  He's going to give some general

23  information about WARF.  He's going to discuss the fact

24  of the Intel license.  He's going to discuss

25  communications --
                CARL GULBRANDSEN - DIRECT

1        THE COURT:  All right.  I'm with you.  Tell me

2   what it was that the MIL -- no, I just want to know what

3   the motion in limine --

4        MR. MARCUS:  MIL 14 was WARF shouldn't talk

5   about where the money goes.  And the Court's orders --

6   the general background information was fine, but this

7   goes into details about providing funds from --

8        MR. CHU:  He's not going to talk about it.

9        THE COURT:  Then don't call it up.

10       MR. CHU:  I was not going to call that up.

11       THE COURT:  I thought you just did.

12       MR. CHU:  I called up the first page.

13       THE COURT:  The first page.  All right.  Step

14   back.

15       MR. CHU:  Can I raise another issue?

16       THE COURT:  Do it very quickly.  These are the

17   kinds of things that I hoped to -- what is it?

18       MR. CHU:  It was in Apple's opening.  He

19   mentioned that the reason Intel took a license, he did

20   this twice, was because Intel thought --

21       THE COURT:  Yes, I remember that.

22       MR. CHU:  Now, the fact is that claim was

23   dismissed by Barbara Crabb, Judge Barbara Crabb before

24   the settlement.  So Apple's counsel was suggesting --

25       THE COURT:  We'll address that at the break.
                CARL GULBRANDSEN - DIRECT

1          MR. CHU:  Okay.

2      (End of sidebar discussion 3:15 p.m.)

3          THE COURT:  Please proceed.  I apologize for

4  that delay.  Now, we will continue with testimony.

5  BY MR. CHU:

6  Q    Just very briefly what is this document?

7  A    This is a slide deck that is used by myself and

8  others at WARF when we have visitors come to WARF and

9  who like to have us explain what WARF is and its

10  relationship to the University.

11  Q    Now, I'd like to use just a couple of the slides.

12  Just go to Slide 2, and if you could just very briefly

13  describe the history of WARF.  And can we put Slide 2 up

14  on the screen.

15  A    Slide 2 contains pictures of WARF's founder,

16  Professor Harry Steenbock.  Professor Steenbock was a

17  professor in agricultural biochemistry, and in the early

18  20's he discovered a process that would increase the

19  vitamin D content of food.  At that time, vitamin D was

20  a problem that existed globally, and one of the

21  consequences of a vitamin D deficiency was rickets.  It

22  particularly affected children.  Rickets results in

23  spongy bone or soft bone.  You see children with very

24  bowed legs, bones tend to fracture easily, causes a lot

25  of disabilities.
              CARL GULBRANDSEN - DIRECT

1       Professor Steenbock had his invention to increase

2   vitamin D content and saw this as a way to hopefully

3   eradicate this problem of rickets.

4   Q    And let's get to Slide 4 and would you briefly

5   describe why WARF was formed.  What were the facts

6   causing it to be formed?

7   A    So Professor Steenbock saw this opportunity to take

8   care of a very serious medical problem.  Coincidentally,

9   the company Quaker Oats had learned about his invention

10  and came to Madison in 1924 and offered him $900,000 for

11  his invention at that time.  He didn't want to sell the

12  invention, he wanted to use the invention to help

13  address this problem of vitamin D deficiency and

14  rickets.  So he turned to the University and offered to

15  give his invention to the University, suggesting to them

16  that they could take a patent application that he had

17  filed, get the patent issued, that it could then be

18  licensed to Quaker Oats and other companies and the

19  revenue could be brought back to the University to fund

20  his research and that of other investigators at the

21  University.  He recognized that additional areas of

22  revenue was going to be important, that you couldn't

23  depend on state funding or other foundation funding for

24  the research to be done.

25            THE COURT:  I'll sustain the objection.  I
                      CARL GULBRANDSEN – DIRECT

1  don't know why we're going into this.  I would like you

2  to stick to the questions as asked, and let's move this

3  along.

4          MR. CHU:  I will.

5          THE COURT:  This is deep background.  It is not

6  relevant to the considerations of this jury.  Next

7  question.

8          MR. CHU:  Yes.

9  BY MR. CHU:

10 Q    What is the process by which WARF decides whether

11 to file a patent application?

12 A    On a monthly basis patents are -- patent

13 disclosures or inventions are disclosed to WARF, and

14 once a month WARF's professional staff, its intellectual

15 property managers and its licensing managers get

16 together and we go through the disclosures that have

17 been brought to WARF and decide, first of all, whether

18 this is a disclosure that we think we can protect,

19 whether we think it's important, and whether we think

20 that there's a market and we can add value to the

21 technology.  Based on that, we make a decision to either

22 accept it or not to accept it.

23 Q    Has the WARF '752 patent ever been licensed?

24 A    Yes.

25 Q    To whom?

                CARL GULBRANDSEN - DIRECT

1   A    The WARF '752 patent was licensed in 2009 to Intel

2   Corporation.

3   Q    And did WARF take any steps to approach other

4   companies about a possible license to the WARF '752

5   patent?

6   A    Yes.  Prior to that we approached a number of

7   companies trying to get them to license the technology.

8   Q    Approximately what time frame was that?

9   A    Probably in the 2003 -- 2002/2003 time frame.

10  Q    And were you involved in knowing about and

11  orchestrating those approaches?

12  A    I was aware that they were approaching these other

13  companies.  It was very difficult to get them to talk

14  with us.

15  Q    Why was that?

16  A    It's unusual for computer companies to license

17  technology from universities.  They don't care to do

18  that.

19  Q    And at the time in the early 2000 period, did WARF

20  have an understanding about whether any of the companies

21  being approached were actually at that time using the

22  technology?

23  A    No, they --

24          MR. MARCUS:  Objection, Your Honor.  Hearsay.

25          THE COURT:  It would have been appropriate
              CARL GULBRANDSEN - DIRECT

230

1  before this.  He's answered the question.  You may ask

2  your next question.

3          MR. CHU:  Yes.

4          THE WITNESS:  Um --

5  BY MR. CHU:

6  Q    Hold on, Dr. Gulbrandsen.  Was there a period of

7  time when WARF approached Apple?

8  A    Yes.

9          MR. CHU:  And I'd like to go to DX 1725, which

10 is not objected to.  And put it on the screen.

11 Q    What is this?

12 A    This is a copy of an email from a WARF employee,

13 Paul Pucci, who was a licensing associate at WARF at

14 that time.  Mr. Pucci is sending an email to Apple

15 asking if they would provide him the name and contact of

16 an individual that he could speak with about some

17 technical materials.

18 Q    And was there a response from Apple?

19 A    Yes.

20         MR. CHU:  Let's go to Exhibit PX 468 and put

21 that on the screen.

22 Q    And would you describe this response, please.

23         THE COURT:  I'm just going to ask you to have

24 him identify it.  None of this is admitted into the

25 record.  You're right that there are no pending

                CARL GULBRANDSEN - DIRECT

1   objections, but you've going to have to identify it.

2   That gives me a chance to confirm that as well as

3   establish its relevance in the case.  So I just blocked

4   it from the screen, but you can certainly describe what

5   that document is.

6           THE WITNESS:  Okay.  This document is an

7   automatic response from Apple to people who submit

8   requests to Apple to talk about technical submissions.

9   BY MR. CHU:

10  Q    And what basically did it say?

11          MR. CHU:  Can we put it up on the screen?

12          THE COURT:  Do you want it admitted?  It is

13  admitted.

14          MR. CHU:  Yes, I will.

15          THE COURT:  I'm publishing it to the jury.  You

16  may proceed.

17          MR. CHU:  Thank you.

18          THE WITNESS:  It essentially says that Apple's

19  policy is to not accept or consider outside submissions,

20  and it refers the person submitting the -- wanting to

21  submit the information to a web page on the Apple site.

22  BY MR. CHU:

23  Q    And are you familiar with the web page that existed

24  at that time?

25  A    Yes.

                CARL GULBRANDSEN - DIRECT

1    Q    So I'm going to Exhibit DX 1723.

2            MR. CHU:  I will want to have it admitted, Your

3    Honor.  And before -- shall I pause before putting it on

4    the screen?

5            THE COURT:  You can put it on the screen, it

6    just can't be published to the jury at this time.  And

7    the witness can certainly identify what that document

8    is.

9            THE WITNESS:  The document --

10           MR. MARCUS:  Your Honor, objection.

11   Foundation.

12           THE COURT:  All right.  I'm also sustaining

13   that objection.  What's your question for the witness?

14   BY MR. CHU:

15   Q    What is Exhibit DX 1723?

16           THE COURT:  Why don't we do it this way.  Do

17   you know what this exhibit is?

18           THE WITNESS:  Yes, I do.

19           THE COURT:  And how do you know?

20           THE WITNESS:  I've looked at this exhibit.

21   It's the exhibit that was referred -- is the web page

22   that was referred to in the prior exhibit.

23           THE COURT:  And the objection is foundation?

24           MR. MARCUS:  Withdraw.  Your Honor.

25           THE COURT:  You may now proceed.
                CARL GULBRANDSEN - DIRECT

233

1          MR. CHU:  May I now show it on the screen?

2          THE COURT:  It is published.

3  BY MR. CHU:

4  Q    Can you describe this Apple policy in the 2008 time

5  frame when WARF approached Apple?

6  A    This is Apple's published policy on their website

7  which states that it does not accept unsolicited

8  submissions and it lays out, if you're going to submit

9  them, it lays out the term of submission which basically

10  is that your submission and contents will automatically

11  become the property of Apple without any compensation to

12  you.

13  Q    Before the part that's been highlighted, just the

14  line or part of the line, what does that say?

15  A    "Despite our request that you not send us your

16  ideas, you still submit -- if you still submit them,

17  then regardless of what your letter says the following

18  terms shall apply to the submission."

19  Q    So at the time WARF was trying to approach Apple,

20  was WARF aware of this policy to the effect that if you

21  made a submission, it was Apple's view that the contents

22  of the submission would automatically become the

23  property of Apple without any compensation to you?

24  A    That's one of the reasons why -- the answer is yes,

25  and it's one of the reasons why we were not more

                    CARL GULBRANDSEN - DIRECT

1    definitive about what we were wanting to talk to Apple

2    about.

3    Q    Did Mr. Pucci take any other steps after being

4    referred to this Apple policy in 2008?  And I'll call

5    your attention to PX 463.

6              MR. CHU:  It's not objected to.  We will want

7    to offer it in evidence.  And please don't put it on the

8    screen yet.

9              THE COURT:  It's actually something you

10   control.

11             MR. CHU:  I see.

12             THE COURT:  Now you may proceed.

13   BY MR. CHU:

14   Q    What is this?

15   A    This is a train of emails.  The first one was kind

16   of a follow-on response from the automatic email that

17   was sent by Apple and this one actually came from a

18   human being, an Arnon Sethuraman, senior patent counsel

19   at Apple.

20   Q    Before you go on --

21             MR. CHU:  May I place this on the screen, Your

22   Honor?

23             THE COURT:  Yes.

24             THE WITNESS:  So Mr. Sethuraman states in his

25   email that he's responding to Paul Pucci's inquiry.  But

                    CARL GULBRANDSEN - DIRECT

1  then he says "This is the only response anyone at Apple

2  is authorized to send you."  And again, he refers to the

3  web page on Apple's policy with respect to unsolicited

4  submissions.

5  BY MR. CHU:

6  Q    And did Mr. Pucci, despite receiving that

7  communication from a human being, a senior patent

8  counsel at Apple, try again to follow up?

9  A    He did.  He provided an email back to

10  Mr. Sethuraman and provided a little bit more

11  information.  We were aware that Apple was acquiring a

12  semiconductor company, PA Semiconductor, and we had

13  reason to believe that they may be wanting to implement

14  the technology of the '756 [verbatim] patent.  So he

15  identifies PA Semiconductor, indicates that he has

16  technical information that he'd like to talk to Apple

17  about in relation to PA Semiconductor.

18  Q    Did Mr. Pucci or WARF receive any response from

19  Apple?

20  A    Yes, they did.

21  Q    I'm referring to Mr. Pucci's email, April 29, 2008.

22  This is after --

23  A    Okay.  Yes.  No.

24  Q    Let me just clarify.  Was Mr. Pucci, on April 28,

25  2008, following up to Mr. Sethuraman's email?
                    CARL GULBRANDSEN – DIRECT

1   A    That's right.

2   Q    And did WARF or Mr. Pucci receive any response from

3   Apple?

4   A    Not to my knowledge.

5   Q    And in the emails that we just looked at, did

6   Mr. Pucci or WARF specifically call out the '752 patent?

7   A    No.

8   Q    Is there a reason for that?

9   A    Well, the state of policy of Apple.

10          MR. MARCUS:  Objection.  Calls for hearsay.

11   And no foundation also.

12          THE COURT:  I'll overrule those objections.

13   You can answer the question.

14          THE WITNESS:  The stated policy of Apple on

15   their website as was referred to us is that if we

16   provided that information, they would be the owner of

17   that patent.

18   BY MR. CHU:

19   Q    Now, between 2008 and when this --

20          THE COURT:  Mr. Gulbrandsen, I just want to

21   make sure I understand.  So your concern was even though

22   you had a fully issued patent, if you called that patent

23   to Apple's attention, you would be bound to have waived

24   all your rights of the patent just by calling it to

25   Apple's attention?  That was WARF's understanding at the

                    CARL GULBRANDSEN - DIRECT

 1    time?

 2          THE WITNESS:  Well, the web page says that they

 3    would take ownership.

 4          THE COURT:  I understand.  But it was your

 5    understanding that that's how it would work?

 6          THE WITNESS:  We didn't want to get into an

 7    argument about it.

 8          THE COURT:  All right.  You may ask your next

 9    question.

10          MR. CHU:  Thank you.

11    BY MR. CHU:

12    Q    Did WARF contact Apple since these communications

13    before this lawsuit was filed in early 2014?

14    A    No, we didn't.

15    Q    And what led to the filing of this lawsuit in

16    January 2014?

17    A    When the Apple smartphones, the iPhones were

18    subsequently introduced, we watched that technology and

19    the early phones that we tested were not using the '756

20    [verbatim] technology.  But when the iPhone 5s was

21    released, our tests on that phone indicated they were

22    using it.

23          MR. CHU:  No further questions, Your Honor,

24    subject to the if we raised sidebar.

25          THE COURT:  All right.  We're going to take our
                      CARL GULBRANDSEN – DIRECT

1   break at this time, one afternoon break.  We will

2   reconvene at 10 to 4 and continue with cross-examination

3   for this witness.

4          All rise, please.

5          (Jury excused from courtroom at 3:28 p.m.)

6          THE COURT:  If the parties would be seated, I

7   would appreciate it.  Mr. Gulbrandsen, you're welcome to

8   step down.  If you could be just so good as to be back

9   in that seat at ten to 4.  And keep in mind that during

10  this break, you're technically sequestered, which means

11  you shouldn't talk to anyone on either side about your

12  testimony.  Thank you.

13         With that said, let me take up a couple issues with

14  respect to the most recent witness.  Just pure

15  housekeeping, none of the exhibits are in evidence.

16  That means they can't be published to the jury until

17  they've been admitted.

18         Mr. Gulbrandsen, feel free to walk by.  It won't

19  interfere.  I don't mind.

20         THE WITNESS:  May I go to the restroom?

21         THE COURT:  Absolutely.  Except for the parties

22  sitting in front of me at these tables, anyone is free

23  to leave at this moment.  My concern is that you

24  understand that you need to become familiar with that

25  single button jury/no jury.  So once it's admitted, it's

1    fine to publish it.  If it's not admitted yet, it's not.

2         Which brings me to the second concern that was

3    raised at sidebar.  Your concern is that there was an

4    explanation given for the timing of the decision to

5    license.  And what was that?

6         MR. CHU:  Twice during Apple's opening

7    statement --

8         THE COURT:  What was the specific statement

9    you're concerned about that was made twice?

10        MR. CHU:  That Intel had funded some work at

11   U.W.; that they believed that they had some rights to

12   the patent.

13        THE COURT:  All right.  And that opens what

14   door in your mind?

15        MR. CHU:  To explain the following facts:

16   That, in fact, that claim was made as a counterclaim in

17   the suit that was before Judge Crabb.

18        THE COURT:  When you say that claim was made --

19        MR. CHU:  That was a counterclaim made where

20   the Regents, individuals, and others were sued based on

21   the claim by Intel that it had rights to the '752 patent

22   because it provided some modest amount of funding.

23        THE COURT:  I don't know how that's relevant at

24   all.  The only statement that was made was that funding

25   was provided.

1          MR. CHU:  No.  The statement -- let me describe

2     the facts and I think you'll understand.

3          THE COURT:  I understand the basic facts.  I

4     understand the counterclaim.  You're saying that a door

5     was opened by virtue of the fact that a statement was

6     made that monies were paid by Intel to Dr. Sohi to do

7     certain research.  What door has been opened as a result

8     of making that statement?

9          MR. CHU:  We would like to show the following

10    facts:  This is the door that's been opened.  That that

11    claim had been dismissed --

12         THE COURT:  That's not a claim.  It's a fact, a

13    statement of fact that monies were provided.  It has

14    nothing to do with whether or not there was a patent

15    right created or that there was a claim, a counterclaim

16    by Intel.  The only statement that was made in this

17    record is that monies were provided by Intel.  That's

18    not something that's out of the case because Intel lost

19    a counterclaim on that issue.  It didn't open any door

20    is what I'm saying, unless you have something else that

21    I'm missing.

22         MR. SHEASBY:  Your Honor, I actually heard the

23    statement slightly differently.  In other words, I heard

24    the suggestion by Mr. Lee that there was a lawsuit filed

25    even though there was a promise of rights to the

1   invention.  In fact, I think if you look at the

2   transcript --

3          THE COURT:  I think I agree to the extent that

4   it was implied that by paying that money, they had some

5   special relationship and really the implication was that

6   they were using the technology.  That's the way it was

7   stated.  It wasn't that they had a right in the

8   technology; on the contrary, they ended up buying a

9   royalty.  They didn't have a right to it.  So I just

10  disagree with you that that opened any door beyond what

11  is already in this case.  So I just disagree that we

12  need to go further down that road.  If you want to

13  provide me with some kind of proffer you think opens a

14  larger door, you're welcome to do so.  But I disagree

15  with you at this point.

16         MR. CHU:  Can I raise just a different subject?

17         THE COURT:  Yes, sir.  Very quickly.

18         MR. CHU:  What is the Court's preferences with

19  respect to the formal admission of exhibits, whether to

20  -- outside the hearing of the jury?  Just have a list?

21  Move them in evidence?  What do you want --

22         THE COURT:  If the parties can agree, I'm happy

23  to just deem them admitted, in which case we don't have

24  to go through the formal process.  Mr. Gulbrandsen, you

25  don't need to get back on the stand yet.  We're going to

1    actually take a break here.  If the parties are in

2    agreement, then they're admitted and you need simply

3    advise me.  If the parties are not in agreement and you

4    think there's no basis to leave it out, I'd consider it,

5    but that should have been something that was worked out

6    between the parties.

7         As I told you from the beginning, an exhibit is in

8    when I admit it as such.  Does that answer your

9    question?

10         MR. CHU:  Yes, Judge.

11         THE COURT:  There was this last area, you did

12    not move its admission, but the first very slide that

13    was shown to Mr. Gulbrandsen which you then used a

14    couple of the slides.  You should advise me as to what

15    is in evidence, because at least one of the slides that

16    makes up that exhibit is not in evidence and is not

17    going into evidence, so if you would work that out with

18    each other at the break, I would appreciate it.

19         MR. CHU:  We will do that.

20         THE COURT:  All right.  Very good.  Was there

21    something more for Apple with respect to the exhibits so

22    far?

23         MR. MARCUS:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  My concern was not with

25    respect to foundation or I believe you said hearsay.  My

1    concern was relevance, and since that wasn't objected

2    to, I sustained -- I overruled the objections.

3         With that said, we are going to take our break with

4    two exceptions.  I would ask that counsel confer and see

5    if they can't reach agreement on the final issues with

6    respect to Mr. Conti's demonstratives.  If not, I don't

7    care who, but someone should be back at quarter to to

8    advise me where that dispute is.

9         And then secondarily, the exhibits that remain in

10   dispute with respect to Apple, I did issue a ruling with

11   respect to Webb and I'd like someone to advise me as to

12   where those stand at quarter to.

13        We are in brief recess and we will reconvene at

14   quarter to.  Thank you.  You're free to move about as

15   you wish.

16        (Recess      3:35-3:45 p.m.)

17        THE COURT:  We're back on the record.  I would

18   simply ask that counsel, with respect to Mr. Conte, be

19   prepared to advise me where things stand.

20        Mr. Gulbrandsen, you can take your seat in the next

21   five minutes any time you wish.  So if you want to come

22   forward you can, but don't feel any obligation.  As long

23   as you're there by ten to.  Thank you.

24        MR. SHEASBY:  So unfortunately we didn't make

25   any more progress; in other words, we talked and I think

1   counsel felt, and it's his right, that that's as far as

2   we're going to go.

3          THE COURT:  That's fine.  Why don't you call up

4   what remains in dispute.

5          MR. SHEASBY:  Sure.  So I think --

6          MR. DOWD:  Actually, Your Honor, I'm not sure

7   that that's exactly right.

8          THE COURT:  All right.  Let's do it this way:

9   Let me hear then from Apple.

10         MR. DOWD:  If I could.  So Your Honor, I think

11  we actually have made some progress.  Right before the

12  break --

13         THE COURT:  Let's just tell me what you think

14  is in dispute or is resolved.

15         MR. DOWD:  Fair enough.

16         THE COURT:  We'll decide whether any progress

17  was made based on that.

18         MR. DOWD:  Well, the first slide is Slide 115,

19  and this is in the new book that WARF handed out this

20  morning.

21         MR. SHEASBY:  Your Honor, we have the --

22         MR. DOWD:  So Your Honor, the first one is

23  Slide 115 and this is a group -- three of these.

24         THE COURT:  Yeah.

25         MR. DOWD:  This is a slide that argues that

1    Apple is trying to add words to the claim.  It's

2    attorney argument and it is not an opinion that appears

3    in Dr. Conte's report.  I was pointed by counsel to

4    paragraph 126 of the report as the support for this.

5              THE COURT:  Well, let's leave it at this.  For

6    WARF, your reason for thinking that it's appropriate for

7    you to be highlighting specific phrases?

8              MR. SHEASBY:  Yes.  It actually was in his

9    report, Your Honor.  In other words, in Professor

10   Conte's report he analyzed Apple's argument and actually

11   explained that these additional --

12             THE COURT:  The highlighting in his -- so he

13   had blue highlighting, yellow highlighting, he

14   emphasized language in red, and he put underneath "Apple

15   wants to add words in the claim."  Those are all part of

16   his report?

17             MR. SHEASBY:  Yes.  And if I can give you an

18   example, I can actually make this connection.  If you go

19   to Slide 170, which is the same version, and let's go to

20   Conte paragraph 1044.  And Your Honor -- Your Honor, I

21   don't want to talk over you.  Let me know when you get

22   there.

23             THE COURT:  You're not talking over me.  I'm

24   looking at the slide.  Actually you don't include 170.

25   You have 169 and 172.  So I don't know what you're

1    asking me to look at.

2           MR. SHEASBY:  Sure.  So what Conte says is

3    "Claim 1 recites a prediction with a predetermined range

4    as a requirement condition for preventing data

5    speculation."  But Claim 1 does not exclude the use of

6    other conditions that must also be satisfied.

7           THE COURT:  All right.  It's out.  115 is out.

8    And that makes it simpler.

9           MR. SHEASBY:  That clause is fine.  We

10   understand that.

11          THE COURT:  Are there any others?

12          MR. DOWD:  In the same category is 127.  Well,

13   actually 131 is an example of the same issue, which is

14   on the screen now.  And 127 is another example of the

15   same issue.

16          THE COURT:  You can call out the language.  If

17   you want to highlight it as the expert talks about it,

18   as long as it's not highlighted by -- in advance of the

19   expert talking about it, that's fine.  But this is just

20   too busy and too argumentative for a demonstrative of

21   someone's testimony.

22          MR. SHEASBY:  Your Honor, we understand your

23   ruling.  Thank you very much.

24          THE COURT:  Very good.  Are there any others we

25   need to address?

1          MR. DOWD:  There were two other categories or

2    additions.

3          THE COURT:  I just want to hear if there's

4    anything more before we bring the jury out.

5          MR. DOWD:  Very briefly, Your Honor.  If we

6    looked at Slides 59 and 60 of the deck, there's one

7    issue and that is the presentation suggests that

8    Mr. Bannon is the first chief architect of the accused

9    chip, and Mr. Williams, who is here to represent Apple

10   today, is the second chief architect, which suggests

11   that somehow instead of bringing the head of the group,

12   we brought the second --

13         THE COURT:  What's the basis for the

14   designation of those two?

15         MR. SHEASBY:  Yes, Your Honor.  It's in their

16   depositions.  Mr. Bannon was the first chief architect

17   of the A7.  He then -- when he became the head of

18   simulation, and after that, Gerald Williams became the

19   second chief architect.  It's a --

20         THE COURT:  I'm not going to require they

21   change it.  You can certainly address that with

22   Mr. Williams.  You can do it in cross-examination if you

23   want to.  But if that's how they described themselves in

24   their deposition, I'm not going to require a change.

25         Was there something more?

1        MR. DOWD:  The actual description was current

2    and former and we'd be fine with that.

3        THE COURT:  If you want to change it to current

4    and former, that seems like a reasonable change.  I

5    apologize for doing that at the last minute.  But if

6    that was the testimony, then I would accept that.

7        MR. SHEASBY:  Your Honor, to be clear, that

8    wasn't the testimony.  The current and former doesn't

9    make any sense because the chip had already been

10   designed.  So there is no current chief architect of the

11   A7.  It was designed many, many years ago.

12       THE COURT:  All right.  We're going to leave it

13   the way it is and you'll have to expand on it.  Was

14   there something more?

15       MR. DOWD:  Yes, there's one final one, which is

16   71.  I have it on the screen, Your Honor.

17       THE COURT:  I'm looking at it as well.  Go

18   ahead.

19       MR. DOWD:  This issue is there are two problems

20   with this:  One is that it's argumentative and

21   misstating the document, and then the second is that

22   it's contrary to the Court's construction of the term

23   data speculation circuit.  The issue is, as you'll see,

24   WARF is highlighting in the email this acronym LSD,

25   which is a load-store dependency predictor.

1          THE COURT:  All right.  What I will allow is
2    that the actual exhibit may be pulled up.  The
3    underlining or I should say the highlighting may be
4    inserted as it's pointed out by the witness, and we'll
5    take out that LSD, load-store dependency definition
6    that's above it.
7       Is that -- I'm sorry, is that ruling clear for
8    WARF's purposes?
9          MR. SHEASBY:  Your Honor, clear.  That's not a
10   problem at all.  We'll make it work.
11         THE COURT:  Good.  Could I then ask if there's
12   something more?
13         MR. DOWD:  The final issue is with respect to
14   the construction.  Your Honor has construed a data
15   speculation circuit as having to detect a
16   mis-speculation and detect dependency.  This slide
17   collapses it and suggests that --
18         THE COURT:  Well, there's two responses to
19   that.  One is you can object to the testimony.  It's not
20   going to be in this slide as it's revised.  If he
21   testifies to it, you can object as it's inconsistent
22   with the report.  In any event, even if I allow him to
23   testify as to his understanding, ultimately you can hold
24   him to the definition if the Court has issued a specific
25   construction.

1        Anything more then?

2                MR. DOWD:  That resolves it.

3                THE COURT:  All right.  All rise, please.

4    We're going to hear from our witness.

5           (Jury brought in courtroom at 3:55 p.m.)

6                THE COURT:  As soon as you're seated, we will

7    begin.  Please be seated.  We will continue now with the

8    cross-examination of Mr. Gulbrandsen.

9           You may proceed, Counsel.

10               MR. MARCUS:  May I proceed, Your Honor?

11               THE COURT:  Please.

12                       CROSS-EXAMINATION

13   BY MR. MARCUS:

14   Q    Good afternoon, Dr. Gulbrandsen.

15   A    Good afternoon.

16   Q    David Marcus for Apple.

17   A    Yes.

18   Q    During your direct testimony you made reference to

19   Exhibit 1725.  Is there any objection to calling that

20   up?

21               THE COURT:  I think it is before the witness

22   now as well as the jury.

23               MR. MARCUS:  Your Honor, may I publish it to

24   the jury?

25               THE COURT:  I thought you said there was
                        CARL GULBRANDSEN - CROSS

1  reference to.  Was it not admitted at that time?  725

2  [verbatim] was not admitted, but I will admit it without

3  objection.  And you may publish it.

4          MR. MARCUS:  Thank you, Your Honor.

5  BY MR. MARCUS:

6  Q   Dr. Gulbrandsen, Exhibit 1725 contains the first

7  email that WARF sent to Apple; correct?

8  A   It's my understanding, yes.

9  Q   Now, before sending this email, WARF hadn't

10 received the automatic response email from Apple about

11 idea submissions; correct?

12 A   Correct.

13 Q   Now, in this email, the first email that WARF sent

14 to Apple, there is no reference to the '752 patent;

15 correct?

16 A   Correct.

17 Q   In fact, the '752 patent wasn't identified in any

18 way in this email; correct?

19         THE COURT:  With apologies, we're going to have

20 a sidebar with counsel.

21      (Discussion at sidebar at 3:54 p.m.)

22         THE COURT:  I know that WARF opened this weird

23 door, but I don't understand why this has any relevance

24 to infringement.  I barely didn't allow it to be

25 mentioned in opening.  What difference does it make for

                    CARL GULBRANDSEN - CROSS

1   purposes of infringement as to when your client learned

2   of the existence of the patent?

3          MR. MARCUS:  I don't think it is relevant.  We

4   just want to make the record more clear.

5          THE COURT:  I'm going to make clear that it's

6   not relevant for either side and we're going to move on.

7          MR. MARCUS:  Thank you.

8       (End of sidebar discussion at 3:55 p.m.)

9          THE COURT:  We've kind of gone down a road

10  which you will be instructed has no relevance for the

11  infringement determination you'll be asked to make at

12  the end of this phase of trial.  It doesn't matter

13  whether Apple knew about the existence of the '752

14  patent.  Their knowledge isn't relevant to deciding

15  whether or not their product infringes, any more than

16  it's relevant as to when WARF advised them of the

17  existence of the '752 patent.  You'll have this in

18  writing as part of my instructions.  Why we went down

19  this road I'm not sure, but I'm closing it now.  So you

20  shouldn't hold it against either side.  It's just not a

21  relevant consideration at this time.

22      You may proceed, Counsel.

23          MR. MARCUS:  Thank you, Your Honor.

24  BY MR. MARCUS:

25  Q   Dr. Gulbrandsen, you're the managing director of
                    CARL GULBRANDSEN - CROSS

1  WARF; correct?

2  A    That's right.

3  Q    You're an attorney; correct?

4  A    I am.

5  Q    You're not offering any opinion as to whether Apple

6  infringes the '752 patent; correct?

7  A    Correct.

8  Q    You've not been asked to make a determination as to

9  whether the '752 patent is valid in light of the prior

10 art; correct?

11 A    Not on my own, that's correct.

12 Q    And you're also not offering an opinion as to

13 whether the '752 patent is valid or invalid; correct?

14 A    I'm not offering that opinion.

15 Q    During your direct testimony, you made reference to

16 some testing that WARF did of Apple products other than

17 the accused products; correct?

18 A    I did.

19 Q    Were those tests produced to Apple in this

20 litigation?

21 A    I don't know.

22 Q    The '752 patent that is the subject of this case

23 was issued in July 1998; correct?

24 A    Correct.

25 Q    And in November 2000, WARF sent out some letters to
                        CARL GULBRANDSEN – CROSS

1  try to license the '752 patent; right?

2  A    If you say so.  I don't have the dates in front of

3  me.

4  Q    Well, you'll agree with me that November 2000 is

5  more than two years after the patent issued; right?

6  A    Sure.

7  Q    Let's take a look at that -- those letters.  Could

8  you turn to DX 1669, which is tab 4 in your binder.  Do

9  you have that in front of you, sir?

10  A    Yes, I do.

11  Q    And this is a letter from Jerry Shattuck of WARF to

12  AMD; right?

13  A    Yes.

14  Q    You recognize the document; right?

15  A    I do.

16  Q    It comes from WARF's files; right?

17  A    That's correct.

18         MR. MARCUS:  Your Honor, may I publish it to

19  the jury?

20         THE COURT:  It is admitted.

21  BY MR. MARCUS:

22  Q    Dr. Gulbrandsen, Jerry Shattuck was a licensing

23  manager at WARF at the time he wrote this letter;

24  correct?

25  A    Yes.

                    CARL GULBRANDSEN - CROSS

1    Q    And the letter was sent on November 7th, 2000;

2    correct?

3    A    That's correct.

4    Q    The purpose of the letter was WARF trying --

5    contacting AMD to try to license the '752 patent;

6    correct?

7    A    Correct.

8    Q    And Mr. Shattuck included the patent number of the

9    '752 patent in this letter; right?

10   A    He did.

11   Q    Mr. Shattuck also included the title of the '752

12   patent in this letter; correct?

13   A    Correct.

14   Q    Now, AMD never took a license to the '752 patent;

15   correct?

16   A    That's correct.

17   Q    Could you turn now to DX 1674, which is tab 5 in

18   your binder.  Do you have that in front of you, sir?

19   A    I do.

20   Q    This is another letter from Mr. Shattuck on behalf

21   of WARF, this time to Compaq; correct?

22   A    Correct.

23   Q    This letter is also trying to license the '752

24   patent; right?

25   A    Correct.
                CARL GULBRANDSEN - CROSS

256

1    Q    And you recognize this letter; right?

2    A    Yes.

3         MR. MARCUS:  Your Honor, we move this letter

4    into evidence.

5         THE COURT:  That's fine.  It is admitted and

6    you may publish.

7         MR. MARCUS:  Thank you, Your Honor.

8    BY MR. MARCUS:

9    Q    This letter was also sent on November 7, 2000;

10   right?

11   A    Right.

12   Q    And Compaq never took a license to the '752 patent;

13   right?

14   A    That's correct.

15   Q    Could you now turn to DX 1671, which is tab 6 in

16   your binder.  Sir, do you have that in front of you?

17   A    I do.

18   Q    This is a letter from Mr. Shattuck on behalf of

19   WARF to Hewlett Packard; right?

20   A    Correct.

21   Q    You recognize the document; correct?

22   A    Yes.

23        MR. MARCUS:  Your Honor, may I publish it to

24   the jury?

25        THE COURT:  You may.  It is admitted.
                    CARL GULBRANDSEN - CROSS

1  BY MR. MARCUS:

2  Q    This is another letter where WARF is trying to

3  license the '752 patent to a computer company; right?

4  A    That's correct.

5  Q    And this letter was also sent on November 7, 2000;

6  right?

7  A    Correct.

8  Q    And Hewlett Packard, HP, never took a license to

9  the '752 patent; right?

10  A    That's correct.

11  Q    So we've now seen three letters sent in November of

12  2000 where WARF tried to license the '752 patent;

13  correct?

14  A    Correct.

15  Q    And then a few months later, in January 2001, WARF

16  sent two more letters trying to interest companies in

17  licensing the '752 patent; correct?

18  A    Correct.

19  Q    Let's take a look at those and I'd ask you to turn

20  to DX 1672 which is tab 7 in your binder.  Are you at

21  tab 7, sir?

22  A    Yes.

23  Q    This is another letter from Mr. Shattuck written on

24  behalf of WARF; correct?

25  A    Correct.
                    CARL GULBRANDSEN - CROSS

258

1   Q    You recognize the document; right?

2   A    Yes.

3        MR. MARCUS:  May I publish the document, Your

4   Honor?

5        THE COURT:  It is admitted.  You may publish

6   it.  But we're not going to highlight it.  You can just

7   get your minimums.  And again, highlighting is to be

8   done at the direction of counsel.

9        You may proceed.

10       MR. MARCUS:  Thank you, Your Honor.

11  BY MR. MARCUS:

12  Q    This letter from Mr. Shattuck is to IBM; correct?

13  A    That's correct.

14  Q    And this letter was sent on January 2nd, 2001;

15  right?

16  A    Yes.

17  Q    The purpose of this letter was to see if IBM wanted

18  to take a license to the '752 patent; right?

19  A    Yes.

20  Q    And once again, Mr. Shattuck, on behalf of WARF,

21  included the patent number and the title of the '752

22  patent in this letter; right?

23  A    That's correct.

24  Q    And IBM never took a license to the '752 patent;

25  correct?

                    CARL GULBRANDSEN - CROSS

1   A     That's correct.

2   Q     Could you now turn to DX 1688, which is tab 8 in

3   your binder.

4         THE COURT:  And just to move things along, this

5   too is admitted without objection and it may be

6   published to the jury.

7         And you should proceed, Counsel.

8         MR. MARCUS:  Thank you, Your Honor.

9   BY MR. MARCUS:

10  Q     This is another letter from Mr. Shattuck on behalf

11  of WARF, this time to Sun Microsystems; correct?

12  A     Yes.

13  Q     Sun Microsystems never took a license to the '752

14  patent; right?

15  A     That's correct.

16  Q     And again, in this letter both the number and the

17  name of the '752 patent were identified to Sun

18  Microsystems; right?

19  A     Right.

20  Q     So in total now we've looked at five technology

21  companies --

22        THE COURT:  Again, the jury can add.  Another

23  question.

24        MR. MARCUS:  Thank you, Your Honor.

25  BY MR. MARCUS:
                    CARL GULBRANDSEN - CROSS

1   Q    In fact, the only company in the world that's

2   licensed the '752 patent is Intel; correct?

3   A    That's correct.

4   Q    And Intel only took a license after WARF sued them;

5   correct?

6   A    That's correct.

7   Q    WARF has never licensed the '752 patent to a

8   company that sells smartphones; correct?

9   A    Correct.

10  Q    And no smartphone company has approached WARF to

11  discuss taking a license to the '752 patent; correct?

12  A    Correct.

13  Q    WARF has never licensed the '752 patent to a

14  company that sells tablets; correct?

15  A    Correct.

16  Q    And no tablet company has approached WARF to take a

17  license to the '752 patent; correct?

18  A    Correct.

19  Q    You have no evidence that any of Apple's

20  competitors are using the '752 patent; correct?

21  A    I have no evidence of that.

22  Q    And sir, you're not aware of any communications --

23  I'll strike that.

24       MR. MARCUS:  Your Honor, I'll pass the witness.

25  Thank you.  (4:05 p.m.)
                 CARL GULBRANDSEN - CROSS

1        THE COURT:  Very good.  Any redirect?

2        MR. CHU:  Yes, Your Honor.

3                  REDIRECT EXAMINATION

4   BY MR. CHU:

5   Q    As of the date of the letter to Compaq Computer in

6   the year 2000, do you have an understanding of who was

7   the major supplier of processors to Compaq?

8   A    Intel.

9   Q    Same question with respect to HP as of the date of

10  the letter to HP.

11  A    Intel.

12  Q    Did you have an understanding as of that year

13  whether Intel was or was not using the technology

14  claimed by the '752 patent?

15  A    As of that year?

16  Q    Yes.

17        MR. MARCUS:  Objection, Your Honor.

18  Foundation.

19        THE COURT:  He's really -- he's asking about

20  this witness's understanding and you've explored his

21  motivation, so I'm going to let him answer the question.

22  Did you have an understanding at that time?

23        THE WITNESS:  At that time our understanding

24  was it was not being used.

25

                CARL GULBRANDSEN - REDIRECT

BY MR. CHU:

Q    Did you have an understanding with respect to AMD,

IBM and Sun Microsystems as of the dates of those

letters as to whether they were or were not using the

WARF technology?

A    My understanding is it was not being used at that

time.

          MR. CHU:  Thank you.

          THE COURT:  All right.  You may step down then,

Mr. Gulbrandsen.  Thank you.  And WARF may call its next

witness.

     (Witness excused.)

          MR. FRISCHLING:  WARF calls Professor Gurindar

Sohi.

     **GURINDAR SOHI, PLAINTIFF'S WITNESS, SWORN,**

          THE COURT:  And you may proceed.

                    DIRECT EXAMINATION

BY MR. FRISCHLING:

Q    Good afternoon.  Please introduce yourself to the

Court and the jury.

A    Okay.  My name is Gurindar Sohi.  I go by the name

of Guri Sohi.

Q    How are you currently employed?

A    I'm a professor at the University of

Wisconsin-Madison in the Computer Sciences Department
                    GURINDAR SOHI – DIRECT

1  and also in the Electrical and Computer Engineering

2  Department.

3  Q    Do you have any other appointments at the

4  University?

5  A    I am a Vilas Research Professor, a John P.

6  Morgridge Professor, an E. David Cronon Professor of

7  Computer Science, and I was also the chair of the

8  Computer Science Department from 2004 through 2008.

9  Q    How long have you been on the faculty?

10  A    I joined the faculty in 1985 when I was 25, so this

11  is my 30th anniversary.

12  Q    Can you describe for us briefly, Professor, your --

13  how you came to be involved in computer architecture?

14  A    So I was growing up in India and my parents were

15  both doctors, they wanted me to be a doctor, and I

16  wanted to study engineering.  And when I went to

17  engineering college, I took a class on digital logic,

18  which is the building blocks of computers.  And so I got

19  very excited and I wanted to study further and the only

20  option was to come to the United States, despite my

21  parents' objections and hesitations I wouldn't be

22  accepted here.

23     I came to grad school at the University of Illinois

24  and that's where I learned about computer architecture.

25  Q    Have you ever testified in court before, Professor?

                    GURINDAR SOHI – DIRECT

1  A    I have not been on the witness stand, but I was

2  sworn in in this very courthouse as a United States

3  citizen in 1993.

4  Q    Professor Sohi, if you would look in a green folder

5  on the witness stand you have there.  It's a copy of

6  Plaintiff's Exhibit 1, '752 patent.  Would you take a

7  look at it and tell me if you recognize it.  And if we

8  could please have on the court system, without

9  publishing it, the visual for everybody else.

10  A    Yes, I do.

11  Q    And can you tell us, sir, please, what it is you're

12  looking at.

13  A    This is the original of the United States patent

14  '752 that was issued by the United States Patent Office.

15         MR. FRISCHLING:  We move admission of

16  Plaintiff's Exhibit 1, Your Honor.

17         THE COURT:  It is admitted.

18  BY MR. FRISCHLING:

19  Q    Thank you, Professor Sohi.  Who are the inventors

20  on the '752 patent?

21  A    The inventors are Andreas Moshovos, Scott Breach,

22  and Terani Vijaykumar.  He goes simply by Vijay.

23  Q    Professor Sohi, I'd like you to tell us just a

24  little bit of the background about each of the

25  inventors.
                    GURINDAR SOHI - DIRECT

1        MR. FRISCHLING:  We have a slide with their

2   photographs, Your Honor, that was not objected to, if we

3   can display that to the jury just as a demonstrative.

4        THE COURT:  You may.

5        MR. FRISCHLING:  Thank you.

6        THE WITNESS:  On the right is Andreas Moshovos.

7   He grew up in Greece and came for graduate studies to

8   work with me at Wisconsin.  He is now a tenured

9   professor at the University of Toronto.

10       In the middle is Dr. Scott Breach.  He grew up on

11  the East Coast and he came to study with me at

12  Wisconsin, and he's now a senior engineer at AMD

13  Corporation, which is a manufacturer of microprocessors.

14       And on the left is Vijaykumar, who like me grew up

15  in India and came to Wisconsin, and he is now a tenured

16  professor at Pursue University.

17  BY MR. FRISCHLING:

18  Q    Thank you, Professor.  Can you describe for us

19  briefly the origin of the work that's described in the

20  '752 patent.

21  A    So what my research was addressed for, you know,

22  from the late to mid-80's onward was how to describe

23  these instructional level processors.  But being an

24  academic who's really charged with looking further out

25  than what others would ordinarily do, I was trying to

                    GURINDAR SOHI – DIRECT

1  look out 10 to 15 years in the future, identify the

2  challenges, and then go and determine how we might go

3  about solving them.

4  Q    What challenges did you identify, Professor, that

5  relate to the '752 patent in the course of your work?

6  A    So the key challenge was that you're going to have

7  to be executing instructions in parallel.  And you heard

8  a little bit about parallel and out of order.  So we

9  were going to execute them out of the order.  Sometimes

10 it's easy to know two instructions can be issued out of

11 order.  So if you're doing 3 plus 2 and 4 plus 1, you

12 can do them in any order and get the same result.  But

13 if you're doing 3 times two plus 6, then if you do the 3

14 times 2 before the plus 6, you get a different result

15 than the 2 plus 6 then times 3.  Okay?  So in that case,

16 it's not -- you can't issue them out of order.  They're

17 data dependent and you can't issue them out of order and

18 get the correct result.

19      But a lot -- there is a large class of instructions

20 that are called *load-and-store instructions*, which you

21 do not know whether they are dependent or not.  And so

22 you want -- if you want to be able to issue them out of

23 order, you have to have very good knowledge about

24 whether you can issue them out of order or not.

25 Q    So Professor, I'd like to just go back to basics.
                    GURINDAR SOHI - DIRECT

1  Can you tell us what a load instruction is, please.

2  A    Okay.  So inside a computer, the heart is a

3  processor, sometimes also called a central processing

4  unit, and, you know, these days it's a microprocessor.

5  And there is memory, which is a collection of locations

6  where you store data and information.  And each location

7  is given an address.  Okay?  It's just like everyone, if

8  you have a mailbox, that has an address on it.  Okay?

9      So a load instruction brings data from a location

10 and address, from a location and memory into the

11 processor, and a store instruction does the work.  It

12 takes data from a processor after the data has been

13 operated upon and puts it back in memory.

14 Q    Professor, just so we have a rancored, what is a

15 program?  How do instructions relate to a program?

16 A    Oh.  So a program is -- so every software

17 application, be it Word or be it a web browser is a

18 program, if you will.  It's a collection of instructions

19 through the computer, through the processor.  The

20 processor executes the instructions and the instructions

21 have an implied order.  And so -- sorry, did I answer

22 your question completely?

23 Q    Yes, you did.

24 A    Okay.  Thank you.

25 Q    Thank you.  Turning to the question that you were

                    GURINDAR SOHI - DIRECT

1  talking about a moment ago, the analysis and the work

2  you had done to identify challenges with loads and

3  stores, is there a term that describes what you were

4  trying -- the challenge you were trying to deal with

5  with regard to load-and-store instructions?

6  A    So we were trying to identify how to execute these

7  load-and-store instructions out of order.  So as I

8  talked to you about earlier, two instructions are

9  dependent on each other, you cannot do them out of

10 order.  But if they're not, you can do them out of

11 order.  So what we're trying to establish is the

12 dependence relationships between these load-and-store

13 instructions.  But, of course, you can't know them

14 completely and so you have to predict whether there's a

15 dependence.  And so what we were trying to come up with,

16 how can we have clever ways to deal with that challenge.

17 Q    So Professor, you described load-and-store

18 instructions that should not be done out of order.  What

19 happens inside the processor if they do go out of order?

20 A    Oh.  So if I do a load instruction before a store

21 instruction, I am speculating that it's not dependent on

22 the store instruction.  And so if it goes out of order

23 and it happens -- if there isn't any dependence, then

24 all is good.  But if there is a dependence, then I have

25 a mis-speculation or a collision, I have to then go

1   ahead and recover and restart, throw things out, squash

2   them, flush them as what's called, and restart the

3   program from the offending instruction.

4   Q    So Professor, the problem of -- first of all, is

5   there a term for what you've just described when a load

6   conflicts with a store?

7   A    It's a memory dependence violation.

8   Q    And you also used the term mis-speculation.  Is

9   there a difference?

10  A    So the mis-speculation is essentially that there

11  was a violation and you had to do something about it

12  again.  So it's essentially the same.

13  Q    Was it --

14          THE COURT:  It's possible to have a violation

15  without it having resulted in a mis-speculation because

16  by happenstance it was right?  Do you draw any

17  distinction between those two events or are they just

18  used interchangeably?

19          THE WITNESS:  Well, different people use

20  different terminology.

21          THE COURT:  But for you, it's your

22  understanding they are basically the same thing.

23          THE WITNESS:  Well, if you have to do some

24  corrective action.

25          THE COURT:  That's clearly a mis-speculation.
                    GURINDAR SOHI - DIRECT

1    But that would also be a miscalculation in your usage.

2              THE WITNESS:  I'm sorry, Judge.

3              THE COURT:  We're talking about the difference

4    between a mis-speculation and a violation.  If -- does

5    it -- for you they're interchangeable terms.

6              THE WITNESS:  That's correct.

7              THE COURT:  That's all I was trying to

8    establish.  I apologize.  You may proceed.

9              THE WITNESS:  No problem, Your Honor.

10   BY MR. FRISCHLING:

11   Q    Professor, were you or your group the first to

12   recognize that loads and stores can mis-speculate?

13   A    No, we were not.

14   Q    That was something that was done before; is that

15   right?

16   A    That is correct.

17   Q    Now, can you tell us what original research you and

18   your colleagues on the '752 patent did to address the

19   challenges that you identified?

20   A    So we were looking for a processor far into the

21   future.  So we knew there was a problem, but we didn't

22   understand the problem.  I knew there was a problem in

23   1990/1991, but you don't know how to solve the problem.

24   To come up with a solution, you really have to

25   understand what is going on.  So what we did is we built
                    GURINDAR SOHI - DIRECT

1    a model of a future processor and in that model we

2    studied how these mis-speculations would occur.

3    Processors at the time when we were doing that research,

4    there's a notion called an instructional window which is

5    how many instructions are you considering for parallel

6    execution at a time and at that time there were maybe 20

7    or so of that order.  What we were concerned about, what

8    if you have several hundred, couple of hundred, 500, a

9    thousand, okay?  There are so many more loads and stores

10   and so many more chances for mis-speculations that you

11   better come up with a good solution, otherwise you're

12   not getting anywhere.

13   Q    So Professor, you mentioned loads and stores in a

14   program.  Do you have a sense of, in a typical program

15   that you would have worked with, what percentage of the

16   programs would have been loads and stores?

17   A    It's about a third.  So if I have, you know, 300

18   instructions or 200 instructions I'm trying to consider

19   for parallel execution, 60, 65, 70 of them typically

20   would be loads and stores.

21   Q    Professor, you mentioned that you built a model.

22   Can you explain a little bit what kind of model that

23   was, how it was built?

24   A    Yes.  So the way you study something that has not

25   been built yet or you cannot build yet is you build --

                    GURINDAR SOHI – DIRECT

272

1   you build a piece of software that's called a *simulator*.

2   And that simulator then simulates the execution,

3   simulates what would be happening in the future model.

4   So we built a simulator.

5   Q    And did you and Dr. Moshovos, Dr. Breach,

6   Dr. Vijaykumar run experiments using the simulator?

7   A    We ran lots and lots of experiments.  Each

8   experiment -- here is a typical experiment.  Here is a

9   program you want to run that you want to understand its

10  execution behavior.  It's going to run for hundreds of

11  millions of instructions.  You run the simulation of

12  that processor and then you do many, many more of these

13  with different programs, different parameters, and so

14  on.

15  Q    Who ran the experiments using the simulator?

16  A    They were done by my graduate students.  They were

17  always much better than me at doing it.

18  Q    Professor, in this case the graduate students are

19  your coinventors on the '752; is that right?

20  A    That is correct.  Scott Breach, Andreas Moshovos,

21  and Vijaykumar.

22  Q    Professor, what did you do with the results of the

23  experiments you ran in your simulator?

24  A    So what we -- what -- we studied the behavior of

25  what was going on, the results we were getting, and made

                    GURINDAR SOHI - DIRECT

1   a key empirical observation that was going to -- that

2   was a foundation, that was a crux of the solution that

3   we came up with.

4   Q    And can you tell us, sir, what that observation

5   was?

6   A    Oh.  So the observation was, well, you know, say

7   this:  Say you have lots and lots of load-store

8   instructions.  Any of them could be dependent on any

9   other.  But there were only a few load-store

10  instructions that were the problem and their behavior

11  changed over time.  So when one load -- a load that may

12  have dependent on one store, at a different point during

13  the time of execution of the program that wasn't going

14  to be the case.

15  Q    And were there any other insights that came out of

16  your experiments?

17  A    So the key insights were that if you were able to

18  -- so what this phenomena would let us do is it allowed

19  us to build a small circuit, because they were small,

20  that would allow us to learn the dependence

21  relationships as we went along and very accurately

22  predict which one of these loads and stores were going

23  to be the problem in the future.

24  Q    Now, you mentioned a small circuit, Professor.  Was

25  there a reason it needed to be a circuit?

                  GURINDAR SOHI - DIRECT

1  A    Yes, there is a reason to be a circuit.  Because

2  this whole tracking of information, whether loads and

3  stores were going to mispredict and make actual

4  decisions on whether a load should be allowed to execute

5  had to be very fast.  So it had to be done in circuitry

6  rather than in software.

7  Q    Professor, are there any terms that are used to

8  describe the techniques that ended up in the '752

9  patent?

10  A    So we started out calling it dynamic approach to

11  improve the accuracy of data speculation, I think.  And

12  then we had a different moniker for it, dynamic

13  synchronization speculation -- I forget.  And finally,

14  we came up with the term memory dependence prediction,

15  and that's what it's widely known in the community.

16  Q    So in your experience, Professor, the phrase memory

17  dependence prediction when used in connection with your

18  work, what does it refer to?

19  A    It refers to the technology of the '752 patent.

20  Q    What are the benefits of that technology in a

21  microprocessor if one were to use that technology in a

22  microprocessor?  Does it give you an advantage?

23  A    Oh.  Oh, of course.  You know, if you can very

24  accurately allow loads to speculate early in time, you

25  would get faster programming execution and more

                    GURINDAR SOHI - DIRECT

1  parallelism and more -- and if you were not throwing

2  away work because you were mis-speculating, then you get

3  energy efficiency.  So overall generally efficient

4  program execution.

5  Q     Professor, let me ask a question.  How did your

6  work relate, if at all, to smartphones, for example?

7  A     So inside a smartphone is a microprocessor and

8  inside the microprocessor is the circuitry that

9  determines how the instruction should be processed.  And

10  then we have the intelligence circuitry over there to

11  make decisions on when to allow load instructions to go

12  as fast, as soon as possible.

13  Q     Let me ask the same question, sir, with respect to

14  tablets.  How does your work relate, if at all, to

15  tablets?

16  A     Very similarly.  In a tablet, at the heart of a

17  tablet is a microprocessor that essentially runs the

18  software.  All the applications are software.  The

19  software runs on the microprocessor.  And inside the

20  microprocessor is the circuitry to use intelligence to

21  make intelligent decisions -- to make intelligent

22  decisions.  Sorry about that.

23  Q     Excuse me.  When did the work on your invention

24  start?

25  A     So we started studying the problem for a long time.

                    GURINDAR SOHI - DIRECT

276

1   You know, when like I said, I was aware of the problem

2   for a long time, but I really couldn't do anything about

3   it until I had assembled a team that could build a

4   simulator to carry out the experiments that we did.

5   Scott Breach and Andreas -- no, and Vijaykumar came on

6   board in about '92.  And in '93 Vijaykumar came on

7   board.  We started doing all the experiments and took a

8   long time until we get to -- we got to the point where

9   we got to -- where we came up with the idea.

10  Q    In the course of that work, did you try other

11  approaches before coming up with the memory dependence

12  prediction ideas of the '752 patent?

13  A    Oh, we tried lots and lots of approaches and this

14  is -- this is, you know, life of a researcher.  You come

15  up with an idea.  You think it's going to work.  You try

16  and then figure out how it's going to behave, and then

17  it doesn't behave that well.  It doesn't work out that

18  well.  You go back to the drawing board and do it all

19  over again, and you do it all over again, and do it all

20  over again.  So we tried many, many other things.

21  Q    When did you and your coinventors in that process

22  that started in '92/'93, at what point did you come up

23  with the solutions to the problem that you put in the

24  '752 patent?

25  A    This was around October of 1995.
                    GURINDAR SOHI - DIRECT

1   Q    And then after you came up with those ideas, what

2   was the next step?

3   A    So after we decided -- decided how our circuitry

4   was going to be -- how it would work, we implemented a

5   model of that circuitry in the simulator and then ran

6   simulation experiments.

7   Q    What did the simulation experiments show you, sir?

8   A    The simulation experiments showed us that our

9   technique worked very well, as good as if it had perfect

10  knowledge of all the dependence relationships in many,

11  many cases.

12  Q    Professor, when did you have your circuitry up and

13  running in your simulator?

14  A    I can't recall the exact date, but sometime in the

15  October, November, early December time frame.

16          THE COURT:  Of 1995.

17          THE WITNESS:  Of 1995.

18  BY MR. FRISCHLING:

19  Q    Professor --

20          MR. FRISCHLING:  Could we please have on the

21  system Exhibit 410, not published to the jury, please.

22  Q    And Professor, if you please would look at Exhibit

23  410 in your binder.

24  A    410?

25  Q    Yes.
                    GURINDAR SOHI - DIRECT

1    A    Yes, I have it.

2    Q    So first can you tell us if you recognize Exhibit

3    410?

4    A    I do.

5    Q    And what is Exhibit 410?

6    A    It's an email from Vijaykumar to myself and Jim

7    Smith.

8    Q    And can you tell us, first of all, is this part of

9    an email chain?

10    A    No, it's not part of an email chain.

11    Q    And is this something that was created in the

12    course of the ordinary work in your lab?

13    A    That is correct.

14    Q    Now, is this something -- the author of the email

15    is Dr. Vijaykumar; is that right?

16    A    Yes, that is correct.

17    Q    Or then Mr. Vijaykumar?

18    A    Yes, that is correct.

19    Q    And who are the addressees?

20    A    Myself and Jim Smith.

21         MR. FRISCHLING:  Move admission of Exhibit 410,

22    Your Honor.

23         THE COURT:  I note that there are objections

24    pending, but I will admit it.

25         MR. LEE:  That's no objection, Your Honor.
                    GURINDAR SOHI - DIRECT

1       THE COURT:  All right.  Then it is admitted.

2  Thank you.

3  BY MR. FRISCHLING:

4  Q    Professor, we're going to put it on the screen.

5  And if you could tell us, sir, first of all, what is the

6  date of the email?

7  A    It's December 11, 1995.

8  Q    And what was the status of the work with the

9  simulator and whether or not your system was up and

10 running as of December 11, 1995?

11 A    So we had implemented the scheme inside our

12 simulator and it was running and we were carrying out

13 experiments of it.

14 Q    What is the language, sir, in the email, if any,

15 that you think supports that?

16 A    That's if you go down to the second paragraph and

17 one, two, three, the third line to the right.

18 Q    The sentence that starts *To implement*?

19 A    That's right.  So "To implement the idea in the

20 multiscalar simulator, Scott Breach, Andreas Moshovos,

21 and I discussed some of the options and Scott

22 implemented an efficient scheme in the simulator."

23 Q    And so what is your belief, sir, as to whether your

24 ideas embodied in the '752 patent were up and running in

25 your simulator as of December 11, 1995?
                GURINDAR SOHI - DIRECT

1   A    They were up and running by then.

2   Q    Professor, when was the application for the '752

3   patent filed?

4   A    December, I think it was 26, 1996.

5   Q    And do you recall when the patent was granted by

6   the Patent Office?

7   A    July 14, 1998.

8   Q    So about how long did it take the Patent Office to

9   examine and consider the '752 patent application?

10  A    About a year-and-a-half.

11  Q    Now, before that 1998 issue date for the '752

12  patent, did you or your coinventors publish any papers

13  regarding your work that's embodied in the '752 patent?

14  A    Yes, we did.

15  Q    Can you tell us when the first such paper was

16  published?

17  A    So the first such paper was published in March of

18  1996.

19  Q    And if we could have, please, Exhibit DX 865, if

20  you would turn to that in your binder, sir.

21        MR. FRISCHLING:  And if we can have that on the

22  system.  I think I've disabled to the jury.  Yes.  Good.

23  Q    Professor, first of all --

24        THE COURT:  We had it there.  Sorry.

25        MR. FRISCHLING:  It seems to get away from me,

                    GURINDAR SOHI - DIRECT

1   Your Honor.

2          THE COURT:  That's fine.  I think we're all up

3   and running.

4          MR. FRISCHLING:  Let me try that one more time.

5          THE COURT:  No, I think you're good.  Don't

6   touch it again and you're in business.

7   B MR. FRISCHLING:

8   Q    Professor, let me ask, first of all, if you

9   recognize this as the March '96 publication you were

10  referring to.

11  A    Yes, that is.

12         MR. FRISCHLING:  So we move admission of

13  Exhibit 865.

14         THE COURT:  It is admitted.

15  BY MR. FRISCHLING:

16  Q    Thank you, Professor.  What was the purpose of

17  publishing this technical report?

18  A    So the purpose was to tell others who read our work

19  about what we had done.

20  Q    And can you describe to us, Professor, how the

21  technical report relates to the '752 patent?

22  A    So the technical report was what we used as a

23  starting point to prepare the '752 patent application.

24  Q    And in terms of the technical ideas, how did the

25  technical ideas communicated in the technical report
                    GURINDAR SOHI - DIRECT

1  relate to those in the '752 patent?

2  A    That's -- the technical ideas in this paper are

3  what we have essentially in the '752 patent.

4  Q    So Professor, was the technical report, Exhibit

5  865, peer reviewed?

6  A    No, it was not.  It was just our department

7  technical report.

8  Q    And what, if anything, did you do to get

9  peer-review feedback on your ideas?

10 A    So we had submitted this tech report, at the same

11 time it appeared, the tech report we had submitted to a

12 conference for review.

13 Q    What conference?

14 A    Oh, it's an acronym.  I can't remember the whole

15 name.  It was the A-S-P-L-O-S.  We call it ASPLOS

16 conference.

17 Q    Can you tell us, Professor, what is peer review?

18 What is that process?

19 A    Oh, so the peer review for a conference works as

20 follows:  There's a person that's the program chair who

21 is responsible for selecting the papers and for managing

22 the process of the selection of papers.  There is about

23 25 people that are called a program committee.

24      Now, the program chair gets each paper peer

25 reviewed by five or six experts in the field and then

                    GURINDAR SOHI - DIRECT

1    the conference committee collectively considers the peer

2    reviews and then decides whether the papers should be

3    accepted or not.

4    Q    So when you submitted the paper -- first of all,

5    the submission to ASPLOS, was the content the same or

6    different than the 865 technical report?

7    A    It was the same.  It was -- what we did is we took

8    the submission and made it into a technical report.

9    Q    Professor, what happened to the submission that you

10   made to ASPLOS?

11   A    Well, unfortunately it wasn't accepted.

12   Q    Did you get any feedback from those expert peer

13   reviewers as to why?

14   A    Yes, we did.

15   Q    Take a look at Exhibit 452, please, in your binder.

16          MR. FRISCHLING:  And in the meantime, if we can

17   have that up for the court, please.

18   Q    Do you recognize Exhibit 452, sir?

19   A    Yes, I do.

20   Q    What is it?

21   A    This is an email from Andreas Moshovos forwarding

22   us the reviews for that paper and the decision that the

23   paper was not accepted.

24   Q    Okay.  Professor, what was the date of that?

25   A    June 5th, 1996.  So he forwarded us on June 5 and

                    GURINDAR SOHI - DIRECT

1  the reviews came on June 4.

2  Q    Is this a typical type of communication that would

3  be received in the ordinary course of business in your

4  laboratory?

5  A    Yes, it is.

6         MR. FRISCHLING:  We'd move admission of Exhibit

7  452, Your Honor.

8         THE COURT:  The objection is continued?

9         MR. LEE:  Your Honor, we have it showing no

10  objection.

11         THE COURT:  That's fine.  I may not have the

12  latest version.  But in any event, it is admitted.  You

13  may publish to the jury.

14         MR. FRISCHLING:  Thank you, Your Honor.

15  BY MR. FRISCHLING:

16  Q    So Professor, what was the problem that was

17  identified by the ASPLOS reviewers in your review?

18  A    I think, you know, one of the key things is that we

19  had just -- the insight that we had, that I talked about

20  earlier, we had just put a sentence over their head.

21  Hey, this is why we believe.  And there's a lot of

22  skepticism in them and a lot of skepticism hey, you

23  know, the scheme that you're proposing is not going to

24  work.

25  Q    Professor, if you take a look at Exhibit 452, can

                    GURINDAR SOHI - DIRECT

1   you point us to an example of what you're referring to?

2   A    So if you go to the next page --

3        MR. FRISCHLING:  Could you please scroll up to

4   the next page?

5   Q    And you see -- if you go to which is a number --

6   says number 2, this one here.

7   A    So here is an example of the skepticism.  "Do you

8   have any data to back up your claim in the second

9   paragraph of section 3 (i.e. data) showing only a few

10  static load-store pairs account for most of the

11  mis-speculations.  If so, you should show it.  This is a

12  key item."

13  Q    So just to be clear, what did you understand data

14  showing that only a few static load-store pairs account

15  for the -- most of the mis-speculations, excuse me --

16  what did you understand that phrase to be talking about?

17  A    So that was precisely highlighting the inside and

18  empirical observation that we had made.

19  Q    After the ASPLOS submission was turned down,

20  Professor, what, if anything, did you and Dr. Moshovos,

21  Dr. Vijaykumar, Dr. Breach do when you learned that?

22  A    So we revised -- we revised the paper, and in

23  November of 1996 we submitted to another conference.

24  The acronym for it is ISCA.  I-S-C-A.

25  Q    And can you tell us briefly what the ISCA
                    GURINDAR SOHI - DIRECT

1  conference is?

2  A    So it's again, it's the International Symposium on

3  Computer Architecture.  It's the premier conference in

4  the research area of computer architecture.

5  Q    What did you add to the submission to -- can I call

6  it ISCA; is that correct?

7  A    Yes.

8  Q    What did you add to the submission to ISCA that you

9  didn't have in the 1996 -- March 1996 submission?

10  A    So we had a lot more data, especially trying to

11  highlight the empirical phenomena we had observed.  And

12  then also added more experimentation data.

13  Q    Now, is that data data that was generated using the

14  simulator we spoke about from the fall of '95?

15  A    That is correct.

16  Q    Professor, would you take a look at Exhibit PX 003,

17  please, in your binder.

18       MR. FRISCHLING:  And if we could have that

19  available for the Court and the parties.

20  Q    And while we're doing that, would you tell us,

21  please, if you recognize it?

22  A    Yes, I do.

23  Q    I believe there's a PX 003A that's a clearer copy

24  of the same.  Unfortunately that one was very hard to

25  read.

                    GURINDAR SOHI - DIRECT

1        MR. FRISCHLING:  Can we put that one up for

2   everybody's benefit, on the parties and the Court.

3        THE WITNESS:  I want to add something to my

4   last answer.  We were constantly improving and modifying

5   the simulator.  So the simulator that we had for test

6   results may not have been the exact same simulator.

7   BY MR. FRISCHLING:

8   Q    Thank you, Professor.  I'd ask you to look at, just

9   so we're both on the same page literally, would you look

10  at PX 003A.

11  A    Yes, I have that in front of me.

12  Q    Is that the ISCA 1997 paper that you were referring

13  to?

14  A    Yes, that is.

15  Q    And was that paper ultimately published?

16  A    Yes, it was accepted for publication.

17        MR. FRISCHLING:  We would move admission of PX

18  003A, Your Honor.

19        THE COURT:  It is admitted and may be

20  published.

21        MR. FRISCHLING:  Thank you.

22  BY MR. FRISCHLING:

23  Q    So Professor, this time around what was the

24  response to the paper that contained the data?

25  A    This time around there was still a fair degree of

                    GURINDAR SOHI - DIRECT

1  skepticism of some here.

2  Q    And did you receive reviews on the paper?

3  A    Yes, we did.

4  Q    And if you'd look in your binder, please, at

5  Exhibit 461.

6  A    Yes.

7  Q    First of all, can you tell us if you recognize the

8  document?

9  A    Yes, I do.

10       MR. FRISCHLING:  Could we have that up, please.

11  Q    Is this the review feedback you got from the ISCA

12  reviewers?

13  A    Yes, it is.

14       MR. FRISCHLING:  So, Your Honor, we'd move

15  admission of Exhibit 461.

16       THE COURT:  It is admitted.

17  BY MR. FRISCHLING:

18  Q    So describe for us, sir, is the process the same or

19  similar to what you went through for review of the

20  ASPLOS submission?

21  A    The process is essentially the same as before as

22  the ASPLOS submission.

23  Q    So are there experts involved in reviewing the

24  report?

25  A    Yes, there are.  And then there's a committee of

                GURINDAR SOHI – DIRECT

1   about 25 people selects which papers get accepted.

2   Q    And if you look at the beginning of Exhibit 461,

3   there's a subject line *ISCA 97 paper number 188*.  Do you

4   see that?

5   A    Yes, I do.

6   Q    And below that can you tell us what the ISCA

7   committee was communicating to you?

8   A    They were communicating it was a great pleasure to

9   inform us that our paper had been accepted and only 30

10  out of 150 papers were accepted.

11  Q    Thank you, Professor.  Now let's go back for a

12  moment to the actual paper itself, PX 3A.  Was that

13  paper, in fact, presented to the ISCA conference?

14  A    Yes, it was.

15  Q    And who presented the paper?

16  A    Andreas Moshovos did.

17  Q    Why did then Mr. Moshovos present it?

18  A    So after we had all collectively come up with a

19  scheme and experimented it, Andreas took lead in

20  carrying out the experiments and then gathering the data

21  and presenting the data and making the figures.  So he

22  presented it and he was the first author of that paper.

23  Q    Now, being first author in your lab, does that

24  signify that the other authors did not contribute as

25  significantly?

                        GURINDAR SOHI - DIRECT

290

1   A    No, it doesn't do that.

2   Q    Professor, did you attend the ISCA conference?

3   A    Yes, I did.

4   Q    And what was the reaction to the paper when it was

5   presented?

6   A    Well, there was some skepticism even then.

7   Q    So what was your understanding, sir, of skepticism

8   when you had had this paper accepted and presented it at

9   the conference?

10  A    My understanding of the skepticism was hey, you

11  know, this is not what we need in processors that were

12  -- people were thinking about at that time.  And what we

13  had seemed quite complex.

14  Q    And what would be the problem with a complex

15  solution?

16  A    Well, a complex solution would take more hardware

17  to implement, it would be slow, and so this hardware is

18  present in one of the -- sort of most important points

19  inside the computer, if you will.  It is -- you're

20  making a decision should I execute this instruction.  So

21  you do not want to slow down that decision-making.  So

22  that was some of the concerns.

23  Q    Professor, did you ever build an actual physical

24  processor based on the invention of the '752 patent?

25  A    No, we did not.
                    GURINDAR SOHI - DIRECT

1   Q    Why not?

2   A    Variety of reasons.  Two important ones is we are

3   academic researchers.  We do research, come up with

4   ideas, train students.  That's what we do at a

5   university.  We don't build processors.

6        Second, and more importantly, is that the power of

7   this technique we felt would only come out when you had

8   processors that were doing, you know, lots more

9   parallelism, if you will.  And, you know, so at that

10  time, the processors would require much more hardware

11  and at that time the processors had 7 to 10 million

12  transistors.  That's what they were being built with.

13  We felt the power of this technique would really come

14  out when there were 2/300 million transistors or billion

15  transistors.

16  Q    Professor, would you look at Exhibit 5 in your

17  binder.  Can you tell us please what that is, sir.

18  A    That -- this is a set of slides from a presentation

19  that I gave.

20  Q    Now, when did you prepare those slides?

21  A    September of 1996.

22  Q    And how do those slides relate to the -- well, let

23  me back up.  To whom did you deliver the slides?

24  A    So I gave a presentation on these -- with this

25  slide deck internally in the computer sciences

                    GURINDAR SOHI - DIRECT

1  department in September of 1996.  Then I gave the same

2  presentation at Intel in Portland in January 1997, I

3  believe.  And then Intel in Haifa, Israel in February or

4  early March of 1997.

5  Q    Professor, Exhibit 5 is a copy of that

6  presentation; is that right?

7  A    Yes, that is correct.

8         MR. FRISCHLING:  We move admission of Exhibit

9  5, Your Honor.

10        MR. LEE:  No objection, Your Honor.

11        THE COURT:  It is admitted.

12 BY MR. FRISCHLING:

13 Q    Professor, can you tell us what the purpose was of

14 this particular presentation?

15 A    So I was getting my vision off what I taught when

16 we had billion transition -- chips with a billion

17 transistors, which is a hundred times more than we had

18 at the time, how some of the important parts of process

19 in getting out a program execution would happen.

20 Q    And how does this presentation, Exhibit 5, relate

21 to the concepts in the '752 patent?

22 A    So one of the -- so what we -- the key technology

23 that we implied is that you're going to have -- if we --

24 if you turn to Slide 8, please.  So what you want to do

25 if you want to facilitate multiple operations for cycle

                GURINDAR SOHI - DIRECT

1   parallelism doing multiple operations at the same time,

2   we have to be able to alleviate dependencies for data

3   dependency speculation.  And then if you're doing data

4   dependence speculation, then you really have to have

5   some very, very clever techniques to get that

6   speculation correct and that is a technology of the '752

7   patent.

8   Q     Professor, if you'd take a look -- first of all,

9   did you give other presentations about the work in the

10  '752 patent?

11  A     Yes.  We gave multiple -- I gave multiple

12  presentations about the work in the '752 patent.

13  Q     So let me come to those in a moment.  I actually

14  wanted to ask you with regard to Exhibit 5, how did you

15  summarize your presentation to those at Intel, both in

16  Israel and in the U.S. when you presented it?

17  A     If you turn to Slide 19.  So I started by

18  summarized that billion transistor chips are going to

19  dramatically alter the hardware and microarchitecture of

20  the structure view of the computer.  And in the second

21  point, I say you're going to have aggressive users of

22  speculation.

23  Q     So Professor, if you would turn to Exhibit 385 in

24  your binder.

25  A     Yes.

                    GURINDAR SOHI - DIRECT

1   Q    Is Exhibit 385 another presentation prepared by you

2   or your colleagues?

3   A    Yes.  This is a presentation that we collectively

4   prepared.

5   Q    And when was that presentation prepared?

6   A    This presentation was prepared sometime in August

7   1996.

8   Q    And was it given to others?

9   A    Yes, it was.

10  Q    Approximately when?

11  A    August 23, 1996.

12  Q    Professor, who gave that particular presentation?

13  A    Andreas Moshovos did.

14  Q    And who attended that presentation?

15  A    So this presentation was as a part of -- we have a

16  program that we had just started, the Industrial

17  Affiliates meeting, where we invited people from several

18  companies to come learn about the research in computer

19  architecture that was going on at U.W. Madison.

20         MR. FRISCHLING:  And I move admission of

21  Exhibit 385, Your Honor.

22         MR. LEE:  No objection, Your Honor.

23         THE COURT:  It is admitted.

24  BY MR. FRISCHLING:

25  Q    And am I correct -- let me withdraw that, Professor

                GURINDAR SOHI - DIRECT

1  Sohi.  How does this particular exhibit relate to the

2  work in the '752 patent?

3  A    This is describing the technology of the '752

4  patent.

5  Q    Now Professor, can you identify for us the

6  companies that you recall that attended the Architecture

7  Affiliates meeting where this presentation was given?

8  A    I can recall a few.  There were people from IBM,

9  people from Intel, people from Cray Research, Sun

10 Microsystems, and DEC.

11 Q    What is DEC?

12 A    DEC was Digital Equipment Corporation.

13 Q    Thank you, Mr. Sohi.  Now, you described to us

14 before some skepticism when your papers were first

15 received.  Has that changed over time?

16 A    Yes, it has.

17 Q    In what way?

18 A    We were -- we've received awards for this work.

19 Q    What awards are you talking about, sir?

20 A    Andreas Moshovos received the Maurice Wilkes award

21 specifically for this work, and I had received the

22 Eckert-Mauchly award, which also included this work.

23 Q    So, Professor, let's take those one at a time.

24 What is the Maurice Wilkes award?

25 A    The Maurice Wilkes award is given by -- again, I'll

GURINDAR SOHI - DIRECT

1   use acronyms -- ACM SIGARCH for an outstanding

2   contribution made by an individual no more than 20 years

3   from when they started their professional career at the

4   time of receiving the award.

5   Q     What is ACM SIGARCH?

6   A     Okay.  ACM is the Association for Computing

7   Machinery, which is the largest professional society of

8   people in computing.  And then this ACM Computing

9   Society has several sub, what they call special interest

10  groups, that are in different areas of computing.  And

11  one of the special interest groups is the special

12  interest group on computer architecture.  So SIGARCH is

13  the special interest group on computer architecture.

14  Q     And how is SIGARCH viewed in the computer

15  architecture community?

16  A     It is the, you know, the leading professional

17  organization for members in the computer architecture

18  community.

19  Q     When did Professor Moshovos receive this award?

20  A     I believe it was 2010.

21  Q     Now, Professor, would you look at Exhibit 151 in

22  your binder, please.  Tell us what that is.

23  A     This is a picture of the plaque that Andreas

24  Moshovos -- when Andreas Moshovos received the award.

25  Q     How do you know that?
                    GURINDAR SOHI - DIRECT

1    A     I was there.  It was a very proud moment for me.

2             MR. FRISCHLING:  Move admission of Exhibit 151,

3    Your Honor.

4             THE COURT:  It is admitted.

5             MR. FRISCHLING:  If we could have this up,

6    please.

7    BY MR. FRISCHLING:

8    Q     First of all, Professor, what is the outstanding

9    contributions that Dr. Moshovos was recognized for in

10   the ACM Maurice Wilkes award?

11   A     This citation is for foundational contributions to

12   the area of memory dependence prediction.

13   Q     Now, what did you understand memory dependence

14   prediction to be referring to?

15   A     This is the technology of the '752 patent that was

16   also presented in the technical report that we described

17   and the ISCA 1997 paper.

18   Q     How do you know, Professor, that this award is

19   related to the work in the '752 patent?

20   A     Oh.  Because I prepared the nomination for Andreas

21   Moshovos.

22   Q     So you nominated Dr. Moshovos.

23   A     Yes, I did.

24   Q     And once you nominated him, what role, if any, did

25   you have in the process of deciding whether he was going

                    GURINDAR SOHI – DIRECT

1  to be granted an award?

2  A    So our professional societies have very, very

3  strict conflict-of-interest rules.  If you have any

4  conflict of interest, you cannot be in any or be

5  associated with any deliberations.  So I had zero.

6  Q    Professor Sohi, what work did you call out to the

7  committee's attention when in your nomination of

8  Professor Moshovos?

9  A    I called out the March of 1996 tech report --

10  technical report that we had come up with earlier, the

11  1997 ISCA paper, and the 75 -- and the patent.

12  Q    Just to be clear, sir, the March technical report

13  that you called out to the committee, that was the

14  exhibit that we looked at earlier from March of 1996;

15  correct?

16  A    That is correct.

17  Q    And the ISCA paper, that was Plaintiff's Exhibit 3A

18  that we saw earlier; is that right?

19  A    That is correct.

20  Q    And the '752 patent, of course, is Exhibit 1 that

21  we brought out.

22  A    That is correct.

23  Q    Now, if you could remind us, Professor, how is it

24  that the March '96 paper and the ISCA '97 paper relate

25  to the '752 patent?
                    GURINDAR SOHI - DIRECT

1  A    The '752 patent embodies the technology that was

2  described in those two papers.

3  Q    Professor, what is your understanding of why it

4  took from '96 or '97 when those papers were published

5  until 2010 for Dr. Moshovos to receive the award for his

6  work?

7          THE COURT:  Just hang on a second.  I expect we

8  have a foundation objection.

9          MR. LEE:  I have an objection.  Foundation.

10         THE COURT:  I'll sustain that.  If you want to

11 lay a different question or lay a foundation.

12 BY MR. FRISCHLING:

13 Q    Professor, do you have an understanding in your own

14 view as to or from communications with others as to why

15 Professor Moshovos received the award in 2010?

16         THE COURT:  I'll sustain the objection.

17 BY MR. FRISCHLING:

18 Q    Dr. Sohi, what was the attitude toward your

19 invention by the time of 2010?

20         MR. LEE:  Objection.  Foundation.  If we're

21 going --

22         THE COURT:  You have to sort of lay -- you have

23 to lay the basics, otherwise it's just not going to come

24 in.

25         MR. FRISCHLING:  Yes, Your Honor.
                    GURINDAR SOHI – DIRECT

BY MS. FRISCHLING:

Q    Professor, did you have communications with, after Professor Moshovos received the award, with those involved with granting the award?

A    I recall some.

Q    And what was your recollection, if you have any, of why -- let me withdraw the question.

     Professor, you mentioned another award, Eckert-Mauchly, if I've got that right.

A    That is correct.

Q    Who received that award?

A    I did.

Q    And when was that?

A    That was in 2011.

Q    And who gave you that award?

A    Again, use acronyms, it was the ACM that we talked about before, and then there's another professional society, the IEEE.  And they jointly give that award.

Q    Is that a similar selection process with committees as you described before?

A    Well, yes.  They have now a committee of six people, three appointed by the ACM and three appointed by the IEEE.

          THE COURT:  You're saying the IEEE or IAAA?

          THE WITNESS:  Sorry.  I'll try and spell it out
                    GURINDAR SOHI - DIRECT

1  for you.

2          THE COURT:  No.  If you know what the acronym

3  stands for, that would be fine.

4          THE WITNESS:  Yes.  It's the International

5  Electronics -- Institution of Electrical and Electronics

6  Engineers.

7          THE COURT:  All right.  Please, continue.

8          THE WITNESS:  So it's the IEEE.

9  BY MR. FRISCHLING:

10 Q    And this was a combined award with the IEEE or

11 IEEE?

12 A    And ACM.

13 Q    Very good.  Professor, who nominated you for that

14 award?

15 A    Professor Mateo Valero of the Barcelona

16 Supercomputing Center in Spain, the director.

17 Q    And did Dr. Moshovos or any of your coinventors

18 have anything to do with your receiving that award?

19 A    No, they did not.

20 Q    And do you recognize Exhibit 601 in your binder?

21 A    Yes, I do.

22 Q    Professor, what are we looking at in Exhibit 601?

23 What are you looking at, sir?

24 A    This is a press release announcing that I won the

25 2011 Eckert-Mauchly award.

                    GURINDAR SOHI - DIRECT

1        MR. FRISCHLING:  We'd move admission of Exhibit

2   601, Your Honor.

3        THE COURT:  And it is admitted.

4        MR. FRISCHLING:  If we can have it on the

5   screen, please.

6   BY MR. FRISCHLING:

7   Q    So Professor, can you tell us what the IEEE and ACM

8   describe the Eckert-Mauchly award to be?  I'm calling

9   your attention to the second paragraph.

10  A    So the Eckert-Mauchly award is known as the

11  computer architecture community's most prestigious

12  award.

13  Q    And Professor, is there anything in the award that

14  signaled to you that it was related to the work of the

15  '752 patent?

16  A    Yes, there is.

17  Q    And what would that be, sir?

18  A    So if you go down, and one, two, three, fourth line

19  starting at the end, his group -- his group also

20  proposed the idea of memory dependence prediction to

21  further improve instruction level parallelism, a

22  technology that has been considered a key innovation in

23  some recent microprocessors.

24  Q    And again, Professor, what did you understand the

25  reference to memory dependence prediction to refer to in

                    GURINDAR SOHI - DIRECT

1    that passage?

2    A    This is the technology embodied in the '752 patent.

3    Q    Professor, what is your view as to why attitudes

4    seem to have shifted from skepticism when those first

5    papers were submitted to awards in 2010/2011?

6    A    My view is that when people were building chips

7    with a smaller number of transistors where they weren't

8    trying to do lots of instructions in parallel, this

9    technology really isn't needed.  But when you really

10   start trying to do lots and lots of instruction level

11   parallelism, this technology is critical, and people

12   came to that realization over the years.

13   Q    Those are those chips that have hundreds of

14   millions or more transistors; is that right?

15   A    That is correct.

16   Q    And when did those chips become commercially

17   available?

18   A    So one of the earliest high-end chips was in 2006,

19   a chip by Intel Core II for the processors.

20   Q    And are there other chips today, Professor, that

21   have hundreds of millions or billions of transistors?

22   A    Yes.  There are chips like the Apple processors.

23   Q    Thank you, Professor Sohi.

24        MR. FRISCHLING:  No further questions at this

25   time, Your Honor.  (5:04 p.m.)
                   GURINDAR SOHI - DIRECT

1          THE COURT:  All right.  Cross-examination.

2    Please proceed.

3                    CROSS-EXAMINATION

4    BY MR. LEE:

5    Q    Good afternoon, Dr. Sohi.

6    A    Good morning, Mr. Lee.

7    Q    I want to start where you ended with your

8    discussion or your opinion about why the industry has

9    moved to '752 patent.  Do you remember that?

10   A    Yes, I do.

11   Q    After 17 years, the only microprocessor company

12   that's taken a license is Intel; correct?

13   A    That is my understanding.

14   Q    After you sued them; correct?

15   A    After WARF sued them, that is correct.

16   Q    Fair enough.  To be clear, WARF owns the '752

17   patent today; correct?

18   A    That is correct.

19   Q    But you have a significant financial interest in

20   this case, do you not?

21   A    That is correct.

22   Q    You get 5 percent of whatever is recovered;

23   correct?

24   A    That is correct.  My coinventors and I, per

25   University policy, the inventors get 20 percent and we

                    GURINDAR SOHI - CROSS

1  have an equal share in that.  That is correct.

2  Q    My question is you have a substantial financial

3  interest in this case and you had a financial interest

4  in the Intel case; correct?

5  A    That is correct.

6  Q    Now, at the time that you nominated Dr. Moshovos

7  for the award that you described, how much time did it

8  take from the time of nomination to the time of the

9  award?

10  A    I don't know.  Two, three years.

11  Q    Isn't it true that you sued Intel in 2007 -- WARF

12  sued Intel.  I'm sorry.  WARF sued Intel in 2007?

13  A    I think that's correct.

14  Q    On the '752 patent; correct?

15  A    That's correct.

16  Q    The nomination of Dr. Moshovos for this award was

17  made after you sued Intel and while the case was

18  pending; correct?

19  A    The first time I made the nomination, that's likely

20  correct.

21  Q    Okay.

22  A    I don't have a recollection of exactly when the

23  first time I did that.

24  Q    Now, if I could take you back in time, I think you

25  told the Ladies and Gentlemen of the Jury that you and

GURINDAR SOHI - CROSS

1  your colleagues came up with your invention sometime in

2  the fall of 1995, October 1995?

3  A    Yes, that is correct.

4  Q    Now, Dr. Sohi, what I'd like to do to help level

5  set us all is just talk about what was known before you

6  did the work in October 1995; okay?

7  A    What was publicly known?

8  Q    What was publicly known.

9  A    Okay.  What was publicly --

10  Q    All the instructions were publicly known.

11       THE COURT:  Why don't we wait until the next

12  question.  He's just giving a general highlight of

13  subject matter.  Why don't you wait for the next

14  question.

15       THE WITNESS:  Okay.

16  BY MR. LEE:

17  Q    Dr. Sohi, if I'm unclear, you let me know.  I'm

18  just trying to orient you so that you know what subject

19  we're going into.  Okay?

20  A    Sure.

21  Q    Okay.  So I'm now trying to go back to the period

22  before you and your three colleagues did your work.

23  Okay?  And I'm trying to discuss with you what was known

24  publicly in the field before then.  Okay?

25  A    Sure.

                   GURINDAR SOHI - CROSS

1  Q     Load instructions certainly were known before then;

2  correct?

3  A     Yes.

4  Q     And store instructions were certainly known before

5  then?

6  A     Yes.

7  Q     The idea of dependent/independent load-and-store

8  instruction pairs was known; correct?

9  A     Yes.

10  Q     The idea of data dependency was known; correct?

11  A     Yes.

12  Q     And, in fact, in your patent you discuss data

13  dependency, do you not?

14  A     I believe we do.

15  Q     Well, so we're clear, if you turn to tab 3 of your

16  notebook, it's another copy of the patent --

17          MR. LEE:  Which is in evidence already, Your

18  Honor.

19  Q     This is your patent; correct?

20  A     Yes.  Correct.

21  Q     And let me turn you to column 1, line 67.

22          MR. LEE:  And if I could ask to have

23  highlighted column 1, line 67, to column 2, line 5.

24          THE COURT:  Technically that would be a blow

25  out, but we'll call that close enough.  Was there

                    GURINDAR SOHI - CROSS

1    something that you -- once highlighted you had a

2    question?

3             MR. LEE:  Yes.

4    BY MR. LEE:

5    Q    Do you see the definition of a data dependency as a

6    dependency of instructions that use data on earlier

7    instructions that change data; correct?

8    A    Correct.

9    Q    That is a correct definition; correct?

10   A    That is a correct definition.

11   Q    And that is something that was known before you

12   began your work in October of 1995; correct?

13   A    Yes, that is correct.

14   Q    Now, you also mentioned the concept of executing

15   instructions out of order.  Do you remember that?

16   A    Yes, that is correct.

17   Q    That was something that was known before you and

18   your colleagues began your work in October of 1995.

19   A    Yes.  And actually I came up with one of the models

20   that's widely used.

21   Q    And Dr. Sohi, just so we can focus on this

22   collection of ideas:  Loaded instructions, store

23   instructions, data dependencies, independent

24   instructions, and dependent instructions, you don't

25   claim to have invented those concepts, do you?

                    GURINDAR SOHI - CROSS

1   A     No, I do not.

2   Q     They had been around for three or four decades

3   before you began to work in 1995; correct?

4   A     That is correct.

5   Q     Now, the idea that there could be data dependence

6   between load-and-store instructions was something that

7   was known before you began your work, and in fact, had

8   been known for some time; correct?

9   A     That is correct.

10  Q     Before you began your work, there were also

11  different techniques for detecting dependencies between

12  instructions; correct?

13  A     Yes, that is correct.

14  Q     And you certainly didn't -- don't claim to have

15  invented the idea of detecting dependencies between

16  instructions; correct?

17  A     No.

18  Q     You claim that you came up with a specific idea of

19  how to detect mis-speculations in the context you

20  described to Mr. Frischling; correct?

21          MR. FRISCHLING:  Objection.  Form.

22          THE COURT:  I'll sustain.

23          MR. LEE:  I'll withdraw.

24          THE COURT:  I'll sustain that objection.  Next

25  question.
                    GURINDAR SOHI - CROSS

BY MR. LEE:

Q    You don't claim to have invented the idea of detecting dependencies between instructions in the '752 patent; correct?

A    That is correct.

Q    Now, the patent also discusses something the jury hasn't heard about called *ambiguous dependencies*, does it not?

A    It does.  I think the jury has heard something about them.

Q    And the concept of ambiguous dependencies was something that was known well before you began your work in October 1995.

A    That is correct.

Q    And ambiguous dependency is a circumstance where you can't quite tell if the load instruction and the store instruction are, in fact, dependent; correct?

A    That is correct.

Q    And before 1995, computer scientists knew and were dealing with ambiguous dependencies; correct?

A    That is correct.

Q    Now, as you told Mr. Frischling, a processor can speculate; correct?

A    That is correct.

Q    And before 1995, computer scientists knew that load

GURINDAR SOHI - CROSS

1  instructions could be allowed to speculate; correct?

2  A    That is correct.

3  Q    And they, in fact, had known about that for many

4  decades; correct?

5  A    I don't know if it was many decades, but it was

6  known before then.

7  Q    Right.  You certainly don't think they invented

8  that concept in the '752 patent; correct?

9  A    Can you please --

10 Q    Sure.

11        THE COURT:  You don't claim to have invented

12 the idea of data dependencies.

13        THE WITNESS:  The speculation, no.

14 BY MR. LEE:

15 Q    And the idea of speculation -- speculatively

16 executing ambiguous instructions is not something that

17 you and your inventors, you and your colleagues claim to

18 have invented; correct?

19 A    Yeah.

20 Q    Right.

21 A    That's correct.

22 Q    Now, let's talk about mis-speculations.  The idea

23 of mis-speculations you discussed with Mr. Frischling;

24 correct?

25 A    That's correct.
                    GURINDAR SOHI - CROSS

1    Q    And before 1995, the idea of mis-speculations was

2    something that was known in the field; correct?

3    A    That is correct.

4    Q    And scientists knew that if you had an instruction

5    that mis-speculated, you had to squash and start over

6    again; correct?

7    A    That is correct.

8    Q    It was a problem; correct?

9    A    That is correct.

10   Q    And that was all known before you began your work.

11   A    That is correct.

12   Q    Now, before 1995 scientists knew -- in the field

13   knew that you could stop a load from speculating if you

14   wanted to; correct?

15   A    Publicly?

16   Q    Yes.

17   A    No.

18   Q    Okay.  Well, let's explore that a little bit.  You

19   knew before you began your work that scientists in the

20   field had published on the concept of prediction, had

21   they not?

22   A    It was a different type of prediction.

23   Q    Well, but in the microarchitecture field, had

24   scientists published on the idea of prediction?

25   A    Prediction is a concept.  There are many different

                         GURINDAR SOHI - CROSS

1    types of prediction.  Scientists had published on some

2    types of prediction, but nothing on data dependence

3    prediction.

4    Q    Well, would you agree with me that before you began

5    your work, there were all sorts of different type of

6    predictions out there?

7    A    There's lots.  There's weather prediction.  There's

8    lots of predictions.

9    Q    Well, turn if you would -- I'm sorry.  You agree

10   with me that there are lots of sorts -- lots of sorts of

11   different types of predictions.

12          THE COURT:  He just did agree with you,

13   Counsel.  Next question.

14   BY MR. LEE:

15   Q    Now, the patent itself describes both control and

16   data dependencies; correct?

17   A    That is correct.

18   Q    And just to be clear, if I turn you to column 1,

19   line 60.

20   A    Sorry.

21   Q    You see the reference to control and data

22   dependencies?

23   A    Yes, I do.

24   Q    And the patent discovers -- discusses control

25   dependencies in the context of branch prediction;

                    GURINDAR SOHI - CROSS

1  correct?

2  A    That is correct.

3  Q    The idea of branch prediction is something that had

4  been worked on before your work on the '752 patent;

5  correct?

6  A    That is correct.

7  Q    In fact, it had been worked on by Professor Smith

8  from the University of Wisconsin in 1981.

9  A    That is correct.

10  Q    And the branch prediction work is analogous

11  technology to the work of the '752 patent, isn't it?

12  A    It's a different problem.

13  Q    Is it analogous technology or not?

14  A    Well, I've used the word analogous technology to --

15  at times, but it's different.

16  Q    Well, you've used the word analogous technology to

17  describe the branch prediction technology; correct?

18  A    Yes, I have.

19  Q    Now, in Dr. Smith's work he actually describes

20  dynamic prediction, does he not?

21  A    In Dr. Smith's 1981 work?

22  Q    Yes.

23  A    I haven't looked at that paper in a long time so I

24  couldn't answer that question.

25  Q    Well, let me turn you to tab 7 in your notebook.

                    GURINDAR SOHI - CROSS

315

1  And we'll put it on a screen, but not for the jury.  Do

2  you find Dr. Smith's 1981 paper?

3  A    Yes, I do.

4  Q    And this is a paper he published entitled *Study of*

5  *Branch Prediction Strategies*.

6  A    That is correct.

7  Q    And this is the paper that you had in mind in 1981;

8  correct?  Published in 1981.

9  A    This is the paper that I -- of course came up after

10  1981 since I started grad school only in 19 --

11  Q    Fair enough.  So after 1981, but dated 1981.

12  A    Yes.

13        MR. LEE:  We offer it, Your Honor.

14        THE COURT:  I will admit it.

15  BY MR. LEE:

16  Q    There we go.  This is the 1981 paper by your

17  colleague Dr. Smith; correct?

18  A    That is correct.

19  Q    And in the title it refers to branch prediction;

20  correct?

21  A    It does.

22  Q    And that's the same branch prediction that was

23  referred to in your patent; correct?

24  A    Well, I haven't -- that's correct.

25  Q    Yes.  And if we were to turn in the paper to the

                    GURINDAR SOHI - CROSS

1   page that says 136 at the bottom, and on the right-hand

2   side you see a column that says Strategy 1.  And I'm

3   going to bring up -- ask that Strategy 1 be up and then

4   I'm going to ask to have two things highlighted.

5        At the top it says "Predict that all branches --

6   I'm sorry.  "Predict that all branches will be taken."

7        Do you see that?

8   A    I do.

9   Q    And then at the very bottom of this section it

10  says -- there's a sentence which reads, and I'll

11  highlight it as I go.  "This leads to dynamic prediction

12  strategies in which the prediction varies on branch

13  history."

14       Do you see that?

15  A    I do.

16  Q    And that is, in fact, what Dr. Smith said in 1981?

17  A    It appears to be.

18  Q    Yes.  Now, let me go back to your patent, if we

19  could.  It's still at tab 3 and it's Plaintiff's Exhibit

20  1.  I want to take you to column 9, line 40 to 43.

21           MR. LEE:  And don't -- we don't need to put

22  anything up yet, but let me just ask you this first.

23  Let's not highlight --

24           THE COURT:  Just don't get ahead.

25           THE WITNESS:  I'm sorry.
                 GURINDAR SOHI - CROSS

1          THE COURT:  That's fine.  Why don't you ask

2    your question.

3    BY MR. LEE:

4    Q    Dr. Sohi, who drafted the patent application?

5    A    Who drafted the patent application.

6    Q    Wasn't it Andreas Moshovos who worked with a lawyer

7    to draft the patent application?

8    A    No.  We collectively worked with a lawyer to draft

9    the patent application.

10   Q    Okay.  And the patent application then becomes part

11   of the specification that we see on the screen now;

12   correct?

13   A    That is correct.

14   Q    So the patent specification has words that you put

15   on paper to apply for the patent; correct?

16   A    That's my understanding.

17   Q    All right.  Could I focus you, Dr. Sohi, on column

18   9, line 40 to 43.

19   A    Sorry.  Can you tell me that tab again?

20   Q    Tab 3.  And I'm taking you to column 9, line 40 to

21   43.

22   A    40 to 43.

23   Q    Yes.  And I've now called it out so you can look at

24   it on the hard copy or you can look at it on the screen.

25   A    Well, I like looking at the hard copy because
                    GURINDAR SOHI - CROSS

1    sometimes you call out stuff without the text around it

2    and this is the context of the text.

3    Q    Fair enough.  Whatever works best for you.

4    A    Yes.

5    Q    And if the hard copy works, I think you have it

6    now.

7         THE COURT:  The question is?

8    Q    Do you see the portion that begins at column 3,

9    line 40 to 43, that begins "Referring now to Figure 3,

10   the normal operation of a data speculation circuit 30,

11   such as is known in the prior art, must be modified

12   slightly to accommodate the present invention."

13        Do you see that?

14   A    Yes.  And I see the sentence after that too.

15   Q    Right.  I've read the sentence correctly; right?

16   A    Yes, that is correct.

17   Q    And that is a sentence that you and your

18   coinventors drafted for submission to the Patent Office.

19   A    Yes, that is correct.

20   Q    Now, let me ask you this:  Can you and I agree that

21   a processor can perform out-of-order execution without

22   practicing the '752 invention you've described?

23   A    Yes, we can.

24   Q    And can we agree that a processor can perform some

25   form of speculative execution without practicing the

                    GURINDAR SOHI - CROSS

1  '752 patent?

2  A    It can perform control speculation, data

3  speculation, and others without performing the '752

4  patent, yes.

5  Q    And it could perform data dependence speculation

6  without using the patent; correct?

7  A    Yes, that is correct.

8  Q    Now, I want to go to the question of who did what

9  work on the patent and I think you told me that -- let

10  me ask this.  Withdrawn.

11      Was Dr. Moshovos the lead author on the March 1996

12  technical report that you discussed with Mr. Frischling?

13  A    Yes, that is correct.

14  Q    Now, is it true that he was the person who was

15  first tasked with drafting the patent application?

16  A    I don't -- I can't recall at this point.

17  Q    Well, let me turn you to tab 9 in your notebook you

18  have before you.

19  A    Yes.

20  Q    And I'm going to --

21  A    This is Exhibit 22?

22  Q    It's exhibit -- it's a document that has a

23  Deposition Exhibit 26, and I'm not going to put it on

24  the screen.

25  A    Well, sorry.  Tab 9 has Exhibit 22 --
                    GURINDAR SOHI - CROSS

1      THE COURT:  It's marked on the back Exhibit 22

2  and I believe that is the exhibit for the case, but it's

3  not in evidence, and for right now just want to make

4  sure you're looking at the right document, which is tab

5  9.  And as you say, on the front of the document it

6  reads Exhibit 22.  So we're on the same page.

7      And you may ask your next question.

8  BY MR. LEE:

9  Q    Dr. Sohi, does this document refresh your

10  recollection that Dr. Moshovos in August of 1996

11  actually took the first pass at drafting the patent

12  application?

13  A    What I'd say is this --

14      THE COURT:  You don't need to read it.  The

15  question is whether it refreshes your memory; whether

16  the statements there --

17      THE WITNESS:  Okay.

18      THE COURT:  -- refresh your memory as to

19  whether he did the first cut at it.  It's not asking you

20  to read it or to adopt it, it's just simply does it

21  refresh your recollection as to what happened.

22      THE WITNESS:  As regards to his previous --

23      THE COURT:  Yes, the previous question as to

24  whether now Dr. Moshovos was the one who did the first

25  draft of the application.
              GURINDAR SOHI - CROSS

1          THE WITNESS:  No.  I'm sorry.

2     BY MR. LEE:

3     Q    Doesn't refresh your recollection?

4     A    Doesn't.

5     Q    Okay.  Let's go to a different topic.  Turn, if you

6     would, in your notebook to tab 10, which is DX 1698.  Do

7     you have that before you?

8     A    Yes.

9     Q    This is an email from Dr. Moshovos to someone named

10    Mr. Chrysos, but copied to you.  Do you see that?

11    A    Yes, I do.

12    Q    And this is an email that was copied to you on

13    March 26, 1996, from Dr. Moshovos; correct?

14    A    Yes, it is.

15          MR. LEE:  We offer it, Your Honor.

16          THE COURT:  It is admitted.

17    BY MR. LEE:

18    Q    Let me -- well, just to level set us, you'll see at

19    the beginning that it's Dr. Moshovos to Mr. Chrysos but

20    copied to you; correct?

21    A    That is correct.

22    Q    And if I turn you to the second page, I want to

23    focus you on one paragraph.  The jury will have the

24    entire document for their deliberations.  I want to

25    focus you on the paragraph that begins "I fully respect
                    GURINDAR SOHI - CROSS

1   that DEC, and later IBM, identified the same problem

2   earlier than we did."

3       Do you see that?

4   A   I see that.

5   Q   "Nevertheless our work is completely independent."

6   Do you see that?

7   A   I see that.

8   Q   Now, do you agree with him that DEC, and later IBM,

9   had identified the same problem earlier than you had?

10  A   No, I don't.

11  Q   Okay.  And is there any email or document back to

12  Dr. Moshovos from you that said no, that's wrong.  They

13  didn't identify it earlier than we did?

14  A   I don't think so.

15  Q   Is there any document from either of the other two

16  colleagues, Mr. Vijaykumar or Mr. Breach, that says no,

17  DEC and IBM didn't identify it first?

18  A   Well, for one, they're not listed on this email, so

19  I'm not sure they've seen this email.  I'm not aware of

20  any.

21  Q   So we're very clear on what the problem was that he

22  was referring to, I'm going to take you back up to the

23  paragraph immediately before and you see where the

24  sentence begins "The first public description of the

25  problem (i.e, impact of mis-speculation penalty on

                    GURINDAR SOHI - CROSS

1  performance) and of possible solutions was in 1996 UW CS

2  TR-1318."

3  A    Yes.

4  Q    All right.  So the problem he's referring to is the

5  impact of mis-speculation penalty on performance;

6  correct?

7  A    That is correct.

8  Q    And he is saying that DEC and IBM had identified it

9  first, that problem?

10  A    Well, I don't know.  Maybe.

11  Q    You know that the DEC work he's referring to is the

12  work of Simon Steely?

13  A    That is correct.

14  Q    You know the work at IBM he is referring to is the

15  work of Dr. Hesson?

16  A    That is correct.

17  Q    Now, Dr. Sohi, turn, if you would, to tab number 11

18  and I want to bring you to another email.

19  A    Yes.

20  Q    All right.  Now, let me ask you this question:

21  Isn't it true that Dr. Vijaykumar thought that others

22  had actually showed that load-store violations are rare

23  with a dependency predictor?

24  A    Dr. who?

25            MR. FRISCHLING:  Objection.  Hearsay.
                    GURINDAR SOHI - CROSS

1          THE COURT:  I'm going to sustain the objection.

2   You have to rephrase.

3          MR. LEE:  Fair enough, Your Honor.

4   BY MR. LEE:

5   Q    Isn't it true that Dr. Vijay -- Dr. Vijaykumar is

6   one of your coinventors; correct?

7   A    That is correct.

8   Q    He has a substantial interest in this case;

9   correct?

10  A    That is correct.

11  Q    As does Dr. Moshovos; correct?

12  A    Correct.

13  Q    As does Dr. Breach; correct?

14  A    Correct.

15  Q    And isn't it true that Dr. Vijaykumar told you in

16  2003 that others, not U.W. scientists, but others had

17  showed that store-load violations are rare with a

18  dependence predictor?

19          MR. FRISCHLING:  Objection.

20          THE COURT:  Same objection and same ruling.

21          MR. LEE:  Your Honor, I'm just asking him

22  whether he told him.  Whether he said it or didn't say

23  it --

24          THE COURT:  Let's have a brief sidebar.

25          (Discussion at sidebar at 5:30 p.m.)
                    GURINDAR SOHI - CROSS

1          THE COURT:  Let's just get on the record.  It's

2    being offered for the truth of the matter asserted.

3    It's hearsay.  I don't understand.  The fact that you're

4    asking him doesn't change it.

5          MR. LEE:  It's a statement by one of the

6    inventors.

7          THE COURT:  But that doesn't make it WARF's

8    statement, which is the only way you get it in as a

9    statement of a party opponent.  If I'm missing

10   something, that's fine.  But let's do this:  We're going

11   to have to take a break.  How much more have you got in

12   terms of your --

13         MR. LEE:  I was going to stop right after this

14   because I've got another 15 or 20 minutes.

15         THE COURT:  15 or 20 minutes, all right.  You

16   weren't going to stop right after this.  The Court will

17   decide when we stop.

18         MR. LEE:  Okay.

19         THE COURT:  And if I feel as though it would be

20   efficient to complete it, then that's what we'll do.  If

21   you only have 10 to 15 minutes, I may check with this

22   jury and see if we can complete it.  How much redirect

23   would you have?

24         MR. FRISCHLING:  Probably another 20 minutes or

25   so.

1          THE COURT:  All right.  Then we will break and

2     we'll discuss this at the break.  But you understand the

3     Court's concern?

4          MR. LEE:  Yes.

5          THE COURT:  Step back.

6      (End of sidebar discussion at 5:30 p.m.)

7          THE COURT:  Because it's 5:30 and because I

8     said we would break at 5:30, we will break now.

9     Unfortunately that means, Dr. Sohi, you will need to

10    come back tomorrow morning and I apologize for that.

11    But we will take our break now.

12         I would ask that you be back and ready to go at

13    8:30 a.m. and we will begin the second day of trial at

14    that time.  I would urge you, whether you're discussing

15    with yourself -- chances are you just want to leave, so

16    that probably won't happen.  But in terms of discussing

17    with others tonight, in terms of doing any outside

18    examination of anything, don't do it.  It's not fair.

19    It's not what you committed to do.  Wait until tomorrow

20    morning at 8:30 and you'll learn more information.

21    Probably more than you care to at the end of the day.

22    Don't discuss it with anyone, even your spouse or others

23    that you're close to, other than to tell them that the

24    building is an odd Harvestore blue on the outside and

25    it's pretty oddly shaped.  You can describe the

architecture.  You can describe anything else.  But

don't discuss the -- anything you've learned in the

courtroom today.  It will ensure that you're considering

what you should when it come times to deliberation.

Thank you, all, and we will see you at 8:30

tomorrow morning.

All rise, please.

(Jury excused from courtroom at 5:31 p.m.)

THE COURT:  Keep in mind that because you're in

the midst of your testimony, you're not to talk with

either side or anyone else about your testimony.  Just

be back in that seat at 8:30 tomorrow morning.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Thank you very much.

THE WITNESS:  No problem.

(Witness excused.)

THE COURT:  Feel free to step down on your own.

Why don't the parties be seated.  If you want to revisit

the question of hearsay, I'm happy to take it now.  I'm

not aware of case law that indicates that simply because

someone was an inventor of the patent that their

statements are statements of a party opponent.  If you

have some authority, I'm happy to look at it.  But I'm

not aware of it.

MR. LEE:  I don't have it right at hand, but --

1          THE COURT:  Said another way, you can either

2     provide me with that authority before 8:30 tomorrow

3     morning or you can provide me with some reason in which

4     this is not offered for the truth of the matter

5     asserted, but that seems like that's exactly what you're

6     offering it for.

7          MR. LEE:  Fair enough.  And Your Honor, the

8     only thing I was going to add at sidebar is I think it's

9     not that he's -- just not that he's an inventor, but he

10    has a 5 percent interest in the case.  And that makes it

11    a little bit different.  A statement by someone with a 5

12    percent interest in the case ought to be -- that come in

13    against the party.  That's the difference.

14         THE COURT:  Yeah, and I don't necessarily

15    disagree with you.  That seems like a reasonable

16    distinction and I don't know if you want to draw any

17    distinction there.  But he's a participant in the

18    outcome of the case, as is the individual Mr. Moshovos

19    who is being quoted back to Professor Sohi.

20         MR. FRISCHLING:  Well, Your Honor, at that

21    point neither of them had an interest because the patent

22    application hadn't been filed.  So it's not a question

23    of them acting on behalf -- even indirectly on behalf of

24    WARF --

25         THE COURT:  Well, you can both give me whatever

1    authority you have by 8:00 a.m. tomorrow morning.  You

2    have very able people who can provide that.  I will look

3    at the issue myself.  I'm inclined -- the reality is

4    that they probably are aware there's a potential

5    financial benefit to them.  Whether that makes them a

6    WARF agent for purposes of hearsay I admit is an open

7    question.  So I'm not sure -- I suppose I could let it

8    in as -- under the catch-all exception as having an

9    indicia of truth or reliability, but I will think about

10   that.  The parties can advise me if they have any

11   further guidance.

12        Was there anything more with respect to this

13   witness?

14             MR. LEE:  No, Your Honor.  Not for Apple, Your

15   Honor.

16             THE COURT:  Then at this time I'd like to take

17   up the objections by WARF to Apple's exhibits.  And

18   perhaps someone can advise me of where we stand with

19   respect to those objections in light of the Court's

20   ruling as to Webb.  I'll hear from -- fine, either side

21   can.

22             MR. MARCUS:  Sure.  David Marcus for Apple.  We

23   conferred during the break with counsel for WARF and I

24   think we thought that we could talk to them and discuss

25   the ruling and its impacts on the exhibits and get back

1    to the Court first thing in the morning.

2              THE COURT:  All right.  Why don't we plan on

3    meeting at 8 a.m. then and I'll take it up at that time

4    if there's any further rulings.  If you discuss it and

5    you determine that you've reached a resolution as to any

6    of the remaining pending exhibits, if you just -- you

7    can docket a joint statement and I will see that and

8    know that I don't need to pay any more attention to it.

9    If not, we'll take it up at 8 a.m.

10        All right.  It sounds like the parties have reached

11   agreement on how Apple's admissions or responses to

12   admissions will come into evidence; is that right?  Or

13   is that motion by WARF still pending?

14             MR. SHEASBY:  Your Honor, there is one

15   outstanding issue.  There are a few interrogatory

16   responses -- excuse me, Requests for Admission responses

17   in which what Apple did is, after admitting, if it ended

18   additional argumentative language to the Request for

19   Admission.  This is --

20             THE COURT:  Can you give me an example?  Maybe

21   just put it on the screen using the document indicator.

22             MR. SHEASBY:  Sure.  Why don't we use Docket

23   325-39.

24             THE COURT:  I have that in front of me too, or

25   I will momentarily.  If you can call it up, that's

1  great.  Otherwise I can pull it up here.

2          MR. SHEASBY:  I can put it on the ELMO too.

3          THE COURT:  That would be ideal.  Let me just

4  do that.  I'm heartened by the fact that some people

5  refer to it as the ELMO.  Technically it's no longer an

6  ELMO, it's now just a document imager.  But I grew up

7  calling it that, so I know what you mean.

8      Which of the responses do you need?

9          MR. SHEASBY:  So we're looking at No. 28.  And

10  if you see what they did is it's a very --

11          THE COURT:  Just give me a moment to read it.

12  I agree.  I think the only thing that should appear in

13  the jury is the request that you admit that in the

14  accused processors there are instances when

15  mis-speculations occur and then it should read Apple

16  admits that mis-speculation -- or you could just say

17  admitted.  That should be abbreviated.  I don't know why

18  there would be any dispute as to your right to modify

19  what's being asked.  You're admitting the requests.

20      So unless someone wants to make an argument to the

21  contrary, that should be modified to show it was

22  admitted.  All right?

23          MR. MARCUS:  Very well, Your Honor.

24          THE COURT:  Does that amplify any further

25  disputes in this area?

1           MR. SHEASBY:  There are two others and I'm

2    assuming --

3           THE COURT:  Why don't you confer tonight.  If

4    you reach a disagreement, you can advise me in the

5    morning.  But that's a classic example of where

6    references to general objections or amplification, which

7    is -- which comes after an admission to the fact

8    asserted, is just not appropriate.

9           MR. MARCUS:  Understood, Your Honor.  Thank

10   you.

11          THE COURT:  Very good.  I believe then that's

12   all that the Court intended to review.  I'll hear if

13   there are issues.  I do want to talk about where we are

14   in terms of timing, but any other issues that WARF would

15   benefit the Court ruling on at this time?

16          MR. CHU:  No, Your Honor.

17          THE COURT:  All right.  Anything more for

18   Apple?

19          MR. LEE:  No, Your Honor.

20          THE COURT:  Let me just ask WARF where are you

21   in terms of your overall predictions of completion in

22   two days?

23          MR. CHU:  I think we're still on track, Your

24   Honor.

25          THE COURT:  All right. So roughly you'd expect

1    you'd complete your case-in-chief by middle of the day

2    on Wednesday, if not Tuesday.

3            MR. CHU:  I think Your Honor had asked us

4    before.  Without cross, we said about a day-and-a-half

5    and so I think it depends on cross.

6            THE COURT:  Assuming that cross remains on its

7    course.

8            MR. CHU:  Yes.

9            THE COURT:  You're roughly on track.

10           MR. CHU:  Right.

11           THE COURT:  I'm not going to hold anyone to an

12    exact time.  The reason I ask is just that I've given

13    some leeway early on, particularly with respect to

14    cross.  I didn't give any leeway with respect to the

15    first witness because I don't know that Mr. Gulbrandsen,

16    who I respect very much, has much to say about the

17    issues of liability in this case.  But aside from that,

18    I've tried to give you leeway to lay your themes and to

19    repeat some of those in cross.  I'm not going to do that

20    to the point of redundancy.

21           So while I'll continue to give you leeway with the

22    first few witnesses, I expect the parties to tighten up

23    some of the presentations on matters not in dispute as

24    we proceed through trial.  But other than that, I

25    continue to be appreciative of both sides' efforts and

1   encourage that as we proceed.

2       And I will see you at 8 a.m. tomorrow morning;

3   doesn't have to be all the lawyers, just those dealing

4   with the two issues that need to be dealt with.  We will

5   begin the trial again at 8:30 -- I should say the trial

6   before the jury at 8:30.

7       Thank you, all.  You're free to move about the

8   courtroom and we are adjourned for the day.

9           MR. CHU:  Thank you, Your Honor.

10          MR. SHEASBY:  Thank you, Your Honor.

11      (Proceedings concluded at 5:40 p.m.)

12

13                      * * * * *

14      I, LYNETTE SWENSON, Certified Realtime and Merit
    Reporter in and for the State of Wisconsin, certify that
15  the foregoing is a true and accurate record of the
    proceedings held on the 5th day of October 2015 before
16  the Honorable William D. Conley, Chief Judge for the
    Western District of Wisconsin, in my presence and
17  reduced to writing in accordance with my stenographic
    notes made at said time and place.
18  Dated this 23rd day of October 2015.

19

20                              /s/_____

21                              Lynette Swenson, RMR, CRR
                                Federal Court Reporter

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
24  unless under the direct control and/or direction of the
    certifying court reporter.

25