UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN ALUMNI RESEARCH FOUNDATION,

     Plaintiff,

-vs-                     Case No. 14-CV-62-WMC

APPLE, INC.,            Madison, Wisconsin
                     October 15, 2015
     Defendant.      8:33 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF NINTH DAY OF JURY TRIAL
MORNING SESSION
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY, and a jury

APPEARANCES:

For the Plaintiff:
                Irell & Manella LLP
                BY:  MORGAN CHU
                    GARY FRISCHLING
                    JASON SHEASBY
                    ALAN HEINRICH
                    AMY PROCTOR
                    CHRISTOPHER ABERNETHY
                    TONY ROWLES
                1800 Avenue of the Stars, Ste. 900
                Los Angeles, California  90067

                Godfrey & Kahn, S.C.
                BY:  JENNIFER GREGOR
                One East Main Street, Ste. 500
                Madison, Wisconsin  53703

Also appearing:  Joshua Oppenhuis-Technology consultant
                Carl Gulbrandsen Managing Director-WARF

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
(608)255-3821

```
 1  For the Defendant:
                        Wilmer Cutler Pickering Hale & Dorr
 2                      BY:  WILLIAM LEE
                             JORDAN HIRSCH
 3                           LAUREN FLETCHER
                        60 State Street
 4                      Boston, Massachusetts  02109

 5                      Wilmer Cutler Pickering Hale & Door
                        BY:  DAVID MARCUS
 6                           JAMES DOWD
                             ANDREA JEFFRIES
 7                           DEREK GOSMA
                        350 South Grand Avenue, Ste. 2100
 8                      Los Angeles, California  90071

 9                      Cetra Law Firm
                        BY:  CATHERINE CETRANGOLO
10                      20 North Carroll Street
                        Madison, Wisconsin  53703
11
    Also appearing:     David Sayres - Technology consultant
12                      Gerard Williams - Apple engineer
                        Iain Cunningham-Director of Litigation
13

14

15                        *  *  *  *  *

16                         I-N-D-E-X

17  DEFENDANT'S WITNESSES          EXAMINATION          PAGES

18  GERARD WILLIAMS         Cont'd direct by Mr. Lee      6-10
                            Cross by Mr. Frischling       11-21
19                          Redirect by Mr. Lee           21
    DAVID PAPWORTH          Video excerpt played          22
20  DAVID AUGUST            Direct by Mr. Dowd            23-118
                            Cross by Mr. Sheasby         118-157
21

22                         E-X-H-I-B-I-T-S

23  PLAINTIFF'S EXHIBITS               IDENTIFIED/RECEIVED

24  Ex. 161    Apple presentation        144        157

25
```

1                         **E-X-H-I-B-I-T-S**

2    DEFENDANT'S EXHIBITS                  IDENTIFIED/RECEIVED

3    Ex. 721     Papworth material           ---         157
        723      Sandy Bridge overview        83         157
4       725      Haswell                      90         157

5      1134      Comparison                   98         ---
       1226      Williams patent             ---          85
6      1352      '447 patent                   8           8
       1475      Weiss article - Dhrystone    55         ---
7      1582      Cover sheet                  72          72
       1608      August spreadsheet           60          61
8      1630                                   ---          81
       1631                                   ---          81
9      1711      Christianson report          96         ---

10

11                       * * * * *

12        (Proceedings called to order.)

13            THE CLERK:  Case Number 14-CV-62.  *WARF v.*

14   *Apple* called for the ninth day of jury trial.  May we

15   have the appearances, please.

16            MR. CHU:  Good morning, Your Honor.  On behalf

17   of WARF:  Morgan Chu, Gary Frischling, and Jason

18   Sheasby.

19            MR. LEE:  Morning, Your Honor.  Bill Lee, David

20   Marcus, Jim Dowd, and Cathy Cetrangolo for Apple.

21            THE COURT:  Very good.  Unless there's

22   something more for the parties then, I'll start with the

23   plaintiff WARF.

24            MR. FRISCHLING:  There is one issue, Your

25   Honor, regarding two exhibits that appeared in

1   Mr. Williams' direct binder that we saw last night.

2   1352 and 1226 are two other patents of Mr. Williams.  As

3   far as I can tell, and I coordinated with counsel this

4   morning, they're unrelated to the LSD predictor.

5   They're on other features of the chip.  And so we have a

6   relevance concern on that testimony obviously.

7           THE COURT:  Anything else for your client this

8   morning?

9           MR. FRISCHLING:  That's it, Your Honor.

10          THE COURT:  All right.  Let me hear from Apple

11  as to your reason for introducing it.

12          MR. LEE:  Both patents relate to the SoC, Your

13  Honor, and the question is how do you allocate the value

14  of the SoC --

15          THE COURT:  I'll allow the introduction of the

16  two patents.  We're not going to go into the details.

17          MR. LEE:  We're not.

18          THE COURT:  That's fine.  And is our witness --

19          MR. LEE:  Mr. Williams is here.

20          THE COURT:  Mr. Williams, if you would come

21  forward and be seated.  Was there anything more for --

22          MR. LEE:  One very brief thing.  Your Honor

23  wanted me to give you this, which is our --

24          THE COURT:  Your witness list.  Thank you.  And

25  Mr. Williams, feel free to go ahead.  You remain under

 1   oath.

 2       **GERARD WILLIAMS, DEFENDANT'S WITNESS, RESUMES,**

 3           MR. LEE:  Very briefly, Mr. Dowd had something

 4   on the Papworth video.

 5           THE COURT:  All right.  I'm happy to hear it.

 6           MR. DOWD:  Thank you, Your Honor.  This is --

 7   briefly.  We're playing the video of David Papworth's

 8   deposition.  We have some documents that we'd move to

 9   admit with that that are -- we're moving under 90 --

10   Rule of Evidence 902.11.  They're self-authenticating

11   documents.  I have the declaration of David Papworth.

12           THE COURT:  And have you shared that with

13   opposing counsel?

14           MR. DOWD:  We have shared that with opposing

15   counsel.

16           THE COURT:  And is there objection to that?

17           MR. SHEASBY:  We just got it, I would say, an

18   hour ago.

19           THE COURT:  Let's do this:  I will reserve as

20   to those and if you want to provide me a copy now,

21   that's fine.

22           MR. DOWD:  Thank you, Your Honor.

23           THE COURT:  And we'll all rise.  Unless there's

24   something more, we'll all rise.

25           MR. LEE:  Nothing.

1          (Jury brought in courtroom at 8:37 a.m.)

2               THE CLERK:  This Honorable Court is again in

3     session.  Please be seated and come to order.

4               THE COURT:  Good morning, Members of the Jury.

5     We're continuing with the direct testimony of

6     Mr. Williams, who remains under oath.

7          Counsel, you may proceed when ready.

8               MR. LEE:  Thank you, Your Honor.

9                    CONTINUED DIRECT EXAMINATION

10    BY MR. LEE:

11    Q    Mr. Williams, good morning.

12    A    Good morning.

13    Q    When we concluded yesterday, we were looking at DX

14    1656.  Do you have that in the notebook before you?

15    It's tab 6.

16    A    Yes, I do.

17    Q    If I could bring that up on the screen just to

18    remind us of where we were.  This is a patent issued to

19    you and three others on your LSD predictor; correct?

20    A    Yes, that's correct.

21    Q    Now, are there a list of references that were

22    before the Patent Office?

23    A    Yes.

24    Q    And if we went to the second page of the

25    references, do you find the Moshovos '752 patent on that

                    GERARD WILLIAMS - DIRECT

1  list?

2  A    Yes, it's right -- whoop.  Right there.

3  Q    Okay.  Did you and your colleagues, in developing

4  the A7 and the A8, receive other patents for the work

5  and the inventions in the A7 and A8?

6  A    Yes.  There were around 70 other inventions that

7  were awarded patents.

8  Q    And those are in the A7 and A8; correct?

9  A    Yes, that's correct.

10  Q    Let's just take a couple of examples quickly.

11  Turn, if you would, to tab 8 in your binder.

12  A    Okay.

13  Q    Can you tell us what this is?

14  A    Yes.  This is a patent at the SoC level regarding

15  one of the security processors.  It's called a *security*

16  *enclave processor* that myself and a few others were

17  awarded inside of Apple.

18  Q    And it's U.S. patent 8,775,757?

19  A    Yes.  B2.

20          MR. LEE:  We offer it, Your Honor.

21          THE COURT:  It is admitted.

22  BY MR. LEE:

23  Q    And does this describe work that you did in

24  developing the A7 and aspects of the A7 and A8?

25  A    Yes.
                    GERARD WILLIAMS - DIRECT

1  Q    Turn, if you would, to tab 9.  Tell what you find

2  there.

3  A    Yes.  Another patent that was awarded to the CPU

4  for the A7 design regarding memory accesses barriers

5  that we convert to prefetches.

6  Q    Is it patent number 8,856,447?

7  A    Yes.  Again with the extension B2.

8  Q    And it's DX 1332?

9  A    1352.

10 Q    1352.

11        MR. LEE:  We offer DX 1352, Your Honor.

12        THE COURT:  It is admitted.

13 BY MR. LEE:

14 Q    And if you could just put it on the screen, I just

15 have one question.  Does this relate to work on the A7

16 and A8?

17 A    Yes, it does.

18 Q    Does it describe inventions of Apple in the A7 and

19 A8?

20 A    Yes.  One of them, yes.

21 Q    Let me go to a different topic.  Yesterday we were

22 talking about fuse devices.  Do you remember that?

23 A    Yes, I recall.

24 Q    Is there just one fuse in an Apple device?

25 A    No.  There are thousands of fuses in an Apple
              GERARD WILLIAMS - DIRECT

1  device.

2  Q     And in order for a device to actually operate, how

3  many of the fuses have to be blown?

4          MR. FRISCHLING:  Objection.  Foundation.

5          THE COURT:  I'll overrule.  You can answer.

6          THE WITNESS:  So there's actually a sequence of

7  steps that you have to undertake.  The first is after

8  the device has been fabricated and bumped and packaged,

9  then it's tested.  When it's tested, a set of fuses are

10 actually programmed for that given device to explain

11 characterization properties about the device and

12 features on the device.  And there's basically two

13 outcomes after you do this:  There's an additional set

14 of fuses within the device as well that lock down

15 security access to, for instance, the phone so that when

16 I as a user or you as a user purchase the phone, nobody

17 can break into your phone.  That distinct set of fuses

18 that are available to be programmed demarcate whether or

19 not you have an engineering sample, which the design

20 teams within Apple first get in order to test the device

21 without the security lockdown put in place.

22     And then there's a secondary thing which is once

23 you blow those fuses, that's what ramps the production

24 and that's what we as end-users purchase so that

25 somebody can't break into your phone.
              GERARD WILLIAMS - DIRECT

1    Q    Now, did Apple provide samples to WARF for testing?

2    A    Yes.  Yes, they did.

3    Q    Which fuses were blown and which fuses weren't?

4    A    So the first set of fuses, it's the engineering

5    sample configuration that was provided to WARF and that

6    is the first set of fuses that every device actually has

7    blown on it, whether it be production or engineering.

8    The security features were not enabled so that you could

9    actually connect up the debugger and the tools to the

10   device and properly do things, manipulate it in certain

11   ways.

12   Q    And those were engineering test devices; correct?

13   A    That's correct.

14   Q    That allowed WARF to test the devices; correct?

15   A    That's correct.

16          MR. LEE:  Nothing further, Your Honor.  Thank

17   you.  (8:43 a.m.)

18          THE COURT:  Cross-examination.  Mr. Lee, the

19   second to the last exhibit, the second of the -- I have

20   1352, but I think it was indicated 1656.  But I had

21   already admitted that.

22          MR. LEE:  Thank you, Your Honor.

23          THE COURT:  Was that the exhibit?

24          MR. LEE:  Can I check?

25          THE COURT:  That's fine.  You can advise me.
                   GERARD WILLIAMS - DIRECT

1                    CROSS-EXAMINATION

2    BY MR. FRISCHLING:

3    Q    Good morning, Mr. Williams.

4    A    Good morning.

5    Q    Who's in charge of manufacturing at Apple for the

6    processors when they are made on silicon?

7    A    The one individual or a company?

8    Q    Let's start with an individual.

9    A    That's the executive management team at Apple is

10   actually in charge of that.

11   Q    And who's on that team?

12   A    Johny Srouji is one of the more senior people

13   that's on that team.  Mr. -- I call him Sri.  We talked

14   about him during the testimony.  His name is Sribalan

15   Santhanam is another member of the team.  There are

16   other senior people that will be involved with that from

17   the architecture side as well as the physical side.  Tim

18   Malay is another.  Myself as well will get involved at

19   times with that.  A gentleman by the name of Steve

20   Polzine.

21        On the physical side you'll get individuals like

22   Patrick McNamara, who we heard from today, and Fabian

23   Claus is another one because he's a process expert.  And

24   various others.

25   Q    So let me clarify the difference.  The physical
                    GERARD WILLIAMS - CROSS

1  side is the actual manufacturing of physical chips as

2  opposed to designing the circuits that are going to go

3  into them?  Have I got that distinction right?

4  A    It's a very -- that's a simplification, but yes,

5  it's basically the process side versus the architecture

6  design side and you need both together.

7  Q    And so the two people that you identified that have

8  responsibility at Apple on the process side were

9  Mr. McNamara and Mr. Claus; right?

10  A    Yes.  And then I mentioned Sribalan Santhanam.  He

11  is a process circuits expert as well, too.  But he's

12  also their manager, so he would most definitely be

13  involved.

14  Q    So the folks at Apple that are involved in the

15  process of actually making the chips, that's

16  Mr. McNamara, Mr. Claus, and Mr. Santhanam, if I

17  pronounced his last name correctly.

18  A    Those are a few, yes.

19  Q    Have you ever been to the Samsung factory in

20  Austin?

21  A    Not in Austin, no.

22  Q    Now, sir, you recall yesterday you had talked a

23  little bit to Mr. Lee about the amount of space on the

24  die that the LSD predictor takes up?

25  A    Yes.  Yes, I remember that.

                    GERARD WILLIAMS - CROSS

1   Q     Very small amount; is that right?

2   A     It's a very tiny amount, yes.

3   Q     I think at some point had you calculated it to be

4   something like .2 percent?

5   A     I said yesterday it was much, much less than 1

6   percent and likely fractions of a percent.

7   Q     And you'd agree with me, Mr. Williams, that when

8   you're evaluating a feature like the LSD predictor for

9   inclusion in a design, one of the things you look at is

10  the amount of space it takes; right?

11  A     We do that for every feature that we incorporate

12  into the device, and the LSD was one feature, yes.

13  Q     And you'd agree with me that when you're making

14  that evaluation, the fact that a feature is small,

15  that's a benefit; right?

16  A     Anything being small is always a benefit, sir, yes.

17  Q     In fact, you describe that as a beautiful benefit;

18  fair?

19  A     Yes, that was my testimony.

20  Q     Now, you also recall talking about the fact that

21  the LSD predictor consumes essentially negligible power;

22  right?

23  A     Yes, I remember.

24  Q     In addition to consuming negligible power, the LSD

25  predictor also avoids pipeline flushes; right?

                    GERARD WILLIAMS - CROSS

1    A    It helps avoid, yes.

2    Q    And you'd agree with me that pipeline flushes are

3    very expensive from a power and energy perspective.

4    A    They're a negative impact.  I don't know that I'd

5    characterize them as very.

6    Q    Well, sir, let's take a look at your deposition

7    testimony.

8         MR. FRISCHLING:  Could we please have Williams'

9    depo 232, 13 to 235, 3 available on the monitors.  And

10   actually what I'd like to look at is 234, I think line

11   10.  Could I have the next page, please.  It's actually

12   on 235.  I'm sorry, go back, it spans the page.  Forgive

13   me.

14   Q    The question and the first line of that paragraph

15   says:

16        "Question:  The Cyclone designs requires an

17   expensive pipeline flush.  What about the Cyclone design

18   made its pipeline flush so expensive?

19        "Answer:  As I just stated, it's the depth of the

20   pipeline.  So if you start from the beginning of the

21   instruction, so you have N stages instruction fetch,

22   you've got N stages into decode or M I should say, you

23   have a few stages to execute.  When you have to flush

24   all the work through all of those stages and refresh it,

25   it's expensive.  It's potentially expensive from a

                    GERARD WILLIAMS - CROSS

1  performance perspective.  It's for sure very expensive

2  from a power and energy perspective because you're

3  throwing away a lot of work.  And then there is -- and

4  so you just don't want to do that kind of thing very

5  often."

6        Did I read the testimony correctly?

7  A    Yes, you did.

8  Q    Mr. Williams, yesterday you recall talking about an

9  estimate of the performance benefit of the LSD predictor

10  that you'd given?

11  A    Yes, I remember.

12  Q    That was your estimate of in the range of 2 to 3

13  percent?

14  A    That's correct.

15  Q    And that was developed using an internal simulator

16  at Apple called cSim; that was your testimony?

17  A     cSim was used to model the pipeline of the

18  processor and study the performance.

19  Q    Now cSim, that's the same processor that Professor

20  Reinman testified about that he wanted access to and

21  didn't get; correct?

22  A    Yes, I believe that's what was stated.

23  Q    Now, you told Mr. Lee, if I understand or remember

24  correctly, that Apple doesn't have records of those

25  simulations anymore; correct?
              GERARD WILLIAMS - CROSS

1  A    Yes, that's correct.

2  Q    Did you ever write down your 2 to 3 percent

3  estimate in a document of some kind?

4  A    No, I did not.

5  Q    So you never wrote the 2 to 3 percent in an email,

6  for example.

7  A    No.

8  Q    You never wrote the 2 to 3 percent estimate in a

9  report to your management.

10 A    No, I did not.

11 Q    Never put it in a journal publication; correct?

12 A    No.  I didn't publish any journals, no.

13 Q    And didn't present it at a peer-reviewed conference

14 of any kind.

15 A    No.

16 Q    Now, you were asked some questions about the '752

17 inventors and the simulations that they had done.  Do

18 you recall that?

19 A    Yes.

20 Q    And you were here when evidence came in that they,

21 in fact, published their results in at least two papers

22 before they filed their patent application.  Do you

23 remember that?

24 A    Yes, I remember that.

25 Q    Now, we've seen a lot of emails among Apple

                    GERARD WILLIAMS - CROSS

1    engineers reporting performance data.  Do you recall

2    that?

3    A    Yes, I do.

4            MR. FRISCHLING:  Could we please have PX 58,

5    which is already in evidence, up on the screen.  And if

6    we could just blow up the top portion of this chain,

7    please.

8    Q    So this is one of the emails from Mr. Meier to the

9    Cyclone architecture group.  Do you recall that?

10   A    Yes, I do.

11   Q    And if we look down in the second full paragraph,

12   he's giving results on comparing a 9-bit tag to a 10-bit

13   tag to an 11- or a 12-bit tag; right?

14   A    He's comparing them to a baseline and that's the

15   performance delta relative to the baseline.

16   Q    And he's reporting performance deltas as small as

17   0.66 percent; right?

18   A    Yes, that's correct.

19   Q    Now, this is the sort of data that goes around by

20   email among the Cyclone architecture engineers at Apple;

21   correct?

22   A    For this particular example, yes.  There are

23   various simulations that are run, and when the engineers

24   study features, they will sometimes report some of the

25   features that they're studying to inform the other

GERARD WILLIAMS - CROSS

1  engineers about what's occurring.

2  Q    But you didn't provide a single email to support

3  your estimate of that 2 to 3 percent; correct?

4  A    I didn't provide an email, but --

5  Q    Thank you, sir.  If you'd answer my question yes or

6  no, I'd appreciate it.

7  A    No, I didn't.

8  Q    And you'd agree with me that -- well, actually let

9  me go and take a look at an exhibit that you --

10 demonstrative you had put up yesterday.  Could we have

11 DDX 86, please.  These are a variety of the features

12 that you identified yesterday outside the LSD predictor.

13 Do you recall that?

14 A    I do, yes.

15 Q    And you didn't provide in your testimony yesterday

16 written documentation on the performance value from any

17 of those; correct?

18 A    Not specifically, no.

19 Q    So I'm not going to go through all nine of them.

20 But let me come back for a moment to your estimate.  You

21 would agree with me, sir, that the only way to verify

22 your testimony about the LSD predictor giving 2 to 3

23 percent performance benefit would be by actually running

24 the full cSim trace file suite; right?

25 A    That and many other real world applications would

GERARD WILLIAMS - CROSS

1 exhibit that property.

2 Q    So sir, can you answer my question yes or no?  In

3 order to verify your testimony, you'd agree that the LSD

4 predictor -- let me withdraw the question and try it

5 again.

6      The only way to verify your testimony that the LSD

7 predictor is giving 2 to 3 percent performance benefit

8 would be by running the full cSim tray suite; correct?

9 A    I wouldn't change my answer, sir.  That would be

10 one piece and then I would also run other applications

11 as well on the device.

12 Q    Could we please have your deposition testimony, if

13 you'd take a look at it in your binder.  Page 190, lines

14 21 to 25.  Have you got that, sir?  It's not up on your

15 screen yet?

16 A    No.

17 Q    "Question:  So the only way to verify your

18 testimony that the LSD predictor is giving 2 to 3

19 percent performance benefit would be by running the full

20 cSim trace file suite?

21      "Answer:  Yes."

22      I read that correctly, didn't I?

23 A    You did, and there's --

24           THE COURT:  There's no need for you to amplify.

25           THE WITNESS:  Okay.  Yes.
                    GERARD WILLIAMS - CROSS

1           THE COURT:  The question was whether he read it

2     correctly.  I'd like you to listen to the question that

3     he asks.  And you may ask your next question.

4           MR. FRISCHLING:  Thank you, Your Honor.

5     BY MR. FRISCHLING:

6     Q     Apple still has the cSim simulator at Apple,

7     correct?

8     A     It does, yes.

9     Q     Apple could have run the trace files as you

10    indicated to verify the 2 to 3 percent performance;

11    right?

12    A     It could have run the tray suite, yes, just like I

13    stated.

14    Q     Thank you.  Apple didn't do that for this

15    litigation, did it?

16    A     No, sir.

17    Q     And Apple didn't allow WARF to do it either, did

18    it?

19    A     To use the simulator?

20    Q     Correct.

21    A     I believe --

22          THE COURT:  I will simply advise the jury that

23    WARF was given access to the various benchmarks but

24    ultimately denied full access to the simulator for their

25    experiments.  And that's where the record ends.  But

                    GERARD WILLIAMS - CROSS

1 that's as far as we're going to go with that.

2          MR. FRISCHLING:  Thank you, Your Honor.  No

3 further questions.  (8:56 a.m.)

4          THE COURT:  Any redirect?

5          MR. LEE:  Very briefly, Your Honor.

6                    REDIRECT EXAMINATION

7 BY MR. LEE:

8 Q     So just two questions, Mr. Williams.  For all the

9 simulations that you ran that allowed you to come up

10 with your estimate of 2 to 3 percent, is there any

11 document at Apple that describes the final performance

12 benefit of the LSD predictor alone at any percent?

13 A     No.  There's no document at all.

14 Q     And if I -- last thing.  I would like to complete

15 your answer.  Mr. Frischling read you a question on page

16 190 and then said your answer was yes.  If we go on to

17 191, the rest of the answer was "That's the way we run

18 the simulation to get performance increases for various

19 features over the entire processor, we run the entire

20 tray set."  That was your answer; correct?

21 A     I'll take your word for it because it's not in

22 front of me.  So yes.

23          MR. LEE:  Thank you.  Nothing further, Your

24 Honor.

25          THE COURT:  You may step down, Mr. Williams.
                    GERARD WILLIAMS - REDIRECT

1    Thank you.  Apple may call its next witness.

2         (Witness excused at 8:59 a.m.)

3         MR. LEE:  Your Honor, our next witness is David

4    Papworth from Intel who is going to testify by

5    deposition.  And the running time is about 25 minutes.

6         THE COURT:  Very good.  While the jury is

7    listening to that transcript, I will speak briefly with

8    counsel at sidebar.

9      (Discussion off record at sidebar  8:59-9:01 a.m.)

10      (David Papworth video deposition    8:59-9:20 a.m.)

11        MR. DOWD:  Your Honor, at this point we would

12   offer Exhibits DX 1630, 1631, and DX 721 through 75.

13        THE COURT:  The Court will reserve on those

14   exhibits.

15        MR. LEE:  Your Honor, the first two were the

16   ones in the video.  I think the latter ones were the

17   ones reserved on.

18        THE COURT:  I understand.  I am reserving on

19   those exhibits and at the break we can address their

20   admission.

21        MR. DOWD:  Thank you, Your Honor.

22        THE COURT:  Did you want to call your next

23   witness?

24        MR. LEE:  We do, Your Honor.  Our next witness

25   is Dr. David August.  Mr. Dowd will do the examination.

1    **DAVID AUGUST, DEFENDANT'S WITNESS, RECALLED,**

2         THE COURT:  Members of the Jury, as you know

3    Dr. August is making a return visit to the stand.  He

4    remains under oath.  You are aware of his general

5    credentials.

6         And you may proceed whenever you're ready, Counsel.

7         MR. DOWD:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9    BY MR. DOWD:

10   Q    Good morning, Dr. August.  Welcome back.

11   A    Thank you.

12   Q    We've asked you back to address the damages issues.

13   Have you considered the opinions from Dr. Conte,

14   Dr. Reinman, and Dr. Annavaram in this case?

15   A    I have.

16   Q    Do you agree with them?

17   A    I disagree with their conclusions.

18   Q    So let's turn to those opinions.

19         MR. DOWD:  If we can bring up Dr. Conte's Slide

20   No. 23, please.  There we go.

21   Q    Now, do you agree with the opinion in this slide?

22   A    No, I do not.

23   Q    Let's turn to -- have you prepared a set of

24   demonstratives to help explain why?

25   A    Yes, I have.

                    DAVID AUGUST - DIRECT

1    Q    Let's turn to DDX 11-4.  What's shown here?

2    A    So this is the A7 SoC floor plan.

3    Q    Now, can you tell us whether the A7 has a memory

4    subsystem?

5    A    Yep.  So the A7 has a memory subsystem separate

6    from the processor.

7    Q    What's contained in the memory subsystem?

8    A    So this is going to be things like the caches, the

9    memory controller, things that interface with the rest

10   of the system's memory.

11   Q    Has WARF accused the memory subsystem of

12   infringement?

13   A    No, it has not.

14   Q    Can you tell us whether the A7 has any graphics

15   subsystem?

16   A    Yes.  It also has a graphics subsystem.

17   Q    What's contained in the graphics subsystem?

18   A    So this will be things like the GPU, which is a

19   graphics processing unit that's used for graphics

20   processing obviously.

21   Q    Has WARF accused the graphics subsystem of

22   infringement?

23   A    No, it has not.

24   Q    Can you tell us whether the A7 has a display

25   subsystem?

                    DAVID AUGUST - DIRECT

1    A    It does.

2    Q    What's contained in that subsystem?

3    A    Controllers for the display, the devices display.

4    Q    That's like the touch screen?

5    A    The touch screen, yes.  Exactly.

6    Q    Has WARF accused the display subsystem of

7    infringement?

8    A    No, it has not.

9    Q    Can you tell us whether the A7 has a camera and

10   image sensor pipeline subsystem?

11   A    It does.

12   Q    What's contained in that subsystem?

13   A    That's going to control the camera and also

14   compensate for irregularities in the camera when you

15   take a picture or a video.

16   Q    Are you familiar with the Kingfisher CPU?

17   A    Yes.

18   Q    What is that?

19   A    That's an ARM processor that's actually in that

20   part of the -- in that subsystem.

21   Q    And does that CPU have an LSD predictor?

22   A    No, it does not.

23   Q    Has WARF accused the camera and image sensor

24   subsystem of infringement?

25   A    No, it has not.
                    DAVID AUGUST - DIRECT

1  Q    Can you tell us whether the A7 has a media

2  subsystem?

3  A    Yeah.  It does have a media subsystem.

4  Q    What does that do?

5  A    That's going to process images and also movies.

6  Q    Has WARF accused the media subsystem of

7  infringement?

8  A    No, it has not.

9  Q    Can you tell us whether the A7 has a NAND

10 subsystem?

11 A    It does.

12 Q    And what's contained in the NAND subsystem?

13 A    So the NAND is the storage where your applications

14 are.  It's the storage that holds data when your phone

15 is off, your permanent storage.  And the NAND controller

16 interacts with that memory.

17 Q    Does that also have a Kingfisher CPU?

18 A    It does.

19 Q    Has WARF accused the NAND subsystem of

20 infringement?

21 A    No.

22 Q    Can you tell us whether the A7 has a secure enclave

23 subsystem?

24 A    It does.

25 Q    What does the secure enclave subsystem do?
                    DAVID AUGUST - DIRECT

1   A     That's a separate part of the phone to hold your

2   passwords and also your fingerprint when you use your

3   fingerprint to get on, just so that it's separate and

4   secure.

5   Q     Does that also have a Kingfisher CPU?

6   A     It does.

7   Q     And has WARF accused the secure enclave subsystem

8   of infringement?

9   A     It has not.

10  Q     Can you tell us whether the A7 has an I/O or

11  input/output system?

12  A     It does.

13  Q     What does that do?

14  A     So this is for getting data onto and off of your

15  device.  So, for example, the USB cable goes through

16  this subsystem.

17  Q     Has WARF accused the I/O subsystem of infringement?

18  A     No, it has not.

19  Q     Can you tell us whether the A7 has a power

20  management subsystem?

21  A     It does.

22  Q     What does that do?

23  A     This is going to control other devices, tell them

24  when to sleep, other components within the system, when

25  to slow down to conserve energy.
                    DAVID AUGUST - DIRECT

1  Q    And has WARF accused that subsystem of

2  infringement?

3  A    No, it has not.

4  Q    Now, can you tell us whether each of these

5  subsystems and more provides value independent of the

6  Cyclone core?

7  A    I believe it does.

8  Q    Can you tell us whether each provides value

9  independent of the LSD predictor?

10  A    They do.

11  Q    And if you take all of these other processor cores

12  together and compare that to Cyclone, what provides the

13  majority of the value in the A7 system-on-a-chip?

14          THE COURT:  The objection is?

15          MR. SHEASBY:  Scope.

16          THE COURT:  Paragraph?

17          MR. DOWD:  It's in 61, Your Honor.

18          THE COURT:  Paragraph?

19          MR. DOWD:  61, Your Honor.

20          THE COURT:  Paragraph 61 of which report?

21          MR. DOWD:  On the damages report.

22          THE COURT:  Let's have a sidebar.

23      (Discussion at sidebar at 9:28 a.m.)

24          THE COURT:  First of all, can we agree on the

25  question that was asked?  Your understanding of what

                    DAVID AUGUST - DIRECT

1  he's being asked is?

2          MR. SHEASBY:  What's the majority of the value

3  on the SoC.

4          MR. DOWD:  And --

5          THE COURT:  And where does he state -- do you

6  agree that's the question you want him to answer?

7          MR. DOWD:  I do.  And that is the question.  So

8  in paragraph 26 he uses a summary opinion about the

9  value.  Paragraph 61 is where he said the same thing I

10 just walked through about the --

11         THE COURT:  Does he anywhere summarize what the

12 value is as opposed to the other component parts?

13 That's what your objection is to?

14         MR. SHEASBY:  Yes.

15         MR. DOWD:  I believe, Your Honor, paragraph 26

16 of his opinion provides that the --

17         THE COURT:  Well, is he about to give a number

18 or a percentage?

19         MR. DOWD:  Not a number.

20         THE COURT:  What is he going to say?

21         MR. DOWD:  He's going to say that things

22 outside the Cyclone provide the majority of the value.

23         THE COURT:  He can say they've overstated their

24 value, but he can't say it's the majority of the value

25 because I don't opine him to that.
                    DAVID AUGUST - DIRECT

1          MR. DOWD:  Okay.  Thank you, Your Honor.

2        (End of sidebar discussion at 9:28 a.m.)

3   BY MR. DOWD:

4   Q    Now, Doctor, the question was --

5          THE COURT:  Well, why don't you just rephrase

6   it and we'll go from there.

7          MR. DOWD:  Thank you, Your Honor.

8   BY MR. DOWD:

9   Q    Has Dr. Conte overstated the value attributed to

10  the Cyclone CPU core?

11  A    I believe by a number of technical metrics he has.

12  Q    Thank you.  Let's go to Dr. Conte's Slide No. 20.

13  Were you here when Dr. Conte presented this slide?

14  A    I was.

15  Q    What does this slide tell you about the role of the

16  CPU?

17  A    So if you'll recall, he was using this slide to

18  highlight the parts of the SoC outside of the processor

19  that did work.  So, for example, he was saying it was

20  not the processor, it was other parts of the system that

21  was primarily responsible for games, multimedia, and

22  photos.  So those things are going to operate and use

23  parts of the -- the SoC that do not use the LSD

24  predictor very heavily.

25          Now shaded, he was saying those were the parts that
                    DAVID AUGUST - DIRECT

1  involve the CPU.  But if you look at the parts that are

2  shaded, social networking, radio, retail, so that's

3  going to Amazon, that kind of thing, instant messengers,

4  these things do involve the CPU, but there's not CPU

5  intensive.  There's not a lot of computation involved in

6  doing these kinds of things.  So I think this supports

7  the case that you can use this to understand the value

8  of the processor in the device.

9  Q    And so if we take the example of social networking

10  and say I'm using my iPhone to go to Facebook to see a

11  video that my family has posted, what part or parts of

12  the A7 are used for me watching the video?

13            MR. SHEASBY:  Objection.  Scope.

14            THE COURT:  You can answer the question.

15            THE WITNESS:  Yes.  So that's the media

16  subsystem we talked about that was outside of the

17  processor.

18  BY MR. DOWD:

19  Q    Okay.  And when you say that the area shaded in

20  gray are not compute intensive for the CPU, does that

21  mean that it's actually the portions outside of the CPU

22  that are doing those things?

23  A    Well, it means that -- well, it does mean that the

24  CPU is involved, but for much of the time the CPU is

25  actually sleeping.  There's a little bit of work when

                DAVID AUGUST - DIRECT

1    you type your text message and send it, but then between

2    the key strokes the processor is going to sleep.

3    There's nothing for it to do.  Once the message is sent,

4    it's waiting for the message from the person you're

5    communicating with.  It also will go to sleep.  So I

6    would consider that to have a very low-duty cycle so

7    it's not a lot of code compute.

8    Q    Now, how many processors other than Cyclone are

9    there in the A7?

10   A    Well, at least five that we counted.

11   Q    Let's turn to DDX 11-5.  What's shown here?

12   A    So this is a Cyclone diagram and I have highlighted

13   here the MDR, which is one of the components on Cyclone

14   that we heard about last week.

15   Q    How many transistors does Cyclone have?

16   A    Cyclone has about 66 million transistors.

17   Q    And if we go to DDX 11-6, what's shown here?

18   A    So this is a subcomponent of the last slide, shown

19   on the last slide, the MDR which I highlighted.  This is

20   blown up.  And here you can see various components of

21   the MDR.  Within the MDR is the load-store dependency

22   predictor shown here.

23   Q    Does this LSD predictor make predictions for any

24   processor core other than Cyclone?

25   A    No.  This is -- the impact of the LSD predictor is

                      DAVID AUGUST - DIRECT

1  limited to the Cyclone core.

2  Q    So all of those other aspects that we looked at,

3  the GPU, that Kingfisher CPU, are any of those affected

4  by what this LSD does?

5  A    No.  It doesn't control them.

6  Q    Let's go to DDX 11-6.

7        MR. DOWD:  Advance the slide.

8  Q    So what's shown here?

9  A    So this is a table that shows the percentage of

10  either lines of code of RTL that we heard about or of

11  the die area of the chip, of the LSD, relative to the

12  processor, the Cyclone processor, and also in the second

13  column relative to the overall chip, the SoC.

14  Q    So measured by lines of RTL code, what percent of

15  the A7 SoC is the LSD predictor?

16  A    Of the A7 SoC it's .6 percent.

17  Q    What percent is it of the Cyclone, just the Cyclone

18  itself?

19  A    So just drilling down into Cyclone, it's 2 percent.

20  Q    Measured by die space, what percent of the SoC is

21  the LSD predictor?

22  A    .2 percent.

23  Q    And if we look just within the Cyclone itself, what

24  percent?

25  A    1.17 percent.
                    DAVID AUGUST - DIRECT

1   Q     Now, were the elements -- were there elements of

2   the LSD predictor that were known in the prior art?

3   A     Elements, yes.

4   Q     And was the circuitry to execute instructions out

5   of order known before the '752 patent?

6   A     Yes.  We heard that last week.

7   Q     Was circuitry to detect data dependence known

8   before the '752?

9   A     Yes, it was.

10  Q     Was circuitry to execute instructions speculatively

11  known before the '752?

12  A     Yes.

13  Q     Was circuitry to recover from mis-speculations

14  known before the '752?

15  A     That was also known.

16  Q     Was circuitry to make predictions --

17        THE COURT:  Mr. Dowd, the jury heard all of

18  this from this witness in the first part of the trial.

19  We're not going to review it.

20        MR. DOWD:  Thank you, Your Honor.

21  BY MR. DOWD:

22  Q    Now, in addition to the prior art elements, can you

23  tell us whether the LSD predictor contains Apple's own

24  inventions?

25  A    It does.
                      DAVID AUGUST - DIRECT

1    Q    If we go to DDX 11-7, what's shown here?

2    A    So this is the '725 patent.  This is Apple's

3    patent.  The inventors are the engineers we heard about

4    that developed the LSD predictor, and the owner of this

5    patent is Apple.

6    Q    And that includes Mr. Williams from whom we just

7    heard testimony?

8    A    That's correct.

9    Q    If we go to DDX 11-9, what are you showing here?

10   A    So this is claim 1 of the patent.

11   Q    Of Mr. Williams' LSD predictor patent?

12   A    That's correct.

13   Q    Have you formed an opinion about whether Apple's

14   LSD predictor practices this claim and is therefore

15   covered by this patent?

16   A    Yes.  I've done the analysis.

17   Q    What is your opinion?

18   A    This covers the LSD predictor.  It reads directly

19   on the LSD predictor in the RTL.

20   Q    How did you reach that conclusion?

21   A    Well, I went element by element in the claim and

22   for each element I went to the RTL and I found the --

23   well, at this point I was already familiar with the RTL

24   so it was very easy to find the component that mapped

25   each one of these limitations.
                    DAVID AUGUST - DIRECT

1    Q    And has any WARF expert disagreed with your

2    conclusion that Apple's LSD predictor practices

3    Mr. Williams' '725 patent?

4            MR. SHEASBY:  Objection.  Scope and relevance.

5            THE COURT:  I'll overrule it.

6            THE WITNESS:  No.

7    BY MR. DOWD:

8    Q    Now, I'd like to --

9            MR. DOWD:  Can we blow up the bottom two

10   limitations of the claim and focus on those for a

11   minute.  The ones down here.

12   Q    Dr. August, if you could explain the last two

13   limitations about incrementing and decrementing.

14   A    Sure.  So this is one of the key innovations that

15   was recognized by the Patent Office.

16           MR. SHEASBY:  Objection.  Scope.

17           THE COURT:  We'll have a sidebar.

18       (Discussion at sidebar at 9:35 a.m.)

19           THE COURT:  Before I hear from you,

20   Mr. Sheasby, is this in his report?

21           MR. DOWD:  It is.  It's paragraph 304 were he

22   provides a claim chart that walks through every

23   limitation.

24           THE COURT:  I suspect you have a different

25   objection than scope.  I wish you would state it.
                    DAVID AUGUST - DIRECT

1          MR. SHEASBY:  My objection is --

2          THE COURT:  Relevance?

3          MR. SHEASBY:  -- relevance.  He mapped this

4     element.  This is the key impactor, a key thing the

5     Patent Office considered.  That's nowhere in his report

6     and that's exactly what the Court --

7          THE COURT:  I didn't hear him.  Was he talking

8     about the PTAP proceeding?  I don't understand.  I'm

9     sorry, that who considered?

10         MR. SHEASBY:  He said the Patent Office

11    considered these two limitations as key limitations.

12         MR. DOWD:  Actually that isn't what he said.

13         THE COURT:  I didn't hear that either.

14         MR. SHEASBY:  Yes, that's what I heard.

15         THE COURT:  Well, I'll review it.  If he did

16    say that, I'll -- I will direct the jury not to consider

17    it.  We're not going to spend a lot of time on this

18    because whether or not this infringes or reads on the

19    other patent really doesn't matter for purposes of the

20    jury's determination of damages.

21         MR. DOWD:  I agree.

22         THE COURT:  I've allowed Apple to continue to

23    talk about other patents, other patents that applied to

24    this chip because in an overall sense it shows that

25    there's a lot of intellectual property.  There has to be
                    DAVID AUGUST - DIRECT

1  some allocation to the specific invention.  And I

2  understand your objection.  But then it wasn't to scope,

3  it was move to strike and it should have been those two

4  words.

5       And I'd appreciate it if we'd move this along.

6  Thank you.

7            MR. DOWD:  Thank you.

8            MR. SHEASBY:   Thank you.

9       (End of sidebar discussion at 9:37 a.m.)

10 BY MR. DOWD:

11 Q   Dr. August, I'd focus --

12           THE COURT:  I'm sorry, I'm still --

13           MR. DOWD:  Sorry, Your Honor.

14           THE COURT:  To the extent that the witness

15 testified that what he was talking about was a key

16 element or a key distinction, you should ignore that

17 testimony.  That's not part of this case.  But he can

18 describe the basic components of this patented -- or

19 this patented invention.

20      And you may proceed, Counsel.

21           MR. DOWD:  Thank you, Your Honor.

22 BY MR. DOWD:

23 Q   And that's really what I intend to ask.  Just those

24 last two elements, can you explain what they are and

25 what they do?
                    DAVID AUGUST - DIRECT

1   A    Yes.  So these last two elements describe how the

2   counter is incremented and decremented.  What it's

3   describing is that when the data ultimately is delivered

4   from the store to the load, if it's delivered through

5   one location, turns out to be the load-store queue, then

6   the counter is incremented.  If it's delivered through

7   another location, through memory, then it's decremented.

8   So what's going on here is an increment and a decrement,

9   not based on dependence detection or mis-speculation

10  detection, but based on the location that the data was

11  delivered from.

12  Q    Let's turn to DX 1656, which is the '725 patent

13  itself.  And if we could turn to page two.  I'd like to

14  look at the art that was considered.  Could we blow up

15  the top portion?

16       Doctor, can you tell us is the WARF '752 patent

17  listed on the list of prior art that the Patent Office

18  considered?

19  A    It is.

20  Q    And did the Patent Office grant Mr. Williams his

21  LSD predictor patent over the '752?

22  A    Yes.

23  Q    Is Dr. Moshovos's 1997 ISCA paper listed on the

24  list of prior art the Patent Office considered?

25  A    It is.  It's not shown on this screen.  It's down

                    DAVID AUGUST - DIRECT

1    lower.

2              MR. DOWD:  Could we go down to that.

3    Q    Would you identify that for us?  You've identified

4    for us the 1997 ISCA paper?

5    A    That's correct.

6    Q    Did the Patent Office grant Mr. Williams' LSD

7    predictor patent over Dr. Moshovos's 1997 paper?

8    A    Yes, it was before them.

9    Q    If we go back up to the top left, did the Patent

10   Office consider the Hesson prior art reference?  Did it

11   consider the Steely prior art reference?

12             THE COURT:  I'm not sure you had an answer to

13   your question.

14             THE WITNESS:  Yes.  It considered both Hesson

15   and Steely.

16             MR. DOWD:  Thank you, Your Honor.

17   BY MR. DOWD:

18   Q    And was Mr. Williams' LSD predictor patent granted

19   over both of those as well?

20   A    Yes, it was.

21   Q    Let's turn back to DDX 11-11.

22             MR. DOWD:  If we could go to Slide 11, please.

23   Q    While that's coming up, is Mr. Williams' LSD

24   predictor patent the only patent that Apple has on the

25   A7 and A8 chips?
                    DAVID AUGUST - DIRECT

1   A    No, it's not.

2   Q    What are you showing here on Slide 11?

3   A    This is another patent.  Here the only inventor is

4   Gerard Williams.

5   Q    So what does this patent cover?

6   A    So this is converting memory accesses to near

7   barriers into prefetches.  So this is actually a

8   different kind of speculation.  It's not load-store

9   dependence speculation, it's a different kind of

10  speculation that's used in the processor.

11  Q    Have you analyzed whether the A7 practices

12  Mr. Williams' '447 patent?

13  A    Yes, I have.

14  Q    What have you concluded?

15  A    It does practice.

16  Q    Has any WARF expert disagreed?

17  A    No.

18  Q    Let's go to DDX 11-12.  What's shown here?

19  A    This is another Apple patent called *Inline Image*

20  *Rotation*.

21  Q    What does this patent cover?

22  A    So this is part of the multimedia subsystem that

23  will allow you to scale and rotate images efficiently.

24  Q    Have you analyzed whether the A7 practices the '359

25  patent?

                    DAVID AUGUST - DIRECT

1    A     Yes.

2    Q     What have you concluded?

3    A     It does.

4    Q     Has anyone disagreed?

5    A     No.

6    Q     Let's go to DDX 11-13.  What is shown here?

7    A     This is a patent.  You'll notice Gerard is on this

8    one as well owned by Apple called *Trust Zone Support in*

9    *system-on-a-chip having Security Enclave Processor*.

10   Q     And what does this patent of Mr. Williams', the

11   '757 patent, cover?

12   A     This covers an aspect of the secure enclave

13   processor.  We talked about that earlier about it's the

14   part of the processor that keeps your passwords secure

15   and your fingerprint secure.

16   Q     Have you analyzed whether the A7 practices

17   Mr. Williams' '757 patent?

18   A     I have.

19   Q     What have you concluded?

20   A     It does practice.

21   Q     And has any expert from WARF disagreed?

22   A     No.

23   Q     Let's go to DDX 11-14.  What's shown here?

24   A     This is another patent covering the secure enclave

25   processor.

                    DAVID AUGUST - DIRECT

1  Q    Is this the '747?

2  A    Yes.

3  Q    What does this patent cover?

4  A    This covers a different aspect of the secure

5  enclave processor.  So the secure enclave processor is

6  very complex.  So this is another patent that covers a

7  separate aspect.  The first one is more about the

8  communication.  This is more about how you manage

9  passwords and encryption.

10 Q    Have you analyzed whether the A7 practices the

11 '747?

12 A    Yes.

13 Q    What have you concluded?

14 A    It does.

15 Q    Anyone disagree?

16 A    No.

17 Q    Let's go to DDX 11-15.  Finally, I'll ask have you

18 analyzed whether the A7 covers, or sorry, whether the

19 6 -- withdrawn.

20      Have you analyzed the '465 patent?

21 A    Yes, I did.

22 Q    And is this another patent that is secure enclave

23 practices?

24 A    Yes.

25 Q    Has anyone disagreed with that?
                    DAVID AUGUST - DIRECT

1   A    No.

2   Q    So let's go to DDX 11-16.  What are you showing

3   here?

4   A    So I went through a large number of patents.  I

5   found at least 70 that cover processor technology.  Of

6   those, 40 -- at least 40 are related to instruction

7   execution within a processor.

8   Q    And these are all patents owned by who?

9   A    They're all owned by Apple.

10  Q    Let's go to Dr. Conte's Slide 12 actually.  And do

11  you recall that Dr. Conte talked about some patents from

12  the Apple v. Samsung litigation?

13  A    Yes, I remember that.

14  Q    And he suggested during his direct examination that

15  these Apple patents were comparable to the '752.  Do you

16  agree with him?

17  A    No, I don't agree.

18  Q    Let's go to DDX 11-36.  What's shown here?

19  A    These are some of those patents.

20  Q    Now, let's just talk about the patents that

21  Dr. Conte talked about.  Is the technology in Apple's

22  '381 patent, the bounce back patent comparable to the

23  '752?

24  A    No.

25  Q    Why not?
                    DAVID AUGUST - DIRECT

1  A    Well, the bounce back patent, that's when you're

2  scrolling, you get to the end, and it kind of bounces to

3  indicate that you're at the end of maybe the top of your

4  email or the bottom.  That's something that a user

5  experiences.  That's, you know, going to be -- it's

6  really like a wow factor the first time you see that.

7  That's part of the experience.  I don't think that's the

8  same as one of many patents that cover some performance

9  gain in a processor.

10 Q    Was this bounce back patent, was that in the very

11 first Apple iPhone?

12 A    Yes, it was.

13 Q    So did Apple invent this bounce back patent, before

14 the A7, before the LSD predictor, before any of the

15 things that issued in this case?

16 A    Yes.

17 Q    Let's turn to the technology in Apple's '721

18 patent, that slide-to-unlock patent.  Is that comparable

19 to the '752?

20 A    No, I don't think it is.

21 Q    Why not?

22 A    Again, it's really about the experience.  It's

23 about solving a problem.  In this case it's, you know,

24 having a phone in your pocket that's doing things that

25 you don't intend like pocket dialing.  That's going to

                    DAVID AUGUST - DIRECT

1   change the user experience.  That's something that users

2   care about.  I think it has more value than one of many

3   patents that impacts the processor performance.

4   Q    So does the slide-to-unlock patent have anything to

5   do with out-of-order processing or any of the technology

6   we've been talking about?

7   A    No.

8   Q    Was the slide-to-unlock patent, was that also

9   invented for the first iPhone before any of the LSD

10  issues that we're talking about here?

11  A    Yes.

12  Q    Is the technology in Apple's '172 patent, that was

13  the autocorrect patent, is that comparable to the '752?

14  A    No.

15  Q    Why not?

16  A    For the same reason.  It's correcting your

17  spelling.  It's helping you communicate.  That's

18  something that you feel.  Again, I don't think that's

19  comparable to one of many patents that impact

20  performance of the processor.

21  Q    And was the autocorrect patent, was that invented

22  before the LSD --

23  A    Yes.

24  Q    -- predictor?  Is the technology in any Apple

25  patent from the Samsung litigation comparable to the

                    DAVID AUGUST - DIRECT

1  '752 patent at issue here?

2  A    No.

3  Q    Was any of the patents -- were any of the patents

4  in that litigation about out-of-order processors?

5  A    No.

6  Q    Were all of those patents invented before the LSD

7  predictor of the A7?

8  A    They were.

9  Q    Let's turn to your opinion on performance testing.

10 I'd like to start with what did WARF's experts compare

11 in this case?

12 A    So they compared -- they used an actual device, an

13 engineering device, and they compared the device with

14 the LSD predictor against no predictor at all and

15 measured that performance difference.

16 Q    And do you agree that the correct comparison is the

17 LSD predictor versus no LSD predictor?

18 A    No.  I think there are better alternatives to just

19 ripping out the predictor and leaving nothing behind.

20 Q    Does comparing the LSD predictor to nothing, does

21 that overstate or understate the performance benefit and

22 value attributable to the '752 patent?

23 A    I think that's going to overstate because you would

24 put something in there in place of the predictor.  You'd

25 use a different predictor.  We've seen many different

                    DAVID AUGUST - DIRECT

1    predictors, and those predictors would naturally perform

2    better than no predictor at all.

3    Q    So what is the correct comparison that should be

4    made?

5    A    Well, I think you want to look for the current

6    predictor, the accused predictor, and the best

7    alternative I think is the right measure.

8    Q    Now, using WARF's approach, the LSD predictor to

9    nothing, what happens to the value provided by Apple's

10   patents like the '725 patent that Dr. Williams has on

11   the predictor?

12           MR. SHEASBY:  Objection.  Scope and relevance.

13           THE COURT:  I'm going to overrule it.  You can

14   answer -- you can answer that question.

15           THE WITNESS:  Yes.  So to the extent there's

16   any additional innovation in the LSD predictor, that's

17   also factored out when you remove the predictor

18   entirely.

19   BY MR. DOWD:

20   Q    And so is WARF claiming the benefit provided by

21   Apple's innovations as a part of its case?

22           THE COURT:  Is this a scope objection?

23           MR. SHEASBY:  Yes.

24           THE COURT:  Is there a specific reference you

25   can give me?
              DAVID AUGUST - DIRECT

1           MR. DOWD:  I'll rephrase, Your Honor.

2           THE COURT:  Thank you.

3    BY MR. DOWD:

4    Q    So in making the comparison, you said that the

5    correct comparison would be LSD predictor to

6    alternative.  Do you recall that?

7    A    Yes.

8    Q    Should you include in the comparison, should you

9    include in the value that you attribute to WARF, in this

10   case things like the value of what Mr. Williams invented

11   in the '725?

12          THE COURT:  I'll sustain that objection as

13   calling for a legal conclusion.  And you may ask your

14   next question, Counsel.

15          MR. DOWD:  I understand, Your Honor.  Thank

16   you.

17   BY MR. DOWD:

18   Q    Did any WARF expert in this case compare the

19   performance of the LSD predictor to a prior art

20   predictor?

21   A    No.

22   Q    Did any WARF expert in this case compare the

23   performance of the LSD predictor to a noninfringing

24   alternative predictor?

25   A    No.
                    DAVID AUGUST - DIRECT

1  Q    Did any WARF expert in this case -- withdrawn.  Did

2  any WARF expert in this case attempt to back out of the

3  valuation, the value of Apple's innovations?

4  A    No.

5  Q    Now, have you helped to prepare a demonstrative to

6  explain the various types of performance testing that

7  exist?

8  A    Yes, I have.

9  Q    Let's go to DDX 11-17.  And what are you showing

10 here?

11 A    I think it's useful to understand that there are

12 different ways of doing testing, because I think a lot

13 of that is getting confused.  And what I've shown here

14 are the three primary ways in which testing is done and

15 that we've seen -- well, some of which we've seen so

16 far.

17 Q    So let's start with the first on the left.  What

18 are server benchmarks?

19 A    So server benchmarks, these are benchmarks that

20 assume a full-duty cycle.  They're the kinds of things

21 that run on high performance machines.  They're going to

22 run in data centers, desktop machines.  They're really

23 trying to characterize what people do on their desktop

24 or in the data center.

25 Q    And is a server in a data center, is that different

                   DAVID AUGUST - DIRECT

1  from a mobile device like an iPhone?

2  A    Dramatically.  I mean the data center has an

3  enormous amount of power, electricity that they can use.

4  There's higher performance processors are in these

5  servers.  The things that they run are just very

6  different from the kinds of things that we run on our

7  phones.

8  Q    Is there a difference in terms of the amount of

9  memory?

10  A    Sure.  Each server -- so a data center will have

11  many, many servers.  Each server will have much more

12  memory than a phone, much more memory bandwidth, how

13  much data it can transfer to and from memory.

14  Q    Is there a difference in terms of the number of

15  loads and stores?

16  A    Yes.  That translates into a big difference in the

17  number of loads and stores per second.

18  Q    Can you give us some examples of server benchmarks?

19  A    Well, we've seen two so far.  There's the SPEC

20  benchmark suite and also Dhrystone.

21  Q    Now, what are user device benchmarks?

22  A    So these are -- we're now getting to benchmarks

23  which are more relevant to a mobile device.  These are

24  programs that you can download from the app store.  They

25  will run a series of tests automatically and put a
                    DAVID AUGUST - DIRECT

1  number on the screen and then you can use that number to

2  compare one device to another device.

3  Q    And why were user device benchmarks created?

4  A    Again, it's really to compare device to device.

5  Q    Can you give us some examples of user device

6  benchmarks?

7  A    Yes.  We've seen one so far which is Geekbench.

8  You've heard about that.  But there are some others:

9  Basemark X, LINPACK and 3DMark.  You can get those from

10 the app store as well.

11 Q    We'll come back to those in some more detail.  But

12 could you explain what your third category of

13 performance testing, this user experience?

14 A    Yeah.  I think this is actually a really important

15 category because what you really want to understand to

16 understand the value of a component in a phone is how

17 does it impact the user experience.  And for that, let's

18 just use real Apple locations.  Put the benchmarks

19 aside, they really aren't even benchmarks.  Benchmarks

20 are a proxy for this.  They want to give you an idea of

21 how the actual applications work.  There's no better way

22 than to use the actual applications themselves.

23 Q    So something like -- can you identify some of those

24 user experience-type applications for us?

25 A    Yes.  So these are -- I would think that we're all

                    DAVID AUGUST - DIRECT

1   more familiar with a camera application, Kindle, Book

2   Reader, Safari, the web browser, Candy Crush, the game,

3   and a music player.

4   Q    So can you actually compare the actual user

5   experience on one of these applications with the LSD

6   predictor on and off?

7   A    That's what I did.

8   Q    Let's go to Dr. Conte's Slide 11, please.  What's

9   shown here?

10  A    Dr. Conte put this slide up to indicate what kinds

11  of things are important, and I should mention this is an

12  email, an Apple email, internal email that's describing

13  that performance improvement would be desired in

14  activities like launching apps, loading attachments,

15  launching the camera, time to first camera shot, open

16  photo library, things that -- various user interface

17  navigation activities.  This is again related to what

18  the user actually experiences.

19  Q    And so this is an email you mentioned that Apple's

20  director of marketing Kaiann Drance wrote?

21  A    Yes.

22  Q    And is she focused on things like benchmarks or is

23  she focused on the actual operation of the applications?

24  A    On the actual user experience, which I think she's

25  saying that's what's going to sell the product.

                    DAVID AUGUST - DIRECT

1    Q    And so how does this relate to the performance test

2    that demonstrate the user experience?

3    A    Well, I think that the best way to understand the

4    user experience is to use actual applications and

5    measure that experience and this is -- we can do that.

6    We have the phone as it's been produced.  We don't need

7    to use simulators or anything like that.  We can

8    actually use real applications on a real device.

9    Q    So if we go back to Slide DDX 11-17, is the

10   performance testing of the user test on the right, is

11   that testing the actual experience of the user on the

12   same application, same types of applications Ms. Drance

13   identified?

14   A    I think it's much, much closer to how the user is

15   going to experience the phone than any benchmark.

16   Q    So we'll come back to that in a moment.  Let's turn

17   to the benchmark tests that Dr. Reinman ran.

18          MR. DOWD:  If we could bring up Dr. Conte's

19   Slide 40, please.

20   Q    What's shown here?

21   A    So this is a slide discussing the controversy

22   around Dhrystone.  This is Dr. Conte's slide.

23   Q    And what type of benchmark is Dhrystone?

24   A    So I've put that in the -- that's the category of a

25   server benchmark.  This was developed in the 80's when

                    DAVID AUGUST - DIRECT

1  there was no such thing as a smartphone.  It was for

2  machines that, you know, would take up rooms.

3  Q    And can you tell us whether Dhrystone has been

4  criticized in the industry?

5  A    Almost universally.

6  Q    Let's go to DX 1475.  This is that Weiss article

7  that I asked Dr. Conte about.  Are you familiar with

8  this article?

9  A    Yes.

10  Q    What is it?

11  A    This is an article about Dhrystone.  By this point,

12  Dhrystone was considered to be overused and some people

13  were concerned about that.

14  Q    And this was written in 2002.  So this concern

15  arose already more than a decade ago?

16  A    Yes.

17         MR. DOWD:  Let's turn to page three.  And if we

18  could blow up the bottom paragraph in the bullets,

19  please.

20  Q    Can you tell us whether computer architecture has

21  changed since Dhrystone was created in 1984?

22  A    Computer architecture is a fast-moving field.  It

23  has changed dramatically.  The processors we had back

24  then are nothing like what we have today.

25         MR. DOWD:  And if we could just highlight the
                    DAVID AUGUST - DIRECT

1  last sentence before the bullets.

2  Q    It says "Dhrystone doesn't take into account any of

3  the following:"  I'd like to identify some of the things

4  that it doesn't take into account.  Does Dhrystone take

5  into account the RISC, R-I-S-C, architecture?

6  A    No, it does not.

7  Q    That's the first on the list.  Is A7 a RISC

8  architecture?

9  A    It is.

10  Q    Does Dhrystone take into account superscalar

11  designs?

12  A    No, it does not.

13  Q    Is A7 a superscalar design?

14  A    It is.

15  Q    Can you tell us whether Dhrystone takes into

16  account large memory subsystems?

17  A    It does not.

18  Q    Is A7 -- does it have a large memory subsystem?

19  A    Yes.

20         MR. DOWD:  I'd like to really focus on the last

21  bullet, if we could highlight that.

22  Q    Does Dhrystone take into account graphics,

23  multimedia, and communication-intensive applications?

24  A    Not at all.  Doesn't do any of those things.

25  Q    What are the major purposes of a smartphone like an
              DAVID AUGUST - DIRECT

1    iPhone?

2    A    Well, many people use them for graphics, games,

3    multimedia, watching movies, things like this.

4    Q    Things like making a phone call, like a

5    communication?

6    A    That would be communication, yes.

7    Q    And so does Dhrystone -- is it appropriate for

8    testing a chip that's being used in a smartphone?

9    A    No, not at all.

10            MR. DOWD:  Let's turn to page four.  And if we

11    could blow up the portion at the top, please.

12    Q    Now, what does the creator of Dhrystone,

13    Dr. Weicker, say about its usefulness for modern CPUs

14    and workloads?

15    A    So this is the creator of this benchmark.  He says

16    it -- it's not useful for modern workloads and CPUs.

17    It's just not --

18            MR. DOWD:  Highlight that, please.

19    Q    And what are the reasons?

20    A    For many of the reasons we already talked about.

21    It just doesn't take into account a lot of the features

22    of modern processors.

23    Q    Okay.  So is Dhrystone appropriate for evaluating

24    the A7?

25    A    I don't think so.
                    DAVID AUGUST - DIRECT

1   Q    Let's go to Dr. Conte's Slide No. 38.  What's shown
2   here?
3   A    So this is the second server benchmark that we
4   talked about.  This is called SPEC, and SPEC is a
5   collection of several dozen smaller programs that are
6   intended to be run together.
7   Q    When was SPEC developed?
8   A    In the 80's.
9   Q    Is that before the smartphone and tablet era?
10  A    Yes.
11  Q    What type of benchmark -- I believe you told us
12  already that this is a server benchmark?
13  A    That's correct.
14  Q    Approximately how many benchmark tests are there in
15  the SPEC suite?
16  A    Well, in the SPEC suites that we've talked about so
17  far in this case there are several dozen.
18  Q    Did Dr. Reinman test all of the SPEC benchmarks?
19  A    No.  He selected -- actually he was given direction
20  to only look at seven of these.
21  Q    Let's go to your Slide DDX 11-19.  What's shown
22  here?
23  A    So these are the tests performed by Dr. Reinman,
24  and you're seeing here the seven that he tested and the
25  results that he obtained.
                    DAVID AUGUST - DIRECT

1    Q    Now, did you perform any SPEC benchmark testing to

2    check Dr. Reinman's work?

3    A    Yeah.   To check his work I reran the same seven,

4    but I also ran as many as I could.   Something to keep in

5    mind here is that this benchmark wasn't intended to be

6    run on something like an iPhone, so many of the programs

7    would simply not run on the iPhone.   And so I just ran

8    as many as I could run to get a better picture than we

9    had with seven.

10   Q    And can you tell us how many you ran in total?

11   A    27.

12   Q    And for the extra benchmarks that you weren't able

13   to run, can you tell us exactly why you can't run them

14   on a processor like the A7?

15   A    There were two main reasons.   The first reason is

16   that the iPhone doesn't have the same kind of memory

17   that a server does in terms of quantity.   So some of

18   these programs needed more memory than was available in

19   an iPhone.

20        The second reason is that many of these programs

21   were written in a language that was made for scientific

22   computing and is not supported on an iPhone.   So the

23   programs are just in a language that just won't

24   translate or compile down to an iPhone.

25   Q    Now, let's pause on that for a second.   What does
                  DAVID AUGUST - DIRECT

1   the fact that SPEC is written in a language that's not

2   useful for the iPhone and has these other problems, what

3   does that tell us about whether SPEC is appropriate as a

4   benchmark for use in this case?

5   A    Yes.  So to be clear, it's the programs that I

6   couldn't run that were written in a language called

7   FORTRAN.  The fact that we weren't -- it's not possible

8   to get them to run I think strongly suggests, if not

9   proves, that this is not appropriate for iPhone testing.

10  Q    Okay.  Let's focus for a moment on what we are able

11  to do with SPEC.  If we go to DX 1608, please.  That

12  should be at tab 5 in your binder, Doctor.  Do you have

13  that?

14  A    Yes.

15  Q    Do you recognize DX 1608?

16  A    Yeah.  This is my spreadsheet where I tabulated the

17  results.

18  Q    And how did you record the results that you got

19  when you ran your tests?

20  A    So the first thing I did -- any time I ran a test,

21  I either recorded a video or took a screen shot so that

22  everything was recorded initially.  Then I would use

23  those screen shots and videos to get the numbers out and

24  put them into the spreadsheet so that I could then do

25  additional calculations on the numbers.

                   DAVID AUGUST - DIRECT

1  Q    And if someone wanted to verify your results, how

2  would they use DX 1608 to do so?

3  A    Well, there's two things.  One is they could look

4  at my videos and screen shots and compare the numbers

5  that were in those pictures or videos to see if they

6  were correctly typed into the spreadsheet.  The other

7  thing they could do is for any of these tests, they

8  could rerun that test, and rerunning that test, they

9  could come up with their own result and they could see

10 if their result was the same as my result.

11         MR. DOWD:  And Your Honor, we offer DX 1608.

12         THE COURT:  It is admitted.

13 BY MR. DOWD:

14 Q    Now, Dr. August, have you prepared a demonstrative

15 that plots your SPEC results against Dr. Reinman's?

16 A    I have.

17 Q    Let's go to DDX 11-20.  What's shown here?

18 A    So I've added -- so this is similar to what we saw

19 before.  The *tested by* Dr. Reinman is in red.  The --

20 which I also reproduced.  And then I also did the

21 additional ones in blue and added them to the same

22 chart.

23 Q    Now, how do your SPEC results compare to

24 Dr. Reinman's?

25 A    So I was surprised to learn that the seven that

                    DAVID AUGUST - DIRECT

1  were selected by Dr. Conte were all -- showed a larger

2  difference between predictor and no predictor.  They

3  were all toward the left side here, and that most of my

4  additional testing of the additional parts of SPEC came

5  in much lower.

6  Q    Did you ever learn why Dr. Conte and Dr. Johnson

7  chose the seven benchmarks that showed the highest

8  difference?

9  A    I didn't know when I did this why.  But when I

10 shared these results with their experts, they then said

11 that it was because they were doing divot testing.  They

12 were saying they were intentionally going for the worst

13 case.

14 Q    And so does that -- what does that mean with

15 respect to overstating the actual performance

16 difference?

17 A    I believe that overstates the results and is not a

18 fair representation of what's happening.

19 Q    And why is it that Dr. Reinman's selection of seven

20 benchmarks to test is not a fair presentation of the

21 performance difference attributable to the LSD?

22 A    Well, SPEC was in -- several reasons, one of which

23 the SPEC was intended to be run in its totality.  We

24 can't do that because we can't get all the programs to

25 run.  But we want to get close to that.  We want to be

                    DAVID AUGUST - DIRECT

1    true to the benchmark and run as much as we can.  When

2    you do that, you get closer to what -- at least what

3    SPEC is measuring.  But for other reasons I don't think

4    SPEC is the appropriate measure.

5    Q    And let's say we were to apply the same approach.

6    If we just took the bottom seven of yours, what sort of

7    performance difference would you have?

8    A    Yeah.  So if I just picked the bottom seven, I mean

9    the results would be close to 0.  So, you know, I didn't

10   do that.  I don't think that's fair.

11   Q    Okay.  Let's turn to Dr. Conte's Slide 52.  Were

12   you here when Dr. Conte presented this slide?

13   A    Yes.

14   Q    And what did Dr. Conte conclude about whether

15   Dhrystone and SPEC should be used in this case?

16   A    So he said that they should be -- they shouldn't be

17   used.  He says do not use the higher SPEC and Dhrystone

18   numbers.

19   Q    Let's go to your slide DDX 11-32.  What are you

20   showing here?

21   A    So this is showing a number of things here.  So the

22   first thing is the three different categories of tests.

23   We have at the top the server benchmarks, the user

24   application benchmarks, and finally the app testing in

25   different rows.  And the big -- it's really a Venn

                    DAVID AUGUST - DIRECT

1  diagram.  This is what I tested, all of these, and this

2  subset here labeled WARF is what WARF's experts tested.

3  Q     So just to make sure we've got it right, everything

4  in the larger blue circle you tested?

5  A     That's correct.

6  Q     And just the portion in the smaller red circle is

7  what Dr. Reinman tested?

8  A     Yeah, just those three.

9  Q     And what does Dr. Conte say about the server

10  benchmarks at the top?

11  A     He says don't use these.

12  Q     Okay.  So what is the only benchmark suite that

13  Dr. Conte actually uses?

14  A     So then they're just left with Geekbench.

15  Q     And is it appropriate to rely on a single set of

16  benchmarks to demonstrate performance differences?

17  A     No.  I think you want to take as many -- you want

18  to do as many tests as possible.  One test may not,

19  especially a benchmark, may not be representative of

20  what's going to be ultimately the user experience.

21  Q     Why is that especially true of benchmark?

22  A     Well, because a benchmark is really a proxy for

23  something else and it's -- for those reasons, it's not

24  going to be by itself.  It's not going to cover all

25  different kinds of behavior you'll see on the phone.
                    DAVID AUGUST - DIRECT

1   It's not going to be as true to the user experience.

2   Q    So let's turn to the testing that you performed.

3   What types of tests did you perform?

4   A    So in addition to rerunning the results, the

5   experiments that Dr. Reinman performed, I also ran some

6   additional user application benchmarks and I also did

7   some application testing.

8   Q    So let's start with the user device benchmarks.  If

9   we go to DDX 11-21, please.  What's shown here?

10  A    So these are the additional user application

11  benchmarks that I ran.  They include Basemark X,

12  LINPACK, and 3DMark.

13  Q    What is the Basemark X benchmark suite?

14  A    This actually -- so video games have what's called

15  a video game engine embedded inside them.  This Basemark

16  X includes what's called the Unity engine, which is the

17  most popular video game engine used in games on the

18  iPhone.  And so this will give you an idea of how the

19  iPhone performs for games.  This is also the most

20  popular user benchmark in the world.

21  Q    So why did you choose to test the Basemark X

22  benchmark suite?

23  A    I wanted to see -- I wanted to increase

24  understanding of how applications perform through the

25  use of these benchmarks, but this will cover things like

                    DAVID AUGUST - DIRECT

1   video games which are very important to many people.

2   Q    And what did your testing, using the Basemark X

3   benchmark suite, show to be the performance difference

4   between having the LSD predictor and not having the LSD

5   predictor?

6   A    So taking out the LSD predictor and not replacing

7   it with anything else, you get a .12 percent performance

8   loss.

9   Q    And has anyone disputed that Basemark shows a 0.12

10  percent performance difference between these two?

11  A    No.

12  Q    Let's go to the next benchmark, LINPACK.  What is

13  that?

14  A    So LINPACK does some what's called *floatingpoint*

15  *computations*.  The floatingpoint is anything that's

16  going to involve fractions of numbers.  It's going to do

17  a lot of floatingpoint arithmetic meaning

18  multiplication, division, that kind of thing.

19  Q    Why did you choose to test the LINPACK benchmark

20  suite?

21  A    A lot of those computations are used in optimizers

22  and other things that are part of other applications,

23  real applications.

24  Q    And does the A7 perform floatingpoint operations?

25  A    Yes, it does.
                    DAVID AUGUST - DIRECT

1   Q    Now, what was the performance difference that you

2   measured using the LINPACK benchmark suite between use

3   of the LSD predictor and no LSD predictor?

4   A    Yes, so this was interesting.  When you remove the

5   LSD predictor, the processor goes faster.  So the way

6   that's shown here is as a negative .51 percent.

7   Q    So the result of removing the LSD predictor for

8   floatingpoint operations is actually it improves them?

9   A    Yeah.  So actually predictors can be wrong and when

10  predictors are wrong and when they're wrong a lot, they

11  can create a different kind of performance divot in the

12  other direction.

13  Q    Now, the third benchmark that you ran is called

14  *3DMark*.  What is that?

15  A    This is a graphics benchmark.  This is going to

16  stress the multimedia system.

17  Q    And why did you choose to test the 3DMark suite?

18  A    So again, graphics are important.  I should say

19  this also stresses the GPU, so a lot of graphics

20  processing.  You might see any time you're manipulating

21  a 3D image or something like that, you're doing a lot of

22  graphics processing or rendering in a video game.  So

23  that's why I added that to the list.

24  Q    And what was the performance difference with

25  3DMark?

                    DAVID AUGUST - DIRECT

1   A    4.41 percent.

2   Q    Now, did WARF's experts run any of these tests?

3   A    No.

4   Q    And are all of the tests lower than the results

5   from Geekbench?

6   A    Yeah.  Just among the user application benchmarks,

7   every single one I tested was lower than Geekbench.

8   Q    Let's turn to the user experience and go back to

9   Dr. Conte's Slide 11.  This was Ms. Drance's email and

10  you said that you performed tests to measure the

11  performance difference experienced by users.  I'd like

12  to turn to those specific tests now.

13          MR. DOWD:  Could we bring up DDX 11-22.

14  Q    What's shown here?

15  A    So these are the five actual applications that I

16  measured.  This is, I believe, the most representative

17  of what the user is going to experience.

18  Q    And can you just identify for us for the record

19  what those specific applications were?

20  A    Sure.  The camera application; Kindle, which is an

21  e-book reader; the music application, which is going to

22  play music; Candy Crush, a video game, very popular; and

23  Safari, the web browser.

24  Q    How did you select these applications to test?

25  A    Well, Candy Crush was easy.  Dr. Reinman had

                  DAVID AUGUST - DIRECT

1   actually downloaded it, described that he had downloaded

2   it and tested it.  But he didn't take any measurements.

3   I wanted to actually take a measurement.  But then I

4   started with a larger set and what I had to do was

5   filter some out because a lot of them had -- would work

6   -- really their performance was related to what kind of

7   network you were on.  Were you on wi-fi?  Were you on

8   the radio?  How fast, you know, for example --

9           MR. SHEASBY:  Objection.  Scope.

10          THE COURT:  I'll sustain that objection unless

11   you -- there's some specific reference to this example.

12          MR. DOWD:  Your Honor, I can rephrase.

13          THE COURT:  Thank you.

14   BY MR. DOWD:

15   Q    So just focusing on these five, was there something

16   about these five that you thought would be particularly

17   useful to test?

18   A    Yes.  So these were outside of other factors like

19   communication.  These would be repeatable.  You'll get

20   the same result.  Because it was important to run each

21   of these ten times, each experiment ten times to make

22   sure that there weren't any transients.  It was just

23   very consistently the same.

24   Q    Okay.  Let's go to DDX 11-42.  What are you showing

25   here?
                    DAVID AUGUST - DIRECT

1  A    So this is what's called a *Tapster robot*.  So when

2  you have a benchmark, you don't need a robot because the

3  benchmark is going to run a synthetic test or a program

4  automatically and it's going to internally measure --

5  it's internally running.  It's internally measuring how

6  long it takes, and then it just gives you a number.

7  It's really easy and that's why we use benchmarks.

8      To actually use real applications, I have to

9  account for the user.  The user is going to be

10 interacting with the touch screen.  And the way to do

11 that in a fair way, in a repeatable way, I used a robot.

12 I could program the robot to take -- to perform the same

13 actions every time and that way I'm doing a fair test

14 run after run.

15 Q    So with the robot, can you control exactly when the

16 program is going to be touched?  When it's going to

17 start?

18 A    Yes.  So I program the robot to, let's say, move --

19 there's like a mechanical finger here.  You can move the

20 finger to a particular point.  Here it's Candy Crush.

21 So I tell it to move to a specific location and push the

22 play button.  The play will start.  Then I have the

23 robot actually go through, in this case, the tutorial

24 and it can move candy pieces around to actually

25 experience the tutorial, for example.

                    DAVID AUGUST - DIRECT

1   Q    Using the robot, can you do it exactly the same way

2   with the LSD and without the LSD?

3   A    The robot is computer controlled, so within

4   milliseconds it's doing the same thing every time.

5   Q    And how did you capture the data that you generated

6   using this testing?

7   A    So because I don't have the -- here these aren't

8   benchmarks, it's not going to tell me how long it took.

9   I used a high-speed camera and the high-speed camera was

10  100 frames per second.  So I could review the video

11  after the fact and see which frame a particular event

12  occurred.  So what frame in the video did the robot

13  touch the button; what frame did, you know, the

14  application load.  And from that I can compare frame to

15  frame and figure out exactly to hundredths of a second

16  how much time each event took.

17  Q    And so did that allow you to actually compare the

18  performance time with the LSD to the performance time

19  without?

20  A    Yes.  So I would do that once with Mode 0 with a

21  predictor and once in Mode 3 without the predictor and I

22  could do a comparison.

23  Q    Did you capture all this data, these videos, did

24  you preserve all that?

25  A    Yeah.  I saved all the videos and I provided those

                    DAVID AUGUST - DIRECT

1  to WARF experts.

2  Q    And if you could turn in tab 12 to DX 1582.  It's

3  in your binder -- I'm sorry.  If you could turn in your

4  binder to tab 12.  You should have the DX 1582 sheet.

5  A    Well, it's just a cover sheet.

6  Q    Yes.  But can you tell us whether DX 1582 is

7  actually the videos that you captured.

8         THE COURT:  It's intended to represent the

9  videos.

10         THE WITNESS:  Oh, I see.

11         THE COURT:  And the Court will just take

12  judicial notice that those videos are part of the record

13  here.

14         MR. DOWD:  Thank you, Your Honor.

15         THE COURT:  And you wish to move their

16  admission.

17         MR. DOWD:  We offer them, Your Honor.

18         THE COURT:  I will allow it.  It is admitted.

19  BY MR. DOWD:

20  Q    So I don't want to go through all the videos, but

21  if we could just do one.  If we could pull up DDX 12-2.

22  Before we begin, what are you showing here, Doctor?

23  A    So this -- so this is actually two videos that were

24  then made into one video for the purpose of

25  illustration.  So on the left, I have the device, the 6

                DAVID AUGUST - DIRECT

1  plus in Mode 0.  That's with the predictor.  That's just

2  one video.  The Tapster robot is going to interact with

3  the Kindle application after it loads it.

4       The other video is without the predictor performing

5  the same task.  Now, we've taken both of those videos

6  and we've put them side by side so you can have the

7  benefit of seeing how they perform together

8  simultaneously.  So this helps exaggerate or make more

9  noticeable any difference in the timing.

10 Q    And if we could run the video, and Doctor, if you

11 could explain to us what happens along the way.

12 A    Yes.  So at the start, the robot is going to

13 activate or load the Kindle app.  There it did it.  It's

14 going to go through the program -- I'm sorry, the

15 document that's included with the Kindle app, it's going

16 forward through the pages.  Now it's going back through

17 the pages.  And in this case, you can see that the

18 timing is very similar.  The videos are very similar

19 because the timing is the same and pretty much

20 everything is happening in the same way except one, the

21 predictor is on and the other predictor is off.

22 Q    So based on this, what were you able to conclude

23 about whether the presence or absence of the predictor

24 had any actual impact on the user experience?

25 A    Well, here the impact was minimal.

                    DAVID AUGUST - DIRECT

1            MR. SHEASBY:  Objection.  Scope.

2            THE COURT:  I'll allow it briefly.  You can

3    describe what the video shows.

4            THE WITNESS:  Yes.  So when you go down to

5    the -- and this is in the recorded numbers.  When you go

6    down to which frame each event occurred, there was

7    little difference between, if any, between the number of

8    frames that elapsed between each event.

9    BY MR. DOWD:

10   Q    I'm just looking at your report, Doctor, at

11   paragraph 218.  Was the performance delta approximately

12   minus .12 percent?

13   A    Yes.  So specifically that's for average load time.

14   So, in fact, it was faster to load the program without

15   the predictor than it was to load the program with the

16   predictor.

17   Q    If we go back to DX 1608, the summary table of your

18   test results -- sorry, that was DX 1608.  That should be

19   at tab 5, Doctor, in your witness binder.

20        Taken together, what was the performance difference

21   attributable to the LSD predictor in your user

22   applications tests?

23   A    It was less than 1 percent.

24   Q    So let's compare the results of the tests that

25   WARF's experts performed to the tests that you
                    DAVID AUGUST - DIRECT

1   performed.  If we go to DDX 11-25.  What's shown here?

2   A    So I've expanded -- so this is the -- this chart is

3   showing the test run by Dr. Reinman.

4   Q    It's adding the additional SPEC test of Slide 26?

5   A    These are the additional SPEC tests with room for

6   some more tests that we're going to show in the next

7   slide.

8   Q    And just based on the adding of the SPEC alone, can

9   you tell us whether the numbers that WARF is relying on

10  are a fair presentation of the performance difference?

11  A    Certainly for the server benchmarks, the results

12  provided by WARF's experts overstate the average.

13  Q    If we go to Slide 27, what's added now?

14  A    So now we're adding the additional user benchmarks,

15  user device benchmarks, and you'll see that they all

16  fall to the right of Geekbench.

17  Q    What is this trend line showing?

18  A    So it's showing now that Geekbench was the most

19  favorable measurement among the user device benchmarks.

20  Q    And the ones that you ran are greater or lesser

21  than that?

22  A    The ones that I ran show a lesser difference

23  between having the predictor on and having the predictor

24  off.

25  Q    If we go to DDX 28, 11-28, what are you showing
                    DAVID AUGUST - DIRECT

1  here?

2  A     So here these are the results of using actual

3  applications with the robot with the high-speed camera,

4  and most of those, if not all of them, fall to the

5  right, very right of this chart.  So they're all lower

6  than Geekbench.

7  Q     What does your application testing say about the

8  performance difference between the LSD being on and off?

9  A     For real applications, it's less than 1 percent.

10 Q     Let's go to DDX 11-30.  What are you showing here?

11 A     So this is highlighting the set of test results

12 that Dr. Conte says do not use.

13 Q     Now, did Dr. Reinman report any performance test

14 results lower than Geekbench?

15 A     No, he didn't.

16 Q     And is it appropriate to ignore those test results?

17 A     Well, yeah, if you had those results, you should

18 not ignore them.

19 Q     Can you tell us whether reliance on a single set of

20 benchmarks to the exclusion of all of these others, all

21 these others over here is reliable?

22 A     Well, I think if you're going to use -- it seems

23 nonscientific to just take one measurement and consider

24 that done, which is really what we have with Geekbench

25 after SPEC and Dhrystone have been thrown away.  You
                    DAVID AUGUST - DIRECT

1  want to test more and more to get a better picture of

2  what's really happening.

3  Q    And as you test more and more to get a better

4  picture of what's really happening, what does that show

5  you about the actual performance difference?

6  A    So as I -- and I did that.  As I tested more and

7  more, it seemed like there was a trend in the

8  performance down to the 1 to 3 percent range.

9  Q    Now, were you here when Mr. Williams testified that

10 based on his internal experience with the design team,

11 the LSD predictor contributes somewhere in the order of

12 1 to 3 percent performance?

13 A    I thought he said 2 to 3 percent.

14 Q    Sorry.  2 to 3 percent.  Is that consistent with

15 the testing that you performed?

16 A    Yes.  So as we test more and more programs, user

17 device benchmarks and applications, we're getting in

18 that range.  I find that range to be credible.

19 Q    Let's turn to the Intel products.  There's been a

20 lot of discussion about Intel and we just heard from

21 Mr. Papworth about memory disambiguation.  You were

22 Intel's expert in the prior case against WARF; is that

23 right?

24 A    I wouldn't --

25 Q    In WARF's prior case against Intel I should say.
              DAVID AUGUST - DIRECT

1  A    Yes.

2  Q    What was accused of infringing?  What was the name

3  of the feature that was accused of infringing in that

4  case?

5  A    It was called the memory disambiguation feature.

6  Q    And could you just briefly explain what the memory

7  disambiguation feature is?

8  A    The memory disambiguation --

9          MR. SHEASBY:  Objection.  Scope.

10         THE COURT:  Is this a reference to a specific

11  paragraph?

12         MR. DOWD:  It's in 361, Your Honor.

13         THE COURT:  Why don't we have a sidebar.  I

14  apologize.  Actually this is probably a reasonable place

15  to take our morning break, so we will do that and at

16  quarter to 11 we will reconvene at that time for more

17  testimony.

18      All rise, please.  You probably didn't hear any of

19  that.  I will see you at ten to 11.

20      (Jury excused from courtroom at 10:30 a.m.)

21         THE COURT:  Let me hear your objection,

22  Mr. Sheasby.

23         MR. SHEASBY:  So all he speaks about is that

24  there's something called memory disambiguation in that

25  section of the report.  There's no description of memory
                    DAVID AUGUST - DIRECT

1    disambiguation or what it does or what it is in his

2    report.

3           THE COURT:  All right.  And I'll hear -- the

4    jury has already heard about memory disambiguation, so I

5    don't know that it's really necessary for you to go into

6    it.  But is there some description as to what he

7    understood it to be?

8           MR. DOWD:  Yes.  Two things, Your Honor.  First

9    is I think Your Honor is right and all I'm asking him to

10   do is identify it so that we can talk about it.  I'm not

11   asking to give a detailed technical explanation.

12          THE COURT:  The jury has heard about it and

13   they have a general understanding of what memory

14   disambiguation in the Intel product is.  So --

15          MR. DOWD:  He does, and --

16          THE COURT:  I'm not going to have him do it for

17   that purpose.

18          MR. DOWD:  Dr. Conte -- I'm sorry --

19   Dr. August.  I've done it again.  Dr. August at

20   paragraph 362 does specifically say I'm familiar with

21   Intel's accused memory disambiguation feature.  I've

22   reviewed the Intel description of that feature in its

23   technical documents.  I've reviewed -- and he lists the

24   documents and he provides a brief explanation of what it

25   is.  In Intel's technical documentation, he describes

                     DAVID AUGUST - DIRECT

1    the Sandy Bridge and Haswell processors as using memory

2    disambiguation involving a predictor to allow load

3    and -- to allow load to pass unknown stores --

4            THE COURT:  Well, let's cut it short.  He can

5    describe his understanding based on that portion of his

6    report.

7            MR. DOWD:  That's all he's doing.

8            THE COURT:  It needs to be consistent with it,

9    just for framing.

10            MR. DOWD:  And that's all it will be.

11            THE COURT:  Anything else, Mr. Sheasby?

12            MR. SHEASBY:  No, that's it as long as

13    that's --

14            THE COURT:  All right.  Thank you.  We will

15    then hear I guess from -- well, I should start with

16    plaintiff WARF.  Is there anything more you wish to

17    raise?

18            MR. CHU:  No.

19            THE COURT:  All right.  I do have a number of

20    exhibits to address.  Was it 1656 or a different

21    exhibit?  You can advise me of that after the break.  I

22    believe you intended to move admission of 1656, which

23    had been admitted last night.  That's fine.  I just need

24    to know.

25            MR. LEE:  I'll check.
                   DAVID AUGUST - DIRECT

1          THE COURT:  In fact, let's leave it at this:

2     It's admitted.  If you intended to move a different

3     exhibit, you can advise me after the break.

4          As to 1630, 1631, Mr. Sheasby, I assume there is no

5     further issue, but I wanted to at least give you an

6     opportunity, since I wasn't sure if they were part of

7     this Papworth declaration.

8          MR. SHEASBY:  So I believe that we still did

9     maintain our --

10          THE COURT:  You had no objections to 1630 or

11     1631?

12          MR. SHEASBY:  That's right.  It was the last

13     one.

14          THE COURT:  So let's admit those.  They are

15     admitted.  And the other exhibits were 721 through 77 --

16     I think you were saying 721 through 775; is that

17     correct?

18          MR. DOWD:  It's a more limited set.  It's

19     actually 721 through 725.

20          THE COURT:  725, all right.

21          MR. DOWD:  And those are the documents that are

22     attached to --

23          THE COURT:  Yes, I understand.  They're the

24     Papworth materials.  And your objection, Mr. Sheasby, if

25     any, is what?

                    DAVID AUGUST - DIRECT

1           MR. SHEASBY:  So Alan, I think you were going

2    to address this.

3           THE COURT:  It's this packet you were

4    providing.  Let's do this:  We'll reconvene at quarter

5    to and I'll hear from the parties on those exhibits

6    then.  Was there something more you wanted to raise?

7           MR. LEE:  Nothing, Your Honor.

8           THE COURT:  Okay.  Very good.  I would

9    encourage counsel to coordinate to see if you can reach

10   an understanding as to what's being proposed, and if

11   there is any objection, that you narrow the scope to

12   what the objection really is between you.  Thank you.

13   We are off the record.

14       (Recess      10:34-10:51 a.m.)

15          THE COURT:  Is there still an issue with

16   respect to the exhibits?

17          MR. DOWD:  Your Honor, I believe there is.

18          THE COURT:  Can you describe it for me?

19          MR. DOWD:  Yes.  Yes, Your Honor.

20          THE COURT:  Actually why don't I hear the

21   objection from WARF.

22          MR. HEINRICH:  Sure.  So this concerns several

23   Intel documents that were never authenticated that are

24   in some cases drafts.  Apple deposed Mr. Papworth --

25          THE COURT:  Is this for all of them, 721
                    DAVID AUGUST - DIRECT

1   through 725?

2          MR. HEINRICH:  Correct.  If I can bring up 723

3   as an example.  So again, Mr. Papworth was deposed.

4   Apple didn't ask him about these documents.  This is an

5   example of one.  It's a Revision 1.0 of Sandy Bridge.

6   If we can go to page four.

7          THE COURT:  I'm on page four.

8          MR. HEINRICH:  Okay.  So it's clearly a draft

9   where it says crude road map.  Not a real road map.

10  I've taken many liberties.  And --

11         THE COURT:  Let me ask a question of Apple's

12  counsel.  Mr. Dowd, was there something that you -- was

13  he asked about this document during his deposition?

14         MR. DOWD:  He could not have been, Your Honor,

15  because it was produced after his deposition.

16         THE COURT:  All right.  So the objection is

17  foundation?

18         MR. HEINRICH:  Right.  And hearsay.

19         THE COURT:  And I don't know how to rule on

20  that.  Why don't you think about your argument in terms

21  of how I determine its admissibility without testimony

22  as to the source.  I understand it was produced by

23  Intel.  I'm just not sure about what it is I would be

24  admitting into evidence.

25         Do you intend to argue with respect to these or as
                    DAVID AUGUST - DIRECT

1  to these in closing?

2         MR. DOWD:  I believe so, Your Honor.  If I

3  could --

4         THE COURT:  Let me --

5         MR. DOWD:  If I could address Your Honor's

6  point.

7         THE COURT:  Very briefly.

8         MR. DOWD:  Your Honor, under Rule of Evidence

9  902.11, if we go to the first page of this document that

10  we have up, 723, the document is self-authenticating if

11  it is accompanied by a certification of a qualified

12  person that identifies it as a --

13         THE COURT:  I see you have a declaration here.

14  I'm not going to hold the jury up on this.  We are going

15  to continue with the trial.  I'll take this under

16  advisement.  I understand the citation to the rule of

17  evidence and you'll get one more chance to talk about

18  this over the lunch hour.

19         MR. DOWD:  May I ask one final question, Your

20  Honor?

21         THE COURT:  Yes.

22         MR. DOWD:  And that is I do plan to ask

23  Dr. August about these documents.  May I do so under

24  Rule 703?

25         THE COURT:  You may do so, period.
                     DAVID AUGUST - DIRECT

```
 1              MR. DOWD:  Thank you.
 2              THE COURT:  They are legitimate use for cross.
 3   I'm just not going to admit them into evidence at this
 4   point.
 5              MR. DOWD:  Thank you, Your Honor.
 6              THE COURT:  Was there something more for Apple?
 7              MR. LEE:  Yes, Your Honor.  I had neglected to
 8   give you the right exhibit number.
 9              THE COURT:  That's fine.
10              MR. LEE:  So it's DX 1226.
11              THE COURT:  All right.  Without objection, DX
12   1226 will be admitted.  All should rise for the jury.
13         (Jury enter courtroom at 10:55 a.m.)
14              THE CLERK:  Please be seated and come to order.
15              THE COURT:  My apologies for that delay.  As
16   you have seen throughout the trial despite the best
17   efforts of the parties and the Court, there continues to
18   be some disputes as to certain evidence and discovery
19   and exhibits and that was the reason for the delay.  But
20   we're back on the record.
21         And you may proceed, Counsel.
22              MR. DOWD:  Thank you, Your Honor.
23   BY MR. DOWD:
24   Q    Now, Dr. August, before the break we were talking
25   about the performance testing.  Do you recall that?
                     DAVID AUGUST - DIRECT
```

1    A    I do.

2    Q    I want to touch on that briefly.

3              MR. DOWD:  If we could bring up Dr. Conte's

4    damages Slide 34, please.

5    Q    Now, we've seen over the course of the case email

6    from Apple engineers where the Apple engineers look at

7    things like Dhrystone and SPEC.  We had this example?

8    A    Yes, we do.

9    Q    Is that surprising?

10   A    Not at all.

11   Q    Why not?

12   A    Well, there's a big difference between designing a

13   processor for a product that you don't yet have and

14   measuring the product after you have it.  When you don't

15   even have the product, you're going to use certain

16   benchmarks out of convenience and necessity that you're

17   not going to -- that you wouldn't -- I don't think are

18   appropriate after you have the device.  They're not able

19   to run real applications with users or a robot

20   interacting with the simulator.  That's just not

21   possible.  So they're going to use these kinds of

22   programs.

23        In addition, they're particularly interested in the

24   worst case scenario, so they're going to use things like

25   SPECint and you'll see Dhrystone because they want to
                    DAVID AUGUST - DIRECT

1    make sure that the worst case scenario is not

2    unacceptable.  But worst case scenario predesign, that's

3    very different from how does the device feel to the

4    user.

5    Q    And so is there a difference between looking for

6    the worst case scenario before you know what the design

7    is going to be in trying to understand what a fair

8    impact is in terms of the final design?

9    A    Yeah, I hope I made that point.

10   Q    I just note on this slide we have (d) as LINPACK.

11   With respect to the types of benchmarks that you

12   performed, LINPACK and Benchmark X and the other ones,

13   in the thousands of tests that Dr. Williams described

14   did they use these other tests?

15   A    No.  And you'll see in these tests there's some of

16   the server benchmarks, the SPECint, and you'll also see

17   some of the user app benchmarks, the Geekbench and the

18   LINPACK.

19   Q    Okay.  So let's turn to -- we can take that down

20   and let's turn to the Intel memory disambiguation point.

21   What -- just briefly, what is the memory disambiguation

22   component?

23   A    This is in the Intel processor.  It's a component

24   that controls the ordering of loads and stores.

25   Q    And that was the component that was accused in the

                    DAVID AUGUST - DIRECT

1    *WARF v. Intel* case?

2    A    That's correct.

3    Q    Do the Intel products today continue to use memory

4    disambiguation?

5    A    They do.

6    Q    And have you examined that feature of -- that

7    feature as a part of the Intel case to begin?

8    A    Yes.

9    Q    So that was a poorly worded question.  Is that

10   something you examined during the Intel case?

11   A    Yeah.  I did -- also looked at the RTL for the

12   Intel products to look for that case.

13   Q    And have you examined Intel's documentation since

14   2009 in this case?

15   A    Yeah.  In connection with this case I have.

16   Q    And have you considered the testimony of Intel's

17   engineer, David Papworth, who we saw in the video just a

18   moment ago?

19   A    Yes.

20   Q    And what did Mr. Papworth testify about whether

21   Intel continues to use memory disambiguation?

22   A    He says they continue to use it.

23   Q    If you could turn in your binder to tab 7.  You

24   should have DX 723 there.  Do you have that?

25   A    Yes.

                    DAVID AUGUST - DIRECT

1  Q    Do you recognize it?

2  A    This is the Sandy Bridge microarchitectural

3  overview.

4  Q    What is Sandy Bridge?

5  A    This is an Intel processor, a product that they

6  make.

7  Q    What's the date on this microarchitectural --

8  microarchitecture document?

9  A    July 2009.

10  Q    Did you consider DX 723 in forming your opinions in

11  the case?

12  A    Yes, I did.

13  Q    Could you turn to page 88.

14  A    Okay.

15  Q    What appears on page 88?

16  A    So this is a slide describing memory disambiguation

17  in this processor.

18  Q    And what does this say about whether the Intel

19  Sandy Bridge processor uses memory disambiguation?

20  A    It says that it uses it and it gives some detail

21  about how it uses it.

22  Q    Let's go to another Intel internal document, DX --

23  actually before we do, can you tell us whether each page

24  of DX 723 is stamped as Intel highly confidential

25  material?

                    DAVID AUGUST - DIRECT

1    A    Every page I've seen so far says highly

2    confidential.

3    Q    So this is --

4    A    It also says *Intel top secret*.

5    Q    So this is Intel's internal top secret explanation

6    of how its Sandy Bridge processor works?

7    A    Yes.

8    Q    Okay.  Now, let's go to another one.  Let's go to

9    DX 725, which would be at tab 8 in your binder.

10   A    Okay.  I'm there.

11   Q    And what is this document?

12   A    This is the Haswell microarchitectural overview, so

13   this is describing a later processor.

14   Q    What is the Haswell processor?

15   A    It's a processor product that Intel makes.

16   Q    What's the date on this document?

17   A    September 2011.

18   Q    So this is now talking about a processor after the

19   settlement of the Intel lawsuit in 2009?

20   A    That's correct.

21   Q    And again, is this an internal document?  Is it

22   marked Intel top secret?

23   A    Yeah, it's marked the same way.  It says highly

24   confidential in the bottom left and then at the bottom

25   it says *Intel top secret*.
                    DAVID AUGUST - DIRECT

1  Q    And did you consider DX 725 in forming your opinion

2  that Intel continues to use memory disambiguation?

3  A    I did.

4  Q    Now, if you could turn, please, to page 87.  What's

5  shown on page 87?

6          MR. SHEASBY:  Your Honor, I'll just preserve my

7  hearsay objection.

8          THE COURT:  There isn't an objection to

9  hearsay.  An expert witness is looking at documents and

10 he can opine from those documents.

11         MR. SHEASBY:  Thank you.

12         THE COURT:  So it's overruled.  And you may

13 proceed, Counsel.

14         MR. DOWD:  Thank you, Your Honor.

15         THE WITNESS:  This slide describes the memory

16 disambiguation feature in that processor.

17 BY MR. DOWD:

18 Q    How does the memory disambiguation feature in

19 Haswell, the 2011 processor, compare to the Sandy Bridge

20 that we saw earlier?

21 A    Well, the description looks identical.  I haven't

22 done a word-to-word comparison, but the concepts are all

23 the same.

24 Q    And so what does this say about whether Intel's

25 Haswell processors continue to use memory
                    DAVID AUGUST - DIRECT

1  disambiguation?

2  A    I think it's clear that's what this document is

3  saying.

4  Q    Let's go to Dr. Conte's Slide 104.  Now, were you

5  here when Dr. Conte presented this slide?

6  A    I was.

7  Q    And Dr. Conte is talking about the Haswell product?

8  A    Yes.

9  Q    That's the same Haswell we were just looking at?

10  A    That's right.

11  Q    The Haswell that has memory disambiguation?

12  A    That's correct.

13  Q    And do you agree with Dr. Conte -- withdrawn.  Do

14  you agree with Dr. Conte that Haswell has essentially

15  the same performance as A7 and A8?

16  A    No.

17          MR. SHEASBY:  Objection.  Scope.

18          THE COURT:  Was this something that he had

19  addressed in his report?

20          MR. DOWD:  It was, Your Honor.

21          THE COURT:  And the paragraph number?

22          MR. DOWD:  It's at paragraph 377, I believe, he

23  addresses the Haswell -- I'm sorry, 362.

24          THE COURT:  Mr. Sheasby, do you maintain the

25  objection?

                    DAVID AUGUST - DIRECT

1           MR. SHEASBY:  Damages report paragraph 362?

2           MR. DOWD:  Yes.  Page 191.

3           MR. SHEASBY:  As to this question I do, Your

4    Honor.

5           THE COURT:  The question is whether he agrees

6    with Dr. Conte that Haswell has essentially the same

7    performance as the A7?

8           MR. SHEASBY:  Yes.

9           THE COURT:  I would really like to avoid these

10   continued delays, but we will have a sidebar.

11          MR. DOWD:  I'll rephrase and see if I can avoid

12   this.

13   BY MR. DOWD:

14   Q    Dr. August, with respect to the Haswell, can you

15   explain the Haswell and whether it has -- what its

16   performance is about?  That's a terrible question.

17        Can you explain the Haswell performance criteria?

18   A    I don't understand the question.

19   Q    Sure.  Where is Haswell used?

20   A    Okay.  So Haswell is used in desktops and servers.

21   It's the -- the context is very high performance.  These

22   chips are clocked at a much higher frequency.  The

23   memory bandwidth is much higher.  Actually I talked

24   about this earlier.  Its data can go in and out of the

25   chip much faster.  Lots more loads and stores per

                     DAVID AUGUST - DIRECT

1  second.  It's really a very high performance product

2  that's sold individually as a processor.

3  Q    Where is the A7 used?

4  A    In the iPhone.   iPad.

5  Q    Does the A7 have those same characteristics?

6  A    No.  So the focus is different.  You've got a

7  battery.  You're dealing with a different set of

8  applications.  You're not dealing with server benchmarks

9  as representative of the kind of things you do on the

10  phone.

11  Q    Let's go to Dr. Conte's Slide 107.  Now, Dr. Conte

12  has suggested that Intel received less performance

13  benefit from the '752 than Apple.  Do you agree with

14  him?

15  A    I don't.

16  Q    Is this slide comparing like with like?

17  A    No.

18  Q    Why not?

19  A    Well, he's not using my number for both Intel and

20  Apple.  He's using my number for Intel -- well, actually

21  one of my numbers, and he's using -- he's using the

22  Geekbench score, the result of Dr. Reinman's test for

23  one benchmark as the Apple score.

24  Q    So he's -- if I've got it right, he's comparing

25  Intel's number to WARF's number, not WARF's number to

                    DAVID AUGUST - DIRECT

1   WARF's number.

2   A    Well, I'd say it's one number in my report in the

3   Intel case to one number from Dr. Reinman's report in

4   this case.

5   Q    Let's look at what WARF's expert actually said in

6   the Intel case.

7            THE COURT:  Before you do, I want to make sure.

8   The .8 percent that you found in Intel, what were you

9   using to arrive at that as a performance benchmark?

10            THE WITNESS:  So that was -- I was using

11   internal Intel data.  I was able to find some

12   information about testing that they had done.  The .8

13   was a result of taking the geometric mean of a set of

14   numbers that had been identified by their expert,

15   Dr. Stone.

16            THE COURT:  All right.  I'm going to leave

17   geometric mean alone.  Ask your next question.

18   BY MR. DOWD:

19   Q    Just to follow up on that, what was the range that

20   produced the geometric mean?

21   A    Well, I had to exclude -- so there was -- there

22   were some negatives -- geometric mean doesn't work with

23   slow down, but there was a range of about .3 to 1.75, if

24   my memory is correct.

25   Q    So this number actually represents a range from .3

                    DAVID AUGUST - DIRECT

1   up to .175 -- 1.75?

2   A    We have the individual numbers so we can actually

3   look at the components of this .8.

4   Q    Let's turn to DX 1711.  It's at tab 9 in your

5   binder.  It should be in your binder at tab 9.  Do you

6   recognize this?

7   A    This is the expert report of Dr. Christianson.

8   Q    And was that WARF's expert in the Intel case?

9   A    Yes.

10  Q    What's the date on this document?

11  A    Looks like he signed it June 19, 2009.

12  Q    Is this a document you considered in this case?

13  A    Yes.

14  Q    I'd like to take you to page 51 of the report.  Do

15  you have that?

16  A    Yes.

17  Q    And paragraph 75 in particular.  Do you see that

18  near the top?

19  A    Paragraph 75.

20  Q    I'm sorry, page 51.  And paragraph 75 is actually

21  near the bottom.

22  A    That's right.

23  Q    What did WARF's expert in the Intel case cite as

24  the percentage performance improvement Intel received

25  from memory disambiguation?

                  DAVID AUGUST - DIRECT

1    A    So he's saying here, and he's quoting others, that

2    Intel had seen as much as 20 to 25 percent improvement

3    in machine performance from this feature, and in

4    brackets memory disambiguation alone.

5    Q    So in the Intel -- in the WARF/Intel case, WARF's

6    expert said Intel received 20 to 25 percent performance

7    improvement?

8    A    Yeah.  That's what he's saying here.

9    Q    And while we're on this page, do you see at the top

10   of the page just above paragraph 74 WARF's expert is

11   discussing your performance numbers in that case?

12   A    I'm sorry, where was that?

13   Q    It's actually -- it's at the end of paragraph 73,

14   right at the top of 51.

15   A    I see that.

16   Q    Do you see how paragraph 73 carries over to the top

17   of page 51?

18   A    Yes.

19   Q    And what is the range that Dr. Christianson

20   attributes to you in terms of Intel's performance?

21   A    So he says, reading my report, responding to my

22   report, that I saw a range of .38 to 1.8 percent

23   depending on the benchmark.

24   Q    And that's what then produced this geometric mean?

25   A    Yeah.  So those were the components, and the

                    DAVID AUGUST - DIRECT

1  geometric mean came as -- like an averaging of that.

2  Q    So let's go and compare like with like.  Let's

3  compare what WARF was saying in Intel to what WARF is

4  saying now; what you were saying in Intel to what you

5  are saying now.

6          MR. DOWD:  So if we can bring up DX 1134,

7  please.

8  Q    What are you showing here?

9  A    So this is just to do a fair comparison between the

10  two cases.  I'm showing some performance ranges, in the

11  case where ranges were used, to estimate the performance

12  of again, this is predictor versus no predictor.

13  Q    And in the Intel case what was WARF's performance

14  estimate of predictor versus no predictor?

15  A    That's this number here.

16  Q    So the 20 to 25?  How does that compare with their

17  performance -- with Dr. Conte's performance opinion in

18  this case?

19  A    Well, they're relying on Geekbench, so it's 8.55

20  percent.

21  Q    So Intel, according to WARF's numbers, received

22  something like more than double the benefit?

23  A    Looks like up to more than double.

24  Q    Okay.  Now, let's focus to the bottom row.  In the

25  Intel case your range was what?

                    DAVID AUGUST - DIRECT

1   A     So in the Intel case .39 to 1.75.

2   Q     And in this case with respect to the A7, both you

3   and Mr. Williams have arrived at what range?

4   A     Actually Mr. Williams says 2 to 3 percent.  I'm

5   saying that based on my testing, I'm seeing 1 to 3

6   percent, and so that's consistent.  The ranges overlap.

7   Q     So in your opinion, is the range that Apple is in

8   about the same as the range that -- at least overlapping

9   with the range that Intel was in?

10  A     Yes.  It's at least overlapping.

11  Q     Okay.  So, now, let's turn to the question of

12  whether there's a reason the '752 patent would be more

13  valuable to Intel than to Apple.  Is there a reason that

14  the '752 patent would be more valuable to Intel?

15  A     I believe that Intel sells microprocessors and they

16  have to compete against others that are selling

17  microprocessors.  And microprocessors are evaluated in

18  large part based on their performance.  Apple doesn't

19  sell processors, it sells devices like iPhones and

20  iPads.  So it doesn't -- really doesn't matter where

21  Apple gets the performance, whether it's in software or

22  in the processor.  What really matters is what the user

23  experiences when using that device.  So Apple has more

24  flexibility when it comes to getting that experience.

25  Q     And if we go to DDX 11-35 --
                    DAVID AUGUST - DIRECT

1            MR. DOWD:  So if we could advance to the next

2    slide.

3    Q    What are you showing here?

4    A    So this is showing the product that Intel sells is

5    the chip itself.  You can buy these and you can plug

6    them in yourself into a server or desktop, and if you

7    want to replace it, you can do that.  That's their end

8    product.  They're not -- they're not selling the

9    servers.  They're not selling the desktops.  They're not

10   selling the device that -- the computers that you would

11   interact with personally or indirectly in the data

12   center.  Apple, on the other hand, is selling the

13   devices.

14   Q    Okay.  And you said that's why it's more important

15   for Intel?

16   A    That's correct.

17   Q    Now, let's turn to the question of power and power

18   testing.  If you could go to DDX 11-38, please.  You're

19   familiar with the opinions that Dr. Annavaram has

20   provided in the case?

21   A    I am.

22   Q    And do you agree that the LSD predictor would

23   produce one-and-a-half to two hours of extra battery

24   life?

25   A    No.

                    DAVID AUGUST - DIRECT

1   Q    Let's turn in your binder to tab 11.  You should

2   have PX 646-R, which I believe has been admitted.

3            MR. DOWD:  If we could bring that up.  And turn

4   to the next page, please.

5   Q    So we have PX 646-R on the screen.  It's a bit hard

6   to read.  It's in your document.  What is this

7   presenting?

8   A    So these are the results that Dr. Annavaram has

9   measured and then from those measurements he's applied a

10  series of equations to compute other numbers.

11  Q    And if we could focus on column R and blow that up

12  for a moment.  What's shown in this column?

13  A    So this is the Mode 3, so this is without the

14  predictor entirely.  He's saying that this is the

15  estimated battery life in hours under the min

16  brightness.  He's setting the display to minimum

17  brightness case.

18  Q    So is this the amount of time that it will run

19  until the battery is just flat dead?

20  A    Yes.  So he's taken some -- a server benchmark,

21  which has basically 100 percent duty cycle, it's really

22  crunching on the processor, and he's estimated based on

23  his current measurements that the battery that comes

24  with the iPhone would actually only sustain that for

25  about -- it looks like around two to three hours before

                 DAVID AUGUST - DIRECT

1  it dies and there's no more battery left.

2  Q    So he did that for both Mode 0, where you have the

3  LSD, and Mode 3 where you don't.

4  A    Yeah.  And I should point out this is not -- he

5  didn't perform this test.  This is -- he looked at when

6  you run the program how much energy it uses, how much

7  power it uses, and then from that he calculated when the

8  battery would run out.  And these are those

9  calculations.

10 Q    Okay.  And so far is there any real dispute that

11 the battery actually dies at something like between two

12 to three hours?

13 A    Yes.  I didn't have any reason to -- well,

14 there's -- his measurements are his measurements and

15 there are actually some flaws with those measurements,

16 but I don't dispute that that's the current he measured.

17 And if you have that measurement, you can then apply an

18 equation to figure out when the battery is going to run

19 out based on published numbers about how much energy is

20 stored in the battery.

21 Q    The duty cycle on this, what is the assumption

22 about the duty cycle that the processor -- let me start

23 with what is a duty cycle for a processor?

24 A    Yeah.  So in the device, most of the time, almost

25 all of the time the processor is asleep.  When the phone

DAVID AUGUST - DIRECT

1   is in your pocket, the processor doesn't need to do

2   anything.  When the phone is waiting for you to hit the

3   next character on a text message, there's no reason for

4   the processor to do anything.  So to save energy, the

5   processor goes to sleep.

6       Over the course of 10 or 12 hours, the processor is

7   going to be asleep most of the time.  Now, what this is

8   is because he's using the benchmarks that Dr. Conte said

9   not to use, he's using the server benchmarks, he's using

10  the 100 percent duty cycle.  This means the processor is

11  full blast until the end.

12      There's a couple issues with that.  First is the

13  phone is going to overheat.  When the phone gets too

14  hot, things are going to change.  It's going to try to

15  recover so it doesn't, you know, become defective, melt,

16  whatever, hurt the user.  But if you assume this doesn't

17  happen, and this is when the battery would run out based

18  on that calculation.

19  Q   So at least up to this point, we're at the point

20  where there's no more battery.  When the battery is

21  dead, can the processor process anything?

22  A   No.  If there -- obviously if there's no power, you

23  can't do anything on the phone.

24  Q   So beyond this point, you can't actually perform

25  any processing instructions or anything like that?
                DAVID AUGUST - DIRECT

1  A    That's right.

2  Q    What does Dr. Annavaram do next?

3  A    Well, he went to the Apple web page and it says

4  that when you do certain things, your iPhone will last

5  10 or 12 hours.  And he says well, let's just assume

6  that's right.  But he doesn't take into account the duty

7  cycle.  He doesn't take into account that for most of

8  that 10/12 hours your phone is sleeping because it wants

9  to be ready.  It wants you to have battery when you need

10  it.  Because he's not taking that into account.  What

11  he's effectively doing when he scales these numbers up

12  to 10 or 12 hours is he's basically saying the battery

13  is on the order of five times larger than it actually

14  is.  So I don't see any basis to do that.

15  Q    And so can you explain what the reason for that is?

16  Is there a reason for that that relates to his basic

17  assumption that you've got the CPU running 100 percent

18  flat out?

19  A    Yeah.  I think it's not -- it starts fundamentally

20  at not using a workload that's representative of what

21  anyone is going to do with their phone.  It's a workload

22  that just doesn't have user interaction; doesn't do

23  anything that -- I think anyone -- well, certainly I

24  wouldn't find useful and assumes 100 percent duty cycle.

25  It's just hammering on the processor to exaggerate its

                    DAVID AUGUST - DIRECT

1  value.

2        MR. DOWD:  And so if we go over to his column U

3  and if we could blow that up.

4  Q    What is he showing in column U?

5  A    So this is again Mode 3 without the predictor and

6  it says here *scaled*.  So estimated battery life scaled

7  by a factor.  Now, what's interesting -- so this is

8  basically just saying assume you have some additional

9  number of batteries in this full duty cycle mode, how

10 long would your battery last?  That's unrealistic, and

11 in fact, earlier in his report he says that this is an

12 impossible scenario.

13 Q    So is it mathematically possible to actually

14 achieve the numbers that he presents here?

15 A    No.  The numbers he showed in the other column

16 indicate when the battery would run out.  I don't know

17 how you scale from when the battery runs out to anything

18 beyond that.  Once the battery is dead, it's dead.

19 Q    So to get to his numbers about one-and-a-half to

20 two hours of extra battery life, does he have to assume

21 a battery that's larger than it actually is?

22 A    Yeah.  Somewhere around five times larger.

23 Q    Does he have to assume the CPU can run for eight to

24 ten hours longer than it actually can according to his

25 own numbers?
                    DAVID AUGUST - DIRECT

1          THE COURT:  Counsel, we're going over and over

2     the same thing.  You're not just going to repeat the

3     same testimony.

4          MR. DOWD:  No, Your Honor.  I'll rephrase.

5     I'll rephrase.

6     BY MR. DOWD:

7     Q    What does he assume about how much longer the CPU

8     can operate beyond what his own numbers say?

9          THE COURT:  That's also been something we've

10    covered, Counsel.

11         MR. DOWD:  Okay.

12    BY MR. DOWD:

13    Q    If we go to -- let me ask you this:  How would you

14    characterize what the battery life differences would be

15    if we actually applied mathematically possible

16    calculations?

17    A    Yes.  Once you factor in the duty cycle, it's not

18    that the time in that first column, the additional

19    battery life goes up, it actually goes down because for

20    that additional time, the processor is not running full

21    speed.  That additional time, the display may be on or

22    the radio may be on, but the processor isn't.  So that

23    number actually goes down.  When you pull out a lot of

24    these assumptions that are incorrect, you actually get

25    to what I would characterize an insignificant difference

                    DAVID AUGUST - DIRECT

1  in the battery life, less than a minute over the course

2  of ten hours.

3  Q    And so in terms of the actual difference that the

4  LSD makes, LSD versus no LSD, how long?

5  A    I think once you get to less than a minute over ten

6  hours, I don't want to do the calculation because there

7  are other factors like how warm the phone is, whether

8  other people are using a phone around you and

9  interfering with your communication, that will have a

10  bigger impact.  So I think it's irresponsible to do a

11  calculation like that.

12         MR. DOWD:  If we can go to DDX 11-38 and

13  advance the slide.  One more.

14  Q    What are you showing here?

15  A    This is just basically the assumption that there's

16  more battery than there actually is.

17  Q    Okay.

18         MR. DOWD:  Now we can take that down.

19  Q    Let's turn to the question of alternatives.

20  Dr. August, all of the testing that anyone has done in

21  this case has involved just turning the LSD predictor

22  off; is that right?

23  A    That's correct.

24  Q    What was the alternative -- sorry, withdrawn.

25  Let's go to slide DDX 11-39.  Were there alternatives

                DAVID AUGUST - DIRECT

1   between the extremes of having an LSD and nothing?

2   A    Yes.  I believe that if you couldn't use the LSD,

3   you would look for alternatives and I've identified a

4   few.

5   Q    And so was having the A6 LSD predictor, was that an

6   alternative?

7   A    Yes.  They could have taken the A6 LSD and scaled

8   it or made changes appropriately to make it work in the

9   A7.

10  Q    What about the load-store predictor from Hesson?

11  A    Well, that's prior art, so they could have done

12  that as well.

13  Q    And EV 6, was that available as well?

14  A    Yes.

15  Q    Let's turn to the question of Samsung.  Do you

16  recall there was testimony about Samsung?

17  A    Yes.

18  Q    Have you formed an opinion about whether Samsung

19  makes anything in the United States that could infringe

20  the '752?

21  A    I do have an opinion.

22  Q    What's your opinion?

23  A    They do not.

24  Q    If we go to DDX 11-37, what are you showing here?

25  A    So on the left, this is the wafer with die.  Each

                    DAVID AUGUST - DIRECT

1    one of these rectangles is a representation or actually

2    what the die would look like if you saw one of these

3    wafers after it had been processed.

4              MR. DOWD:  May I approach, Your Honor?

5              THE COURT:  You may.

6    BY MR. DOWD:

7    Q    Doctor, if I can give you an actual wafer, can you

8    explain this process?  So how does that wafer that we've

9    just handed up relate to the image that you show on the

10   slide?

11   A    So this is the wafer before the photolithography.

12   They basically use a series of steps with chemicals and

13   a mask that provides a shadow that indicates where the

14   wires and transistors should go on this wafer.  And then

15   it will look more like what we see in the picture.

16   Q    Now, what manufacturing takes place at Samsung in

17   Texas?

18   A    They perform that step in Texas.

19   Q    And is that just the initial fabrication step?

20   A    Yeah.  There are many other steps before this

21   becomes product.

22   Q    Now, let me contrast the wafer that you have there

23   with -- if we can go to the ELMO -- the A7 chip.  What

24   does it take to go from the wafer, if you can hold up

25   that wafer, to this little chip?
                    DAVID AUGUST - DIRECT

1    A    Well, so there are a number of steps because that

2    chip is in a package.  So in general or in this case?  I

3    could describe either way.  It doesn't matter.

4    Q    Why don't we describe the process generally.

5    A    Okay.  Sure.  So there are many steps, but the ones

6    that are most important for this case are after the

7    photolithography, there's also a step called bumping and

8    this is where additional -- really look like little

9    balls of metal are placed down so that electricity

10   either signals or power can actually get into the chip.

11   So that's bumping.

12        In addition, there's fusing and that's blowing --

13   there may be hundreds or thousands of fuses on a chip.

14   You blow some fuses and that actually will configure the

15   circuitry into its final form.  In addition to fusing,

16   they also want to slice this up.  This is a chip, a

17   single die on the wafer.  There may be 100.  So you have

18   to cut it very carefully and pull those pieces out.  And

19   there are a series of other steps to put it into the

20   package:  More wiring protection, that kind of thing.

21   Q    So if we go back to your slide, is it that each one

22   of these individual squares on the wafer ultimately ends

23   up having to be sliced and all these other processing

24   steps?

25   A    Some are thrown away if they're defective, but the

                DAVID AUGUST - DIRECT

1 ones that are okay will end up in a package like you saw

2 on the ELMO.

3 Q    So let's focus on some of the key aspects that you

4 identified.  Once the circuitry is printed on the wafer,

5 what happens next in the Samsung process?

6 A    Then it's sent to Korea.

7 Q    The whole wafer is sent?

8 A    Yeah, just like this.

9 Q    Okay.  And at that point do we have any chips yet?

10 A    No, we have no chips.

11 Q    Could the wafer be used in an iPhone?

12 A    No.

13 Q    Could any of the circuitry on the wafer be used to

14 process an instruction?

15         MR. SHEASBY:  Objection.  This is a scope

16 issue.

17         THE COURT:  And the paragraph in which he

18 testifies as to whether it could be used in a product is

19 what?

20         MR. DOWD:  One moment, Your Honor.  This is

21 actually in the infringement report, if I could just

22 grab that.  I believe it's at paragraph 412, but I just

23 want to confirm.

24         THE COURT:  In the meantime, Mr. Sheasby,

25 perhaps you can look.  Please, if you have that report

                    DAVID AUGUST - DIRECT

1    in front of you.

2           MR. SHEASBY:  It's paragraph 413.

3           THE COURT:  And do you maintain your objection?

4           MR. SHEASBY:  I do and I -- I do.

5        (Discussion at sidebar at 11:32 a.m.)

6           THE COURT:  Do you have 413 with you?  Just

7    bring it up.  Mr. Sheasby, I'll take that.  And your

8    specific concern is with respect to its ability to

9    actually perform the functions?

10           MR. SHEASBY:  Yes.  This is the test probe

11    issue that came up yesterday and he doesn't talk about

12    test probes or the impact of test probes.

13           THE COURT:  It's not really a test probe issue.

14    He's asking whether it could be used to perform the

15    functions.  And you're saying that he nowhere opined

16    that it could not?

17           MR. SHEASBY:  Correct.

18           THE COURT:  I'm going to allow him to testify.

19    I mean he says it's not a processor capable of executing

20    program instructions.  If you want to draw out that

21    distinction --

22           MR. SHEASBY:  I understand.

23           THE COURT:  -- and the fact that he never

24    opined, never examined it, you can do that.  Let's

25    proceed.
                     DAVID AUGUST - DIRECT

1          MR. SHEASBY:  Thank you.

2       (End of sidebar discussion at 11:33 a.m.)

3          THE COURT:  All right.  We will proceed.

4  BY MR. DOWD:

5  Q    So Doctor, can you answer that question?

6  A    Can you repeat the question?

7  Q    Sure.  At the point at which the wafer leaves the

8  manufacturing facility at Samsung in Texas, can any of

9  the circuitry actually process instructions?

10 A    No, they cannot.

11 Q    Why not?

12 A    Well, the circuitry is actually not complete until

13 it's been fused, and the fusing does not happen in

14 Texas.

15 Q    Where does the fusing happen?

16 A    In Korea.

17 Q    Now, you mentioned bumping.  Is bumping related?

18 A    Yes.  Bumping is also done in Korea.

19 Q    And how does bumping impact the ability of the chip

20 to be able to actually process instructions?

21 A    So the bumping will allow the chip to be powered

22 and you can connect to it memory and other things so

23 that it can communicate with the outside world.  At that

24 point after fusing and bumping, it would be capable of

25 executing instructions.

                    DAVID AUGUST - DIRECT

1   Q     So that's only after you get to Korea?

2   A     That's correct.

3   Q     All right.  So as the circuitry on the wafer leaves

4   the United States, could you load a program onto any of

5   the die at all?

6   A     No.

7   Q     Could you cause it to -- is it capable of executing

8   any program instructions at all?

9   A     No.

10  Q     And with respect to the fuses you mentioned, what

11  is the importance of blowing the fuses?

12  A     Well, there are actually components in the

13  microprocessor, in the die that aren't fully configured.

14  There are some measurements that need to be taken to

15  figure out, for example, how to interact with cache

16  memory.  And once those measurements are taken, the

17  fuses can be customized and blown for that particular

18  die and at that point will actually be able to

19  communicate with memory.  So that actually activates

20  part of the circuitry or completes some of the

21  circuitry.  Before that's done, there's no -- it's not

22  functional.

23          MR. SHEASBY:  Your Honor, I move to strike

24  that.  That's outside the scope of his report.

25          MR. DOWD:  Your Honor, it's page 163 just above

                    DAVID AUGUST - DIRECT

1  paragraph 412.

2          THE COURT:  I will give an instruction -- let's

3  do this.  We've got to come to sidebar.  And I apologize

4  because we should not be having this many delays.

5      (Discussion at sidebar at 11:35 a.m.)

6          THE COURT:  The specific reference is?

7      MR. DOWD:  That was the question.  Blowing

8  fuses.  What does it do.  It allows the software to

9  work.

10         THE COURT:  I'm looking at the statement

11 Samsung configures the chips to the extent that the chip

12 is able to work with implementing Apple software.

13         MR. SHEASBY:  Right.  He can say that.  They're

14 making a new argument for the first time this morning

15 with Mr. Williams that the circuits will not work

16 without blowing the fuses.  It's never been disclosed to

17 us and that's what he's trying to talk about right now.

18 He can say --

19         THE COURT:  I'm more concerned -- he does say

20 so the chip is able to work.  The implication is the

21 same.  My concern is are they saying that there's a

22 separate process -- well, I mean the blowing doesn't

23 occur until -- I'm not going to strike it.  Continue.

24     (End of sidebar discussion at 11:36 a.m.)

25         THE COURT:  You should ask your next question,
                 DAVID AUGUST - DIRECT

1    Counsel.

2             MR. DOWD:  Thank you, Your Honor.

3    BY MR. DOWD:

4    Q    With respect to blowing the fuses, is the chip able

5    to work with software before the fuses are blown?

6    A    No.

7    Q    Is that true for all processes?

8             THE COURT:  I don't understand that.

9             THE WITNESS:  I don't either.

10   BY MR. DOWD:

11   Q    Before the fuses are blown, can you load a program

12   onto the die on the wafer?

13   A    Can you repeat the question?

14   Q    Before the fuses are blown, can you load a program,

15   a computer program, a set of instructions onto the die

16   on the wafer?

17   A    No, you can't.

18   Q    Can you do that in any testing?

19   A    No.

20   Q    And where does testing happen?  Is that in the U.S.

21   or Korea?

22   A    That happens in Korea.

23   Q    Okay.  Now, Dr. Conte testified that a processor is

24   complete as soon as it is printed on the silicon wafer

25   and that later steps in the manufacturing process have

                    DAVID AUGUST - DIRECT

1    no impact on the functionality of the processor.  Do you

2    agree with him?

3    A    I disagree.

4    Q    Why do you disagree?

5    A    Those steps are necessary steps to make the

6    processor work.

7    Q    Let's go back to PX 1, the '752 patent.

8         MR. DOWD:  If we could bring that up and turn

9    to claim 1.

10   Q    And I'd like to focus you on the portion of the

11   claim at the top, the limitation that reads "a processor

12   capable of executing program instructions in an

13   execution order differing from their program order."

14       Can the wafers that leave Samsung's facility in

15   Texas perform that function?

16   A    No, they can't.

17   Q    Why not?

18   A    Because they're not capable of executing program

19   instructions in any order.

20   Q    And what are your reasons for that?

21   A    Because they haven't been fused.  They haven't been

22   bumped.  They are not complete.

23   Q    And what does that mean for whether those wafers

24   are capable of practicing claim 1?

25   A    They are incapable of practicing that claim.

                    DAVID AUGUST - DIRECT

1    Q    Does claim 9 have the same requirement?

2    A    Yes.

3    Q    And are your opinions the same for claim 9?

4    A    Yes.          (11:39 a.m.)

5         MR. DOWD:  Your Honor, I pass the witness.

6         THE COURT:  Good.  Cross-examination.

7                    CROSS-EXAMINATION

8    BY MR. SHEASBY:

9    Q    Good morning, Dr. August.

10   A    Good morning.

11   Q    We've met before a couple times.  I want to turn

12   first to the Intel case, if I may.  Now, in the Intel

13   case you served as an expert for Intel; is that correct?

14   A    That is correct.

15   Q    You took the position that the Intel feature was

16   noninfringing; correct?

17   A    That's correct.

18   Q    And as part of your work for them, you were asked

19   by Intel to calculate the average performance gain or

20   loss attributable to memory disambiguation across all

21   three platforms:  Mobile, desk, and servers based on

22   Intel's 2006 benchmark testing; correct?

23   A    Well, I was asked more generally to comment on the

24   performance.

25   Q    Well, you were asked, and I'll read it again, you
                    DAVID AUGUST - CROSS

1   were asked to calculate the average performance gain or

2   loss attributable to memory disambiguation across all on

3   three platforms: mobile, desktop, and server based on

4   Intel's 2006 benchmark testing; correct?

5   A    Can you repeat the last part of that question?

6   Q    You were asked to calculate the average performance

7   gain or loss attributable to memory disambiguation based

8   on Intel's 2006 benchmark testing.

9   A    That's correct.

10  Q    And when you combined all those -- actually let me

11  ask you the next question.  Now, for this benchmark

12  testing, the way it worked is that when you disabled

13  memory disambiguation, which was the Intel feature, then

14  the processor would not speculate; correct?

15  A    When you disabled the memory disambiguation

16  feature, the processor would not speculate with respect

17  to loads and stores.

18  Q    Exactly.  So the disabled mode was no speculation

19  with respect to loads and stores.

20  A    That's correct.

21  Q    And the enabled mode was speculation some of the

22  times with loads and stores; correct?

23  A    Some of the time, yes.

24  Q    And when you did the calculation, when you took

25  every single benchmark that Intel had run in 2006 and

                    DAVID AUGUST - CROSS

1  you applied that geometric mean, which is a fancy word

2  for some type of average, it was 0.80 percent; correct?

3  A    Well, I don't know if I had every benchmark that

4  Intel had in 2006, but all the ones that I was aware of,

5  yes.

6  Q    At least all the benchmarks that Intel gave you,

7  you combined them all together and concluded that memory

8  disambiguation contributed 0.80 percent benefit;

9  correct?

10  A    That's with the geo mean, yes.

11  Q    And we can actually show that slide, we'll show

12  those numbers.

13        MR. SHEASBY:  Mr. Oppenhuis, I believe it's 21.

14  Q    So I have those numbers.  That's correct; is that

15  right?

16  A    That looks correct.

17  Q    Okay.  Now, in the Apple LSD predictor, there are

18  different modes that you can switch it too; correct?

19  A    That's correct.

20  Q    And one of those modes is a no speculation of

21  ambiguous load-stores; correct?

22  A    That's correct.

23  Q    That's Mode 2; correct?

24  A    That's correct.

25  Q    And now let's pull up August cross demonstrative 9.
                DAVID AUGUST - CROSS

1          THE COURT:  Since we're on it and since it's

2     come up and been characterized, is the difference

3     between a mean and a geometric mean and what's the

4     difference?

5          THE WITNESS:  So a mean is the average like

6     we're all familiar with.  You sum the numbers up, you

7     divide by the number of numbers.  Geometric mean

8     involves multiplying the numbers together and taking a

9     root.

10          THE COURT:  And the benefit of the geometric

11     mean is what?

12          THE WITNESS:  There's some debate in the

13     community about which one is more true to the original

14     numbers when talking about rates, which we're doing

15     here.

16          THE COURT:  All right.  And is there a dramatic

17     difference between the mean and the geometric mean in a

18     case like this?

19          THE WITNESS:  There can be.

20          THE COURT:  Are you aware whether there is in

21     this case?

22          THE WITNESS:  Well, in this particular slide

23     there is because of the way that geometric mean has a

24     problem with negative numbers, so the mean here will be

25     different than --
                    DAVID AUGUST - CROSS

1          THE COURT:  It does when you multiply them, you

2    end up with a positive, which you don't want.

3          THE WITNESS:  Well, you end up with a negative

4    and you have to take the root of the negative.

5          THE COURT:  All right.  You can continue.

6    BY MR. SHEASBY:

7    Q    It's actually a relevant point.  You took the

8    geometric mean of this, and you see the WME 9 number was

9    a negative 6.15 percent number?

10   A    That's correct.

11   Q    If you just took the average where you could

12   actually integrate that negative number into the mean,

13   it would be something closer to 0.3 percent thereabouts,

14   in that neighborhood?

15   A    Well, I think it would be lower than the .8.

16   Q    It would be lower than the .8.  Would you take my

17   representation that you said it would be in the .3 range

18   in your Intel damages case?

19   A    I don't have any reason to believe that you're

20   making that up.

21   Q    I wouldn't do that.  I promise.

22   A    Thank you.

23   Q    So here's what we know:  We know that at Intel,

24   when you took all the benchmarks that Intel gave you in

25   2006, it was 0.8.  We know that modes that you switch
                DAVID AUGUST - CROSS

1  between was between memory disambiguation and no

2  speculation of ambiguous loads and stores; correct?

3  A    That's correct.

4  Q    And now we can actually think about that in the

5  context of Apple's processor.  In Apple's processor, we

6  can add the LSD predictor on; correct?  That's one

7  option.  That's Mode 0.

8  A    Yes.

9  Q    And then another option is we can switch to a mode

10  where no speculation of ambiguous loads and stores is

11  allowed; correct?

12  A    We could do that.

13  Q    And that's called Mode 2; correct?

14  A    That's right.

15       MR. SHEASBY:  Why don't we go to August cross

16  demonstrative 9, Mr. Oppenhuis.

17  Q    So we actually have Mode 2 numbers that were run by

18  Dr. Reinman; correct?

19  A    Yes, I've seen them.

20  Q    Now, you didn't run Mode 2, did you?

21  A    No, I didn't.

22  Q    And the Mode 2 differences for between LSD on and

23  no speculation in the A6 -- A7 and A8, it's not .08

24  percent, is it?

25  A    No.

                    DAVID AUGUST - CROSS

1   Q     It's 114 percent on Dhrystone; correct?

2   A     Yeah.  If this is correct, yes.

3   Q     It's 53.78 percent on SPEC; correct?

4   A     For the seven, yes.

5   Q     And Mr. Srouji, remember, he's the senior operating

6   engineer, he said that SPEC was industry standard;

7   correct?

8   A     It's industry standard for some things, yes.

9   Q     And then on Geekbench, the Geekbench score was

10  59.64 percent; correct?

11  A     I believe that that sounds about right.

12  Q     And it's that Geekbench that we've seen internal

13  Apple documents talking about being "not open to

14  debate"; correct?

15  A     I think those are words that some people have used,

16  yeah.

17  Q     At Apple.  Some people at Apple have used.

18  A     One person.

19  Q     And you disagree with that; correct?

20  A     Well, I think that Geekbench serves a purpose.

21  Q     Can you answer my question?  Do you disagree with

22  the statement that Geekbench is not open to debate?

23  A     Well, it depends on how it's used.  You can debate

24  whether it's appropriate in different circumstances.

25  Q     Sir, can you answer my question yes or no fairly?
                    DAVID AUGUST - CROSS

1   Do you disagree with the statement that in the context

2   of Apple's A7 and A8 processors, Geekbench is not open

3   to debate?

4   A    There's some assumptions in that question I'm not

5   sure how to answer.

6   Q    Okay.  That's no problem.  Now, you read some

7   testimony from Mr. Christianson; correct?  I'll take it

8   back.  You paraphrased a report filed by

9   Mr. Christianson in the Intel case; correct?

10  A    On my direct?  Yes.

11          THE COURT:  And for the benefit of the jury,

12  there are two Mr. Christiansons.  You saw one by video.

13  Not the same.  This is now a damage expert in the Intel

14  case.  And you may proceed.

15  BY MR. SHEASBY:

16  Q    And Mr. Christianson was not a technical expert for

17  WARF in that case; correct?

18  A    That's my understanding.

19  Q    The technical expert for WARF in that case was

20  Mr. Stone; correct?

21  A    There were many technical experts for WARF.

22  Q    The technical expert who on infringement and

23  performance issues was Mr. Stone; correct?

24  A    Primarily, yes.

25  Q    And Mr. Stone filed a report in that case as well;

                    DAVID AUGUST - CROSS

1  correct?

2  A    Yes, he did.

3  Q    And I think Mr. Stone's report should be up there.

4  Is it up there?  It should be in the front pocket of

5  your big binder.

6  A    This one?

7         MR. SHEASBY:  May I approach to assist, Your

8  Honor?

9         THE WITNESS:  This?

10         THE COURT:  It should be right there.  There's

11  one that's damage report of Stone and then rebuttal

12  expert report of August.

13  BY MR. SHEASBY:

14  Q    It's the damages report of Stone.  You have it.

15  A    Here we go.

16  Q    And why don't we go to the end of Mr. Stone's

17  report, which is paragraph 41.

18         THE COURT:  Was there a question?

19  Q    Are you oriented, sir?

20  A    Yes.

21  Q    And in paragraph 41, Mr. Stone also calculated his

22  position on what the performance benefit of memory

23  disambiguation was; correct?

24  A    I think he's using my numbers to compute an average

25  instead of a geo mean.

                    DAVID AUGUST - CROSS

1    Q    What he says is he provides his own calculation of

2    the Intel information that was given to you; correct?

3    A    Yes.  He's doing a calculation using a different

4    mean with my numbers.

5    Q    Right.  So he took the Intel numbers from 2006 and

6    he ran his own calculation; correct?

7    A    That's correct.

8    Q    And his conclusion was that the average benefit of

9    memory disambiguation was 1.89 percent; correct?

10   A    That's correct.

11        MR. SHEASBY:  And why don't we put up his

12   slides, Mr. Oppenhuis.  We'll put up his data to make

13   sure we have it right.

14   Q    Now, that's his data; correct?  1.89 percent

15   average.

16   A    No, he's taking my data and applying a different

17   equation.

18   Q    I appreciate the precision.  I'll reask it again.

19   This is the Intel data that was given to you; correct?

20   A    Yes.

21   Q    And he's doing a calculation of that same Intel

22   data; correct?

23   A    That's correct.

24   Q    And his average is 1.89 percent; correct?

25   A    I wouldn't characterize it as his average.  It's my

                    DAVID AUGUST - CROSS

1  data that he's averaging in a different way.

2          THE COURT:  Is it your data or Intel's average?

3          THE WITNESS:  Well, it was Intel's -- each of

4  these benchmarks is going to involve many other numbers

5  that get averaged.  So it's Intel's averages that I've

6  selected --

7          THE COURT:  It's Intel's averages.  You

8  selected them as relevant, and this is now another

9  expert, technical expert who did his own average from

10  your averages.

11          THE WITNESS:  That's correct.

12          THE COURT:  Next question.

13  BY MR. SHEASBY:

14  Q    And to be clear, 1.89 percent was his number.

15  A    I wouldn't characterize what he's saying here as

16  that's his number.  That's his number in this scenario.

17  Q    Can you turn to paragraph 42 of his report.  And

18  you see where he says "using this methodology, the

19  average improvement from memory disambiguation across

20  the six benchmarks is 1.89 percent."

21  A    I see that.

22  Q    Did I read that statement correctly?

23  A    You did.

24  Q    Okay.

25          MR. SHEASBY:  So why don't we go back to the
                    DAVID AUGUST - CROSS

1  slide we were on previously.  Actually why don't we go

2  to -- give me a second -- why don't we go to DDX 11-34.

3  Q    Now, this was a slide that you showed to the Ladies

4  and Gentlemen of the Jury; correct?

5  A    That's correct.

6  Q    And you stated that Mr. Christianson said that the

7  benefit to Intel was 20 to 25 percent; correct?

8  A    Yes.  Up to 20 to 25 percent.

9  Q    Well, there you said 20 to 25 percent, correct, on

10  that slide?

11  A    I think later I said -- I said up to.

12  Q    Okay.  So can you, just for the purposes of

13  clarity, did Mr. Christianson say the benefit was 20 to

14  25 percent or did he say on some traces it may be up to

15  20 to 25 percent?

16  A    Yes.  It was one of the numbers he put forth as up

17  to.

18  Q    Up to; correct?

19  A    That's correct.

20  Q    And the basis for that was actually an article;

21  correct?

22  A    I believe so.

23  Q    And that was an article that we looked at at your

24  deposition.  Do you remember it?  The Anandtech article.

25  A    I don't remember that.

                    DAVID AUGUST - CROSS

1    Q    So you don't know if that article was saying -- let

2    me ask it this way:  The 20 to 25 percent number, those

3    relate to individual traces or pieces of code; correct?

4    A    Can you show me the article?

5    Q    Well, do you know what the 20 to 25 percent relates

6    to?

7    A    At some point I might have.

8    Q    Do you know --

9              THE COURT:  As you sit here today, you don't

10   know where Dr. Christianson, who was not a technical

11   expert but was an economist, you don't know where he got

12   the 20 to 25 percent from as you sit here today.

13             THE WITNESS:  As I sit here today, no, I don't

14   recall exactly.

15             THE COURT:  Next question.

16   BY MR. SHEASBY:

17   Q    We all agree what Dr. Christianson said was up to

18   on some benchmarks; correct?

19   A    Yeah.  He had many numbers he used and that was

20   one.

21   Q    But the number that Dr. Stone used was 1.85

22   percent; correct?

23   A    Among others.

24   Q    Now, in the Intel case you stated in your report

25   that Intel is disabling the memory disambiguation
                    DAVID AUGUST - CROSS

1  feature; correct?

2  A    I said that in conversations I had had with

3  Dr. Papworth, that was my understanding.

4  Q    And you used the phrase Intel is disabling the

5  memory disambiguation feature; correct?

6  A    I understood that to be their plan, yes.

7  Q    And just so we're clear, if you can answer my

8  question yes or no for the Ladies and Gentlemen of the

9  Jury, please do so.  You said in your report "Intel is

10 disabling the memory disambiguation feature."

11 A    That sounds right, but I could check it for you if

12 you'd like.

13 Q    Sounds right; correct?

14 A    Sound right, yes.

15 Q    Now, sometime after that Intel turned back on the

16 memory disambiguation feature; correct?  That's your

17 testimony?

18 A    That's my understanding.

19 Q    Now, you didn't analyze any of the code, the RTL

20 code for Intel's new products; correct?

21 A    Actually I did.

22 Q    Oh, that's right.  You analyzed the portions of the

23 RTL code from the old products that happened to be in

24 the new products; correct?

25 A    No.  I looked at new products.
                    DAVID AUGUST - CROSS

1    Q    In your report do you analyze any RTL code for

2    Intel's new products?

3    A    In my report I don't describe that analysis.

4    Q    Okay.  Now, in general it's your position that

5    pre-silicon simulation is less accurate than

6    post-silicon testing; correct?

7    A    Well, I would say that there are different

8    purposes.  Pre-silicon/post-silicon testing is going to

9    be generally done for different purposes.

10   Q    Sir, can you answer my question yes or no?

11   A    Can you repeat the question?

12   Q    Pre-silicon performance simulation is less accurate

13   than post-silicon testing; correct?

14   A    I would say that's generally true.

15   Q    Now, the numbers that Mr. Williams were talking

16   about -- that Mr. Williams was talking about in his

17   testimony, that was on pre-silicon simulation; correct?

18   A    That's correct.

19   Q    And what we did in this case was not the simulator

20   at all.  What we accessed, what we used, Professor

21   Reinman and you, were the actual silicon, the physical

22   devices.

23   A    Yes.  We did the test on actual devices.

24   Q     cSim no one used; correct?

25   A    None of the experts used cSim in this case.
                    DAVID AUGUST - CROSS

1    Q    Now, in your testimony on direct you speak about a

2    number of potential design arounds; correct?

3    A    That's correct.

4    Q    And in your testimony on direct, you don't report

5    any percentage of what could be achieved from using an

6    alternative to the LSD predictor; fair?

7    A    That's correct.

8    Q    Now, in your Intel damages report, Intel had

9    actually prepared in code a design around to the '752

10   patent; correct?

11   A    Yes.

12   Q    And you reported that they were able to achieve

13   roughly 82 to 85 percent of the performance gained if

14   they used their design around as opposed to the '752

15   patent; correct?

16   A    That's right.

17   Q    Let's turn to another subject.  I want to talk

18   about all the pieces that are in the A7 and A8

19   processor.

20   A    Okay.

21   Q    You gave this long list:  Memory system, graphic

22   system, media, NAND, secure enclave, I/O, power

23   management.  You gave this list; right?

24   A    That's right.

25   Q    Now, you don't have any evidence that Apple is able

                    DAVID AUGUST - CROSS

1   to compete with folks like Samsung or other chip

2   manufacturers based on any of those subsystems; correct?

3   A    Well, I didn't take any performance measurements of

4   those systems.  So from that technical basis, I can't

5   tell you about the performance of those aspects.

6   Q    In other words, from a technical basis you have no

7   ability to say whether those subsystems allow Apple to

8   be unique and allow it to compete; correct?

9   A    Well, I understand that those are very important

10  subsystems that are necessary --

11  Q    Sir, can you answer my question yes or no?

12         THE COURT:  I think he was attempting to answer

13  your question and I think you should rephrase rather

14  than pose that one.

15         MR. SHEASBY:  Sure.  I'm happy to do so.

16  BY MR. SHEASBY:

17  Q    You disagree that 75 percent of the value of the

18  A7, A8, and A8 SoC is attributable to the processor that

19  contains the accused functionality; correct?

20  A    Correct.

21  Q    You think anyone who takes that position is

22  mistaken; correct?

23  A    I would say in this case for this SoC, I think that

24  overstates the benefit.

25  Q    Now, one of the things you talk about is lines of
                    DAVID AUGUST - CROSS

1  code that are devoted to the LSD predictor; correct?

2  A    Yeah, I counted the lines of code.

3  Q    And you've never designed a commercial processor;

4  correct?

5  A    I've been part of commercial processor design

6  projects.

7  Q    Oh.  Okay.  Your research group at Princeton has

8  not produced a product; correct?

9  A    That's correct.

10 Q    And you haven't designed something that can be

11 produced as a product in its final form; correct?

12          THE COURT:  You're talking now about the

13 Princeton Research Group?

14 Q    I'm talking about you generally, Professor August.

15 A    I'm not sure what you mean by final form.  There's

16 a lot of steps that go into producing a processor and

17 many of them happen early and then many of them happen

18 later stage.

19 Q    So just so we can get the record clear, you haven't

20 designed something that can be produced as a product in

21 its final form; correct?

22          THE COURT:  You have contributed to a design,

23 but you didn't produce it, design the product in its

24 final form.

25          THE WITNESS:  Yeah.  I think that's what
                    DAVID AUGUST - CROSS

1  engineers do, they contribute to the project.

2  BY MR. SHEASBY:

3  Q    Okay.  Well, why don't we read some of your

4  testimony.  Actually, you haven't designed a commercial

5  memory dependence predictor; correct?

6  A    That's correct.

7  Q    In fact, you haven't designed any functional unit

8  in a commercial processor; correct?

9  A    I've made contributions to functional units.

10  Q    Sir, why don't we read your testimony at 68 --

11        THE COURT:  Why don't you pose the question

12  again and see if there's really a disagreement.

13  BY MR. SHEASBY:

14  Q    You have not designed any functional unit in a

15  commercial processor; correct?

16  A    I've contributed to the design.

17  Q    Okay.  Why don't we read your testimony at 68, 12

18  through 16.

19        "Question:  Have you ever designed a commercial

20  memory dependence predictor?

21        "Answer:  I haven't designed a dependence predictor

22  that isn't a product."

23        Is that your testimony, sir?

24  A    That's what I said.

25  Q    Now --

                    DAVID AUGUST - CROSS

1          MR. DOWD:  I object.  That's not --

2          THE COURT:  It was improper impeachment and you

3    should ignore the reading.  And you should continue.

4    BY MR. SHEASBY:

5    Q    So we were speaking again about lines of code;

6    correct?

7    A    Lines of code, yes.

8    Q    In the LSD predictor.

9    A    In the LSD predictor, yes.

10   Q    Right.  And in your report, do you identify any

11   engineer who designs processors in a commercial context

12   who believes lines of code is an appropriate way of

13   valuing a feature in the microarchitecture?

14   A    In my -- are you asking is that a true statement or

15   is it in my report?

16   Q    In your report do you identify.

17   A    That I don't know.

18   Q    And do you identify in your -- another thing you

19   talk about is how much area on the die the LSD predictor

20   takes up; correct?

21   A    Yes.  I do report that in my report.

22   Q    And in your report do you identify any commercial

23   engineer, someone who designs processors for a living,

24   who uses the amount of real estate a feature takes up as

25   a metric of its value?
                    DAVID AUGUST - CROSS

1    A    So you're asking about what's in the report?

2    Q    Yes.

3    A    I don't know sitting here without reviewing it

4    exactly what's in the report.

5    Q    Would you take my representation that they aren't

6    in your report?

7    A    Without the report in front of me, I have no basis

8    to disagree.

9    Q    Okay.  So why don't we go to 11-11 -- wait.  11-11,

10   let's start there.  You were talking about some of

11   Apple's patents.  Do you remember that?

12   A    Yes, I do.

13   Q    Let me turn to my section.  Now, the first thing

14   you did -- well, not the first thing.  You showed up the

15   slides where you said 71 Apple patents; correct?

16   A    I said at least 70.

17   Q    At least 70.  Now, you were only -- of those 70,

18   your report only identifies six, I believe, that you

19   could find in the A7 and A8 processor using a claim

20   chart; correct?

21   A    I only did the claim chart for six, I believe.

22   Yes.

23   Q    Okay.  So we were at 71.  Now we're at six.  Let's

24   talk about those six.

25            MR. SHEASBY:  Let's pull up 11-11.  Sorry,
                    DAVID AUGUST - CROSS

1  Mr. Oppenhuis.

2  Q    11-11.  This is the Apple '447 patent; correct?

3  A    That's correct.

4  Q    Now, is this patent related to anything that's

5  physically in the LSD predictor?

6  A    This does not describe the LSD predictor, but

7  there's going to be interaction between the loads and

8  stores.

9  Q    Well, let's do it in pieces.

10  A    Sure.

11  Q    This patent doesn't describe the LSD predictor;

12  correct?

13  A    That's correct.

14  Q    It describes some other feature that's outside of

15  the LSD predictor; correct?

16  A    That's correct.

17  Q    Let's go to the next patent.  Let's go to the next

18  slide, 11-12.  *Inline image rotation*.  Does this patent

19  that you showed describe anything in the LSD predictor?

20  A    No, it does not.

21  Q    Let's go to the next patent you showed, 11-13.

22  Does this patent describe anything in the LSD predictor?

23  A    No, it doesn't.

24  Q    Let's go to the next slide, 11-14.  Does this slide

25  describe anything in the LSD predictor?
            DAVID AUGUST - CROSS

1  A    No, it doesn't.

2  Q    Let's go to the next slide, 11-15.  Does this slide

3  describe anything in the LSD predictor?

4  A    No.

5  Q    And for these patents that we've shown, I've shown

6  you Slides 11-11 through 11-15, you've done no analysis

7  on the performance benefit quantitatively that is

8  achieved using these features; correct?

9  A    No, I haven't done that analysis.

10  Q    And you've done no quantitative analysis on the

11  energy benefits that's achieved using these features;

12  correct?

13  A    Not for these features.

14  Q    Okay.  Let's go to your user interface patents.

15  These are the patents that Apple asserted against

16  Samsung.  Let's go to 11-36.  We talked about these

17  patents.  These are the patents on, for example, rubber

18  banding; correct?

19  A    Yeah -- yes.

20  Q    You've heard of it as rubber banding.

21  A    Yes.

22  Q    And you understand that Ms. Drance, she's the head

23  of marketing at Apple; correct?

24  A    If you represent that to me.  I have no reason to

25  disagree.

                    DAVID AUGUST - CROSS

1  Q    If you're putting me on the spot I'm going to do it

2  more precisely.  She's the head of iPhone marketing at

3  Apple.

4  A    I believe that.

5  Q    Okay.  I appreciate it.  And Ms. Drance has stated

6  that rubber banding is not something customers even care

7  about; correct?

8  A    I don't recall one way or the other.

9         MR. SHEASBY:  So why don't we pull up her

10 testimony, which is at 201 through 205, and let's see

11 what she says.

12        MR. DOWD:  Objection.  There's no foundation

13 for this witness.

14        THE COURT:  You may have him read it, but it's

15 not to be shown to the jury.

16        MR. SHEASBY:  I understand.

17        THE COURT:  And you shouldn't read it aloud.

18 BY MR. SHEASBY:

19 Q    Do you see the testimony?

20 A    Yes.

21 Q    And does this refresh your recollection about what

22 Ms. Drance thinks of rubber banding?

23 A    No.  It appears that maybe she hasn't heard it by

24 that term.

25 Q    Ms. Drance is saying she hasn't heard the concept
                    DAVID AUGUST - CROSS

1   of rubber banding; correct?

2   A    She says -- can I read the question?

3         THE COURT:  The real point is it doesn't

4   refresh your recollection about anything she said in

5   this area.

6         THE WITNESS:  No.

7         THE COURT:  Next question, Counsel.

8         MR. SHEASBY:  We'll move on.

9   BY MR. SHEASBY:

10  Q    Let's talk about energy.  Professor Annavaram ran

11  some studies regarding energy; correct?

12  A    I wouldn't call it a study.

13  Q    Professor Annavaram did some analysis regarding

14  energy; correct?

15  A    He took some measurements and applied some factors.

16  Q    Now, you didn't run any study regarding energy;

17  correct?

18  A    No.

19  Q    You didn't take any measurements; correct?

20  A    I didn't take any measurements.

21  Q    And there's nothing that would have prevented you

22  from running an energy study; correct?

23  A    No.

24  Q    There's nothing that would have prevented you from

25  presenting data from -- to the Ladies and Gentlemen of
                    DAVID AUGUST - CROSS

1    the Jury that could have been used to dispute Professor

2    Annavaram; correct?

3    A    I did present opinions and an analysis that

4    disputes his results.

5    Q    I'm sorry.  I said data.

6    A    Data.

7    Q    There's nothing that would have prevented you from

8    performing experiments generating data and presenting

9    them to the Ladies and Gentlemen of this Jury; correct?

10   A    Well, I did present data.  I presented

11   Dr. Annavaram's data to refute his conclusions.

12   Q    Sir, I will ask the question more precisely.  There

13   was nothing that would have prevented you from

14   performing your own experiments and presenting that

15   information to the jury on energy; correct?

16   A    That's correct.

17   Q    And you didn't do it; correct?

18   A    That's correct.

19   Q    Now, another thing you talked about is the

20   differences between the Haswell processor and the A7

21   processor and the A8 processor.  Do you remember that?

22   A    Yes.

23   Q    And the -- you said that Professor Conte's

24   connection of the Haswell processor which sells in the

25   $200 range to the A7 to A8, you disagreed with that;

                DAVID AUGUST - CROSS

1   correct?

2   A    That's correct.

3   Q    Why don't we go to PX 161, and let's not show it to

4   the jury.  Now, PX 161 is an Apple presentation;

5   correct?  And we can scroll down a couple pages so you

6   can talk about it.

7   A    It looks like some slides.

8   Q    It's a group of slides that has an Apple Bates

9   range on it; correct?

10  A    Yes.

11  Q    And it relates to the A7 processor, which is one of

12  the things you've studied in this case; correct?

13  A    Yes.  Here is the slide.  There's a slide that

14  shows the A7.

15  Q    And it relates to issues --

16          MR. SHEASBY:  Why don't we scroll down one more

17  slide.

18  Q    It relates to key aspects of what's important in

19  the iPhone and iPad products; correct?

20  A    What are you saying this represents?

21  Q    It talks about some features of the iPhone and iPad

22  products.

23  A    I don't agree with that.

24  Q    Okay.

25          MR. SHEASBY:  So why don't we go to Slide 61,
                    DAVID AUGUST - CROSS

1  page 61 of that presentation.  Now, in PX 161, we're on

2  slide -- can we go down one more slide?  Let's do that.

3  We'll go to PX 161, page 62.  And if you see this --

4          MR. DOWD:  Your Honor --

5          THE COURT:  Is there any objection?

6          MR. DOWD:  It's just that this doesn't appear

7  to be in the witness binder that I was handed.

8          THE COURT:  I'll allow it.  You can proceed.

9          MR. SHEASBY:  I'm sorry about that.

10         MR. DOWD:  Did you give the witness a copy?

11         MR. SHEASBY:  Do you want me to give the

12  witness a copy or do you want to have it?

13         MR. DOWD:  I'll take both.

14         MR. SHEASBY:  I only have one.

15         MR. DOWD:  Then we should give it to the

16  witness.

17         MR. SHEASBY:  May I approach, Your Honor?

18         THE COURT:  You may.  The question that's posed

19  is what?

20  BY MR. SHEASBY:

21  Q    The question that's posed is you gave the opinion

22  that you thought the Haswell was not comparable to the

23  A7 and A8; correct?

24  A    Yes, that's correct.

25  Q    And if we turn to page 62 of that presentation,
                    DAVID AUGUST - CROSS

1   you'll see that the title of the slide is Single

2   Thread --

3           THE COURT:  It's also on your screen.

4   Q   *Single Thread Geekbench Results at Two Gigahertz.*

5   Do you see that?

6   A   I see that.

7   Q   And you'll see that on the left is the A7 at 1;

8   correct?

9   A   Yes.

10  Q   And in the middle is Haswell, which is between 1

11  and 1.5; correct?

12  A   That's correct.

13  Q   And the A8 is actually higher performance on

14  Geekbench than the Haswell; correct?

15  A   So at the top it says at two gigahertz.

16  Q   That's right.  When you run the experiment at two

17  gigahertz, the A8 actually outperforms Haswell; correct?

18  A   Yes, with that qualifier.

19  Q   And when you run the experiment at two gigahertz,

20  the A7 actually comes close, within .25 of Haswell;

21  correct?

22  A   Define close.  That doesn't look close to me.

23  Q   So you don't believe the difference between 1 and

24  1.25, you think that's not that close?

25  A   25 percent.

                    DAVID AUGUST - CROSS

1    Q    Okay.  Now, this is an experiment that was run at

2    two gigahertz; correct?

3    A    That's correct.

4    Q    And the Apple processor doesn't run at two

5    gigahertz in the phone because it would suck up too much

6    power; correct?

7    A    That's correct.

8    Q    But what this slide does show is that when you give

9    Haswell and A8 the same amount of power, A8 outperforms

10   Haswell; correct?

11   A    No, I wouldn't characterize it as the same amount

12   of power.  I suspect they have different -- consume

13   different amounts of power.

14   Q    When you run both the A8 and Haswell at two

15   gigahertz, on the Geekbench score the A8 outperforms

16   Haswell; correct?

17   A    Yes.  When you bring the Haswell to two gigahertz,

18   I would believe -- I have no reason to dispute these

19   numbers.

20   Q    Sure.  And so --

21        MR. SHEASBY:  Your Honor, we would offer this

22   into evidence.

23        THE COURT:  I'll reserve on its admission.

24        MR. SHEASBY:  Thank you, Your Honor.

25   BY MR. SHEASBY:
                    DAVID AUGUST - CROSS

1    Q    Let's talk about Samsung next.  And by Samsung, I

2    mean the chips that are manufactured in Austin.

3    A    Okay.

4    Q    Now, in Austin the logic circuits for the processor

5    are put on the wafer for each processor; correct?

6    A    There's photolithography transistors and wires,

7    yeah.

8    Q    That creates the logic circuits in the processor?

9    A    I wouldn't characterize them as being the logic

10   circuits because they're not complete.  But like I said,

11   it's the wires and transistors.

12   Q    And the wires and transistors for the LSD predictor

13   are put down on each of the little spots on the wafer in

14   Austin, Texas; correct?

15   A    It applies to the whole chip, including the LSD

16   predictor.

17   Q    So the wires and transistors for the whole entire

18   chip are placed in the individual locations on the wafer

19   in Austin, Texas; correct?

20   A    That's correct.

21   Q    Now, the steps that occur in Korea, you talked

22   about wafer bumping; correct?

23   A    That's correct.

24   Q    You talked about cutting out the individual chips

25   from the wafer; correct?
                    DAVID AUGUST - CROSS

1    A    That's right.

2    Q    And you talked about something relating to blowing

3    fuses and testing the chips; correct?

4    A    Yes.

5    Q    Now, does the word bump occur anywhere in the '752

6    patent?

7    A    I don't recall the word bumped in the patent.

8    Q    Does the word singulation occur anywhere in the

9    '752 patent?

10   A    I don't think so.

11   Q    Does the word blown fuses and testing chips appear

12   anywhere in the '752 patent?

13   A    No.

14   Q    And you were here for Mr. Colwell's testimony

15   yesterday; is that correct?

16   A    That's correct.

17   Q    Dr. Colwell.  You were here for Dr. Colwell's

18   testimony yesterday; correct?

19   A    Yes, I was.

20   Q    And Dr. Colwell was asked the question:  "Other

21   than the predictor circuit, does the '752 cover other

22   parts of the processor?"  And he answered "No."

23   Correct?  Do you remember that?

24   A    That sounds right.

25   Q    And do you agree with him or do you disagree with

                    DAVID AUGUST - CROSS

1    him?

2    A    Well, they're interfaces, but I would generally

3    agree, yeah.

4    Q    And the transistors and the wires for the LSD

5    predictor as we discussed are created in Austin, Texas;

6    correct?

7    A    That's correct.

8    Q    Now, when you looked at claim 1, you didn't

9    understand it to be requiring that the processor

10   actually be doing things; correct?

11   A    That's correct.

12   Q    And claim 1 --

13        MR. SHEASBY:  Let's actually pull up claim 1,

14   Mr. Oppenhuis.  Checking our time.  Claim 1.

15   Q    Claim 1 refers to two types of circuits, a data

16   speculation circuit; correct?

17   A    That's correct.

18        MR. SHEASBY:  Can we highlight that,

19   Mr. Oppenhuis, up top, second line -- third line.  Data

20   speculation circuit.  Thank you so much.

21   Q    And the data speculation circuit is made up of

22   wires and transistors; correct?

23   A    That's correct.

24   Q    And those wires and transistors are put down in

25   Austin, Texas; correct?
                    DAVID AUGUST - CROSS

1  A    That's correct.

2  Q    And let's go down -- then there's another circuit

3  that's talked about in the '752 patent.  That's the data

4  speculation decision circuit.

5       MR. SHEASBY:  Why don't we go down and

6  highlight that now.

7  Q    And the wires and transistors for the data

8  speculation decision circuit are laid down in Austin,

9  Texas; correct?

10  A    Yes.

11  Q    And you showed Mr. --

12       MR. SHEASBY:  Mr. Dowd, can I have your

13  demonstrative, sir?  The A7.  Thank you so much.

14  Q    So Mr. Dowd showed you a big glossy 300-millimeter

15  wafer; correct?

16  A    He handed it to me, yes.

17  Q    And that wafer is not actually what is completed in

18  Austin and sent to Korea; correct?

19  A    That's correct.

20  Q    What is completed in Austin and sent to South Korea

21  is the wafer with each of the individual chips on it;

22  correct?

23  A    Yeah, as depicted in my slide.

24  Q    Let's go to 11-37.  So each of these things are

25  individual chips; correct?
                DAVID AUGUST - CROSS

1    A    They're die.

2    Q    The die.  And die is a fancy word for the -- you

3    have dies on a wafer, then you cut out the dies and they

4    become processors.

5    A    That's correct.

6    Q    Okay.  Now, the processing of bumping and

7    singulating and testing and blowing fuses, what is the

8    comparative cost of doing that to the process of laying

9    down the billion or in case of -- the billion

10   transistors that exist in the A7 processor that are

11   created in Austin, Texas?

12   A    I don't have the cost data of the breakdown of

13   that.

14   Q    Would you take my representation that the vast

15   majority of the costs of the processor --

16            MR. DOWD:  Objection, Your Honor.

17            THE COURT:  I don't know what the objection is.

18            MR. DOWD:  Foundation.

19            THE COURT:  You want him to assume what?  You

20   should be seated.  What is it you want the witness to

21   assume?

22   BY MR. SHEASBY:

23   Q    I want you to assume that the vast majority of the

24   cost of making the wafer is putting down the

25   photolithography.

                    DAVID AUGUST - CROSS

1  A    Okay.  You're asking me to assume that.

2  Q    Okay.  Now, you didn't take that fact into account

3  in rendering your opinion; correct?

4  A    I did in that I didn't -- I don't think that it

5  makes a difference.

6  Q    So now let's talk about your work on benchmarks.

7  Now, one of the benchmarks that we've run in this case

8  is Dhrystone, at least one of the benchmarks that's been

9  run by WARF is Dhrystone; correct?

10  A    I also ran that.

11  Q    You ran Dhrystone as well?

12  A    I ran everything that WARF ran, everything that

13  Dr. Reinman ran and more.

14  Q    And you said that Dhrystone is criticized almost

15  universally; correct?

16  A    That's what I said.

17  Q    And you understand that Apple's engineers who

18  designed the LSD predictor have discussed using

19  Dhrystone to assess performance; correct?

20  A    They use it to find divots.

21  Q    Well, let's go to August cross, Slide 11.  So this

22  is a slide of a quote from Mr. Mylius, and this document

23  is already in evidence.  He says -- he's reporting on

24  the power consumption of the LSD predictor when running

25  on Dhrystone; correct?

                    DAVID AUGUST - CROSS

1  A    Yes, he's commenting on Dhrystone and the power

2  while running Dhrystone.

3  Q    And he doesn't use the word to test for divots

4  there, does he?

5  A    He doesn't use the word.

6  Q    Now, let's go to Slide 12.  And this is a slide

7  also prepared of a document from the Cyclone program

8  update; correct?

9  A    Yes.

10 Q    And in this document they're talking about

11 measuring power using Dhrystone; correct?

12 A    That's correct.

13 Q    And no reference to divots on this page; correct?

14 A    No.

15 Q    And the -- one of the primary benchmarks that

16 Professor Annavaram used to measure power was Dhrystone;

17 correct?

18 A    He used it, yes.

19 Q    Now, you also talked about SPEC 2000 and 2006;

20 correct?

21 A    That's correct.

22 Q    And we talked about the fact that a senior Apple

23 engineer described it as industry standard; correct?

24 A    I believe I've seen that.

25 Q    And you were suggesting that Professor Reinman
                    DAVID AUGUST - CROSS

1  should have run more SPEC benchmarks; correct?

2  A    Yes.

3  Q    And you ran as many as you could; correct?

4  A    That's correct.

5  Q    And do you remember when Mr. Williams testified, it

6  was last week, he said at the beginning "All we had was

7  a goal of one SPECint per blank."  Do you remember that

8  testimony?

9  A    I remember that.

10  Q    In other words, they are defining the processor at

11  the beginning, at the beginning based on SPECint; right?

12  A    On SPECint.

13  Q    SPECint; right?  And you ran SPECint in this case;

14  correct?

15  A    So I ran programs from the SPECint side of SPEC as

16  well as SPEC FP side of SPEC.

17  Q    And he referenced SPECint 2000, I believe; is that

18  correct?

19  A    It was either 2000 or 2006.

20  Q    We'll do both.  So let's pull up August cross No.

21  2.  So for your SPECint 2000 numbers, for the 5s and the

22  6 plus, the performance benefit of using the LSD

23  predictor was over 12 percent; correct?

24  A    That sounds about right.  Do you want me to check?

25  Q    No.  I checked it myself.  And for SPECint 2006,
                     DAVID AUGUST - CROSS

1   the performance benefit that you calculated for the

2   iPhone 5s and iPhone 6 was over 9 percent; correct?  Why

3   don't we go to the next slide.

4   A    That sounds about right.

5   Q    And those numbers are both higher than the 8.55

6   percent Geekbench number that Professor Conte suggested

7   should be used conservatively; correct?

8   A    They're both higher than Geekbench, yes.

9   Q    And in fact, if we combine all of SPEC CPU

10  together, every SPEC you ran, every part of the SPEC you

11  ran, all 27 of them, the number is greater than 9

12  percent performance improvement; correct?

13  A    That sounds about right.

14  Q    Go to the next slide just so we can see that.  So

15  you know I'm telling you the truth.  When we ran every

16  SPEC together, your numbers were greater than 9 percent;

17  correct?

18  A    That sounds about right.

19  Q    Okay.  So you talked about Basemark; correct?

20  A    Basemark X.

21       THE COURT:  Mr. Sheasby, how much more do you

22  have for this witness?

23       MR. SHEASBY:  15 minutes.

24       THE COURT:  All right.  We will take our lunch

25  break at this time and we will reconvene at 1:30.  All

                    DAVID AUGUST - CROSS

 1   rise, please.

 2        (Jury excused from courtroom at 12:31 p.m.)

 3        THE COURT:  If the parties would please be

 4   seated.  The first matter of business is -- and you may

 5   step down.  Because you are in your cross now, you

 6   shouldn't speak to anyone.

 7        THE WITNESS:  Okay.  Thank you.

 8        (Witness excused.)

 9        THE COURT:  PX 161.  It sounded as though the

10   defense had a concern, other than you hadn't seen the

11   exhibit, and I guess you still have it since it's up

12   there.  But there's a reference within the guide.  There

13   were a number of objections to it.  I don't know if they

14   stand any longer.

15     161 was the system-on-chip presentation by Apple,

16   internally by Apple.

17        MR. DOWD:  Your Honor, I still haven't seen it,

18   but I think it's going to be fine.

19        THE COURT:  Well, the objections were mainly to

20   relevancy and to motion in limines that wouldn't prevent

21   it, so I'm going to admit it.

22        MR. DOWD:  Thank you.

23        THE COURT:  The next category is the exhibits

24   that were offered with respect to the declaration of

25   David Papworth.  They seem to meet all the requirements
                     DAVID AUGUST - CROSS

1  of 902.11 with -- and certainly if the objection is

2  relevance, I'm going to admit them since they were

3  something, as I understand it, had been relied upon by

4  Dr. August and you certainly had an opportunity to

5  challenge him with respect to those.  My only concern is

6  the declaration appears to have been provided two days

7  ago and I don't know the nature of the concern, if any,

8  with respect to the representation by Papworth.

9          MR. HEINRICH:  In fact, we just received the

10  declaration today even though it's dated two days ago.

11  And we do have some concerns with those representations.

12          THE COURT:  In fairness, if it's dated two days

13  ago, I'm not sure that the other side would have

14  received it any sooner since it's quite a packet of

15  materials.  I assume they got it yesterday.  But

16  regardless, your concern is what?

17          MR. HEINRICH:  Well, our concern, for example,

18  with 723.

19          THE COURT:  That's tab C?

20          MR. HEINRICH:  Correct.  The declaration of

21  Mr. Papworth doesn't answer the questions regarding the

22  status of that document or whether that document

23  actually is describing the commercialized version of

24  Sandy Bridge.  It doesn't answer any of the business

25  records issues regarding that document.

1        THE COURT:  Was this among the -- were each of

2   these exhibits among those relied on by Dr. August or

3   listed by Dr. August in his report as having been

4   something he had seen?

5        MR. HEINRICH:  I believe that's the case.

6        MR. DOWD:  It is, Your Honor.

7        MR. SHEASBY:  It is, Your Honor.

8        THE COURT:  All right.  That's fine.  The rule

9   requires a fair opportunity to challenge, as I read it,

10  to challenge the proponent, and I don't know how that

11  could have been accomplished here.  So I'm not sure on

12  what basis I would admit it into evidence.  Your expert

13  relied on them.  He explained his reasons.  I don't know

14  what else I can do in terms of admission under 902.11.

15  If you wanted them admitted into evidence -- had these

16  been previously marked as exhibits in the case?

17        MR. DOWD:  Your Honor, if I could explain that.

18        THE COURT:  You didn't expect there to be any

19  objection to these at trial.  Is that your explanation?

20        MR. DOWD:  I didn't expect there to be an

21  objection on this basis.  Mr. Papworth is an employee of

22  Intel, third party.  He was out of the country

23  unavailable.  To address the objections, we worked very

24  hard to get his declaration, which we received yesterday

25  and provided yesterday by email.

1       THE COURT:  Which would have been great if you

2  had worked just as hard to advise plaintiff WARF that

3  you intended to offer him in that manner so that they

4  had some warning and they could at least address it with

5  you.

6       MR. DOWD:  I believe there wasn't -- I don't

7  think that this is coming as a surprise that we wanted

8  to offer these exhibits because they were marked --

9       THE COURT:  No, no, the surprise is whether or

10 not this declaration was adequate.  And if you had been

11 talking about this in advance because of unavailability,

12 they might have been able to address it.  In other

13 words, you're trying to get it in under a special

14 Federal Rule of Evidence 901.11 which requires that the

15 party has a fair opportunity to challenge them and I

16 read them to be the proponent give an adverse party

17 reasonable written notice of the intent to offer the

18 record and for the party to have a fair opportunity to

19 challenge them.  And it includes the record and the

20 certification available for inspection.

21      MR. DOWD:  And --

22      THE COURT:  This has only come to their

23 attention, I guess, today.

24      MR. DOWD:  Well, Your Honor, we did provide it

25 as soon as we got it, which was yesterday.  I think --

1           THE COURT:  You knew he wasn't going to be

2    here.  You wanted to offer these exhibits.  And you

3    didn't provide the declaration under 902.11 until now.

4    I'm not -- I understand you have lots of things you're

5    doing in this case, but...

6           MR. DOWD:  Your Honor, if I could, I don't

7    understand there to be any challenge to the statements

8    that are made by Mr. Papworth under the pains and

9    penalties of perjury as actually being not his

10   testimony, and that's really what this goes to.

11   Mr. Papworth has provided this as a sworn declaration

12   under 28 U.S.C. Section 1746.

13          THE COURT:  Well, I don't think you're being

14   completely fair.  But let's go through it then one at a

15   time.  As to attachment A, is there an objection to the

16   use of this or to the admission of this exhibit, 721?

17          MR. HEINRICH:  So there is, Your Honor.

18          THE COURT:  And the objection is what?

19          MR. HEINRICH:  For all of these, that this has

20   not been a surprise to them that we've been challenging

21   these documents since they weren't addressed in

22   Mr. Papworth's deposition.  We didn't have an

23   opportunity to examine him on the relationship between

24   these documents and the commercialized products and

25   we've made that --

1          MR. DOWD:  Your Honor, on this very point the

2   documents weren't produced until after Mr. Papworth's

3   deposition and that's why neither one of us had the

4   opportunity to ask him about them.  If I look to the

5   objections that were made on this, it's relevance,

6   foundation, hearsay and --

7          THE COURT:  Which goes to the point that was

8   just discussed.  Are these, in fact, the specs for the

9   Intel document?  I'm not sure how we can make that

10   determination based on the document.

11          MR. DOWD:  Mr. Papworth addresses that in two

12   ways:  He says in paragraph 5 that "Document A describes

13   the technical features of Intel's narrowing processors."

14   And in paragraph 4, that it is a true and correct copy

15   of the record that was created on that date.

16      And then the second is in paragraph 14, he says

17   that this document, "Exhibit A, was kept by Intel in the

18   course of regularly conducted activities at Intel's

19   business and that making these documents" --

20          THE COURT:  I think you meet all of the

21   requirements of 902.11, including 803.6 (a) through (c),

22   which is a requirement, but you still have an

23   opportunity, as I read this, to challenge the affidavit,

24   the declaration.

25          MR. DOWD:  And Your Honor, in terms of meeting

1    the objections that were made to this exhibit, I think

2    that that means that we have met the objections and that

3    the question is going to the weight that the document

4    should be given, which could be done through

5    cross-examination.

6         THE COURT:  I'm just looking at 902.11 which

7    says "before the trial or hearing, the proponent must

8    give an adverse party reasonable written notice of the

9    intent to offer the record so that the party has a fair

10   opportunity to challenge them."  You haven't done this

11   before the trial or the hearing.

12        MR. DOWD:  With respect to the record itself,

13   we did.  We provided notice to WARF of our intent to

14   offer DDX 7-21.  We didn't have a certification to

15   provide any earlier than we did and that's because it

16   was from a third party who was outside of the country

17   and we could not access --

18        THE COURT:  All right.  Why don't both sides

19   provide me any citations in support or in opposition to

20   the admission of a record through declaration during the

21   course of a trial and I'll take it under advisement.

22        The last issue I just want to briefly address is

23   how we frame the issue for the jury.  And the jury

24   hasn't -- the jury has not received instructions as to

25   how to think about the chip on a -- I'm sorry, is it

1  called a disk?

2        MR. DOWD:  A die on a wafer.

3        THE COURT:  A die -- a wafer on a die.  The

4  wafer is the bigger.

5        MR. DOWD:  Right.

6        THE COURT:  All right.  So I think in your

7  instructions you were calling it a chip.

8        MR. DOWD:  No.

9        THE COURT:  But in any event -- well, no,

10 actually I think it was yours.  But if the question is

11 for a die on a wafer, I take it that the claim of

12 infringement is as to claims 2, 3, and 5?  Actually, why

13 don't I hear from WARF as to what claims you believe are

14 infringed.

15        MR. CHU:  It's all the same claims:  1, 2 --

16        THE COURT:  One says in a processor capable of

17 executing program instructions.  It's not in a processor

18 capable of executing program instructions; right?

19        MR. CHU:  No.  Our position is that it is.

20        THE COURT:  I'm just completely lost as to what

21 -- the parties seem to be focusing on the same thing

22 which is the effect -- the ability of the die or I guess

23 we can't say wafer anymore, so we'll say the die to

24 function in a manner which infringes the claims in the

25 patent.  And if the question the jury has to decide is

1  whether bumping, blowing, fusing, and dicing is required

2  before it is capable of infringing, that would be one

3  way to frame it.  But neither side has really done a

4  very good job of proposing language for the jury to

5  think about how it determines infringement; that is,

6  what's -- what is this -- I guess maybe we do mean the

7  wafer.  What is it that you're claiming is infringing at

8  the time it leaves Samsung's plant in Texas?

9       MR. CHU:  With the Court's permission, may I

10 just spend 30 seconds on the concepts?

11      THE COURT:  Yes.

12      MR. CHU:  The wafer is the huge disk.  It has

13 many chips or die or processors on it.  So those three

14 terms --

15      THE COURT:  But is that clear that that is a

16 processor?

17      MR. CHU:  All -- every one of the -- let me

18 call them the little squares that are --

19      THE COURT:  That's fine.  You can call them --

20 let's stick with chip.

21      MR. CHU:  Okay.  Every one of those chips, when

22 it leaves the plant in Texas, has one billion or more

23 transistors all connected.

24      THE COURT:  All right.  Let's make it simple.

25 Both of you should provide a specific instruction to the

1   jury, as you propose it, so that they clearly understand

2   the question that's being proposed to them with respect

3   to those chips.  It's simply not enough to tell them

4   that you have to find whether they infringed the claims,

5   because we're well beyond that.  It's whether or not

6   they are enabled, I guess, would be one way of phrasing

7   it without bumping, blowing or dicing.  Some explanation

8   as to what's left for the jury to find before they can

9   find infringement with respect to those manufactured

10  chips.  And the sooner you can provide it the better.

11          MR. CHU:  We will do that.

12          THE COURT:  Okay.  Was there anything more then

13  for WARF before we take our break?

14          MR. SHEASBY:  Your Honor, there was a sidebar

15  about the cSim versus engineering device issue and we're

16  preparing a written proffer.  It may have already been

17  served, so just to explain the difference.  Just --

18          THE COURT:  I understand the difference between

19  the two and I understand that you were never given

20  access to the cSim.

21          MR. SHEASBY:  Yes.

22          THE COURT:  And that you ultimately arrived at

23  a compromise.  My problem is that you didn't go back to

24  Judge Crocker and say we need to run the same tests on

25  the cSims as Mr. Williams did.  Now, you may have

1  concluded that Apple was going to oppose everything and

2  you wouldn't get it, but I don't read Judge Crocker as

3  ever saying you wouldn't get that.  I think it's clear

4  you weren't going to get most of what you asked for,

5  including any kind of testing of alternate product.

6  Apple had planted its flag in the ground, and reading

7  Judge Crocker, I think it's fair to say that he wasn't

8  going to insist on that.  But you didn't try to make a

9  showing that you needed to test Mr. Williams'

10  recollection since there wasn't any evidence.

11      Had you gone back to Judge Crocker on that,

12  readings his rulings, it's not clear to me you couldn't

13  have gotten that.  Now, maybe there's something about

14  that testing that Apple represented to you during the

15  course of the instructions.  Clearly Apple did

16  everything they could to keep the simulator from being

17  used in this case.  But I don't know that I can give you

18  an instruction that goes as far as Mr. Frischling's

19  questions suggested which was that you were denied

20  access to the sims for that specific purpose.

21          MR. SHEASBY:  And we will address that in our

22  filing because our motion to Judge Crocker was to be

23  able to run tests on the actual LSD design in silicon.

24          THE COURT:  It was.

25          MR. SHEASBY:  It was.  That was part of it.

1          THE COURT:  And he sent you back --

2          MR. SHEASBY:  Oh, I understand your

3   distinction.

4          THE COURT:  -- to discuss it and to see if you

5   could reach some agreement and you compromised on

6   running the machines.  Now, I agree it's not totally

7   fair to say that that was all on WARF.  Apple was

8   refusing any use of the sims.  But it's not clear to me

9   that you ripened the issue as you should have with

10  respect to Mr. Williams' test.

11     I don't expect Apple to try to use this as an

12  opportunity because they took a very hard position that

13  the sims shouldn't be used, but I also don't know that I

14  can leave it that WARF was denied the opportunity to run

15  a sims with respect to Williams.  That's where I'm

16  considering.

17     Perhaps I don't give any more instructions to the

18  jury since I cut off the questioning and it's fair to

19  both sides to leave the record ambiguous, but I'm at

20  least giving you the opportunity to address it.  I

21  understand you submitted something.  I'll look at it.

22          MR. SHEASBY:  Thank you, Your Honor.  That's

23  all.

24          THE COURT:  Anything more for Apple?

25          MR. LEE:  Nothing, Your Honor.

1        THE COURT:  Very good.  We are in lunch recess.

2   We'll reconvene at 1:30, and you're free to move about

3   as you wish.  Actually we'll go on the record for one

4   statement.  Mr. Sheasby, you should be tightening up the

5   remaining of your cross.

6        MR. SHEASBY:  I will, Your Honor.  Thank you.

7        THE COURT:  Thank you.

8     (Noon recess          12:48 p.m.)

9

10

11                    * * * * *

12      I, LYNETTE SWENSON, Certified Realtime and Merit
    Reporter in and for the State of Wisconsin, certify that
13  the foregoing is a true and accurate record of the
    proceedings held on the 15th day of October 2015 before
14  the Honorable William D. Conley, Chief Judge for the
    Western District of Wisconsin, in my presence and
15  reduced to writing in accordance with my stenographic
    notes made at said time and place.
16  Dated this 10th day of November 2015.

17

18                         /s/_____

19                         Lynette Swenson, RMR, CRR
                           Federal Court Reporter
20

21

22  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
23  unless under the direct control and/or direction of the
    certifying court reporter.

24

25